**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

FILED
IN CLERK'S OFFICE

2005 DEC -8  P 4: 38

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| HONEY DEW ASSOCIATES, INC. and ) | |
| BOWEN INVESTMENTS, INC., ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION |
| ) | No. 04-10702-RWZ |
| C-NINE SEVEN, INC., VINCENZO CIUMMO ) | |
| and SHARON CIUMMO, ) | |
| Defendants ) | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**STATEMENT OF UNDISPUTED FACTS**

1. The plaintiff Honey Dew Associates, Inc. ("HDA") is a Massachusetts Corporation with a principal place of business in Massachusetts at 2 Taunton Ave., Plainville. (Verified Complaint, ¶ 3, except that the address has changed to 2 Taunton Ave., Plainville, according to the current records of the Corporation Division of the Massachusetts Secretary of State's office, Exhibit A, attached hereto).

2. The plaintiff Bowen Investments, Inc. ("BII") is a Massachusetts Corporation (Verified Complaint, ¶ 2) which, at the time it entered into the franchise agreement with the defendant C-Nine-Seven, Inc. had a principal place of business in Massachusetts at 2 Taunton Ave., Plainville, Massachusetts, but which, at least as of August 2004 (Deposition of Robert Bowen, p. 12, Exhibit B, attached hereto) was relocated to 1215 Reservoir Avenue, Cranston, Rhode Island (Bowen Investment Inc, 2004 Annual Report, Exhibit C, attached hereto).

3. The defendant C-Nine Seven, Inc. ("C-Nine Seven") is a Rhode Island Corporation which had a principal place of business at 355 Broad Street, Central Falls, Rhode Island. (Answer, ¶ 4).

4. The individual defendants Vicenzo Ciummo and Sharon Ciummo are guarantors of a Honey Dew Donuts franchise agreement between C-Nine Seven, Inc. and BII (Answer, ¶ 13) .

5. HDA owns the Honey Dew Donuts® trademarks and service marks, together with all trade dress, trade names and other proprietary forms of identification. (Verified Complaint, ¶ 7).

4. Honey Dew Associates is in the business of franchising donut and coffee shops known as a Honey Dew Donuts® Shop. (Verified Complaint, ¶ 3).

2

5. On about January 11, 1999, C-Nine Seven purchased a franchise from BII to operate a Honey Dew Donuts® Shop at 355 Broad Street, Central Falls, Rhode island ("the Honey Dew shop"). (Verified Complaint, ¶ 12 & Answer, ¶ 12).

6. From about January 11, 1999 to about February 17, 2004, C-Nine Seven operated the Honey Dew shop as an HDA franchise. (Complaint, ¶¶ 12 & 17, Answer, ¶¶ 12 & 17).

7. On or about February 17, 2004, BII sent C-Nine Seven a Notice of Termination of its franchise for the Honey Dew shop (Complaint, ¶¶ 16 & 17 and Exhibit E), which the defendants admit, claiming that C-Nine Seven failed to comply with certain terms and conditions of the franchise agreement , which the defendants deny (Answer. ¶¶ 12 & 17).

8. From about February 17, 2004 through about May 12, 2004, when it received service of the Verified Complaint (Summons, return of service), C-Nine Seven operated the Honey Dew shop with the knowledge of HDA and BII, while attempting to negotiate the reinstatement of the franchise with Jack J. Mikels, counsel for both HDA and BII. (Complaint ¶¶ 18-20; "Reinstatement Agreement," Exhibit E, attached hereto).

9. During the time that C-Nine Seven continued to operate the Honey Dew shop, after receiving the Notice of Termination (Verified Complaint, Exhibit E), it purchased its supplies, beverages and bakery products exclusively from HDA approved vendors and exclusively sold Honey Dew Donuts® brand foods and HDA approved beverages. (Affidavit of Vincenzo Ciummo, ¶¶ 7 & 11, filed herewith, ("Ciummo Affidavit"))

10. During the time that C-Nine Seven was operating as a Honey Dew Donuts® franchisee, after receiving the Notice of Termination (Verified Complaint, Exhibit E) and up until the termination of its operation of the Honey Dew shop on about June 27, 2004, C-Nine Seven continued to pay make the payment of royalties to BII and contribution to HDA's advertising fund required by the franchise agreement (Ciummo Affidavit, ¶ 8).

11. BII has received all of the royalties and advertising fees due from C-Nine Seven under the terms of the franchise agreement during the time that C-Nine Seven operated the Honey Dew shop. (Ciummo Affidavit, ¶ 9).

12. At no time during the negotiations to reinstate the BII franchise, up until I was served with this lawsuit, did HDA, BII or Attorney Mikels ever tell me that I had to stop operating the Honey Dew shop, even though they were aware that I was continuing to operate the franchise, because I provided BII with weekly reports of sales and sent BII and HDA their weekly payments. (Ciummo Affidavit, ¶ 11).

13. The Honey Dew shop did not bake its own products. All of the bakery products which the Honey Dew shop sold were baked by another Honey Dew Donuts® franchise, which assured both that C- Nine Seven only sold Honey Dew bakery products and that the quality of the products was up to HDA's standards. In addition, all of the non-bakery items, such as coffee

3

and beverages, were purchased only from HDA approved suppliers, which also assured that the quality of the products was up to HDA's standards. (Ciummo Affidavit, ¶ 12).

## ARGUMENT

Federal Rules of Civil Procedure 56 provides in relevant part:

**(b) For Defending Party**. A party against whom a claim, counterclaim or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part therof.

**(c) Motion and Proceedings Thereon**. ... . The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Under this standard, the "party seeking summary judgment [must] make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996) (quoting Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)). In deciding whether to allow a motion for summary judgment, a court " 'must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.' " Mullin v. Raytheon Co., 164 F.3d 696, 698 (1st Cir. 1999) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). But, a court "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" Santiago v. Feeney, 379 F.Supp.2d 150, 154 (D. Mass. 2005).

4

## I. Introduction

The plaintiffs have framed this as a trademark infringement case under the Trademark Act of 1946 (the Lanham Act), 15 U.S.C. §§ 1051-1137 (1982) (Verified Complaint, ¶1), seeking injunctive relief and monetary damages (Verified Complaint, Count I). A copy of the referenced sections of the Lanham Act are attached as an Addendum. The plaintiffs have joined with their federal cause of action[1] what they style as a "supplemental" state law contract action for money damages.[2] (Verified Complaint, Count II). As discussed in more detail below, the Lanham Act claim must fail, both because BII impliedly licensed the continued use of the Honey Dew Donuts® trademarks and because C-Nine Seven closed its franchise in June of 2004, more than a year and a half ago, and the claim for injunctive relief in Count I of the Verified Complaint is moot. As to any monetary damages arising out of C-Nine Seven's continued operation of the Honey Dew shop for after the termination of its franchise, there were none, because all of the royalties and advertising fees due under the franchise agreement were paid through the time of the franchise closed. (Ciummo Affidavit, ¶ 8) Since the state law claims are supplemental to the federal claim, they too must fail for lack of jurisdiction, if not on their own lack of merit.

---

[1] 28 U.S.C. §§1338(a) and (b) (Verified Complaint, ¶1).

[2] 28 U.S.C. 1367(a) (Verified Complaint, ¶1).

5

## II. Trademark Infringement (Lanham Act) Claim of HDA.

### A.  BII Impliedly Licensed C-Nine Seven To Use The Honey Dew Donuts® Trademark By Allowing It To Continue Operating the Honey Dew Shop While Negotiating The Reinstatement Of The Franchise Agreement.

A trademark license and a requirement for quality control can be implied from the

dealings of the parties. See, *e.g.*, Birthright v. Birthright, Inc., 827 F.Supp. 114 (USDC NJ, 1993)

(trademark owner's allowance of use of trademark found to be an implied license terminable at

will); University Book Store v. University of Wisconsin Board of Regents, 33 U.S.P.Q2d 1385,

1396 (T.T.A.B 1994) (no abandonment of the mark of a college mascot by informal, implied,

royalty-free license granted by college to nearby bookstores to sell apparel with the college's

mascot on it when the quality of the apparel remained at an acceptable level). "It is irrelevant

whether the parties thought of an arrangement at the time in terms of an implied license. The test

for whether or not an implied license existed is based solely on the objective conduct of the

parties." Villanova University v. Villanova Alumni Educational Foundation, Inc., 123 F.Supp.2d

293, 308 (USDC EDPA, 2000).  A copy of the Villanova University decision is included in the

Addendum for the convenient reference of this Honorable Court.

In the present case, C-Nine Seven's continued operation of the Honey Dew shop while

the parties attempted to negotiate a reinstatement of the franchise was neither antithetical nor

adverse to HDA's trademark rights. To the contrary, the quality of the product was assured[3], see

Villanova University, *supra*, 308, and the continued operation of the franchise during the

negotiations worked to both party's benefit by maintaining  continuity of service to the customers

---

[3]The bakery products were all bought from another Honey Dew Donuts® franchise and the other products were all purchased from approved HDA suppliers. (Ciummo Affidavit, ¶ 11).

6

and an ongoing stream of revenue to BII and HDA . Under a statute whose purpose is primarily equitable – to allow the owner of a trademark to retain the benefits of ownership and assure the public of the quality of branded goods and services – it would be inequitable to allow a franchisor to sue a franchisee for the continued *allowed* use of the trademark during good faith efforts to reinstate the franchise. As recognized in Lanham Act cases holding that plaintiffs should not been penalized for even long delays in exercising their equitable rights during settlement negotiations, the courts favor private resolution of disputes. See *e.g.*, Armco Inc. v. Armco Burglar Alarm Co., *supra*. It would defeat public policy to require a franchisee to renegotiate with the Lanham Act axe to fall, if the negotiations fail. *A fortiori*, if the franchisor is allowed to file a Lanham Act complaint *during* the negotiations without giving notice to the franchisee of the action for over a month, as in this case. Said succinctly, a franchisor must act consistently with its termination of the franchise. If it does not, and the franchisee acts to its detriment, then the franchisor is estopped from pursing a Lanham Act claim. See Villanova University, *supra*, 307.

## A. HDA Is Not Entitled To Either Equitable Relief Or Monetary Damages Under The Lanham Act.

HDA has asked for two forms of relief, an injunction and monetary damages. The claim in the Verified Complaint, that HDA will suffer irreparable harm by C-Nine Seven's continued operation of its franchise after termination of the franchise agreement, is obviated by HDA's own actions. HDA sent its notice of termination to C Nine-Seven on February 7, 2004. HDA filed the present lawsuit on or about April 6, 2004, two months *after* it terminated the franchise. Although the Verified Complaint alleges that negotiations to reinstate the franchise continued

7

through at least the date of filing (Verified Complaint, ¶¶18-20), apparently culminating in a

reinstatement offer made by HDA on April 12, 2004 (See fax date stamp on "Reinstatement

Agreement," Exhibit E, attached hereto), HDA withheld serving C Nine-Seven until May 12,

2004. While the courts favor the private resolution of disputes and will not penalize a trademark

holder for reasonable delay in seeking injunctive relief while negotiating in good faith, Armco,

Inc. v. Armco Burglar Alarm Co., 693 F.2d 1155 (5ᵗʰ Cir. 1982) (two years of negotiations not

counted towards laches), HDA's failure to prosecute its claim for a temporary restraining order

by serving it on C-Nine Seven for more than month *after* filing suit or failing to prosecute its

claim up to the time C Nine-Seven voluntary closed its Honey Dew shop in June of 2004, more

than two months after it sought injunctive relief, is clear and convincing evidence that HDA did

not consider itself damaged by the continued operation of the franchise.[4]

In the absence of any evidence that HDA seriously intended to pursue its claim for an

injunction, what is left of its Lanham Act claim are monetary damages. "Most courts agree that

if the trademark owner frames its complaint against a terminated licensee solely as a dispute over

royalty payments, no federal claim of trademark infringement is alleged." *McCarthy on*

*Trademarks and Unfair Competition*, §25:31, J. Thomas McCarthy, Thompson-West, 2003,

---

[4]To the contrary, the fact that HDA had no qualms about allowing the franchise to continue to
operate for months after filing suit for an injunction demonstrates that it believed it was to its
advantage to allow C-Nine Seven to keep the Honey Dew Shop open. This is understandable
when considered in conjunction with: (1) HDA's desire to take over the location as an operating
Honey Dew Donuts® shop, as evidenced by the proposed "Reinstatement Agreement" (Exhibit
E), which essentially forfeited the Honey Dew shop to HDA, if C-Nine Seven defaulted one more
time, a matter which was exclusively determined by HDA's subjective inspection standards, and;
(2) the prior decision in Honey Dew Associates, Inc., et al. V. M & K Foods, Inc., et al., 81 F.
Supp 352 (2000) (Exhibit F, attached hereto), in which the United States District Court for the
District of Rhode Island refused to enforce the franchise agreements non-compete provision and
allowed the franchisee to turn the location into a generic donut shop in the same location.

citing Foxrun Workshop, Ltd. V. Klone Mfg., Inc., 686 F.Supp 86 (S.D.N.Y. 1988). HDA and

BII have admitted in identical litigation[5] that their only damages for a franchisee continuing to

operate the franchise after termination are the royalties and advertising fees due under the

franchise agreement:

> The plaintiffs [HDA and BII] waived recovery for trademark infringement, stating
> that "in light of the damages already requested under the contact [royalties due to
> BII and advertising fees due to HDA under the franchise agreement], we don't
> feel its cost effective to proceed on the Lanham Act statutory damages. Honey
> Dew Associates and Bowen Investment, Inc. v. M & K Food Corp., et al. 241 F.3d
> 23, 25 (1st Cir. 2001). A copy of the decision is attached as Exhibit D.

As there are no material issues of fact in controversy as to the failure of HDA to pursue

its claim for injunctive relief or its failure to allege any damages recognized by the Lanham Act,[6]

with all due respect, summary judgment on HDA's Lanham Act claim in Count I of the Verified

Complaint should be granted.

## III. State Law Breach of Contract Claim of HDA.

Beginning in paragraph 12, the Verified Complaint recites numerous allegations of a

contractual relationship between Plaintiff BII and Defendant C-Nine Seven, Inc. For example,

Paragraph 12 states:

---

[5]A copy of the Complaint is attached as Exhibit E (without the extensive attachments which
franchise documents essentially duplicate those attached to the Verified Complaint in this case.

[6]There is no evidence that C-Nine Seven palmed off inferior products (see Ciumo Affidavit, ¶ 7
and ¶ 11 ) or otherwise tarnished HDA's trademark or reputation resulting in the loss of good
will. To the contrary, as discussed *supra*, it appears that HDA was sufficiently satisfied with C-
Nine Seven's operation of its franchise to allow it to continue in operation for four months after
it terminated the franchise and more than two months after it filed the present suit seeking to
enjoin the operation and had every intention of continuing to operate it after it took it over (see
"Reinstatement Agreement," Exhibit E).

9

> On or about January 11, 1999, BII granted C-Nine Seven a franchise to operate a
> Honey Dew Shop at the Premises [355 Broad Street, Central Falls, RI], pursuant
> to a Franchise Agreement, [and other documents] which are attached to [sic]
> hereto as Exhibit B (collectively the "Franchise Documents").

Notably, HDA is not a party to any of the "Franchise Documents." (Verified Complaint,

Exhibits B), although it is entitled to receive 2% of the franchise's gross sales for its Advertising

Fund (Complaint, ¶39) . However, as HDA's Lanham Act claim fails, so must its state law

contract claim.

Apart from the procedural impediment to pursing its claim for monetary damages, the

determination of the alleged state law breach of contract claim by HDA would also be

appropriate for disposition by summary judgment on its merits. According to C-Nine Seven, all

of the advertising fees due to HDA have been paid (Ciummo Affidavit, ¶__ & Exhibit 1).

## IV.  Trademark Infringement (Lanham Act) Claim of BII

Paragraph 7 of the Verified Complaint alleges that HDA is the owner of various

trademarks. There is no allegation as to BII's ownership of any trademarks or service marks.

Paragraph 9 of the Verified Complaint merely describes BII as the subfranchisor for the purpose

of contracting franchise agreements for "certain Honey Dew Donuts Shops in Rhode Island."

Paragraphs 27 through 30 of the Verified Complaint further allege trademark violations by the

Defendants against HDA, with no mention of any violation of any rights of BII. However, the

plaintiffs' request for relief at the end of the trademark infringement count requests in paragraph

"E" that this Court "[g]rant judgment for each Plaintiff against Defendants jointly and severally."

On the basis of the above deficiencies in pleading, the Verified Complaint fails to state a claim

by BII for trademark infringement.

10

Apart from the procedural impediment to pursing its claim for trademark infringement,

the determination of the alleged state law breach of contract claim by BII would also be

appropriate for disposition by summary judgment on its merits.  The Verified Complaint

repeatedly makes sworn allegations that the owner of the trademarks at issue in this case is HDA.

Moreover, the Affidavit of Richard J. Bowen, President of HDA and a fifty percent owner of

plaintiff BII states that:

> 2.  At all times relevant hereto, HDA has been and continues to be the owner of
> several United States trademarks and service marks...  The Plaintiff is also the
> owner of the service marks 'Honey Dew Donuts'..., all duly registered with the
> State of Rhode Island ... .

Finally, the Rule 30(b)(6) deposition testimony of BII by Robert Bowen, it's President, regarding

BII's ownership of trademarks was:

> Q: Are there any trademarks owned by BII?
>
> A: I don't know.
>
> Id., p. 50, attached as Exhibit E

As there are no material issues of fact in controversy as to BII's lack of ownership of any

trademarks used by C-Nine Seven, with all due respect, the defendants' motion for summary

judgment as to BII's Lanham Act claim should be granted.

## V.  State Law Breach of Contract Claim of BII..

HDA and BII are two separate Massachusetts Corporations.  (Verified Complaint, ¶¶ 2 &

3) and BII only conducts business in Rhode Island:

> 9.  At all relevant times hereto, BII and HDA have agreed that BII may act as a
> subfranchisor for the purpose of franchising certain Honey Dew Donuts Shops in
> Rhode Island.  (Verified Complaint, ¶9)

11

C-Nine Seven is a Rhode Island corporation which held a Rhode Island franchise and the

individual defendants are Rhode Island residents (Verified Complaint, ¶¶4, 5 & 6). BII tried the

United States District Court in Rhode Island and did not like the result. See Honey Dew

Associates, Inc. and Bowen Investments, Inc. V. M & K Food Corp., et al., *supra*, attached as

Exhibit C (1st cir.) and Exhibit F (USDC RI). Shopping for a friendlier forum,[7] BII has attached

itself to the coattails of HDA in this action by invoking this Honorable Court's supplemental

jurisdiction. HDA has already admitted that it has nothing but contract damages and, with the

failure of its Lanham Act claim, BII has lost its grip. Moreover, BII's claim is not just for

Lanham Act damages, which arguably would be the royalties and advertising fund contributions

due during the time that C-Nine Seven continued to operate the Honey Dew shop after the

termination of the franchise, but for alleged liquidated damages in the form of *future* royalties

and contributions to the advertising fund to the expiration of the franchise agreement on March 5,

2006 (Verified Complaint, ¶¶37 & 38). See Honey Dew Associates, et al. v. M & K Food Corp.,

*supra,* attached as Exhibit C.  The Judicial Improvement Act of 1990, gave the federal courts the

power to exercise supplemental jurisdiction "over all claims that are so related to claims in the

action within such original jurisdiction that the form part of the same case or controversy under

Article III of the United States Constitution." 28 U.S.C. § 1367(a).  The alleged contractual

liquidated damages for royalties and advertising fees projected long after the use of the

trademarks has ceased have nothing to do with the Lanham Act.[8]  As there are no material issues

---

[7]According to the docket in that case, although the First Circuit Court of Appeals remanded it for
further proceedings in the District Court, the action was not retried.

[8]C-Nine Seven has no explanation for why the United States District Court in Rhode Island
entertained BII's liquidated damages claim in Honey Dew Associates, Inc., et al v. M & K Foods,

12

of fact in controversy on the issue of the lack of jurisdiction over BII's liquidated damages claim,

with all due respect, the defendants motion for summary judgment as to BII's claim for post-

termination damages set forth in Count II of the Verified Complaint should be granted.

## VII. Neither HDA Nor BII Are Entitled To Recover Punitive Damages or Attorney's Fees.

Although the prayers for relief in the Verified Complaint include a request for punitive

damages and attorney's fees, the former is not recoverable under the Lanham Act[9] or, under

Massachusetts law,[10] absent an express statutory provision, Flesner v. Technical Communications

Corp., 410 Mass. 805, 813 (1991), which has not been pleaded in this case.

---

Inc., et al., *supra*, attached as Exhibit F, especially after HDA and BII waived federal jurisdiction under the Lanham Act, other than that the issue was before the court and M & K's attorney's did not oppose it. Nor does C-Nine Seven have an explanation for why the First Circuit Court of Appeals remanded the case to the District Court, attached as Exhibit C, for further hearing on that and other contractual issues, other than that there was an erroneous decision already on record that needed to be corrected. The fact that the action was voluntarily dismissed after being remanded may indicate the belated recognition by the court that the liquidated damages claim could not stand alone.

[9]Under the Lanham Act, 15 U.S.C. § 111 4, a court may award double or treble "compensatory" damages. This has usually been interpreted to apply where the trademark infringement was "willful" or "egregious." See, *e.g.*, Taco Cabana International, Inc. v. Two Pesos, Inc., 932 F.2d 1113 (5th Cir. 1991); affirmed 505 U.S. 763, 120 L.Ed.2d 614, 112 S.Ct. 2752 (1992). Neither apply here. It appears that HDA and BII acquiesced in, if not encouraged, C-Nine Seven's continued operation during the parties's efforts to negotiate a reinstatement of the franchise, as evidenced by the "Reinstatement Agreement," HDA's and BII's failure to serve C-Nine Seven for a month after praying for an injunction and HDA's and BII's failure to pursue their claim for injunctive relief to close the Honey Dew shop. Moreover, before one can double or treble damages, one must have damages. Caesars World, Inc. v. Veus Lounge, Inc., 520 F.2d 269 (3rd Cir. 1975). Neither HDA nor BII has shown that they suffered any monetary damages recoverable under the Lanham Act.

[10]The Franchise Agreement chooses Massachusetts law. (Verified Complaint, Exhibit B; See M & K Foods, Inc., *supra*, Exhibit C and Exhibit F).

13

The 1975 amendment to the Lanham act permits the court to award attorney's fees in

exceptional cases to the *prevailing* party. 15 U.S.C. § 117. The plaintiff's have not prevailed on

their Lanham Act claim. Nor, with all due respect, can a case in which the plaintiffs never

pursued their prayer for injunctive relief and admitted they had only contract damages be

considered exceptional. The Franchise Agreement also provides for attorney's fees. See Honey

Dew Associates, Inc., et al. v. M & K Foods, Inc., et al., *supra,* attached as Exhibit C. HDA and

BII should not be rewarded for bringing their contract action in the wrong forum.

## V. Assuming, *Arguendo*, That This Honorable Court Reaches The Issue Of Liquidated Damages Under The Franchise Agreement, They Are Unenforceable As A Matter Of Law.

### A. C-Nine Seven Has Sufficiently Pleaded That the Liquidated Damages Provision In The Franchise Agreement Is Not Enforceable.

The so-called "liquidated damages" provision in the franchise agreement (Exhibit B to

the Verified Complaint" requires the franchise to immediately pay the full amount of the

"projected" future royalties and contributions to the advertising fund for the remainder of the

franchise period, if the franchise is prematurely terminated. HDA's and BII's first line of attack

is to profess astonishment that a franchisee would consider having to pay tens of thousands of

dollars for nothing to be a penalty. According to HDA, a franchisee sued in federal Court based

on Lanham Act jurisdiction is barred from litigating the enforceability of the franchise

agreements liquidated damages provision, unless they have specifically pleaded it. This

argument was unpersuasive to Judge Lagueux in the United States District Court for the District

of Rhode Island, Honey Dew Associates, Inc., et al. v. M & K Food Corp, et al., *supra*, and

equally unpersuasive to the First Circuit Court of Appeals:

14

Plaintiff's [HDA and BII] argue on appeal that because M & K never pled
explicitly that the liquidated damages clause was an unenforceable penalty, they
have waived any claim to this affirmative defense. Although failure to plead an
affirmative defense generally "results in its waiver and exclusion from the case,"
[citation omitted] the defendants' *pleadings* in this case provide notice of the
penalty defense. [emphasis added]. Honey Dew Associates, Inc. et al. v. M & K
Food Corp., et al., supra, 26.

In the present case, the defendants have pled as affirmative defenses:

2) ILLEGALITY. The plaintiffs are barred from recovery of damages because they are
based upon contractual agreements that are illegal or were obtained by illegal means.

5) UNJUST ENRICHMENT. The recovery sought by the plaintiffs would be an unjust
enrichment.

8) UNCONSCIONABILITY. The plaintiffs are barred from recovery because the
contractual agreements upon which they base their complaint are unconscionable.

these are more than sufficient to place the plaintiffs on notice that the defendants consider the

liquidated damages provision in the franchise agreement to be unenforceable. Moreover, the

claims are explicitly set forth in the *Joint* Pretrial Memorandum [emphasis added]:

**6. Issues of Law.**

b. Whether the liquidated damages provision in the Franchise Agreement is a penalty.

c. Whether the liquidated damages provision in the Franchise Agreement is an
acceleration clause.

**8. Additional Matters to Aid in the Disposition of the Action.**

b. The issues raised as to whether the liquidated damages provision in the Franchise
Agreement is a penalty or an acceleration clause may be disposed of by Summary
Judgment. See Honey Dew Associates, Inc. and Bowen Investment, Inc. v. M & K Food
Corporation, et al., 81 F.Supp.2d 352 (200 USDC RI): 241 F.3d 23 (1st Cir. 2001).

15

**B. A Comparison Of The Liquidated Damages Provision In the BII Franchise Agreement With M & K Food Corp. and C-Nine Seven Proves On The Face Of The Documents That The Liquidated Damages Provision In The C-Nine Seven Franchise Agreement Is An Unenforceable Penalty As A Matter Of Law.**

In the M & K franchise agreement, the liquidated damages provision is based on the

*average* of the last full calendar year's revenues:

> Franchisor's weekly damages shall be calculated as the average of the royalties
> due for the calendar year ending prior to termination. Honey Dew Associates,
> Inc., et al. v. M & K Food Corp., *supra*, 356.

The liquidated damages provision in the C-Nine Seven franchise agreement is based on the

average of the *twenty-six highest sales weeks* of the last full calendar year's revenues:

> Our weekly damages for lost royalties and, if applicable, percentage rent,
> following termination shall be based on the average of weekly gross sales for *the*
> *twenty-six highest sales weeks* in the year

"A liquidated damage clause is enforceable where at the time the agreement was made, potential

damages were difficult to ascertain and the clause contained a reasonable forecast of the damages

expected to result from the breach, regardless of whether the parties suffered actual damages

from the breach." Honey Dew Associates, Inc.,et al. v. M & K Food Corp., et al., *supra*, 356-357

citing Marx v. Kelly, 428 Mass. 877, 881-882, 705 N.E.2d 114 (1999). In the present case, HDA

and BII have previously told the court that a liquidated damages provision based on the average

of the last calendar years revenues is reasonable. Therefore, they are judicially estopped from

presenting evidence otherwise. According to Vincent Ciummo, the President of C-Nine Seven,

there are significant monthly fluctuations in revenues, which are well know to HDA and BII:

> The revenues from a neighborhood donut shop, such as the Honey Dew shop
> operated by C-Nine, depend on automobile and foot traffic. In good weather,
> when it is warm and sunny, about April through November, we do significantly
> more business than in bad weather, when it is cold or it is raining or snowing,

16

> about December through March. Even in the good months, revenues can vary
> significantly, depending on the weather. HDA and BII know this, because we and
> all of the other franchises give them weekly revenue reports on which the royalties
> and advertising fees are calculated. Ciummo Affidavit, ¶ 12.

Using the average of the last years revenues evens out these fluctuations. Using only the *highest*

six months of revenues[11] indisputably gives HDA and BII a windfall and could not be a

reasonable forecast of their damages.[12] As it appears from the inconsistency of the franchise

agreement on its face with what HDA and BII have represented in open court to be reasonable

liquidated damages, the liquidated damages which the plaintiffs seek to enforce is a penalty and

is unenforceable as a matter of law.

## CONCLUSION

WHEREFORE, for the foregoing reasons the defendants respectfully move for summary

judgment and pray that the plaintiff's Verified Complaint be dismissed with prejudice.

**CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of the foregoing
on the attorney of record for each party and/or party
pro se by mail on *12/9/05.*
Sworn and subscribed to _____

Respectfully submitted,
The Defendants
By their attorneys,

John N. Lewis
BBO# 298520
Lawrence Mehl, of Counsel
BBO# 566235
JOHN N. LEWIS & ASSOCIATES
21 Merchants Row, 5th Floor
Boston, MA 02019
(617) 523-0777

---

[11] The fact that HDA and BII recognize that there will be six *highest* months in the calendar year proves that they understand there will fluctuations in monthly revenues, with some significantly less than others.

[12] C-Nine Seven's argument is without waiver of or prejudice to the other issues raised by Judge Lagueux in Honey Dew Associates, Inc., et al. v. M & K Foods Corp, *supra*, 356-358, such as that the liquidated damages provision does not discount the payments and that it does not take into consideration the savings to HDA and BII for not having to monitor the operation.

15 USC

§1117. Recovery for violation of rights; profits, damages and costs; attorney fees; treble damages

(a)
When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 43(a) or (d) [15 USC 1125(a) or (d)], or a willful violation under section 43(c) [15 USC 1125(c)], shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 [15 USC § §1111, 1114], and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.
(b)
In assessing damages under subsection (a), the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 32(1)(a) of this Act (15 U.S.C. 1114(1)(a)) or section 220506 of title 36, United States Code, that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 34(d) of this Act (15 U.S.C. 1116(d)), in connection with the sale, offering for sale, or distribution of goods or services. In such cases, the court may in its discretion award prejudgment interest on such amount at an annual interest rate established under section 6621(a)(2) of the Internal Revenue Code of 1986 [26 USC §6621(a)(2)], commencing on the date of the service of the claimant's pleadings setting forth the claim for such entry and ending on the date such entry is made, or for such shorter time as the court deems appropriate.
(c)
In a case involving the use of a counterfeit mark (as defined in section 34(d) (15 U.S.C. 1116(d)) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a), an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of--

(1)
not less than $ 500 or more than $ 100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or
(2)

if the court finds that the use of the counterfeit mark was willful, not more than $ 1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

(d)
In a case involving a violation of section 43(d)(1) [15 USC 1125(d)(1)], the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $ 1,000 and not more than $ 100,000 per domain name, as the court considers just.
(e)
In the case of a violation referred to in this section, it shall be a rebuttable presumption that the violation is willful for purposes of determining relief if the violator, or a person acting in concert with the violator, knowingly provided or knowingly caused to be provided materially false contact information to a domain name registrar, domain name registry, or other domain name registration authority in registering, maintaining, or renewing a domain name used in connection with the violation. Nothing in this subsection limits what may be considered a willful violation under this section.

smblueline pictureReturn to Index

2

15 USC

§1114. Remedies; infringement; innocent infringement by printers and publishers

(1)
Any person who shall, without the consent of the registrant--

(a)
use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark
in connection with the sale, offering for sale, distribution, or advertising of any goods or services
on or in connection with which such use is likely to cause confusion, or to cause mistake, or to
deceive; or

(b)
reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction,
counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles
or advertisements intended to be used in commerce upon or in connection with the sale, offering
for sale, distribution, or advertising of goods or services on or in connection with which such use
is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by
the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant
shall not be entitled to recover profits or damages unless the acts have been committed with
knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or
to deceive.

As used in this paragraph, the term "any person" includes the United States, all agencies and
instrumentalities thereof, and all individuals, firms, corporations, or other persons acting for the
United States and with the authorization and consent of the United States, and any State, any
instrumentality of a State, and any officer or employee of a State or instrumentality of a State
acting in his or her official capacity. The United States, all agencies and instrumentalities thereof,
and all individuals, firms, corporations, other persons acting for the United States and with the
authorization and consent of the United States, and any State, and any such instrumentality,
officer, or employee, shall be subject to the provisions of this Act in the same manner and to the
same extent as any nongovernmental entity.

(2)
Notwithstanding any other provision of this Act, the remedies given to the owner of a right
infringed under this Act or to a person bringing an action under section 43(a) or (d) [15 USC
1125(a) or (d)] shall be limited as follows:

(A)
Where an infringer or violator is engaged solely in the business of printing the mark or
violating matter for others and establishes that he or she was an innocent infringer or innocent
violator, the owner of the right infringed or person bringing the action under section 43(a) [15
USC 1125(a)] shall be entitled as against such infringer or violator only to an injunction against
future printing.
(B)

Where the infringement or violation complained of is contained in or is part of paid advertising matter in a newspaper, magazine, or other similar periodical or in an electronic communication as defined in section 2510(12) of title 18, United States Code, the remedies of the owner of the right infringed or person bringing the action under section 43(a) [15 USC 1125(a)] as against the publisher or distributor of such newspaper, magazine, or other similar periodical or electronic communication shall be limited to an injunction against the presentation of such advertising matter in future issues of such newspapers, magazines, or other similar periodicals or in future transmissions of such electronic communications. The limitations of this subparagraph shall apply only to innocent infringers and innocent violators.

(C)

Injunctive relief shall not be available to the owner of the right infringed or person bringing the action under section 43(a) [15 USC 1125(a)] with respect to an issue of a newspaper, magazine, or other similar periodical or an electronic communication containing infringing matter or violating matter where restraining the dissemination of such infringing matter or violating matter in any particular issue of such periodical or in an electronic communication would delay the delivery of such issue or transmission of such electronic communication after the regular time for such delivery or transmission, and such delay would be due to the method by which publication and distribution of such periodical or transmission of such electronic communication is customarily conducted in accordance with sound business practice, and not due to any method or device adopted to evade this section or to prevent or delay the issuance of an injunction or restraining order with respect to such infringing matter or violating matter.

(D)

(i)

(I) A domain name registrar, a domain name registry, or other domain name registration authority that takes any action described under clause (ii) affecting a domain name shall not be liable for monetary relief or, except as provided in subclause (II), for injunctive relief, to any person for such action, regardless of whether the domain name is finally determined to infringe or dilute the mark. (II) A domain name registrar, domain name registry, or other domain name registration authority described in subclause (I) may be subject to injunctive relief only if such registrar, registry, or other registration authority has--

(aa)

not expeditiously deposited with a court, in which an action has been filed regarding the disposition of the domain name, documents sufficient for the court to establish the court's control and authority regarding the disposition of the registration and use of the domain name;
(bb)

transferred, suspended, or otherwise modified the domain name during the pendency of the action, except upon order of the court; or
(cc)

willfully failed to comply with any such court order.
(ii)

An action referred to under clause (i)(I) is any action of refusing to register, removing from registration, transferring, temporarily disabling, or permanently canceling a domain name--

(I)

in compliance with a court order under section 43(d) [15 USC 1125(d)]; or

(II)

in the implementation of a reasonable policy by such registrar, registry, or authority prohibiting the registration of a domain name that is identical to, confusingly similar to, or dilutive of another's mark.

(iii)

A domain name registrar, a domain name registry, or other domain name registration authority shall not be liable for damages under this section for the registration or maintenance of a domain name for another absent a showing of bad faith intent to profit from such registration or maintenance of the domain name.

(iv)

If a registrar, registry, or other registration authority takes an action described under clause (ii) based on a knowing and material misrepresentation by any other person that a domain name is identical to, confusingly similar to, or dilutive of a mark, the person making the knowing and material misrepresentation shall be liable for any damages, including costs and attorney's fees, incurred by the domain name registrant as a result of such action. The court may also grant injunctive relief to the domain name registrant, including the reactivation of the domain name or the transfer of the domain name to the domain name registrant.

(v)

A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this Act. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant.

(E)

As used in this paragraph--

(i)

the term "violator" means a person who violates section 43(a) [15 USC 1125(a)]; and

(ii)

the term "violating matter" means matter that is the subject of a violation under section 43(a) [15 USC 1125(a)].

(3)

(A)

Any person who engages in the conduct described in paragraph (11) of section 110 of title 17, United States Code [17 USC 110], and who complies with the requirements set forth in that paragraph is not liable on account of such conduct for a violation of any right under this Act. This subparagraph does not preclude liability, nor shall it be construed to restrict the defenses or limitations on rights granted under this Act, of a person for conduct not described in paragraph

(11) of section 110 of title 17, United States Code [17 USC 110], even if that person also engages in conduct described in paragraph (11) of section 110 of such title [17 USC 110].

(B)

A manufacturer, licensee, or licensor of technology that enables the making of limited portions of audio or video content of a motion picture imperceptible as described in subparagraph (A) is not liable on account of such manufacture or license for a violation of any right under this Act, if such manufacturer, licensee, or licensor ensures that the technology provides a clear and conspicuous notice at the beginning of each performance that the performance of the motion picture is altered from the performance intended by the director or copyright holder of the motion picture. The limitations on liability in subparagraph (A) and this subparagraph shall not apply to a manufacturer, licensee, or licensor of technology that fails to comply with this paragraph.

(C)

The requirement under subparagraph (B) to provide notice shall apply only with respect to technology manufactured after the end of the 180-day period beginning on the date of the enactment of the Family Movie Act of 2005 [enacted April 27, 2005].

(D)

Any failure by a manufacturer, licensee, or licensor of technology to qualify for the exemption under subparagraphs (A) and (B) shall not be construed to create an inference that any such party that engages in conduct described in paragraph (11) of section 110 of title 17, United States Code [17 USC 110], is liable for trademark infringement by reason of such conduct.

15 USC

§1125. False designations of origin and false descriptions forbidden

(a)
Civil action.

(1)
Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A)
is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B)
in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

(2)
As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this Act in the same manner and to the same extent as any nongovernmental entity.

(3)
In a civil action for trade dress infringement under this Act for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

(b)
Importation. Any goods marked or labeled in contravention of the provisions of this section shall not be imported into the United States or admitted to entry at any customhouse of the United States. The owner, importer, or consignee of goods refused entry at any customhouse under this section may have any recourse by protest or appeal that is given under the customs revenue laws or may have the remedy given by this Act in cases involving goods refused entry or seized.

(c)
Remedies for dilution of famous marks.

(1)
The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in

commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection. In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to--

(A)

the degree of inherent or acquired distinctiveness of the mark;

(B)

the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C)

the duration and extent of advertising and publicity of the mark;

(D)

the geographical extent of the trading area in which the mark is used;

(E)

the channels of trade for the goods or services with which the mark is used;

(F)

the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G)

the nature and extent of use of the same or similar marks by third parties; and

(H)

whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

(2)

In an action brought under this subsection, the owner of the famous mark shall be entitled only to injunctive relief as set forth in section 34 [15 USC 1116] unless the person against whom the injunction is sought willfully intended to trade on the owner's reputation or to cause dilution of the famous mark. If such willful intent is proven, the owner of the famous mark shall also be entitled to the remedies set forth in sections 35(a) and 36 [15 USC § §1117(a), 1118], subject to the discretion of the court and the principles of equity.

(3)

The ownership by a person of a valid registration under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register shall be a complete bar to an action against that person, with respect to that mark, that is brought by another person under the common law or a statute of a State and that seeks to prevent dilution of the distinctiveness of a mark, label, or form of advertisement.

(4)

The following shall not be actionable under this section:

(A)

Fair use of a famous mark by another person in comparative commercial advertising or promotion to identify the competing goods or services of the owner of the famous mark.

(B)

Noncommercial use of a mark.

(C)

All forms of news reporting and news commentary.

(d)

Cyberpiracy prevention.

(1)

(A)

A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person--

(i)

has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii)

registers, traffics in, or uses a domain name that--

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or (III) is a trademark, word, or name protected by reason of section 706 of title 18, United States Code, or section 220506 of title 36, United States Code.

(B)

(i)

In determining whether a person has a bad faith intent described under subparagraph (A), a court may consider factors such as, but not limited to--

(I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information

when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of section 43 [subsec. (c)(1) of this section].

(ii)

Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.

(C)

In any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark.

(D)

A person shall be liable for using a domain name under subparagraph (A) only if that person is the domain name registrant or that registrant's authorized licensee.

(E)

As used in this paragraph, the term "traffics in" refers to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration.

(2)

(A)

The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if--

(i)

the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c); and

(ii)

the court finds that the owner--

(I) is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or (II) through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) by--

(aa)

sending a notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and

(bb)

publishing notice of the action as the court may direct promptly after filing the action.

(B)

The actions under subparagraph (A)(ii) shall constitute service of process.

(C)

In an in rem action under this paragraph, a domain name shall be deemed to have its situs in the judicial district in which--

(i)

the domain name registrar, registry, or other domain name authority that registered or assigned the domain name is located; or

(ii)

documents sufficient to establish control and authority regarding the disposition of the registration and use of the domain name are deposited with the court.

(D)

(i)

The remedies in an in rem action under this paragraph shall be limited to a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark. Upon receipt of written notification of a filed, stamped copy of a complaint filed by the owner of a mark in a United States district court under this paragraph, the domain name registrar, domain name registry, or other domain name authority shall--

(I) expeditiously deposit with the court documents sufficient to establish the court's control and authority regarding the disposition of the registration and use of the domain name to the court; and (II) not transfer, suspend, or otherwise modify the domain name during the pendency of the action, except upon order of the court.

(ii)

The domain name registrar or registry or other domain name authority shall not be liable for injunctive or monetary relief under this paragraph except in the case of bad faith or reckless disregard, which includes a willful failure to comply with any such court order.

(3)

The civil action established under paragraph (1) and the in rem action established under paragraph (2), and any remedy available under either such action, shall be in addition to any other civil action or remedy otherwise applicable.

(4)

The in rem jurisdiction established under paragraph (2) shall be in addition to any other jurisdiction that otherwise exists, whether in rem or in personam.

smblueline pictureReturn to IndexTop of PageBottom of PageBitLaw Home Pageblueline picture