Westlaw.

123 F.Supp.2d 293                                                                 Page 1
123 F.Supp.2d 293, 58 U.S.P.Q.2d 1207, 149 Ed. Law Rep. 513
**(Cite as: 123 F.Supp.2d 293)**

**C**
Briefs and Other Related Documents

United States District Court,E.D. Pennsylvania.
VILLANOVA UNIVERSITY, in the State of
Pennsylvania Plaintiff,
v.
VILLANOVA ALUMNI EDUCATIONAL
FOUNDATION, INC., Defendant.
**No. CIV.A. 00-3007.**

Nov. 20, 2000.

Non-profit university sued disaffiliated alumni
organization for trademark infringement and unfair
competition. On university's motion for preliminary
injunction, the District Court, Anita B. Brody, J., held
that: (1) university's marks were inherently
distinctive; (2) organization's use of marks was likely
to cause confusion; (3) organization's use of marks
was not fair use; and (4) university's claims were not
barred by laches or estoppel.

Motion granted.

West Headnotes

**[1] Injunction 212 ☜138.1**

212 Injunction
    212IV Preliminary and Interlocutory Injunctions
        212IV(A) Grounds and Proceedings to Procure
            212IV(A)2 Grounds and Objections
                212k138.1 k. In General. Most Cited
Cases
Factors to consider in evaluating motion for
preliminary injunction are: (1) likelihood that
plaintiff will prevail on merits at final hearing; (2)
extent to which plaintiff is being irreparably harmed
by conduct complained of; (3) extent to which
defendant will suffer irreparable harm if preliminary
injunction is issued; and (4) public interest.

**[2] Trademarks 382T ☜1421**

382T Trademarks
    382TVIII Violations of Rights
        382TVIII(A) In General
            382Tk1418 Practices or Conduct Prohibited
in General; Elements
                382Tk1421 k. Infringement. Most Cited

Cases
    (Formerly 382k332)
Elements of cause of action for service mark
infringement are: (1) mark is valid and legally
protectable; (2) mark is owned by plaintiff; (3)
defendant's use of mark to identify its goods or
services is likely to cause confusion regarding source
or sponsorship of its goods and services. Lanham
Trade-Mark Act, § 32(1), 15 U.S.C.A. § 1114(1).

**[3] Trademarks 382T ☜1030**

382T Trademarks
    382TII Marks Protected
        382Tk1029 Capacity to Distinguish or Signify;
Distinctiveness
            382Tk1030 k. In General. Most Cited Cases
            (Formerly 382k462)

**Trademarks 382T ☜1420**

382T Trademarks
    382TVIII Violations of Rights
        382TVIII(A) In General
            382Tk1418 Practices or Conduct Prohibited
in General; Elements
                382Tk1420 k. Unfair Competition. Most
Cited Cases
    (Formerly 382k462)
Elements of a cause of action for unfair competition
are same as for claim of service mark infringement,
except that they apply to unregistered marks, which
are protectable if they are found to be distinctive.
Lanham Trade-Mark Act, § § 32(1), 43(a), 15
U.S.C.A. § § 1114(1), 1125(a).

**[4] Trademarks 382T ☜1354**

382T Trademarks
    382TVII Registration
        382TVII(C) Effect of Federal Registration
            382Tk1352 Incontestability in General
                382Tk1354 k. Grounds. Most Cited

Cases
    (Formerly 382k252)
Trademark becomes incontestable after owner files
affidavits stating that mark has been registered, that it
has been in continuous use for five years, and that
there is no pending proceeding and there has been no
adverse decision concerning registrant's ownership or
right to registration. Lanham Trade-Mark Act, § § 8,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 F.Supp.2d 293
123 F.Supp.2d 293, 58 U.S.P.Q.2d 1207, 149 Ed. Law Rep. 513
(Cite as: 123 F.Supp.2d 293)

Page 2

15, 15 U.S.C.A. § § 1058, 1065.

## [5] Trademarks 382T 🔑1362

382T Trademarks
    382TVII Registration
        382TVII(C) Effect of Federal Registration
            382Tk1358 Particular Effects;   Rights
Acquired
                382Tk1362 k. Infringement and Other
Violations;   Likelihood of Confusion. Most Cited
Cases
            (Formerly 382k256, 382k255)
If allegedly infringed mark is federally registered and
has become incontestible, then validity, legal
protectability, and ownership are proved. Lanham
Trade-Mark Act, § § 8, 15, 15 U.S.C.A. § § 1058,
1065.

## [6] Trademarks 382T 🔑1369

382T Trademarks
    382TVII Registration
        382TVII(C) Effect of Federal Registration
            382Tk1364 Scope of Rights Acquired;
Limitations
                382Tk1369 k. Goods or Services
Underlying Mark;  Class. Most Cited Cases
            (Formerly 382k256, 382k255)
Presumption of trademark validity and ownership
based on registration extends only so far as goods and
services noted in registration certificate. Lanham
Trade-Mark Act, § § 8, 15, 15 U.S.C.A. § § 1058,
1065.

## [7] Trademarks 382T 🔑1369

382T Trademarks
    382TVII Registration
        382TVII(C) Effect of Federal Registration
            382Tk1364 Scope of Rights Acquired;
Limitations
                382Tk1369 k. Goods or Services
Underlying Mark;  Class. Most Cited Cases
            (Formerly 382k350.1)
Registration of non-profit university's service marks
for purposes of education and entertainment services
logically extended to university's use of marks in
fundraising activities that were necessary to support
such services, for purpose of determining whether
competing fund raiser's use was infringing. Lanham
Trade-Mark Act, § 32(1), 15 U.S.C.A. § 1114(1).

## [8] Trademarks 382T 🔑1039

382T Trademarks
    382TII Marks Protected
        382Tk1039 k. Arbitrary or Fanciful Terms or
Marks. Most Cited Cases
            (Formerly 382k350.1)
University's unregistered "Wildcat," "Villanova
Wildcats" and "Villanova Alumni Association"
marks were inherently distinctive, arbitrary marks,
entitled to protection from infringement. Lanham
Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

## [9] Trademarks 382T 🔑1523(2)

382T Trademarks
    382TVIII Violations of Rights
        382TVIII(D)   Defenses,   Excuses,   and
Justifications
            382Tk1521 Justified or Permissible Uses
                382Tk1523 Identification or Description
                    382Tk1523(2) k. Of One's Own
Product;  Fair Use. Most Cited Cases
            (Formerly 382k375.1)
Disaffiliated alumni organization's use of protected
"Villanova Alumni" mark in its name "Villanova
Alumni Educational Foundation" was not fair use,
merely describing class of people involved; rather, it
was used as source identifier which would lead
public to believe organization was associated with
university.

## [10] Trademarks 382T 🔑1096(2)

382T Trademarks
    382TIII Similarity Between Marks;  Likelihood of
Confusion
        382Tk1093 Relationship Between Marks
            382Tk1096 Particular Marks, Similarity or
Confusion Involving
                382Tk1096(2) k.  As  Applied  to
Particular Goods or Services. Most Cited Cases
            (Formerly 382k350.1)

## Trademarks 382T 🔑1106

382T Trademarks
    382TIII Similarity Between Marks;  Likelihood of
Confusion
        382Tk1106 k. Relationship Between Parties or
Actors Using Marks. Most Cited Cases
            (Formerly 382k350.1)

## Trademarks 382T 🔑1110

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
        382Tk1107 Nature and Circumstances of Use of Marks
            382Tk1110 k. Trade Channels;    Sales, Advertising, and Marketing. Most Cited Cases
                (Formerly 382k350.1)
Disaffiliated alumni organization's use of "Wildcat Club" mark was sufficiently similar to non-profit university's protected "Wildcat" mark to be likely to cause consumer confusion, for purpose of determining whether it was infringing; organization used mark together with other words and images suggesting affiliation with university, and targeted persons who associated mark with university. Lanham Trade-Mark Act, § §    32(1), 43(a), 15 U.S.C.A. § § 1114(1), 1125(a).

## [11] Estoppel 156 🌐 52.15

156 Estoppel
    156III Equitable Estoppel
        156III(A) Nature and Essentials in General
            156k52.15 k. Essential Elements. Most Cited Cases
Essence of estoppel defense is that defendant changed its position in reliance upon misleading representation of plaintiff.

## [12] Equity 150 🌐 72(1)

150 Equity
    150II Laches and Stale Demands
        150k68 Grounds and Essentials of Bar
            150k72 Prejudice from Delay in General
                150k72(1) k. In General. Most Cited Cases
Elements of laches defense are: (1) inexcusable delay in filing suit, and (2) prejudice resulting to defendant from such delay.

## [13] Trademarks 382T 🌐 1534

382T Trademarks
    382TVIII Violations of Rights
        382TVIII(D)    Defenses,    Excuses,    and Justifications
            382Tk1533 Delay in Assertion of Rights; Laches
                382Tk1534 k. In General. Most Cited Cases
                    (Formerly 382k385.1)

## Trademarks 382T 🌐 1540

382T Trademarks
    382TVIII Violations of Rights
        382TVIII(D)    Defenses,    Excuses,    and Justifications
            382Tk1540 k. Estoppel. Most Cited Cases
                (Formerly 382k389)
Non-profit university was not barred by estoppel or laches from asserting trademark infringement by recently    disaffiliated    alumni    fundraising organization; university exercised sufficient control over organization during period of affiliation to warrant finding that its use of marks while affiliated was pursuant to implied license, which was terminated upon disaffiliation.

## [14] Trademarks 382T 🌐 1113

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
        382Tk1113 k. Accompaniments Mitigating Confusion; Disclaimers. Most Cited Cases
            (Formerly 382k350.1)
Disaffiliated alumni association's use of disclaimer that it was not affiliated with university was insufficient to support its continued use of service marks and images which infringed university's protected marks; given parties' history of affiliation, highly similar nature of marks in question, services provided, marketing means, and targeted audience, disclaimer was not sufficient to avoid confusion. Lanham Trade-Mark Act, § §    32(1), 43(a), 15 U.S.C.A. § § 1114(1), 1125(a).

## [15] Trademarks 382T 🌐 1704(9)

382T Trademarks
    382TIX Actions and Proceedings
        382TIX(F) Injunctions
            382Tk1701 Preliminary or Temporary Injunctions
                382Tk1704 Grounds and Subjects of Relief
                    382Tk1704(9)    k.    Similarity; Likelihood of Confusion. Most Cited Cases
                        (Formerly 382k620)
Irreparable injury follows showing of likelihood of confusion as matter of course, for purpose of determining    appropriateness    of    preliminary injunctive relief in trademark infringement action.

## [16] Trademarks 382T 🌐 1704(2)

123 F.Supp.2d 293
123 F.Supp.2d 293, 58 U.S.P.Q.2d 1207, 149 Ed. Law Rep. 513
(Cite as: 123 F.Supp.2d 293)

Page 4

382T Trademarks
   382TIX Actions and Proceedings
      382TIX(F) Injunctions
         382Tk1701 Preliminary or Temporary Injunctions
            382Tk1704 Grounds and Subjects of Relief
            382Tk1704(2) k. Infringement in General. Most Cited Cases
         (Formerly 382k620)
University was being irreparably injured by disaffiliated alumni organization's continued use marks which were confusingly similar to university's protected marks, for purpose of determining appropriateness of preliminary injunctive relief in trademark infringement action; even if organization was using marks for charitable purposes which benefitted university students, university was harmed by its lack of control over organization.

[17] Trademarks 382T ⬤~1704(2)

382T Trademarks
   382TIX Actions and Proceedings
      382TIX(F) Injunctions
         382Tk1701 Preliminary or Temporary Injunctions
            382Tk1704 Grounds and Subjects of Relief
            382Tk1704(2) k. Infringement in General. Most Cited Cases
         (Formerly 382k620)
Any harm to disaffiliated alumni organization from enjoining its infringing use of university's marks was caused by its own conduct, and thus did not outweigh harm to university from infringement, for purpose of determining appropriateness of preliminary injunctive relief.

*295 Paul G. Gagne,Dennis R. Suplee, Robert A. McKinley. Philadelphia, PA, for plaintiff.

Stanley H. Cohen, Mona Gupta, Caesar, Revise, Bernsteain, Cohen & Pokotilow, Philadelphia, PA, W. Peter Weir, Joseph C. Hare, Weirt Partners, Philadelphia, PA, for defendant

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.
Before me is plaintiff's Motion for a Preliminary Injunction on its infringement and unfair competition claims under the Lanham Act. On August 28-30, 2000, I conducted an evidentiary hearing on the Motion, and on September 25, 2000 I heard Oral Argument from both parties. I will grant the motion.

## I. Factual Findings

Plaintiff Villanova University ("Villanova") filed this action against defendant Villanova Alumni Educational Foundation, Inc. (VAEF) on June 13, 2000, alleging service mark infringement and dilution, unfair competition, and breach of contract. The name and marks at issue are: "Villanova", "Villanova University", "Villanova Alumni", "Villanova Wildcats", "Wildcat", "Wildcat Club", and the image or depiction of a wildcat.

Villanova is a private, Catholic, non-profit, post-secondary educational institution incorporated under the laws of the Commonwealth of Pennsylvania, and located in Villanova, Pennsylvania. Founded in 1842 as Villanova College, the college attained university status in 1953 and began to use the name "Villanova University" to identify itself and its services. Villanova is the owner of United States Service Mark Registration No. 1,346, 818, issued on July 2, *296 1985, for the mark "Villanova." The registration is for education and entertainment services, namely conducting educational programs and courses of instruction on the undergraduate, graduate and professional levels, conducting research programs, and conducting athletic and cultural events. Ex. 84.

Villanova has also used the mark "Villanova Alumni Association" continuously since 1875 as a collective membership mark to identify members of the Alumni Association, and in connection with services offered by the Alumni Association and Villanova graduates. The services offered by the Villanova Alumni Association include sponsorship of alumni association chapters and events, alumni location and referral services, sponsorship of athletically-themed events, and production and distribution of publications of interests to its graduates. Villanova has approximately 80,000 alumni, all of whom are considered members of the Villanova Alumni Association, that receive their publications. The Alumni Association also uses University marks on its website, which is part of the Villanova University website. In 1991, the Alumni Association was incorporated as a separate entity. It continues to use the mark "Villanova Alumni Association" with the permission of and under guidelines established by Villanova.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 F.Supp.2d 293
123 F.Supp.2d 293, 58 U.S.P.Q.2d 1207, 149 Ed. Law Rep. 513
(Cite as: 123 F.Supp.2d 293)

Villanova operates an intercollegiate athletic program which sponsors teams in all major sports. It is a member of the National Collegiate Athletic Association ("NCAA") and the Big East Conference. Since 1926, Villanova has continuously used the marks "Wildcat," "Wildcats," and "Villanova Wildcats," as well as logos and images of wildcats to identify its athletic teams and its athletes and in connection with athletic-related events, such as tailgate parties and pep rallies. Villanova's athletic teams are well known to the public and in the media as the "Wildcats" and "Villanova Wildcats".

Villanova solicits charitable donations for the support of its educational, athletic and other programs in a variety of ways. The University uses its marks "Villanova", "Villanova University", "Villanova Alumni Association", "Villanova Wildcats" and the image of a wildcat in connection with its fundraising. Since disaffiliation from the defendant in October 1999, the University has conducted fundraising for its athletes and athletic programs through the "Block V Club". Malloy Tr. 81. The marks used by the University serve to communicate to the public Villanova's reputation and good will.

Defendant, VAEF, is a non-profit corporation incorporated under the laws of the Commonwealth of Pennsylvania. Defendant was incorporated in 1973 under the name "Villanova Educational Foundation, Inc." ("VEF") for the official purpose of soliciting funds, particularly "for use in support of the Villanova University's athletic programs and for use by or on behalf of Villanova University students participating in such programs." *Articles of Incorporation, Ex. 51.* It trades under the name "Wildcat Club." The Club changed its name to VAEF, Inc. in January 2000. The majority of defendant's present members are Villanova University alumni. Throughout its existence, all of the money raised by the Club, apart from its operating expenses and minor expenditures for other charitable purposes, was contributed to the University.

In 1969 and again in 1971, certain Villanova alumni approached Rev. William Farrell, O.S.A., Villanova's Vice-President for Development. They expressed interest in forming and sought to obtain permission from the University to form, the Wildcat Club to raise funds to support Villanova's athletic programs. In a letter from Jack McAndrews, the first president of the Club, to Father Farrell, dated January 11, 1971, Mr. McAndrews states that he and other interested alumni are "attempting to form the "Villanova

Wildcat Club" ". The letter addressed the need to "obtain permission ... to arrange for the development of the Club." Defendant's trade *297 name, "The Wildcat Club", was part of the defendant's proposal to the University at least as early as 1971 and was the subject of the initial meetings between the University and the interested alumni to discuss the Club's formation. FN1

> FN1. Edward J. Rideout, former employee of Villanova University and former member of the Wildcat Club who attended the meeting of November 29, 1972 testified in his deposition that the name "Wildcat Club" was brought up at the meeting. Deposition Tr. p. 24.

Father Farrell arranged for these alumni to meet Father Edward McCarthy, then-President of the University, on November 29, 1972, to discuss their proposed formation of the Wildcat Club. At that meeting, a second meeting was arranged for December 14, 1972. At these two meetings, Father McCarthy gave verbal permission to the alumni present to incorporate an entity titled "Villanova Educational Foundation," to trade under the name "Wildcat Club", for the purpose of supporting the University's athletic programs. At these initial meetings, Father McCarthy also verbally set forth guidelines for the Club, including the restriction that the entity was to be a separate entity from the University, that it would not be permitted to solicit the general alumni as a whole, and that all money collected was to be contributed to the University.

Defendant held its first meeting on December 14, 1972, shortly after the meeting with Father McCarthy. Their first meeting confirmed that they would form the VEF, which would trade as the Wildcat Club, to support the University's athletic programs. In February and March, 1973, upon Father Farrell's request, Morgan, Lewis & Bockius, Villanova's outside counsel, prepared documents for and accomplished the formal incorporation of the VEF and registration of its fictitious name "Wildcat Club".

From 1973 to 1981, defendant operated generally in accordance with a list of "ground rules" (hereafter "guidelines") that were first established verbally by Father Farrell as "prerequisites to the establishment of the Wildcat Club." Exhibit 28. In July, 1973, Father Farrell died. Father Riley was then promoted to the position of Vice President of Development, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 F.Supp.2d 293
123 F.Supp.2d 293, 58 U.S.P.Q.2d 1207, 149 Ed. Law Rep. 513
(Cite as: 123 F.Supp.2d 293)

was directed by Father McCarthy (still the University's president) to oversee Defendant's activities. On September 6, 1973 Father Riley and John G. McNamara sent a letter to Mr. McAndrews reminding him of the verbal guidelines established by Father Farrell and stating that the University interprets these verbal prerequisites as binding on the Wildcat Club. *See* Ex. 28. These guidelines, as stated in the letter, include:

(A) "[t]here will be no mass solicitation of alumni in support of the Wildcat Club"; (B) the organization and program of the Club will be conducted out of the Development office; (D) "Wildcat Club mailings must be closely coordinated with the Development Office to minimize conflicting solicitations"; "[t]he business of the Wildcat Club will be conducted through a corporation known as the Villanova Educational Foundation." *Id.*

Ronald Russo, former President and founding member of the Wildcat Club, testified that these and other requirements were among the "understandings between the university and the club in connection with the formation of the club." Tr. 62.

During subsequent years, pursuant to Father McCarthy's instructions, Father Riley took steps to reinforce the guidelines, address minor violations by the Wildcat Club of the University's guidelines, and to promulgate new or revised guidelines. For example, on February 25, 1975, Father Riley wrote to the Club's then-president James Haughton, detailing the guidelines under which the Club was required to operate. Ex. 36. According to the minutes from a Wildcat Club meeting on March 11, 1975, Haughton's reply to Father Riley's letter stated that "every **\*298** effort will be made to prevent any conflict of interest." Ex. 37. <sup>FN2</sup>

> FN2. Other examples of Father Riley's continuous effort to reinforce the guidelines include:
>
> (1) In June 1978, Father Riley invited Messrs. Russo, Murray and the Wildcat Club's then-Vice President Louis Kahl to a meeting, which became known as the "Overbrook meeting," to review the guidelines under which the Club was to operate. Exs. 38, 39, 40, 66. The matters addressed included details of the Club's mailing list and solicitation targets, the attendance of University representatives at the Club's meetings, approval by the University of changes to the Club's

promotional materials, and distribution and allocation of contributions. Ex. 38.
> (2) On March 20, 1984, Father Riley met with the Club's then-President Donald Creamer, to review the guidelines, including the coordination of solicitation schedules, distribution of contributions, and approval by the University of Defendant's annual budget. Ex. 44

The relationship between the parties during this period was informal. Although, Father Riley considered the guidelines imposed by the University to be binding on the Club, he used a gentle hand in dealing with violations in light of the close relationship between the parties and the fact that the Club was composed of a large number of University alumni. (Riley, Tr. 173). Still, the defendant presented no evidence that it ever refused the guidelines set forth by the University. To the contrary, there is evidence that members of the Club openly accepted the fact that its existence was subject to University authorization and the University's guidelines. Douglas J. Murray stated in a letter dated November 12, 1979, during his tenure as president of the Club, that "[t]he Wildcat Club ... operates under guidelines and with charter approval by both the Development Office and the President of the University." <sup>FN3</sup>

> FN3. This letter was written in opposition to the idea of the formation of a Basketball Booster Club. Mr Murray sent a copy of the letter to the President of the University, Father Driscoll, to Father Riley, to the Athletic Director, and to the Coach of the Basketball team. Mr. Murray testified on cross examination that he wrote this letter upon the University's request in order to prevent the formation of a booster club. He was told by the University to do whatever it takes. He testified that he was not under oath at the time he wrote the letter. Under any circumstances, however, it is evidence of Mr. Murray's public position.

In 1981, when the Board of Trustees of Villanova voted to eliminate football as an intercollegiate sport, the relationship between the parties became strained. In response to the Board's decision, the defendant organized a committee to restore football. On May 18, 1981, the defendant's committee put out a full-page advertisement in the Philadelphia Bulletin protesting the decision to drop football and later

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

requested the resignation of the University's president. The decision by the Board and the position taken by the defendant generated substantial animosity between the parties. Neither party took any formal action, however, to sever the relationship. Football was brought back in 1984 and the relationship between the parties was restored by at least 1991 and possibly as early as 1987 <u>FN4</u>. In 1987, with the University's permission, the Club entered into a contract with MBNA to sponsor an affinity credit card bearing the designation "Villanova Wildcats".

> <u>FN4.</u> On January 12, 1987, Michael Manning, President of the Wildcat Club at the time, wrote to Father Riley, stating that "[t]he Wildcat Club's purpose is to generate funds to be turned over to your office, and we want to ensure that our efforts are in consonance with your goals and desires." Ex. 45
>
> In 1991, Father Dobbin, then president of the University, invited the defendant back to the campus and offered an office rent free, as was the case before 1981.

In 1992, the parties formalized their relationship through an Affiliation Agreement ("The 1992 Agreement"). The 1992 Agreement was negotiated by Joseph Hare, counsel to the defendant, and Dorothy Malloy, General Counsel to the University. Paragraph 1(h) of that Agreement, the provision that is most pertinent in this matter, states:

**\*299** [The VEF] shall not use the name of "Villanova" or the [Villanova University] trademark "Wildcat" or any other [Villanova University] trademark or service mark in any activities not previously authorized by [Villanova University] (such as merchandising, affinity credit cards, public relations or charitable solicitation initiatives not heretofore undertaken) without the prior written consent of [Villanova University]. [Villanova University's] consent to the use of its name, trade and service marks for [Villanova University] fundraising activities shall not be unreasonably withheld.

Exhibit 3.

This provision, by its terms, applies to the use of "Villanova" in "Villanova Educational Foundation" and to the use of "Wildcat" in "Wildcat Club". <u>FN5</u> The 1992 Agreement also detailed some of the guidelines under which defendant was to operate,

including that it would comply with applicable NCAA regulations (paragraph 1(a)) and ethical standards of fundraising (paragraph 1(c)); that it would donate all funds raised, less reasonable expenses, to the University (paragraph 1(e)); and that it would submit its annual fundraising plan and solicitation materials to the University for approval (paragraph 1(f)).

> <u>FN5.</u> Even if this provision is not unambiguous on its face, it was the intention of the parties that the provision apply broadly to include all of the University's trademarks and service marks. At the time the agreement was made, neither party expressed that "Wildcat" or "Villanova" as these marks are used in the defendant's corporate and trade names were to be excluded from the agreement (Malloy Tr. 57-58; Hare Tr. 67).

The 1992 Agreement expired on September 15, 1995. On that date, the parties entered into a revised Affiliation Agreement ("The 1995 Agreement"). The 1995 Agreement contained the same paragraph 1(h) concerning use by the defendant of the University's name and marks. Exhibit 4. The 1995 Agreement also set forth guidelines, under which defendant was to operate, in greater detail than in the 1992 Agreement.

The 1995 Agreement expired on September 15, 1996. By its terms, the 1995 Agreement could be renewed by mutual written agreement. At this time the parties entered into a three-year period of negotiations in an effort to agree upon the terms of a new affiliation agreement. Throughout this period of negotiation, the parties operated under an informal agreement to conduct their relationship in accordance with the terms of the 1995 Agreement. Both parties continued to abide by the spirit and letter of the 1995 Agreement. <u>FN6</u>

> <u>FN6.</u> The 1999 Annual Report presented by the defendant to its members is evidence that the defendant acknowledged an informal agreement to abide by the terms of the 1995 Agreement. Exhibit 13. In this document, the defendant also acknowledges that it did in fact continue to abide by the terms of the 1995 Agreement, to the extent possible. Counsel to the defendant, Joseph Hare, testified at the hearing that they

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

continued to abide by the terms of the agreement only in order to ensure that there would be no violation of the NCAA regulations. However, the motive behind the defendant's compliance with the Agreement is not relevant to the issue of whether or not there was an informal agreement. The fact remains that the objective conduct of the defendant remained in accordance with the Agreement throughout the period of negotiations.

On October 27, 1999, having concluded that the parties would be unable to reach agreement on a new affiliation agreement, the University gave the Club notice of termination of their affiliation. Ex. 89. The letter of termination stated that the Club is no longer authorized to solicit funds for the University, its athletic programs or athletic scholarships, or to represent that future funds raised by the Club benefit the University, its athletic programs, or its athletes. *Id.* On May 23, 2000, counsel for the University sent a letter to counsel for the Club demanding that the Club cease and desist all use of the University's names and marks, in particular "Wildcat Club", "Villanova Alumni **\*300** Educational Foundation" and "Villanova." Ex. 90.

After the disaffiliation, in January, 2000, the defendant changed its corporate name to "Villanova Alumni Education Foundation." They added the word "Alumni" in an effort to distinguish itself from the University by indicating that its members were alumni of the University. The Club also changed its mission. The Club now articulates a mission of raising funds for scholarships to support non-athlete students of the University. To further its mission, the club continues to solicit funds through the use of mailings, via website, and through social outings such as tailgates at University football games. The Club continues to make use of the designations "Wildcat Club", "Villanova Alumni Educational Foundation", "Villanova Alumni", "Villanova", and "Villanova Wildcats", as well as the image of a wildcat, in various pieces of its promotional literature, including its website. Ex. 92-96. The Club also employs other images traditionally associated with Villanova University, including the school colors, images of Villanova University athletes and campus landmarks (including the distinctive St. Thomas of Villanova Chapel), and references to the University motto, *veritas, unitas, caritas* (truth, unity, charity) and to the "Augustinian tradition" of the school. Since the disaffiliation, the Club has added a disclaimer to its application for

scholarships and all of its publications stating that the Club is not affiliated with Villanova University. [FN7] The Club also recently terminated its affiliation with MBNA/"Villanova Wildcats" affinity card in September 2000.

> FN7. The disclaimer appears below the signature line of its scholarship application and at the bottom or in the corner in fine print on all other publications. The disclaimer states:
> The "Wildcat Club" and the logo "The Wildcat club, plus logo design," are service marks of the Villanova Alumni Educational Foundation, which is not affiliated with Villanova University.

Since October 27, 1999, the Club's use of the designations "Wildcat Club", "Villanova Alumni Educational Foundation", "Villanova Alumni", "Villanova", "Villanova Wildcats", and the image of a wildcat has resulted in a number of instances of actual confusion between the Club and Villanova University and their respective programs. On fifteen to twenty occasions, University employees have communicated their confusion to counsel for the University. Gary Olsen, Director of Alumni Affairs for the University, has encountered confusion from individuals including a professor, an Alumni Association chapter president, students, parents and others concerning (a) the source of Defendant's scholarship program [FN8], (b) the sponsorship of the Club's golf outing, and (c) the sponsorship of the club's affinity credit card. [FN9]

> FN8. Evidence of confusion regarding the source of the scholarship program consisted of an audiotape, played at the hearing, of a voice mail message reflecting a parent's mistaken belief that the Club's scholarship program was sponsored by the University's Alumni Association. Exs. 1097, 1097A. Although, the message did not specifically name the Wildcat Club scholarship, the timing of the call coincided with the recent mailing of the new scholarship program material. In addition, Mr. Olsen, as Director of Alumni Affairs, had no knowledge of any other new scholarship programs that were initiated around that time. Tr. 137-38.

> FN9. At the hearing, the defendant objected

to this testimony on hearsay grounds. I overruled the objection. This testimony is not hearsay. It is anecdotal information that is evidence of confusion.

Representatives of the Club have taken the position that they are free to use the marks that are directly at issue in this matter to solicit charitable donations to support Villanova students and in any other way that the Club may choose. Counsel for the Club, Joseph Hare, testified at the hearing that the Club had considered sponsoring scholarships at other Augustinian schools in Philadelphia. As of the time of the hearing, however, the Club decided to maintain its narrow mission in support of Villanova University students. Tr. 40-41.

### *301 II. Conclusions of Law

[1] In evaluating plaintiff's Motion for a Preliminary Injunction, I must consider four factors: "(1) the likelihood that the plaintiff will prevail on the merits at the final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest." *Merchant & Evans, Inc. v. Roosevelt Building Products Company, Inc.,* 963 F.2d 628, 632 (3rd Cir.1992). I conclude that Villanova University has met its burden on each of these factors.

### A. Likelihood of Success on the Merits

[2] [3] Villanova University's motion for a preliminary injunction encompasses two claims: (1) infringement of the University's service marks, in violation of Section 32 of the Lanham Act. ^FN10, and (2) unfair competition, in violation of Section 43(a) of the Lanham Act. ^FN11 The Lanham Act "protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983). There are three elements of a cause of action for service mark infringement: (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; (3) defendant's use of the mark to identify its goods or services is likely to cause confusion regarding the source or sponsorship of its goods and services. *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 291 (3rd Cir.), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). The elements of an unfair

competition claim are identical, except that they apply to unregistered marks, which are protectable if they are found to be distinctive. *See Dominion Bankshares Corp. v. Devon Holding Co.,* 690 F.Supp. 338, 344 (E.D.Pa.1988).

FN10. Section 32 provides:
(1) Any person who shall, without the consent of the registrant-
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, ...
shall be liable in a civil action by the registrant for the remedies hereinafter provided.

FN11. Section 43(a) provides:
(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ...
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
An action under 43(a) is designated as one for "unfair competition." *See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 191, 194 (3rd Cir.1999).

### (1) Validity, Protectability, and Ownership

[4] [5] Villanova University satisfies the first two requirements, validity, protectability, and ownership with respect to all of the marks. First, the marks "Villanova" and "Villanova University" are federally registered and incontestable under the Lanham Act, 15 U.S.C. § § 1058 and 1065. "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 F.Supp.2d 293
123 F.Supp.2d 293, 58 U.S.P.Q.2d 1207, 149 Ed. Law Rep. 513
(Cite as: 123 F.Supp.2d 293)

been in continuous use for five years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 472 n. 7. (3rd Cir.1994). "If the mark at issue is federally registered and has become incontestible, then validity, legal protectability, **\*302** and ownership are proved". *See Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.,* 214 F.3d 432, 438 (3rd Cir.2000). *See also, Opticians Association of America v. Independent Opticians of America,* 920 F.2d 187, 194 (3rd Cir.1990); 15 U.S.C. § 1115(b).

[6] [7] The defendant correctly argues that the presumption of validity and ownership based on registration "extends only so far as the goods and services noted in the registration certificate." *Natural Footwear Ltd., v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1396 (3rd Cir.1985) (citations omitted). The University's federal Certificates of Registration for "Villanova" and "Villanova University" state the purposes of education and entertainment services. The defendant argues that the University's ownership of these marks, therefore, does not extend to charitable services, which is the defendant's only business under these names. I disagree. First, the educational activities of a non-profit educational institution inherently encompass charitable services. Thus, the registration certificate logically extends to the University's use of these marks in fundraising activities that are necessary to support its education and entertainment activities. Similarly, the defendant's business, raising funds to support Villanova athletics, is also an educational/entertainment service, and the defendant's new mission of supporting scholarships is clearly an educational service.

When the Third Circuit adopted this rule limiting the presumption of ownership to the terms of the registration, the court explained the underlying policy reasons for the rule: "[T]he purpose of [the Lanham Act] is best served by limiting the impact of a registered mark to only the specific terms of the registration so as to allow parties interested in marketing products with a new mark to rely as fully as possible on the registry." *Id.* This policy is not implicated here where the defendant started using the marks, not as a market competitor, but as a member of the 'Villanova family' with an interest in assisting the University in its education, entertainment and charitable missions. In 1973, when the defendant starting using the marks "Villanova" and "Villanova

University", it was well aware that the University's use of these marks extended to fundraising activities. Thus the plaintiff is entitled to a presumption of validity, protectability, and ownership of "Villanova" and "Villanova University" based on the federal registration of these marks. [FN12]

> FN12. Alternatively, absent a presumption of validity, predictability and ownership, "Villanova" and "Villanova University" have acquired secondary meaning under the analysis applied below to the remaining marks at issue.

[8] Villanova University had also acquired the right to exclusive use of the unregistered marks "Wildcat", "Wildcats", "Villanova Wildcats", and "Villanova Alumni Association", as well as the depiction of a wildcat, in connection with the University and its activities by 1972. "If the mark at issue has not been federally registered ... then 'validity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive.' " *Commerce National Insurance Services,* 214 F.3d at 438. "A mark is inherently distinctive if it may be fairly characterized as arbitrary, fanciful, or suggestive." *Id.* at 438 n. 5 (citing *Ford Motor Co.,* 930 F.2d at 292 n. 18). "Arbitrary marks are 'those words, symbols, pictures, etc., which are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services.' " *Ford Motor Co.,* 930 F.2d at 292 n. 18 (quoting 1 McCarthy, Trademarks and Unfair Competition at § 11:4). "Wildcat", "Wildcats", and "Villanova Wildcats", and the associated depiction of the wildcat are logically arbitrary marks and are, therefore, inherently distinctive.

**\*303** Even if they are not distinctive, they clearly have secondary meaning. "Secondary meaning is demonstrated where, 'in the minds of the public, the primary significance of a ... term is to identify the source of the product itself.' " *Id.* at 292 (citing *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 152 (3rd Cir.1984)). Neither party contests that "Wildcat", "Wildcats", and "Villanova Wildcats" were strongly identified with Villanova University by the time the defendant began its operation as the Wildcat Club in 1973. As demonstrated by the newspaper articles submitted by the University, it is particularly clear that by 1972, the public had come to associate "Villanova Wildcats" and "Wildcats" with the athletic teams and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

athletes of Villanova University. This identification explains the very reason that the defendant selected the marks to be used in connection with their services directed at Villanova students, alumni, and fans.

After continuous use by the Villanova Alumni Association for over a century, "Villanova Alumni" had also acquired secondary meaning by 1972. Like "Villanova" and "Villanova University", the primary significance of "Villanova Alumni" is identification with the plaintiff. "The Third Circuit has further concluded that, "[w]ith respect to ownership of unregistered marks, the first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce." " *Id.* (citing *Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.,* 811 F.2d 1470, 1473 (Fed.Cir.1987)) ("trademark rights in the United States are acquired by ... adoption and use, not by registration"). The plaintiff can therefore establish the first two elements of the trademark infringement and unfair competition claims. The marks at issue are valid, legally protectable, and owned by the plaintiff under the Lanham Act.

[9] The defendant argues that it is not using "Villanova" or "Villanova Alumni" in a trademark sense but in a descriptive sense, because it uses these marks only to describe a particular class of people (i.e. group of Villanova graduates). The Ninth Circuit has held such use to be "fair use" that is not a violation of trademark law. See *New Kids on the Block v. New America Pub., Inc.,* 971 F.2d 302, 307 (1992) ( "Cases like these are best understood as involving a non-trademark use of a mark-a use to which the infringement law simply does not apply"). The facts in this case lead to a different conclusion.

The defendant does not use the words "Villanova Alumni" in its name "Villanova Alumni Educational Foundation" merely for a descriptive purpose, but in a trademark manner. The "fair use" doctrine does not apply when the defendant's use of the mark in question "implicate[s] the source-identification function that is the purpose of trademark." *The New Kids,* 971 F.2d at 308. The doctrine only applies where use of a mark in narrative is necessary to describe the defendant's goods and services. For example, in *WCVB-TV v. Boston Athletic Association,* 926 F.2d 42 (1st Cir.1991), the court ruled that defendant television station had the right to use the mark "Boston Marathon" in reporting on the results of that race, even though a competing station had purchased an exclusive right to televise the event. In reaching this conclusion, the court was clear to

point out that there was no way for the defendant to report the results of the race without using the mark. Likewise in *The New Kids on the Block,* the court found that the defendant newspapers could not conduct a poll on the popularity of the band New Kids on the Block without making reference to the group's name. In this case, it would constitute permissible "fair use" if the defendant were to use the marks "Villanova" and "Villanova Alumni" in descriptive text in order to identify club members.

The defendant's prominent use of "Villanova" and "Villanova Alumni" in its name and logo, however, is not descriptive use. The First Circuit held that application of **304 the "fair use" doctrine turns on whether the defendant is using the mark as an "attention-getting symbol," indicated by "the large size of the words on the screen," or primarily as a description, indicated by the "timing, meaning, context, intent, and surrounding circumstances." *WCVB-TV,* 926 F.2d at 46. Use of protected marks in a name and logo is precisely the use as an "attention-getting symbol" that the court decried in *WCVB-TV.* The defendant uses its name and logo on all of its written materials and on the homepage of its website. This use of the mark in its name and its logo is not necessary to describe its services. The "fair use" doctrine allows for use of a mark when it is "used in a way that does not deceive the public," but is simply "being used to tell the truth." *The New Kids,* 971 F.2d at 308 (quoting Justice Holmes in *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 68 L.Ed. 731 (1924)). Here the defendant's prominent use of the marks "Villanova" and "Villanova Alumni" is likely to be misleading. "A rational analysis of the situation" leads to the conclusion that the public will believe that the Club is affiliated with Villanova University. *Id.* at 307 n. 5.

### (3) Likelihood of Confusion

[10] Once it is established that the marks are either distinctive or have secondary meaning and that the defendant is using the marks in a trademark manner, the next step is an analysis of whether there is a likelihood of confusion, the third element of an infringement or unfair competition claim. A likelihood of confusion, exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Dranoff-Perlstein Associates v. Sklar,* 967 F.2d 852, 862 (3rd Cir.1992) (citations omitted). A plaintiff need not prove actual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 12

confusion under the Lanham Act to be entitled to relief, but rather likelihood of confusion. *See Ford Motor Co.,* 930 F.2d at 292. [FN13] But, instances of actual confusion, such as were proven by Villanova University, are strong evidence of the likelihood of confusion. *See F. Schumacher & Co. v. Silver Wallpaper & Paint Co.,* 810 F.Supp. 627, 632 (E.D.Pa.1992).

> FN13. The same is true as to the University's unfair competition claim. *See Warner-Lambert Co. v. Breathasure, Inc.,* 204 F.3d 87 (3d Cir.2000) (to obtain injunctive relief, plaintiff need show only tendency to deceive or confuse, not actual consumer reliance on defendant's advertising or marks).

Establishment of likelihood of confusion requires an assessment of a number of confusion "factors." *See Scott Paper Co. v. Scott's Liquid Gold,* 589 F.2d 1225 (3d Cir.1978). The factors listed in *Scott Paper Co.* are:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time defendant has used the mark without evidence of actual confusion; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties; sale efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

I will employ this ten-factor test only with respect to the marks "Wildcats", "Wildcat", and "Wildcat Club", in response to the defendant's argument that these marks are not similar enough to cause confusion. For reasons similar to those that follow, the likelihood of confusion is also present with respect to the defendant's*305 use of "Villanova", "Villanova University", "Villanova Alumni", and the image or depiction of a wildcat.

First, the defendant's mark "Wildcat Club" differs from the plaintiff's mark "Wildcat" only by addition of the word "Club", a one-syllable, generic term. Nothing about the word "Club" distinguishes the

defendant from Villanova University. [FN14] The test for determining similarity of marks is whether they create the "same overall impression." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 477 (3rd Cir.1994). Moreover, the marks must be examined in "the context in which they are found," considering "the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr USA Publishing v. Meredith Corp.,* 991 F.2d 1072, 1078 (2d Cir.1993). The defendant here uses "Wildcat Club" together with "Villanova", "Villanova Alumni", and other words and images that suggest an affiliation with Villanova University. In addition, all of its activities are centered at Villanova University or Villanova University athletic events. In this context, the word "Wildcat" is not dissimilar from "Wildcats".

> FN14. The defendant argues that "Wildcat" and "Wildcat Club" are analogous to "Miracle Bra" and "Miraclesuit", which this court found to be "somewhat distinct." *A & H Sportswear Co. v. Victoria's Secret Stores,* 57 F.Supp.2d 155 (E.D.Pa.1999). I disagree. Where the term in common is as distinct as "Wildcat", as opposed to the more generic term "miracle", the descriptive term "club" is not sufficient to distinguish the two marks. Indeed, "a mark that is entirely generic ... may never be protected by trademark" and "adding a suffix to a generic term ... will not change the generic nature of the word." *Dranoff-Perlstein,* 967 F.2d at 861. ("The test for genericness is whether consumers think the term represents "the generic name of the product [or service] or a mark indicating merely one source of that product [or service]." " *Id.* at 859.) "Miracle" is reasonably classified as generic; "Wildcat", particularly when it is used as a school mascot, is not.

Second, there is abundant support for the strength of Villanova's mark "Wildcats" as it is used in this context. It is undisputed that, as it is used by both parties in this case, the mark represents the athletes and athletic teams of Villanova University. Furthermore, the members of the Club, the targets of the Club's solicitations, and the beneficiaries of its services all associate "Wildcats" with Villanova University. [FN15] Third, considering the context in which the defendant predominantly operates, at casual gatherings such as tailgates at Villanova football games, in which viewers are bombarded with

123 F.Supp.2d 293
123 F.Supp.2d 293, 58 U.S.P.Q.2d 1207, 149 Ed. Law Rep. 513
**(Cite as: 123 F.Supp.2d 293)**

a variety of signs, logos, and other indicia of Villanova University, they cannot be expected to exercise the extreme care necessary to assess the identity and lack of affiliation of the Club. This is particularly, true in light of the defendant's long history (28 years) as an affiliate of the University.

> FN15. The defendant argues that the use by other Universities of Wildcats as their school mascot diminishes the strength of the mark, citing *Trustees of Columbia University v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733 (S.D.N.Y.1997). The other schools with this mascot include University of Arizona, Northwestern University and University of Kentucky. However, in this case both parties direct their services only to a narrow population (students, alumni and fans of Villanova University). The fact that Wildcat may be more strongly identified with another school for those outside of this population, bears no relevance to the determination of a likelihood of confusion in this case. The use of the Wildcat mascot by other schools does not dilute the mark within the relevant population.

The fourth and sixth factors [FN16], both relate to evidence of actual confusion, which I have found does exist. Furthermore, incidents of confusion have already occurred in the short time since the parties disaffiliated in October, 1999. There is also no question that the seventh and eighth factors, relating to whether the services\*306 are marketed through the same channels and targeted to the same parties, weigh in favor of finding a likelihood of confusion. The services of both parties are directed at Villanova students, parents, alumni, friends and fans. Both parties seek to communicate with this audience and solicit donations through direct-mail campaigns, advertisements in print and electronic media, and through social gatherings such as tailgates and golf outings. The evidence that both parties engage in charitable activities also satisfies the ninth factor, the relationship or similarity of the goods. [FN17]

> FN16. I do not find it necessary to make a finding one way or the other regarding the fifth factor, defendant's intent in continuing to use the name "Wildcat", because all of the other factors weigh in the plaintiff's favor.

> FN17. The defendant's argument that the University does not use "Wildcats" in connection with charitable services is of no moment given the strong connection, discussed above, among this audience between "Wildcats" and Villanova University. Furthermore, the defendant uses the mark "Wildcat" in conjunction with its corporate name encompassing the mark "Villanova" and conducts much of its activities at Villanova athletic events.

Finally, Villanova University is a non-profit charitable institution. It is well-known by the public that institutions such as Villanova rely on charitable contributions as a matter of course. Persons who are exposed to the defendant's mark "Wildcat Club" in connection with charitable services and solicitations are certainly likely to believe that these services and solicitations are somehow affiliated with the University. In sum, there is abundant proof that "Wildcat" has come to represent Villanova University in the minds of the public, and that Defendant's use of "Wildcat Club" gives rise to a likelihood of confusion.

In addition, where the parties offer competing goods or services, the Court "need rarely look beyond the mark itself" to determine whether likelihood of confusion exists. *Ford Motor Co. v. Summit Motor Products, Inc.* 930 F.2d 277, 293 (3rd Cir.), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). That is the case here. While they are not commercial entities, the parties to this action are now in competition in that they offer similar services and engage in similar activities. Both Villanova University and Defendant use the designations "Villanova", "Villanova Alumni", "Wildcat" and "Villanova Wildcats" to indicate collective membership in a group of individuals with a common interest-the activities of Villanova University. Villanova University directs many of its services and events toward its 80,000-plus alumni, while Defendant's activities and solicitations are directed almost exclusively to the same alumni. Both parties engage in University-oriented fundraising activities. Villanova University solicits funds for the support of the University's athletes and athletic teams through its "Block V Club", as well as for the general student population and for general academic and other purposes through the University's Development Office. Until October 1999, Defendant solicited funds solely for the purpose of supporting Villanova University's athletes and athletic teams, and, despite

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 F.Supp.2d 293
123 F.Supp.2d 293, 58 U.S.P.Q.2d 1207, 149 Ed. Law Rep. 513
(Cite as: 123 F.Supp.2d 293)

Page 14

the change in Defendant's formal mission, it continues to conduct its activities around Villanova University athletic events. Thus, the plaintiff is able to establish the third and final element of its service mark infringement and unfair competition claims.

### (4) Defenses Raised

[11] [12] [13] The defendant has raised two related defenses to these claims: the equitable doctrine of estoppel, or alternatively, the equitable doctrine of laches. "The essence of an estoppel defense is that the defendant changed its position in reliance upon the misleading representation of the plaintiff." *Guardian Life Ins., supra,* 943 F.Supp. at 518, n. 5. "Estoppel is not a separate defense but is referred to as 'estoppel by laches' and 'estoppel by acquiescence.' " *Id. citing* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 30.01-30.03 (3d.ed.1996). Laches consists of two essential elements: (1) inexcusable delay in filing suit, and (2) prejudice resulting to defendant from such *307 delay. *University of Pittsburgh v. Champion Products, Inc.,* 686 F.2d 1040, 1044 (3d Cir.1982).* The merit of these defenses turns on whether or not the defendant used the marks at issue prior to October, 1999 pursuant to a licensing agreement, either express or implied, between the parties.

The defendant argues that there was never a license agreement between the parties, either express or implied, with respect to the use of the marks at issue. Therefore, the defendant contends, after twenty-eight years of uncontrolled use of the names "Villanova Educational Foundation" and "Wildcat Club", the plaintiff is barred from now seeking an injunction against use of the names. In other words, the defendant was entitled to rely on the University's acquiescence in the defendant's use of the marks. Based on my factual findings, I conclude that the conduct of the parties prior to 1992 gave rise to an implied license, which encompassed the defendant's use of the marks at issue in its name and materials. I also find that the 1992 and 1995 Affiliation Agreements ratified this license agreement, such that the plaintiff's request for an injunction is not presently barred by either estoppel or laches.

"[A]n implied license in fact 'arises out of the objective conduct of the parties, which a reasonable person would regard as indicating that an agreement has been reached.' " *Birthright v. Birthright, Inc.,* 827 F.Supp. 1114, 1134 (D.N.J.1993). Permission to use the trademarks coupled with the exercise of reasonable control over such use can lead to the conclusion that an implied license existed between the parties, even where no contract was made. *See United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134 (3rd Cir.1981) ( "the district court found as facts that state and local chapters affiliated with the United States Jaycees were permitted during the term of affiliation to use the National's trade and service marks. Thus some type of license agreement existed." *Id.* at n. 7 (citations omitted)).

The facts lead to the conclusion that the defendant was formed in 1972 with the permission of the University and authorized by the University to raise funds to support Villanova athletics under the corporate name "Villanova Educational Foundation" and under the trade name "Wildcat Club". The founding members of the Club deliberately sought approval from the University's president before organizing. Permission was obtained through the series of meetings held between the founding members, the President of the University, and the Vice-President of Development. The fact is that the defendant's names were clearly on the table throughout the meetings and discussions leading up to the University's approval of the Club. [FN18] The University had already achieved ownership of the marks "Wildcats" and "Villanova" by 1972. Permission to use the names was one component of the University's approval of formation of the club in 1972. Furthermore, the language of paragraph 1(h) found in the 1992 and 1995 agreements, signed by both parties, assumes that prior authorization with respect to the names was granted by the University. [FN19] Edward J. Rideout testified in his deposition that *308 once the Club was formed, they "pretty much assumed that the things that they were doing were approved by the University." Deposition Tr. p. 35

> FN18. The defendant's argument that the University never granted the Club permission to use the names is largely based on the factual argument that the names were not even on the table in 1972 and thus that they could not have been approved.

> FN19. Paragraph 1(h) states:
> [The VEF] shall not use the name of "Villanova" or the [Villanova University] trademark "Wildcat" or any other [Villanova University] trademark or service mark in any activities *not previously authorized* by [Villanova University] (such as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

merchandising, affinity credit cards, public relations or charitable solicitation initiatives not heretofore undertaken) without the prior written consent of [Villanova University]. [Villanova University's] consent to the use of its name, trade and service marks for [Villanova University] fundraising activities shall not be unreasonably withheld.
Exhibit 3 (emphasis added).

The University exercised a sufficient degree of control over the defendant's operations such that an implied license was created in 1972. <u>FN20</u> "[T]he proponent of a claim of insufficient control must meet a high burden of proof." *United States Jaycees,* 639 F.2d at 140. By continually identifying and enforcing guidelines for the defendant's operations, the University maintained the requisite level of control. Furthermore, the University's "display of a degree of tolerance" towards the defendant's failure to completely abide by all of the guidelines "did not constitute non-use and did not demonstrate an intent to abandon" the marks. *Id.* The University's control over the defendant did lapse between 1981 and 1987, during the period of tension over the decision to eliminate football. However, by this time an implied license had already been established and there is no evidence that the license was terminated by either party. Despite the falling out, the parties continued to operate in accordance with the principal terms of the license.

> FN20. "Licensing without reasonable control can work an abandonment." *Jaycees,* 639 F.2d at 140.

It is irrelevant whether the parties thought of the arrangement at the time in terms of an implied license. The test for whether or not an implied license existed is based solely on the objective conduct of the parties. *See Allen-Myland v. International Business Machines Corp.,* 746 F.Supp. 520, 549 (E.D.Pa.1990). *See also, Jaycees,* 639 F.2d at 140, n. 7. The evidence clearly supports a finding of an implied license between 1972 and 1992.

The 1992 and 1995 Affiliation Agreements ratified and made express the previously implied license agreement between the parties. In particular paragraph 1(h), found in both agreements, confirmed that the Club's use of the name and marks owned by the University, including the designations "Wildcat Club", "Villanova Educational Foundation", "Villanova", and "Villanova Wildcats", and the image of a wildcat, was solely with the authorization of the University. <u>FN21</u> Both Agreements also provided the specific guidelines under which the Club was to operate. From these provisions, it is clear that the University intended to maintain the level of control required in a licensing agreement over defendant's operations under the authorized names. There is no evidence from which to conclude that this intent was not carried out.

> FN21. Paragraph 1(h) states:
> [The VEF] shall not use the name of "Villanova" or the [Villanova University] trademark "Wildcat" or any other [Villanova University] trademark or service mark in any activities not previously authorized by [Villanova University] (such as merchandising, affinity credit cards, public relations or charitable solicitation initiatives not heretofore undertaken) without the prior written consent of [Villanova University]. [Villanova University's] consent to the use of its name, trade and service marks for [Villanova University] fundraising activities shall not be unreasonably withheld.
> Exhibit 3.

After the 1995 Affiliation Agreement expired in September 1996, the parties operated under an informal agreement to conduct their relationship in accordance with the terms of the 1995 Agreement. Throughout a three-year period of negotiations, in an effort to agree upon a new affiliation agreement, both parties continued to abide by the spirit and letter of the 1995 Agreement. Parties may orally agree to extend an agreement, even where the agreement provides that it may only be modified or extended in writing, when the parties conduct clearly shows the intent to waive the requirement of a writing. *See Somerset Community Hospital v. Allan B. Mitchell & Associates, Inc.,* 454 Pa.Super. 188, 685 A.2d 141, 146 (1996). <u>FN22</u> **\*309** Not only did the parties here verbally agree to extend their agreement, that intent was later confirmed in writing by defendant's counsel and president (Ex. 13, 14). Accordingly, the defendant's use of the designations at issue continued to be solely with the authorization of the University and pursuant to the 1995 Affiliation Agreement until the relationship between the parties was terminated on October 27, 1999.

> FN22. Although, the claims at issue in this injunction are federal claims, the validity of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contracts is typically governed by state law. *See Three Rivers Motors Co. v. The Ford Motor Co.*, 522 F.2d 885 (3rd Cir.1975). *See also, Kiwanis International v. Ridgewood Kiwanis Club et al.*, 806 F.2d 468, 472 n. 8 (3rd Cir.1986)("A trademark licensing agreement is a contract to be interpreted and enforced under state law.") Federal cases discussing oral modification of contracts consistently cite state law in support of their conclusions on this issue. *See, e.g., United States v. Klefstad Engineering Co., Inc.* 324 F.Supp. 972, 975 (W.D.Pa.1971)(citing the Pennsylvania Supreme Court for the principle that writings may be modified avidly despite contrary provisions in an action filed under the Miller Act, 40 U.S.C. § 270a.).

In light of this history of a licensing agreement between the parties from 1972 to 1999, the University is not barred from relief under the doctrines of laches or estoppel. A passage of six months time, while the parties attempted repeatedly to reach agreement without resort to fractious litigation, is not the sort of delay that strips the University of its rights. *See Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157 (3d Cir.2000). Moreover, while a six-month delay may bar a claim for an accounting for past infringement, it is not a bar to the prospective injunctive relief sought by the University. *See, e.g., Champion*, 686 F.2d at 1044-1045 (only extreme delay that would constitute abandonment is sufficient to bar all injunctive relief). To hold otherwise would chill reasonable efforts by trademark owners to settle claims of infringement.

The defendant's continued use of the marks "Wildcat", "Wildcat Club", "Villanova Alumni Educational Foundation", "Villanova Alumni", "Villanova", and "Villanova Wildcats", as well as the image of the wildcat, after October 27, 1999 when the plaintiff explicitly withdrew authorization has been without the authorization of the University. The defendant at no time acquired rights of its own in the University's marks at issue. "To say that the licensee has acquired rights that survive the legal termination of that license, destroys the entire concept of a license.... No rights are established by such use." *United States Jaycees*, 639 F.2d at 143.

[14] The unauthorized use of a mark by a former licensee presents a particular danger of confusion to the public. It has been described as "a fraud on the public, since they are led to think that the ex-licensee is still connected with the licensor."   4 McCarthy, Sec. 25:31.  The fact that this case involves a former licensee of Villanova University, accordingly, strengthens the University's claim that there is a likelihood of confusion.     From its inception, Defendant's use of the name and marks "Villanova Educational Foundation" and "Wildcat Club" was pursuant to a license to use such marks.  The license has been terminated.  As long as Defendant uses the designations "Wildcat" and "Villanova", it is inevitable that there will be confusion among individuals who mistakenly believe, for example, that a contribution to the "Wildcat Club" is a contribution to Villanova University.    [FN23]    *See* **\*310***United States Jaycees*, 639 F.2d at 143 ("Once a license has expired, use of the formerly licensed mark constitutes infringement.").

> FN23. The defendant incorrectly contends that the use of a disclaimer in its promotional materials is sufficient to avoid confusion.  The defendant relies on *A & H Sportswear*, arguing, again, that the relatedness of "Wildcats" to "Wildcat Club" is analogous to the relatedness of "Miraclesuit" to "Miracle Bra". In *A & H Sportswear*, the court held that the defendant could continue to use the marks accompanied by a disclaimer, because the disclaimer makes the two marks distinct. *See* 57 F.Supp.2d at 175.  As discussed supra, n. 17, I reject the analogy to the marks in *A & H Sportswear* because of the distinctiveness of the mark "Wildcat". Furthermore, in light of the history of affiliation, the highly similar nature of the marks used by both parties, the services provided, the marketing means, and the targeted audience, the disclaimer is not sufficient to avoid confusion. In *Jaycees*, faced with similar facts of infringement by a prior licensee, the Third Circuit held that "the avoidance of confusion to the infringer's interests cannot support an order permitting the continued use of the trademark even if it is ... accompanied by a disclaimer of affiliation with the trademark owner." 639 F.2d at 142.

Based on these conclusions, I find that the plaintiff has demonstrated a likelihood of success in establishing that the defendant has infringed on the University's registered service marks in violation of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 32 of the Lanham Act, and that the defendant has engaged in unfair competition with the University under Section 43(a) of this Act. [FN24] Plaintiff is able to establish all three elements of these claims-(1) validity and protectability; (2) ownership; and (3) a likelihood of confusion-and the defendant has no meritorious defenses to these claims.

> FN24. The conduct that constitutes infringement compels a finding that the defendant has also engaged in unfair competition with the University under Section 43(a). *See Nugget Distributors Co-op. v. Mr. Nugget, Inc.,* 776 F.Supp. 1012, 1024 (E.D.Pa.1991) ("[s]ince trademark infringement is a narrower concept, any finding that it has occurred will, by necessity, support an additional finding that the defendant is also guilty of unfair competition"). *See also Birthright,* 827 F.Supp. at 1136-37.

### B. Irreparable Harm to the Plaintiff as a Result of Defendant's Conduct

[15] [16] Irreparable injury follows a showing of likelihood of confusion "as a matter of course." *Opticians Association,* 920 F.2d at 195; *F. Schumacher & Co.,* 810 F.Supp. at 636. The Third Circuit has stated that "once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury." *Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.,* 143 F.3d 800, 804 (1998) (citations omitted). The irreparable harm to Villanova University includes the loss of control of its reputation and loss of good will engendered by actual or likely confusion. *See* 2 McCarthy, at Sec. 30:18. Plaintiff's "mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use." *Ambassador East, Inc. v. Orsatti, Inc.,* 257 F.2d 79, 82 (3d Cir.1958), *quoted in Opticians Association,* 920 F.2d at 195 (citations omitted). *See also Hasbro Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988) (showing of likelihood of confusion "establishes both a likelihood of success on the merits and irreparable harm"); *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1220 (9th Cir.1987) ("Once the plaintiff in an infringement action has established a likelihood of

confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief does not issue").

Thus it does not suffice to argue that the defendant in this case is not using the marks "in an unwholesome or disparaging manner," but for "charitable purposes which benefit the students of [the University]." *Defendants Conclusions of Law* nos. 98-99. The potential loss of control, and hence, the risk of harm, is particularly acute where, as here, Defendant was a former licensee of plaintiff. *See Church of Scientology,* 794 F.2d at 43-44; *Grand Lodge v. Eureka Lodge No. 5,* 114 F.2d 46, 48 (4th Cir.), *cert. denied,* 311 U.S. 709, 61 S.Ct. 319, 85 L.Ed. 461 (1940)(to allow former Elk lodge that had seceded from national organization to continue to use the name would "subject plaintiff in the public mind to responsibility for the action of a *311 group over which it has no further control"). [FN25]

> FN25. In addition, the Club admits that it is free to channel the funds raised using Villanova's marks towards schools other than Villanova University.

### C. Harm to the Defendant if an Injunction is Issued

[17] This factor requires the balancing of the relative hardships to the parties. The purpose of balancing the relative hardships "is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the mark's owner." *Opticians Association,* 920 F.2d at 197. The defendant argues that taking away its name would seriously prejudice and hamper the Club's charitable mission. "Protection of infringers," however, "is not a purpose of the Lanham Act." *United States Jaycees,* 639 F.2d at 142. While Defendant may suffer some inconvenience from issuance of an injunction, that would not be greater than the hardship suffered by the University through the continued loss of control over its name, marks and goodwill.

One who uses another's marks without permission "can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself." *Opticians Association,* 920 F.2d at 197 (citations omitted). "[T]he avoidance of confusion to the infringer's interests cannot support an order permitting the continued use of a trademark even if it is ... accompanied by a disclaimer of affiliation with the trademark owner." *United States*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 F.Supp.2d 293                                                                                                      Page 18
123 F.Supp.2d 293, 58 U.S.P.Q.2d 1207, 149 Ed. Law Rep. 513
(Cite as: 123 F.Supp.2d 293)

*Jaycees,* 639 F.2d at 142.   Defendant is responsible for its own plight by continuing to use the University's marks despite the termination of the license that allowed such use.   See *Pappan,* 143 F.3d at 805.   Where both parties may suffer harm, but that harm was a result of defendant's own conduct, it follows that issuance of an injunction would not impose a greater hardship on defendant than denial would impose on plaintiff.   *Opticians Association,* 920 F.2d at 197.

Villanova University is entitled to relief regardless of the asserted noble nature of defendant's charitable mission.   Even if a party conducts itself in a proper manner, it is not entitled to use the marks of another. *Kraft General Foods, Inc. v. BC-USA, Inc.,* 840 F.Supp. 344, 351 (E.D.Pa.1993).   This Court's Order will not prevent the members of Defendant from associating with one another or continuing with their current charitable mission or any other mission they might choose.   Nor would entry of an injunction work a hardship on Defendant due to its allegedly sudden nature.   Defendant has been aware since October 1999 that its affiliation with Villanova University had terminated.   Defendant has kept its members apprized of the progress of the dispute between the parties. (Tr., Capone 98-99).   The Club and its members should therefore be fully aware of and prepared for the possibility of an injunction.

### D. Public Interest

In a service mark case, public interest " 'is most often a synonym for the right of the public not to be deceived or confused.' " *Opticians Association,* 920 F.2d at 197-98, *quoting* 2 McCarthy, Sec. 30:21.   *See also SK&F Co. v. Premo Pharmaceutical Laboratories,* 625 F.2d 1055, 1057 (3d Cir.1980) ("preventing deception of the public is itself in the public's interest").   Having established not only that there is a likelihood of confusion between Villanova University's name and service marks and those used by Defendant, but that there has been actual confusion, it necessarily follows that the public interest would be damaged were such use permitted to continue.   The requested injunction clearly is in the public interest.

### III. Conclusion

For all of the foregoing reasons, I find that Villanova University has demonstrated**\*312**   a likelihood of success on the merits of its claim of service mark

infringement and unfair competition.   I also find that the University has demonstrated irreparable harm as a result of Defendant's actions, and has proven that both the balance of hardship and public interest weigh in favor of issuance of an injunction. Accordingly, Villanova University's motion for Preliminary Injunction shall be granted.

### ORDER

**AND NOW**, this day of November, 2000, the Motion for Preliminary Injunction of Villanova University in the State of Pennsylvania is **GRANTED.**   Pending final adjudication on the merits, Defendant Villanova Alumni Educational Foundation, Inc., is enjoined from making any use of the designations "VILLANOVA", "VILLANOVA UNIVERSITY", "WILDCAT", "WILDCATS", "WILDCAT CLUB", "VILLANOVA ALUMNI", "VILLANOVA ALUMNI EDUCATIONAL FOUNDATION", "VILLANOVA WILDCATS", or the image or depiction of a wildcat.

E.D.Pa.,2000.
Villanova   University   v.   Villanova   Alumni Educational Foundation, Inc.
123 F.Supp.2d 293, 58 U.S.P.Q.2d 1207, 149 Ed. Law Rep. 513

Briefs and Other Related Documents (Back to top)

• 2:00CV03007 (Docket) (Jun. 13, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.