A

# EXHIBIT A



## The Commonwealth of Massachusetts
## William Francis Galvin

No Fee

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

Statement of Change of Registered Office Address by Registered Agent

I, **RICHARD J. BOWEN , Registered Agent**

of HONEY DEW ASSOCIATES, INC. *(exact name of business entity)*

**Current registred office address:   35 BRAINTREE HILL OFFICE PARK  BRAINTREE , MA 02184**

**New registred office address:**
No. and Street:        2 TAUNTON STREET
City or Town:          PLAINVILLE              State: MA     Zip: 02762     Country: USA

**The registered agent's address is the same as the corporation's registered office address as required by General Laws, Chapter 156D.**

**SIGNED, this 15 Day of February, 2005,**
**RICHARD J. BOWEN , Signature of Registered Agent.**

© 2001 - 2005 Commonwealth of Massachusetts
All Rights Reserved

**B**

EXHIBIT B

```
 1    UNITED STATES DISTRICT COURT
 1    DISTRICT OF MASSACHUSETTS
 3              Docket No. 04-10702-RWZ
 4    ..............................
 3    BOWEN INVESTMENT, INC.
      and HONEY DEW ASSOCIATES, INC,
 6                   PLAINTIFF
 7    VS.
 3    C-NINE SEVEN, INC.
      VINCENZO CIUMMO AND SHARON CIUMMO,
 9                   Defendant
10    ..............................
11
12
13            DEPOSITION OF ROBERT P. BOWEN,
14    taken pursuant to Massachusetts Rules of Civil
15    Procedure, before Barbara A. Hoey, a Notary Public in
16    and for the Commonwealth of Massachusetts, at the Law
17    Offices of Lawrence Mehl, 21 Merchants Row, Boston,
18    Massachusetts on August 17, 2005 commencing at
19    10:00 a.m.
20
21
22
23            LIPMAN COURT REPORTING
                 191 Tremont Street
24               Boston, MA 02108
                   617-227-3985
25
```

```
 1    APPEARANCES:
 2    ATTORNEY JACK J. MIKELS
      One Batterymarch Park
 3    Quincy, MA 02169
 4    On Behalf of the Plaintiff
 5    ATTORNEY LAWRENCE MEHL
      21 Merchants Row
 6    Boston, MA
 7    On Behalf of the Defendant
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                I N D E X
 2
 3    Witness              Page
 4
 5    ROBERT P. BOWEN
 6
 7    Examination by Attorney Mehl:    4
 8
 9
10
11
12
13
14
15            E X H I B I T S
16
17    No.       Description
18
19    1         Notice of Deposition
20    2         Affidavit
21    3         Complaint
22    4         Franchise Agreement
23    5         Interrogatories
24    6         Reinstatement Agreement
25
```

```
 1             S T I P U L A T I O N S
 2
 3            It is hereby stipulated and agreed by
 4    and between counsel for the respective parties that the
 5    deposition transcript will be read and signed by the
 6    deponent under the pains and penalties of perjury.
 7            Counsel have further stipulated and
 8    agreed that all objections, except as to form, and
 9    motions to strike are reserved until the time of trial.
10            ROBERT P. BOWEN, a witness called by
11    the Defendant, having first been duly sworn,
12    deposes and says as follows in answer to
13    EXAMINATION BY ATTORNEY MEHL:
14        Q. Mr. Bowen, please state your full name, sir,
15    and spell your last name?
16        A. My name is Robert P. Bowen, B O W E N.
17        Q. Since we all know that you've been deposed in
18    the past I won't bore you with the process.   Do you
19    have any questions, sir?
20        A. None at the moment.
21            ATTORNEY MIKELS: I have none on cross.  Are
22    we done?
23        Q. No.  Your address is, sir?
24        A. 331 Doyle Avenue, Providence, Rhode Island.
25        Q. Your employment history, sir, please explain?
```

Condensolt!

1   A. Sorry.
2   Q. Have you always been involved with the Honey
3 Dew Donut business one way or the other?
4       ATTORNEY MIKELS: Objection.
5   A. No.
6   Q. What other areas of employment have you had?
7       ATTORNEY MIKELS: Objection. Is there a time
8 frame?
9   Q. Since 1975?
10   A. In 1975 I have owned a coffee shop called Old
11 Fashion Donuts in Attleboro, Massachusetts.
12   Q. Then after that time up to date would you
13 please trace your employment history for us?
14   A. I continued to be with Old Fashion Donuts up
15 until approximately 1987. At that time I changed my
16 donut shop that was in Franklin, Mass to a Honey Dew
17 Donut franchise.
18   Q. Then after that time?
19   A. Continued to be a Honey Dew Donut franchisee,
20 and approximately in 1986 I was granted the right to be
21 a subfranchisor for Honey Dew Donuts in the State of
22 Rhode Island which I am presently doing now.
23   Q. Who is the one that granted you that right?
24   A. Honey Dew Associates.
25   Q. As far as you know that is owned by?

1   A. Richard Bowen.
2   Q. Was that right granted in writing, sir?
3   A. Yes.
4   Q. Is it still -- is that same agreement still
5 in existence?
6   A. Yes, I believe so.
7   Q. Has it been changed since then, since 1986?
8   A. Sorry. I don't understand the question.
9   Q. On the subfranchise you said that was granted
10 to you in '86. Has that agreement ever been changed?
11   A. The original agreement?
12   Q. Yes, sir.
13   A. I don't know.
14   Q. I don't know or the answer is no?
15   A. I don't know. I don't know.
16   Q. But you would be the guy that would know --
17       ATTORNEY MIKELS: Objection.
18   Q. -- if anybody did or not?
19   A. I don't know.
20       (Deposition notice marked as Exhibit One.)
21   Q. We have here Exhibit One. Would you please,
22 sir, read that and then I will ask you a couple of
23 questions about it? Sir, have you ever seen that
24 document before?
25   A. Yes.

1   Q. Prior to today, when was that?
2   A. I believe it was yesterday afternoon.
3   Q. Where did you see it?
4   A. In my attorney's office.
5   Q. Mr. Mikels?
6   A. Yes.
7   Q. That was the first time you have seen this
8 document?
9   A. I believe so.
10   Q. How long was that meeting?
11   A. Approximately two hours.
12   Q. So you understand on behalf of Bowen
13 Investment, Inc you are the designated witness? You
14 understand that, sir?
15   A. Yes.
16   Q. For all of the items on Exhibit A to the
17 deposition notice?
18   A. Yes.
19   Q. Did you review any documents yesterday in
20 connection with this deposition notice?
21   A. Yes.
22   Q. Those documents were what, sir?
23   A. The documents right in front of me, list
24 Exhibit A.
25   Q. You reviewed all of the documents in

1 connection with those?
2   A. No, I read the items on Exhibit A.
3   Q. Yesterday?
4   A. And various other documents would be
5 inspection sheets in connection with C-Nine Seven
6 former franchisee.
7   Q. You read the inspection reports and anything
8 else?
9   A. I can't recall anything else.
10   Q. Do you own all of the stock of Bowen
11 Investment, Inc?
12   A. No.
13   Q. You don't?
14   A. No.
15   Q. Who are the other stockholders?
16   A. The other stockholder is my brother Richard
17 Bowen.
18   Q. Is that a 50/50 equal ownership?
19   A. Yes.
20   Q. Has it always been?
21   A. Yes.
22       (Affidavit marked as Exhibit Two.)
23   Q. Sir, if you will please review that. On page
24 three is that your signature?
25   A. Yes.

1  Q. Turn back to page one, paragraph one. Does
2  it state there that you are the sole shareholder of
3  Bowen Investment, Inc? Does that say that, sir?
4  A. It does.
5  Q. Is that wrong?
6  A. I believe so.
7  Q. I think it is a yes or no question, sir?
8  A. I believe it is wrong.
9  Q. Did you draft this affidavit, sir?
10 A. With help of my counsel.
11 Q. Is that Mr. Mikels?
12 A. Yes.
13 Q. Did you read it before you signed it?
14 A. I did.
15 Q. Do you remember when that was?
16 A. Exactly, no.
17 Q. It is dated April 2, 2004. Is that
18 accurate, sir, on the third page?
19 A. To the best of my knowledge.
20 Q. Is that what it says, sir, that it was signed
21 by you on April 2, 2004?
22 A. Yes.
23 Q. Is the 2nd, was that your own writing?
24 A. To the best of my knowledge.
25 Q. So this is in error, right, in paragraph one?

1  A. Yes.
2  Q. You are not the sole shareholder? You have
3  never owned in Bowen Investment, Inc more than 50
4  percent of the stock, is that accurate, sir?
5  A. I believe it is, yes.
6  Q. What is Bowen Investment, Incorporated's
7  address, sir?
8  A. 1215 Reservoir Ave, Cranston, Rhode Island.
9  Q. Do you know who the corporate officers are?
10 A. Yes.
11 Q. Would you tell me please?
12 A. I'm the president, Robert Bowen, also the
13 treasurer. And I believe that's it.
14 Q. Do you know who's the corporate secretary?
15 A. I know my daughter Katie was at one time. I
16 thought she was at one time. I'm not sure if she still
17 is.
18 Q. If I told you that it was Mr. Mikels, would
19 that be right?
20     ATTORNEY MIKELS: Objection.
21 A. As I just stated I wasn't sure.
22 Q. I'm going to show you a document I pulled off
23 of the Secretary of State's web site and ask you if
24 that is current? Is that current, sir?
25 A. Yes.

1  Q. You told us earlier your daughter's name is
2  Kate or Katie, right?
3  A. Her legal name is Kate Bowen Jones.
4  Q. She is on the board according to this report,
5  is that accurate?
6  A. Yes.
7  Q. Does she own any of BII?
8  A. No.
9  Q. Do you recall when she went on the board?
10 A. Is that approximately?
11 Q. That's fine approximately.
12 A. Ten years ago.
13 Q. Do you know the reason?
14 A. No, I don't recall.
15 Q. You told us that BII's offices were in Rhode
16 Island. Is that accurate, sir?
17 A. Currently, yes.
18 Q. Were they always?
19 A. No.
20 Q. When did they move?
21 A. Approximately a year ago.
22 Q. Would be August, 2004?
23 A. Approximately.
24 Q. What was their old address?
25 A. Two Taunton Street, Plainville,

1  Massachusetts.
2  Q. Why did they move?
3     ATTORNEY MIKELS: Objection. What's the
4  relevance to the lawsuit?
5  Q. Would you answer the question please, sir?
6  A. To be more convenient to the franchisees and
7  the franchise in Rhode Island.
8  Q. Was your brother Dick Bowen ever on the board
9  of BII?
10 A. No.
11 Q. Let's go back if we may, sir, Exhibit Two
12 which is your affidavit. In paragraph one it says --
13 are you coaching the witness? You want me to wait?
14     ATTORNEY MIKELS: We're looking at documents.
15 Q. It reads on the third line in relevant part
16 -- well, I'll paraphrase it. It says that BII has
17 had an agreement with HDA to act as a subsidiary of
18 HDA. Would you explain that please, sir?
19 A. My understanding is Bowen Investment, Inc is
20 a subfranchisor of Honey Dew Associates in Rhode
21 Island.
22 Q. That's under the term of that written
23 agreement which you mentioned earlier, is that
24 accurate?
25 A. Sorry. I don't understand the question.

1  Q. Bowen Investment, Inc you said acts as HDA's
2  subfranchisee just for Rhode Island. But this says it
3  acts as a subsidiary. I'm asking you to tell me what
4  that means?
5     A. Again my understanding is that Bowen
6  Investment, Inc is a subfranchisor of Honey Dew
7  Associates. That is my understanding.
8     Q. But it also says it is to act as a subsidiary
9  of HDA. Would you explain that please?
10    A. I don't understand.
11    Q. All I am asking you, sir, is what you wrote
12 in your affidavit. Please explain it to me?
13       ATTORNEY MIKELS: Objection.
14    A. Again my understanding of this is that Bowen
15 Investment, Inc is a subfranchisor of Honey Dew
16 Associates in Rhode Island.
17    Q. I understand that, and that is exclusively
18 under the terms of the written agreement, is that
19 correct?
20    A. Sorry. Would you repeat that please?
21    Q. BII acts as HDA's subfranchisor exclusively
22 under the terms of a certain written contract, is that
23 accurate?
24    A. Yes.
25    Q. But it also says here to act as a subsidiary

1  of HDA. I don't understand that. Can you explain
2  that please?
3        ATTORNEY MIKELS: Objection.
4     A. Again my understanding we're the
5  subfranchisor for Honey Dew Donuts in the State of
6  Rhode Island.
7     Q. I understand that, sir. You are the one,
8  sir, that signed this affidavit. You are the one that
9  obviously read it. Then you signed it. I just want
10 to know what that means?
11    A. Again my understanding is that Bowen
12 Investment, Inc has been granted the right to be the
13 subfranchisor of Honey Dew Donuts in Rhode Island.
14       ATTORNEY MIKELS: Is that your understanding
15 what paragraph one means?
16    A. Yes.
17    Q. Thank you, Jack. When a company is owned by
18 you and your brother which you had told me you two
19 owned all of the stock how can that company be a HDA
20 subsidiary?
21       ATTORNEY MIKELS: Objection.
22    A. I don't know.
23    Q. Turn back to Exhibit One please, Exhibit A to
24 Exhibit One. Last page, item number one talks about
25 -- item number one on Exhibit A refers to the Honey

1  Dew system. Would you explain to me, sir, exactly
2  what that is?
3     A. My understanding is that the Honey Dew system
4  is made up of design, colors, the logo and that type of
5  thing, showcases, uniforms and things that make Honey
6  Dew Donut Shop look like a Honey Dew Donut Shop.
7     Q. So are you telling me that each of those
8  items which you just mentioned is exclusive to the
9  Honey Dew stores?
10       ATTORNEY MIKELS: Objection.
11    A. Yes.
12    Q. Is there anything else you can tell me about
13 the system, Honey Dew system?
14       ATTORNEY MIKELS: Objection.
15    A. No.
16    Q. To explain it?
17       ATTORNEY MIKELS: Objection.
18    A. Sorry. What was the question?
19    Q. In the Verified Complaint there is a
20 reference to the Honey Dew system, and I'm just asking
21 you if you will, sir, tell me what that means? You are
22 the designated witness.
23       ATTORNEY MIKELS: You want to show him what
24 you're referring to?
25    Q. In just a minute I will. I want to know what

1  he knows first. We all know what he wrote.
2     A. Sorry. I still don't understand the
3  question.
4     Q. Explain the term the Honey Dew system?
5        ATTORNEY MIKELS: Objection.
6     A. Again we talked about showcases, uniforms,
7  signage, proprietary product like coffee, manuals,
8  operation manuals. That's all I can recall at this
9  time.
10    Q. Fair enough. During the calendar year 2003
11 were there any Honey Dew stores comparable to the one
12 that's involved in this lawsuit?
13       ATTORNEY MIKELS: Objection. How do you
14 define comparable?
15       ATTORNEY MEHL: I can ask you that question.
16       ATTORNEY MIKELS: I'm not here to answer
17 questions. The question is too vague. Comparable in
18 sales? Comparable in size? Comparable in quality?
19 What are you trying to ask?
20       ATTORNEY MEHL: I will get to that.
21       ATTORNEY MIKELS: Okay. When you do he'll
22 answer it.
23    Q. Sir, are you not going to answer the question
24 now? In your mind were there any stores comparable to
25 the store operated by C-Nine Seven in 2003?

1  A. I don't understand the question.
2  Q. I'm going to show you a copy of the Verified
3  Complaint without exhibits.
4      (Verified Complaint marked as Exhibit Three.)
5  Q. We've marked as Exhibit Three a copy of the
6  Verified Complaint. Would you read that over please,
7  sir. Tell me if you've ever seen that before? With
8  regard to Exhibit Three when was the first time that
9  you saw this document?
10  A. I don't recall.
11  Q. Turn to the very next to the last page. Is
12  that your signature?
13  A. Yes.
14  Q. So you signed the verification. You don't
15  know -- sorry, do you know the date that was signed by
16  you?
17  A. I don't recall.
18  Q. Did you read all of this document prior to
19  your signing the verification?
20  A. Yes.
21  Q. Did you understand everything in this
22  Verified Complaint at the time it was signed by you?
23      ATTORNEY MIKELS: Objection.
24  A. Yes.
25  Q. Let's turn to page three, Paragraph 10. You

1  see that?
2  A. Yes.
3  Q. It reads -- if you will, sir, please read the
4  -- is Paragraph 10 accurate?
5  A. I believe so.
6  Q. Sir, would you tell me please what BII
7  actually did with regard to the allegation in Paragraph
8  10?
9  A. I worked with the franchisee Mike Dutra in
10  assisting him every step of the way with construction
11  and purchasing the equipment and supervising the job.
12  Q. Did BII pay for any of that?
13  A. No.
14  Q. So the way Paragraph 10 is drafted is that
15  false?
16      ATTORNEY MIKELS: Objection.
17  A. Again I supervised with the franschisee in
18  preparing the Honey Dew Donut Shop in Central Falls and
19  assisting him with the purchase and the construction
20  and the finish work.
21  Q. But it states here you or BII purchased and
22  installed all of these items.
23      ATTORNEY MIKELS: No. I've got to object to
24  that. That's not what it says.
25  Q. It says BII prepared the premises including

1  the purchase and installation, that's what it says,
2  right?
3      ATTORNEY MIKELS: Yeah, the purchase and
4  installation of equipment. It does not say he
5  purchased the equipment.
6  Q. So BII did not pay for any of that, is that
7  accurate?
8      ATTORNEY MIKELS: Objection.
9  A. Yes.
10  Q. What exactly did BII do?
11      ATTORNEY MIKELS: Objection.
12  A. Again I worked with the franschisee.
13  Q. You personally?
14  A. I personally.
15  Q. How many hours or how many days, how many
16  weeks did you personally get involved?
17  A. I don't recall.
18  Q. Was it more than ten days worth of your time?
19  A. I don't recall.
20  Q. Was it more than just -- it was more than
21  you do with other new stores?
22  A. I'm not sure I understand the question.
23  Q. The effort and time that you personally
24  devoted to this store, is it comparable to the time and
25  effort that you put in with other stores?

1      ATTORNEY MIKELS: Objection.
2  A. I don't recall.
3  Q. Well, do you know?
4  A. Sorry. I don't understand the question.
5  Q. In Paragraph 10 you individually said -- I'm
6  sorry. You said that you were the individual who did
7  the things mentioned in here. What I'm asking you is
8  do you do this for all of your stores?
9      ATTORNEY MIKELS: Objection.
10  A. Sorry. I still don't understand the question.
11  Q. You told us earlier you were the guy on
12  behalf of BII who assisted Mr. Dutra in all of these
13  items here. Is that accurate, sir?
14      ATTORNEY MIKELS: Objection.
15  A. Yes.
16  Q. Do you do that for the other new stores?
17      ATTORNEY MIKELS: Objection.
18  Q. You assist all franchisees?
19  A. As much as I can.
20  Q. But the time and effort that you devoted to
21  this store is it about the same as you do to other new
22  stores?
23      ATTORNEY MIKELS: Objection.
24  A. I don't recall.
25  Q. Well, when there is a new store being built

1  approximately how many hours do you individually put
2  in?
3        ATTORNEY MIKELS: I'm going to object to
4  that. I don't know in what year this particular store
5  was built.
6     Q. It says 1998.
7        ATTORNEY MIKELS: But asking him now seven
8  years later how much he spent on a new store has no
9  relevance to anything that has to do with this
10 lawsuit.
11       ATTORNEY MEHL: Jack, Paragraph 10 is
12 extremely vague here. You know I want to know what
13 the facts are. You know you made the allegation -- I
14 don't think it's right.
15       ATTORNEY MIKELS: Ask him what he did with
16 this store.
17       ATTORNEY MEHL: I already asked him.
18       ATTORNEY MIKELS: I don't agree with that.
19    Q. What did you do for that store?
20       ATTORNEY MIKELS: That you've asked him twice.
21 If you have specific questions ask him specific
22 questions.
23    Q. Did you do anymore for that store than you
24 did that year for any other stores?
25       ATTORNEY MIKELS: Objection.

1     A. I don't recall.
2     Q. What did you do for this store?
3     A. I assisted the franchisee, Mike Dutra in the
4  planning of the store, the construction, the plans,
5  signage.
6     Q. Was there anyone else that did that or just
7  you?
8     A. I assisted Mr. Dutra.
9     Q. Right, and was there anybody else from Bowen
10 Investment that also helped Mr. Dutra?
11    A. Not that I recall.
12    Q. Was there anyone from HDA that helped Mr.
13 Dutra?
14    A. I don't recall.
15    Q. Am I to understand then the store was built
16 in accordance with all of HDA and BII specs?
17    A. Again, Bowen Investment, Inc assisted Mr.
18 Dutra in the planning and construction of the store.
19    Q. But was it in accordance with BII and HDA
20 specs?
21    A. I believe it was.
22    Q. So the store's construction would be like any
23 other new franchisee store being built in accordance
24 with HDA and BII's specs down in Rhode Island?
25       ATTORNEY MIKELS: Objection.

1     A. Sorry. Would you repeat the question?
2     Q. Since you testified that this store was built
3  in accordance with HDA and BII specs that would be
4  applicable to any other store being built?
5        ATTORNEY MIKELS: Objection.
6     A. Sorry. I don't understand.
7     Q. Before BII and HDA allow any new store to
8  open does that store have to be in accordance with HDA
9  and BII specs?
10    A. Yes.
11    Q. So this store along with all other stores
12 would have been built in accordance with HDA and BII
13 specs, is that accurate?
14       ATTORNEY MIKELS: Objection.
15    A. Yes.
16    Q. So the time and effort that you put in for
17 this store would be comparable to the other new stores
18 being built?
19       ATTORNEY MIKELS: Objection.
20    A. I don't recall.
21    Q. Why would you do more work for this store
22 than any other store being built?
23       ATTORNEY MIKELS: Is this a hypothetical?
24       ATTORNEY MEHL: No.
25       ATTORNEY MIKELS: Objection.

1     Q. I want to know the background here. I'm not
2  getting it.
3     A. Sorry. I don't understand the question.
4     Q. Would there be any reason why you would put
5  in more time and effort for this store than any other
6  new store?
7     A. All stores are different, different size,
8  different shapes. Sometimes there is zoning problems. I
9  don't recall the particular circumstances with this
10 particular store.
11    Q. But does BII take care of any of the new
12 stores problems?
13       ATTORNEY MIKELS: Objection.
14    Q. Such as zoning problems that you just
15 mentioned or is that the obligation of the
16 franschisee?
17       ATTORNEY MIKELS: Objection.
18    A. We try to assist the franchisee with whatever
19 they need.
20    Q. Have you ever assisted with any zoning
21 problems?
22       ATTORNEY MIKELS: Objection.
23    A. I don't recall.
24    Q. When did this store first open?
25    A. I don't recall.

```
 1    Q. Would it be 1998?
 2    A. I don't recall.
 3    Q. What was the purpose of the 1998 efforts?
 4        ATTORNEY MIKELS: Objection.
 5    A. Sorry. I don't understand the question.
 6    Q. Paragraph 10 states that all of these efforts
 7  that you did took place in the year 1998. Why would
 8  those efforts have been done then?
 9    A. To build a Honey Dew Donut Shop.
10    Q. So did the store open that year or the next
11  year?
12    A. I don't recall.
13    Q. Would it be possible the store opened at any
14  time earlier than 1998?
15    A. I don't recall.
16    Q. I'm not asking you that. Would it be
17  possible that the store might have opened prior to 1998
18  as a Honey Dew Donut Store, yes or no?
19    A. I don't know.
20    Q. You testified earlier that at this time you
21  assisted Mr. Dutra as a franschisee.
22        ATTORNEY MIKELS: Is that a question?
23    Q. Yes. Is that correct?
24    A. Yes.
25    Q. Mr. Dutra was the first franschisee at this
```

```
 1  store?
 2    A. I believe so.
 3    Q. Did Mr. Dutra own the property?
 4    A. I believe he did.
 5    Q. Do you know Mr. Dutra?
 6    A. I do.
 7    Q. Are you social friends?
 8    A. I am.
 9        ATTORNEY MIKELS: Objection.
10    Q. Do you have any business relationship with
11  Mr. Dutra?
12        ATTORNEY MIKELS: Objection.
13    A. I'm not sure I understand the question.
14    Q. Do you individually have any business
15  relationship with Mr. Dutra at all?
16        ATTORNEY MIKELS: Objection.
17    A. Right now?
18    Q. Yes, sir.
19    A. I don't believe so.
20    Q. Did you ever have any?
21    A. Yes.
22    Q. Those were what, sir?
23    A. He was a franschisee.
24    Q. Of Bowen or HDA?
25    A. Bowen Investment.
```

```
 1    Q. For the store?
 2    A. For this store.
 3    Q. Any other stores?
 4    A. Also the one in Pawtucket.
 5    Q. When was the first time that you met Mr.
 6  Ciummo?
 7    A. Approximately?
 8    Q. Yes, sir.
 9    A. 1991, '92, something along those lines.
10    Q. What were the circumstances?
11    A. It was my understanding that he was a night
12  manager for one of my franchisees.
13    Q. That franchisee's name was what?
14    A. Tom DeStephano.
15    Q. Is he related to Mr. DeStephano?
16    A. I don't know.
17    Q. Then when did you meet Sharon Ciummo?
18    A. I never met Sharon Ciummo.
19    Q. When did you have any discussions about Mr.
20  Ciummo becoming a BII franchisee?
21    A. Sorry. I don't understand the question.
22    Q. Let's back up. You met him approximately in
23  '91 or '92. When did you see him after that?
24        ATTORNEY MIKELS: Objection.
25    A. I'm not sure I understand.
```

```
 1    Q. Did you have any ongoing discussion with Mr.
 2  Ciummo after '92?
 3    A. I don't recall.
 4    Q. Did he and you ever talk about him becoming a
 5  BII franchisee?
 6    A. Yes.
 7    Q. That was when, sir?
 8    A. I don't recall.
 9    Q. Where did those discussions take place?
10    A. At the Honey Dew Donut Shop in Central Falls.
11    Q. The franschisee was Mr. DeStephano, is that
12  correct?
13        ATTORNEY MIKELS: Objection.
14    A. No, the franschisee was Mr. Dutra.
15    Q. What was Mr. Ciummo doing there?
16        ATTORNEY MIKELS: Objection.
17    A. From what he told me he was observing.
18    Q. Observing what?
19    A. Honey Dew Donut Shop in Central Falls.
20    Q. What was the reason you were there?
21    A. I believe he asked me to meet him there.
22    Q. Mr. Ciummo or Mr. Dutra?
23    A. Both.
24    Q. They both asked you?
25    A. I believe so.
```

Condenselt!

1    Q. What was the reason?
2    A. To discuss Mr. Ciummo becoming the
3 franchisee at the Central Falls location.
4    Q. You don't know approximately when that was?
5    A. I don't recall.
6    Q. Would you summarize those discussions for me
7 please?
8      ATTORNEY MIKELS: Objection.
9    A. Sorry. I don't understand.
10    Q. You said that you met with them at the time
11 at Mr. Dutra's store?
12    A. I met with Mr. Ciummo.
13    Q. Only?
14    A. I believe so.
15    Q. What was the nature of those discussions?
16      ATTORNEY MIKELS: Objection. When you say
17 those discussions.
18    Q. Of your meeting with Mr. Ciummo, tell me
19 about that? What did he say and what did you say?
20    A. We talked about him possibly becoming the
21 franschisee at that particular spot in Central Falls.
22    Q. What did you say to him?
23    A. I believe I gave him the franchise circular.
24    Q. Right then and there?
25    A. Right then and there.

1    Q. And did you get him to sign a receipt for it?
2    A. I believe so.
3    Q. What else did you say to him other than
4 here's the circular and sign your name on the receipt?
5    A. I don't recall.
6    Q. Was that meeting more than 30 minutes?
7    A. I don't recall.
8    Q. Was Mr. Dutra present for any part of that
9 meeting?
10    A. I don't believe so.
11    Q. Where did that meeting occur in the store?
12    A. In the front room.
13    Q. Front room meaning where the customers walk
14 in?
15    A. Sitting down on the stools right next to the
16 window.
17    Q. Where was Mr. Dutra at that time?
18    A. I don't know.
19    Q. But he was in the store?
20    A. I don't recall.
21    Q. I thought you told me earlier when you walked
22 in the store Mr. Dutra was there. No?
23      ATTORNEY MIKELS: Objection.
24    A. No, I didn't say that.
25    Q. So on that day you did not see at the store

1 Mr. Dutra?
2    A. I don't recall.
3    Q. Were there any other meetings with Mr. Ciummo
4 and you after that?
5      ATTORNEY MIKELS: Objection. At any time from
6 then to now?
7    Q. I'm getting ready to go forward. At any time
8 from that first meeting what was the next meeting, if
9 there was one?
10    A. Sorry. I don't understand the question.
11    Q. You testified that you met with him for the
12 first time to talk about Mr. Ciummo becoming possibly a
13 BII franchisee. That occurred at Mr. Dutra's store, is
14 that accurate?
15    A. I believe so.
16    Q. When was the next meeting?
17    A. I don't recall.
18    Q. Was there a next meeting?
19    A. Yes.
20    Q. What was the purpose of that meeting?
21    A. I don't recall.
22    Q. What was the reason for that subsequent
23 meeting?
24    A. I don't recall.
25    Q. Were there any subsequent meetings?

1      ATTORNEY MIKELS: Objection.
2    Q. To that next meeting which you just said?
3      ATTORNEY MIKELS: Objection.
4    A. Sorry. I don't understand the question.
5    Q. You said there was at least one more meeting,
6 but you didn't know where or when or time or what you
7 talked about. So now I'm asking you were there any
8 meetings after that meeting?
9      ATTORNEY MIKELS: Objection to the
10 characterization of what Mr. Bowen has testified to
11      ATTORNEY MEHL: I don't think so.
12      ATTORNEY MIKELS: You don't think I'm
13 objecting?
14      ATTORNEY MEHL: You can.
15    A. Sorry. Would you repeat --
16    Q. I'll ask it this way, after the first meeting
17 at Mr. Dutra's store before Mr. Ciummo's company became
18 a BII franchisee how many meetings did you have with
19 him?
20    A. I don't recall.
21    Q. More than one?
22    A. I don't recall.
23    Q. But at least one?
24    A. Sorry. I don't understand the question.
25    Q. You had at least one more meeting with him?

1   A. I don't recall.
2       Q. When the deal was signed were you at that
3   closing?
4       A. I don't recall.
5       Q. Would you have ordinarily been there?
6       A. Yes.
7       Q. Is there anyone else on behalf of BII
8   authorized to sign any franchise agreement?
9       ATTORNEY MIKELS: Objection.
10      A. I don't believe so.
11      Q. So you would be the guy that signed on behalf
12  of BII at the closing?
13      ATTORNEY MIKELS: Objection.
14      A. I'm not sure I understand.
15      Q. At the closing?
16      ATTORNEY MIKELS: At what closing?
17      Q. I'm getting ready to answer.  At the closing
18  when Mr. Ciummo's company became a BII franchisee would
19  he have signed a BII franchise agreement?
20      ATTORNEY MIKELS: Objection.  You're assuming
21  there was a closing.
22      ATTORNEY MEHL: No.  I think you put that in
23  the complaint.
24      ATTORNEY MIKELS: That there was a closing?
25      ATTORNEY MEHL: All right, Jack, I won't play

1   that game.
2       Q. Did Mr. Ciummo's company ever become a BII
3   franschisee?
4       A. Yes.
5       Q. Tell us please the circumstances?
6       ATTORNEY MIKELS: Objection.
7       A. Sorry.  I don't understand the question.
8       Q. How did his company become a franschisee?
9       A. He bought the franchise from Mr. Dutra.
10      Q. Did you authorize that transaction?
11      A. I agreed to the transfer.
12      Q. To the transfer of the franchise?
13      A. From Mr. Dutra to Mr. Ciummo.
14      Q. But it was a transfer of Mr. Dutra's
15  franchise
16      A. Yes.
17      Q. It was not a brand new franchise agreement?
18      A. Right.
19      Q. When was that, sir?
20      A. I don't recall.
21      Q. Were you there on that date when you
22  authorized that transfer?
23      ATTORNEY MIKELS: Objection.
24      A. Sorry.  I don't understand the question.
25      Q. On the date of Mr. Dutra's transfer of the

1   existing franchise you agreed to that, I'm asking you?
2       ATTORNEY MIKELS: Objection.
3       Q. Were you there on that day that you agreed to
4   that?
5       ATTORNEY MIKELS: Objection.
6       A. I don't recall.
7       Q. Are you the person that authorized that
8   transaction?
9       A. Yes.
10      ATTORNEY MIKELS: For Bowen Investment?
11      Q. For Bowen Investment, Inc, of course.  We're
12  only talking about Bowen Investment.  You authorized
13  it.  Tell me how that was authorized by you?  Did you
14  sign your name on any document --
15      ATTORNEY MIKELS: Objection.
16      Q. -- approving that transaction?
17      A. I don't recall.
18      (Franchise agreement marked as Exhibit Four.)
19      (There was a discussion off the record.)
20      ATTORNEY MIKELS: Mr. Bowen had one correction
21  he wanted to make.
22      A. In connection with the transfer between Mr.
23  Dutra of the franchise to Mr. Ciummo, I believe Mr.
24  Ciummo signed new franchise documents at that time.
25      Q. Did that information -- did that correction

1   come from your lawyer, sir?
2       ATTORNEY MIKELS: Don't answer that question.
3   We're not going to discuss conversations Mr. Bowen and
4   I had.
5       Q. That was after the break?
6       ATTORNEY MIKELS: It was after the break.  The
7   information was incorrect.  He's corrected it.
8       Q. Look at Exhibit Number Four please.  I will
9   tell you, sir, this document was filed as to your
10  company's Verified Complaint.  Have you ever seen that
11  document, sir?
12      A. Yes.
13      Q. When did you see that for the first time?
14      ATTORNEY MIKELS: Objection.
15      A. I don't recall.
16      Q. Did you or your -- on page three did you
17  personally sign that, sir?  Is that your signature?
18      A. It looks like it.
19      Q. Is it?
20      A. I believe it is.
21      Q. Is anyone else authorized to sign your name?
22      ATTORNEY MIKELS: Objection.
23      A. No.
24      Q. What was the date on this document, sir?
25      A. 11th day of January, 1999.

Q. So is this document the one where you on
behalf of BII approved and authorized the transfer to
C-Nine Seven, Inc?
    ATTORNEY MIKELS: Objection.
A. I believe it is.
Q. When this was signed by you as well as C-Nine
Seven, Mr. Dutra's company was that at any meeting or
was the document just mailed around to the various
parties for signature?
    ATTORNEY MIKELS: Objection.
A. I don't recall.
Q. When BII approves other transfers are you
usually present at some formal type of closing?
    ATTORNEY MIKELS: Objection.
A. Sometimes.
Q. Were you in this instance?
A. I don't recall.
Q. So you don't know if on January 11th, 1999
whether you saw or met or talked with Mr. Ciummo?
A. I don't recall.
Q. Is it possible?
A. Sorry. I don't understand the question.
Q. When BII authorizes a transfer of a store or
of a franchise as they did in this deal here tell me
please what the process is?

    ATTORNEY MIKELS: Objection.
A. I don't understand.
Q. You told us that this agreement is the one
whereby you approved this transfer, is that accurate?
A. Yes.
Q. What is the process behind this agreement?
    ATTORNEY MIKELS: Objection.
A. To allow one franschisee to transfer to
another party.
Q. Did you draft this agreement, sir?
A. I don't recall.
Q. Do you know who did draft it?
A. I don't recall.
Q. Was it Mr. Mikels' office?
A. I don't recall.
Q. Would it have been any other law firm?
A. I don't recall.
Q. In 1999 did BII use any other law firm other
than Mr. Mikels' law firm?
A. I don't remember.
Q. Turn back to Exhibit A of the notice please,
sir. Let's go to item 3 please. What was your role
in this granting of the franchise?
A. Sorry. I don't understand.
Q. 3, what was your role in granting the

franchise?
A. I allowed Mr. Dutra to transfer the donut
shop to Mr. Ciummo.
Q. Did you draft any documents?
A. I don't recall.
Q. You personally, did you draft any documents?
A. I don't recall.
Q. Did you negotiate any terms of any of the
documents?
A. I don't recall.
Q. Would you normally be the one that would do
that?
A. Sorry. I don't understand.
Q. Would you be the individual on behalf of BII
that would negotiate some or all of the terms of the
franchise agreement?
A. Yes.
Q. Did you negotiate any of the terms with Mr.
Ciummo?
A. I don't recall.
Q. But if there was any negotiations you were
the one?
A. Sorry. I didn't understand the question.
Q. If there was any negotiation you would be the
guy, is that factual?

    ATTORNEY MIKELS: Objection.
A. Sorry. I still don't understand the
question.
Q. You told me earlier, if I'm wrong please
correct me if I'm wrong now, no one other than you is
authorized to engage in any negotiation on behalf of
BII with any franschisee, is that accurate?
    ATTORNEY MIKELS: Objection.
A. Sorry. I'm still confused.
    ATTORNEY MIKELS: Me too. I don't remember
that ever being discussed. Are you trying to find out
if he has a final say on negotiations?
    ATTORNEY MEHL: Yeah.
    ATTORNEY MIKELS: Do you have final say on
franchise negotiations on behalf of BII?
A. Yes.
Q. If there was any negotiation you are the guy,
yes or no?
    ATTORNEY MIKELS: You are the guy doesn't mean
anything. That's the problem. He just said he has
final say if that's what you're looking for. Can we
move on?
Q. I want to find out what was done in
connection with this franchise. Did you individually
negotiate any of the terms?

1   A. I don't recall.
2   Q. Were the individual on behalf of BII to sign
3 the franchise agreement with Mr. Ciummo?
4   A. I don't recall.
5       ATTORNEY MIKELS: Did you want to show him the
6 franchise agreement?
7   A. No, I don't want to show him the franchise
8 agreement. Was anyone else authorized to sign on
9 behalf of BII?
10   A. Not that I know of.
11   Q. So if there was a franchise agreement between
12 BII and C-Nine Seven you signed it on behalf of BII, is
13 that accurate?
14   A. Sorry. Would you repeat that please?
15       ATTORNEY MEHL: You want me to get a franchise
16 agreement or do you want to stipulate he signed it on
17 behalf of BII?
18       ATTORNEY MIKELS: I'll stipulate that it was
19 signed on behalf of BII.
20       ATTORNEY MEHL: By him?
21       ATTORNEY MIKELS: Without seeing it I don't
22 know.
23       ATTORNEY MEHL: You don't know?
24       ATTORNEY MIKELS: I know the addendum was
25 signed by him, and the addendum was part of the

1  franchise agreement.
2       ATTORNEY MEHL: You want me to waste the time
3 and get the franchise agreement?
4       ATTORNEY MIKELS: Is it really an issue?
5       ATTORNEY MEHL: I'm getting ready to ask him
6 questions about it. You will stipulate he is the one
7 that signed the franchise agreement on behalf -- yes?
8       ATTORNEY MEHL: I can't stipulate to that.
9       ATTORNEY MEHL: You can't.
10      ATTORNEY MIKELS: He has to see it.
11      ATTORNEY MEHL: You don't know the answer to
12 that question?
13      ATTORNEY MIKELS: I have no reason to believe
14 it wasn't.
15   Q. Fine. What was your role in item 4 that's
16 the liability agreement?
17      ATTORNEY MIKELS: Objection.
18   Q. Did you draft that agreement?
19   A. Do we have the agreement in front of us?
20   Q. Not yet we don't, but you referenced it in
21 Exhibit 3. Paragraph 13, did you draft that agreement,
22 sir?
23   A. With the help of counsel.
24   Q. You negotiated that agreement with anybody?
25   A. I don't recall.

---

1   Q. Do you know if anybody else negotiated that
2 agreement --
3   A. I don't recall.
4   Q. -- with Mr. Ciummo.  Do you know if in
5 January of '99 when the agreement for transfer, Exhibit
6 Four was executed if C-Nine Seven retained a lawyer?
7   A. Sorry. What was the question?
8   Q. Did you ever meet any lawyers for C-Nine
9 Seven?
10   A. I don't recall.
11   Q. Do you recall when the franchise agreement
12 was delivered to Mr. Ciummo?
13   A. I don't recall.
14   Q. Were you there?
15   A. Yes.
16   Q. Where was that meeting?
17   A. At Honey Dew Donut Shop in Central Falls.
18   Q. That's when you gave him the franchise
19 agreement?
20   A. When I gave him the franchise circular.
21   Q. When did you give him the franchise
22 agreement?
23      ATTORNEY MIKELS: Larry, the agreement is in
24 the circular.
25      ATTORNEY MEHL: Thanks, coach.

1       ATTORNEY MIKELS: I'm not coaching.
2   Q. I'm talking about the signed one, when did
3 you give him that?
4   A. I don't recall.
5   Q. Did you give him that?
6   A. I don't recall.
7   Q. Did anybody give him that?
8   A. I don't recall.
9   Q. So you have no idea if there is or is not --
10 if there was at the time, I'm talking about 1999, a
11 franchise agreement?
12   A. Sorry.
13   Q. At any time during 1999 was there any
14 existing franchise agreement between Mr. Ciummo or
15 C-Nine Seven, Inc?
16      ATTORNEY MIKELS: Objection.
17   A. I don't recall.
18   Q. So if you don't know if there was in 1999 a
19 franchise agreement with Mr. Ciummo who else might
20 know?
21   A. My attorney possibly.
22   Q. That's Mr. Mikels?
23   A. Yes.
24   Q. With regard to item two on Exhibit A for
25 those answers which you did not know or did not recall

Condensit!

1  who else might know the answers?
2      A. Sorry. I don't understand your question.
3      Q. Item two talks about the preparation of the
4  store. You claim that on many of the items you just
5  did not remember. I'm asking is there anyone else
6  that might know?
7      A. I still don't understand your question.
8      Q. Item 2, do you see that?
9      A. Yes.
10     Q. On Exhibit A several things I asked you about
11 that you claimed you did not recall. So I'm asking is
12 there anyone else that might know?
13     A. I don't recall your question regarding that
14 earlier.
15     Q. You claim you didn't know the extent of your
16 time and efforts there. Is there anyone else who
17 might know that other than you?
18     A. I don't know.
19     Q. You also claim that you didn't know if your
20 time and efforts there were more or less than you would
21 do for any other store. Is there anybody else that
22 might know that answer?
23     A. I don't know.
24     Q. You are the designated witness for these
25 items. You don't know if you negotiated the terms of

1  the franchise agreement. Is there anyone else that
2  might know the answer to that?
3      A. I don't know.
4      Q. Is there anyone else that might have
5  negotiated that agreement other than you?
6      A. I don't know.
7      Q. Ordinarily who negotiates the franchise
8  agreement for the franchisees?
9      A. I do.
10     Q. Is there anyone else that does that?
11     A. I don't believe so.
12     Q. What about on the liability agreement, is
13 there anyone else other than you that negotiates that
14 agreement?
15     A. What was the question?
16     Q. Item 4 on Exhibit A, did you negotiate that
17 agreement?
18     A. I don't recall.
19     Q. Is there anybody else that might know the
20 answer to that question?
21     A. I don't know.
22     Q. Is there anybody else that might have
23 negotiated that agreement?
24     A. I don't know.
25     Q. Do you ordinarily get those from every single

1  franchisee?
2      A. I don't know.
3      Q. Did you execute it?
4      A. I don't recall.
5      Q. Is there anybody else that might know the
6  answer to that?
7      A. I don't know.
8      Q. Did you draft the agreement?
9      A. Is the agreement here in front of me?
10     Q. No, sir. Look at Exhibit Two. Let's talk
11 about paragraph nine. Exhibit Two is the Verified
12 Complaint?
13     A. That's three.
14     Q. The Verified Complaint, let's talk about
15 paragraph nine. Tell us please what the process is on
16 each deal where HDA allows BII to grant the franchise
17 please?
18         ATTORNEY MIKELS: Objection.
19     A. Sorry. I don't understand your question.
20     Q. Explain to me, sir, paragraph 9 in Exhibit
21 Three?
22         ATTORNEY MIKELS: Objection.
23     A. My understanding that Honey Dew Associates
24 gives permission to Bowen Investment, Inc to be a
25 subfranchisor to develop Honey Dew Donut Shops in the

1  State of Rhode Island.
2      Q. Did they approve each and every deal or is it
3  just a blanket approval?
4      A. I don't know.
5      Q. You don't know. Each time a new BII
6  franchise store opens do you have to seek HDA's
7  approval?
8      A. I don't know.
9      Q. You don't know the answer to that?
10     A. I don't.
11     Q. Does BII under the terms of your agreement
12 with HDA -- is BII obligated to pay them any money?
13     A. Sorry. What was the question?
14     Q. You claim in your affidavit there is a
15 subfranchise agreement. I'm asking you under that does
16 BII ever have to pay any money to HDA?
17     A. I don't recall.
18     Q. When was the last time that you saw that
19 agreement?
20     A. Sorry. Which agreement are you talking
21 about?
22     Q. Subfranchise agreement?
23     A. I don't recall.
24     Q. Was it this year?
25     A. I don't remember.

Condensed!

1  Q. Do you know where the document is?
2  A. I don't recall.
3  Q. Do you have a copy of it?
4  A. I don't remember.
5  Q. Does Mr. Mikels have a copy of it?
6  A. I don't know. You'd have to ask him.
7  Q. One of these days I will. Does your brother
8  have a copy of it, Richard Bowen?
9  A. I don't know.
10  Q. Next area are the allegations in the
11  complaint about misappropriations. Item five, would
12  you read that over please. I'm going to ask you some
13  questions. Do you know which trademarks were infringed
14  as you claim?
15  A. Sorry. I don't understand the question.
16  Q. Were there any HDA owned trademarks infringed
17  upon in this lawsuit claimed by you?
18      ATTORNEY MIKELS: Objection.
19  A. Sorry. Would you repeat that please?
20      (The last question was read back by the court
21  reporter.)
22  A. I don't know.
23  Q. You don't know?
24  A. No.
25  Q. Who would know?

1  A. I don't know.
2  Q. Would Richard Bowen know?
3  A. I don't know.
4  Q. Would Mr. Mikels?
5  A. I don't know.
6  Q. You have no idea -- all right. So you just
7  don't know?
8  A. I don't.
9  Q. Are there any trademarks owned by HDA?
10  A. I don't know.
11  Q. Are there any trademarks owned by BII?
12  A. I don't know.
13  Q. Who would know the answer?
14  A. I don't know.
15  Q. During C-Nine Seven's operation of the store
16  did they pay all advertising fees up to the date the
17  store closed to BII?
18  A. I don't know.
19  Q. Who else might know?
20  A. I don't know.
21  Q. Would Monica Keafer know?
22  A. I don't know.
23  Q. How about royalty payments were those paid up
24  to date?
25  A. I don't know.

1  Q. Do you know if in the suit which you did sign
2  -- do you know whether in the complaint which you
3  signed whether you allege -- whether there was
4  allegations of trademark infringement?
5  A. Sorry. I don't understand the question.
6  Q. In Exhibit Number Three which is right there
7  do you know if there are any allegations of trademark
8  infringement?
9  A. Sorry. What page are you on?
10  Q. I'm actually not on any page. I'm asking you
11  the question in general.
12  A. I don't know.
13  Q. You don't know. You signed this, sir, is
14  that accurate?
15  A. Exhibit Three?
16  Q. Yes, sir. You testified that it was your
17  signature earlier?
18  A. Yes, I did sign it.
19  Q. But you have no idea if there are any
20  allegations with regard to trademark infringement?
21  A. I don't know.
22  Q. Who might know?
23      ATTORNEY MIKELS: You might.
24      ATTORNEY MEHL: How in the hell would I know?
25      ATTORNEY MIKELS: By reading it

1      ATTORNEY MEHL: I didn't sign it. I didn't
2  draft it.
3      ATTORNEY MIKELS: It's a legal document.
4  Either it is or it isn't.
5  Q. Do you have any evidence that BII might have
6  that C-Nine Seven infringed on any HDA owned
7  trademarks?
8  A. I don't know.
9  Q. What was the date C-Nine Seven was terminated
10  by BII as a franchisee?
11  A. I don't recall.
12  Q. Did they operate the store after that date?
13  A. I don't recall.
14  Q. Who would know that answer?
15  A. I don't know.
16  Q. Do you have any evidence that they did
17  operate after they were terminated?
18  A. I don't know.
19  Q. In 2004 what was the nearest store to the
20  C-Nine Seven store?
21      ATTORNEY MIKELS: Objection.
22      ATTORNEY MEHL: Why?
23      ATTORNEY MIKELS: The nearest store could be
24  the K-mart next door.
25  Q. The nearest talking about the nearest Honey

1  Dew store. Thank you for helping. Was it one mile o.
2  five miles or 50 miles?
3     A. I don't know.
4     Q. You don't know.  How many stores are there.
5  do you know, in this city?
6        ATTORNEY MIKELS: Objection.
7     Q. Is this Cranston, Rhode Island or Central
8  Falls?
9     A. I believe it's Central Falls.
10    Q. Are there any other stores in Central Falls,
11 Honey Dew stores?
12       ATTORNEY MIKELS: Objection.
13    A. I don't believe so.
14    Q. What would be the nearest -- what would be
15 the nearest Honey Dew store to this store?
16    A. I don't know.  Probably Pawtucket.
17    Q. That is approximately how far, sir?
18    A. Just guessing probably four miles.
19       (Interrogatories marked as Exhibit Five.)
20    Q. I'm going to hand you Exhibit Five.  Read 3
21 please, sir, to yourself or your counsel.  3, please
22 answer that question?
23       ATTORNEY MIKELS: Objection.
24    A. Sorry.  I don't understand the question.
25    Q. What is BII's answer to 3?

        ATTORNEY MIKELS: You're asking him to tell
2  his answer without showing him the answer?
3        ATTORNEY MEHL: I'm going to show him that.
4        ATTORNEY MIKELS: Why don't you show it to him
5  now.
6        ATTORNEY MEHL: I want him to answer first the
7  question.
8     A. I don't recall.
9     Q. At the time you signed your affidavit as well
10 as the verification did you have any evidence with
11 regard to the answer to 3?
12    A. Sorry.  Could you repeat the question?
13       (The last question was read back by the court
14 reporter.)
15    A. I don't remember.
16    Q. Who might otherwise know if it isn't you?
17    A. I don't know.
18    Q. 4, read that please, sir.  At the time you
19 signed your affidavit and the verification what was the
20 answer to that item 4?
21       ATTORNEY MIKELS: Objection.
22    A. I don't recall.
23    Q. Who might know the answer?
24    A. I don't know.
25    Q. Would Richard Bowen know the answer?

1     A. I don't know.
2     Q. 5, same thing.
3        ATTORNEY MIKELS: Objection.
4        ATTORNEY MEHL: I'll go through it with him.
5        ATTORNEY MIKELS: I'm just stating it for the
6  record.
7        ATTORNEY MEHL: You want to get out of here
8  I'm trying to shorten my question.
9        ATTORNEY MIKELS: Do it whatever way you want.
10    Q. I'm trying to help you.  At the time of your
11 affidavit and of the verification what was the answer
12 to Interrogatory 5?
13    A. I don't recall.
14    Q. Were there any?
15    A. I don't remember.
16    Q. Is there anyone else who might know the
17 answer?
18    A. I don't know.
19    Q. 6, at the time of your affidavit and of the
20 verification what was the answer to Interrogatory
21 Six?
22    A. I don't recall.
23    Q. Do you know who might?
24    A. No, I don't know.
25    Q. On the date of your affidavit and the date

1  when you signed verification did you know on that date
2  the answers to Interrogatory Three, Four, Five and
3  Six?
4        ATTORNEY MIKELS: Objection.
5     A. I don't recall.
6     Q. You don't recall if on that date whether you
7  knew or not. Do you know if Mr. -- Do you know if
8  C-Nine Seven operated the store after the day of
9  termination?
10    A. I believe they did.
11    Q. How do you know that answer?
12    A. I remember talking with Mr. Ciummo and trying
13 to get him reinstated.
14    Q. When was that?
15    A. I don't recall.
16    Q. That was after the date they were terminated?
17    A. I believe so, yes.
18    Q. During that period from the date he was
19 terminated until the date you talked to him did BII
20 suffer any damages?
21    A. I don't know.
22    Q. If they did what would those damages be?
23    A. I don't know.
24    Q. Was BII's reputation damaged?
25    A. I don't know.

1  Q. What about the good will, was that damaged?
2  A. I don't know.
3  Q. Do you know who might?
4  A. I don't know.
5  Q. Do you have any documents that might help you
6  know?
7  A. I don't know.
8  Q. You don't know whether you've got any
9  documents that might help you?
10  A. I don't know.
11  Q. You told me earlier that there was a meeting
12  -- tell me about your meeting after they were
13  terminated?
14      ATTORNEY MIKELS: Objection.
15  Q. Tell me the circumstances?
16      ATTORNEY MIKELS: Objection.
17  Q. Telephone call or face to face meeting?
18      ATTORNEY MIKELS: Could you hold it to one
19  question?
20  Q. I'm just trying to help him. Choose A, B, C
21  or D. It's multiple choice.
22      ATTORNEY MIKELS: Objection.
23  A. Sorry. What was the question again?
24  Q. You told me earlier after he was terminated
25  there was a subsequent meeting, is that right, sir?

1  A. I believe so, yes.
2  Q. Where was that meeting?
3  A. In my office in Plainville, Massachusetts.
4  Q. What was the date of that meeting?
5  A. I don't recall.
6  Q. Who was there?
7  A. I was there. Frank Worthington was there,
8  Vinny Ciummo and also he designated his manager. His
9  name is Lou. I don't know his last name.
10  Q. What was the purpose of that meeting?
11  A. To try and get the Honey Dew Donut in Central
12  Falls reinstated.
13  Q. Did you call that meeting?
14  A. I believe I invited Vinny, yes.
15  Q. What did you tell him about reinstatement?
16  A. First I had Mr. Worthington explain where he
17  was coming from with his inspections and what the
18  issues were. After that I gave him a copy of
19  reinstatement form which Vinny told me he would get
20  back to me in four or five days, and then he left.
21  Q. How long was this meeting?
22  A. Approximately one hour.
23  Q. What else was said?
24  A. I don't recall.
25  Q. What was the reinstatement form that you

1  mentioned?
2  A. It was a form that Vinny took with him, and
3  we asked him to hopefully negotiate -- as a matter of
4  fact I asked him to call Jack and see if we can get him
5  reinstated to avoid any legal issues.
6  Q. Did you draft that agreement?
7  A. With the help of counsel.
8  Q. Which parts did you draft?
9  A. I don't recall.
10  Q. Did you use that form for everything under
11  similar circumstances?
12      ATTORNEY MIKELS: Objection.
13  A. I don't recall.
14  Q. Have you ever used that form?
15      ATTORNEY MIKELS: Objection.
16  A. I don't remember.
17  Q. In the past five years have there been any
18  terminated franchisees that have been reinstated?
19      ATTORNEY MIKELS: Objection.
20  A. I don't recall.
21  Q. Who would know the answer?
22  A. I don't know.
23  Q. Let's talk about that franchise agreement --
24  sorry -- reinstatement agreement. Read that over, sir.
25  I'm going to ask you some questions. Is that the

1  document you were referring to?
2  A. I believe so.
3  Q. The date of this document is what? Let me
4  change that. Look at the top of the page in the fax
5  line. What is the date that you see there?
6  A. 12/2004.
7  Q. Turn the page. What does it say at the top
8  of the next page on the fax line? What does that say?
9  A. Looks like April 12.
10  Q. 2004?
11  A. Yes.
12  Q. Is that the date when you gave this document
13  to Mr. Ciummo?
14  A. I don't recall the exact date.
15  Q. Is this that document?
16  A. I believe it is.
17  Q. You testified that there were certain items
18  in here that you drafted. I'd like to know which ones?
19  A. I think I testified I worked with counsel in
20  drafting.
21  Q. Which items did you --
22  A. I don't recall.
23  Q. Was this the only draft or were there any
24  earlier drafts?
25  A. I don't recall.

Q. Were there any later drafts?
A. I don't recall.
Q. You testified earlier that you formally owned a store and you were a HDA franschisee, is that accurate?
A. Yes.
Q. What happened to that store?
A. I sold it.
Q. What was the buyer's name you recall?
A. I don't remember.
Q. When the store was sold did you transfer to the buyer the HDA franchise?
A. I don't recall.
Q. Did you grant HDA a general release?
A. I don't recall.
Q. Was C-Nine Seven ever terminated prior to January of 2004?
A. I don't recall.
Q. If I told you in your complaint which you signed you allege that they were, would that help you?
ATTORNEY MIKELS: Where does it say that?
ATTORNEY MEHL: In the complaint I seem to recall you stated they were terminated previously and they were reinstated again. I just want to ask him about that.

ATTORNEY MIKELS: I don't recall that.
ATTORNEY MEHL: If I'm wrong, I'm wrong.
ATTORNEY MIKELS: You're right.
ATTORNEY MEHL: Where is that?
ATTORNEY MIKELS: Paragraph 16.
Q. Do you see that, sir?
A. Yes.
Q. When they were terminated in February of 2002 did they sign at any time after that any form of reinstatement agreement?
A. I don't recall.
Q. Who would know that answer?
A. I don't know.
(Reinstatement Agreement marked as Exhibit Six.)
Q. Let's talk about Exhibit 6. Let's talk about that. Explain to me if you will, sir, do you know as of April 12, 2004 which is when this is dated apparently at the top of the page Mr. Ciummo's company's investment in this store and the franchise, do you have any idea what that number is?
A. I don't recall.
Q. Would you think it would be more than $10,000?
A. I don't know.

Q. You have no idea. My understanding, which I am going to tell you, please tell me if I'm right or not, under the terms of this deal, Exhibit Six, if he failed -- if his store failed a reinspection after this was signed his obligation was to turn over the store to you, is that accurate?
A. I don't know.
Q. Read, sir, then Paragraph 3B VI at the top of three.
A. Sorry. What was that again?
Q. At the top of page three read VI subparagraph. You see that?
A. Yes.
Q. What does that mean to you?
A. I don't know.
Q. You don't know what that paragraph means? This is an agreement you gave to Mr. Ciummo you testified earlier, is that accurate? Did you give this agreement to Mr. Ciummo, sir?
A. I believe I gave him a copy of this, yes.
Q. You also testified you were the one that assisted Mr. Mikels in drafting this agreement. Tell me what this paragraph means please, sir?
A. I don't know.
Q. You have no idea?

A. I don't know.
Q. Is there anybody else that might know what this paragraph means?
A. I don't know.
Q. You think Mr. Mikels might know?
A. You'll have to ask him.
Q. I intend on that. You are the designated witness, sir. Is there anybody else who might know what this means?
A. I don't know.
Q. Let's go to Paragraph 5 which is on the same exact page. Read that please, sir? What was the purpose of this Paragraph 5?
A. I don't know.
Q. Do you know what the meaning of this paragraph is, sir?
A. I don't know.
Q. You have no idea?
A. I don't know.
Q. Have you ever heard the phrase general release?
A. I have.
Q. What does that mean to you?
A. I don't really know.
Q. Where did you hear that phrase?

1    A. I don't recall.
2    Q. Is this one of the paragraphs which you
3 helped Mr. Mikels draft?
4    A. No.
5    Q. Is Paragraph 5 a general release?
6    A. I don't know.
7    Q. You see in Paragraph 5 towards the end of it
8 it talks about -- come up from the bottom three and a
9 half lines. It has a reference to a case
10 03-10965-RCL. Do you know what that is?
11    A. I don't know.
12    Q. You have no idea?
13    A. I don't.
14    Q. Then up above that four lines it talks about
15 Mass GLC. 93A. Do you know what that is?
16    A. I don't know.
17    Q. I am not asking you what Mr. Mikels may have
18 told you, but did he explain Paragraph 5 to you ever?
19    ATTORNEY MIKELS: Don't answer that question.
20    Q. At the time you gave this document to Mr.
21 Ciummo did you understand this document?
22    A. I don't recall.
23    Q. You said there was a man named Frank
24 Writington or Worthington, one of those names, right?
25 What does he do for BII?

1    A. Mr. Writington is the inspector.
2    Q. Is he an employee?
3    A. No.
4    Q. Is he employed by any HDA affiliate?
5    A. I don't know.
6    Q. Who is he employed by, HDA?
7    A. Sorry. I don't understand the question.
8    Q. Is he employed by HDA?
9    A. I don't know.
10    Q. Is he an employee of BII?
11    A. No.
12    Q. Is he an employee of any of BII affiliated
13 companies?
14    A. Not that I know of.
15    Q. Who does he report to?
16    ATTORNEY MIKELS: Objection.
17    A. In Rhode Island he reports to me.
18    Q. You pay him?
19    A. I do.
20    Q. As an employee?
21    A. No.
22    Q. Do you have any contract with him?
23    A. No.
24    Q. What does he charge you?
25    A. I don't recall.

1    Q. Does he charge you a flat fee for each store?
2    A. I don't recall.
3    Q. Have you reviewed all of the inspection
4 reports on this store?
5    A. I don't recall.
6    Q. Have you reviewed any of them on this store?
7    A. Yes.
8    Q. Which ones?
9    A. I don't recall.
10    Q. Is it possible there were any errors made in
11 those reports?
12    A. I don't know.
13    Q. Were there any errors made in any of those
14 reports which you read?
15    A. I don't know.
16    Q. With regard to Exhibit 6, do you know if that
17 agreement was ever signed by either party?
18    A. I don't believe so.
19    Q. Do you know if that agreement, if it were
20 signed, would have improved BII's terms with C-Nine
21 Seven?
22    ATTORNEY MIKELS: Objection.
23    A. I don't know.
24    Q. Do you think that agreement was fair?
25    ATTORNEY MIKELS: Objection.

1    A. I don't know.
2    Q. Whose idea was paragraph number VI at the top
3 of page three?
4    A. I don't recall.
5    Q. What do you think C-Nine Seven owes BII?
6    A. I don't know.
7    Q. Who might know?
8    A. I don't know.
9    Q. Thank you, sir.
10    (The proceeding suspended at 1:15 p.m. The
11 proceeding resumed at 1:25 p.m.)
12 EXAMINATION BY ATTORNEY MIKELS:
13    Q. Mr. Bowen, let me refer you to Exhibit Three
14 and refer you to a specific paragraph. Paragraph 12
15 indicates that BII granted C-Nine Seven franchise on or
16 about January 11, 1999. Do you believe that to be
17 correct?
18    A. Yes.
19    Q. It says there was a franchise agreement
20 executed. Do you believe that to be correct?
21    A. Yes.
22    Q. Would you agree that the franchise agreement
23 was either signed by you or on your behalf?
24    A. Yes.
25    ATTORNEY MEHL: Objection.

Condensit!

1    Q. On behalf of BII?
2    A. Yes.
3    Q. There is an allegation that C-Nine Seven had
4  flunked an inspection in December of 2003.
5       ATTORNEY MEHL: Objection.
6    A. Yes.
7    Q. Is that correct?
8    A. I believe so yes, sir.
9    Q. In Paragraph 17 there is an allegation there
10 was notice of default sent to C-Nine Seven on January
11 9, 2004. Is it correct such a notice was sent?
12   A. I believe so.
13   Q. It was sent on behalf of BII?
14   A. Yes.
15   Q. That was for failure to pass an inspection?
16   A. Yes.
17   Q. On February 17, 2004 a notice of termination
18 was sent to C-Nine Seven, is that correct?
19   A. I believe so, yes.
20   Q. That was because as stated in Paragraph 17 it
21 had not cured the default found in the store inspection
22 on December 18, 2003, is that correct?
23   A. Yes.
24      ATTORNEY MEHL: Objection.
25   Q. Under your franchise agreement that BII had

1  with C-Nine Seven after termination is a franchisee
2  allowed to continue operating as a Honey Dew Shop?
3    A. No.
4    Q. In situations where BII has the right to take
5  over the store would it be correct to say in those
6  circumstances the franchisee is required to turn the
7  keys over to Bowen Investment, Inc and it becomes Bowen
8  Investment, Inc's shop not the franchisee's. Is that
9  right?
10      ATTORNEY MEHL: Objection.
11   A. Yes.
12   Q. In that situation would you agree with me
13 whatever investment the franchisee made in the store at
14 that point is lost, is that right?
15   A. Yes.
16   Q. Would it be fair to say Bowen Investment, Inc
17 attempts to avoid situations where it terminates
18 franchisees and takes away stores?
19   A. Yes.
20      ATTORNEY MEHL: Objection.
21   Q. Now, directing your attention to Exhibit Six
22 the reinstatement agreement you talked a little bit
23 with Attorney Mehl about the first paragraph on page
24 three which is 3B VI. I'd like to take you back
25 through all of Section 3.  Paragraph 3A requires

1  C-Nine Seven to pay BII $750 for the cost of four
2  inspections, is that right?
3    A. Yes.
4    Q. Why would that cost be imposed on C-Nine
5  Seven?
6    A. That's what BII had to pay Mr. Writington.
7    Q. Then there was an additional $300 for
8  additional services provided by BII's inspector. Do
9  you recall what those were?
10   A. I don't.
11   Q. But is it fair to say it's your understanding
12 again those were charges that BII actually incurred to
13 Mr. Worthington?
14   A. Yes.
15      ATTORNEY MEHL: Objection. That's not what it
16 says.
17   Q. There is a request for $900 in legal fees in
18 connection with the default and reinstatement, is that
19 correct?
20   A. Yes.
21   Q. What's your understanding what that amount is
22 for?
23   A. Again that would be for reimbursement to BII
24 for legal counsel.
25   Q. Would it be fair to say that Section 3A

1  provides that as part of reinstatement C-Nine Seven is
2  going to reimburse Bowen Investment, Inc for its out of
3  pocket cost of the default and the termination?
4    A. Yes.
5    Q. Do you find anything unreasonable about that
6  request?
7    A. I do not.
8    Q. Would you have been involved in the drafting
9  of those terms?
10   A. Yes.
11   Q. Turning to Section 3B it requires an
12 inspection after execution, is that correct?
13   A. Yes.
14   Q. What was the purpose of requiring an
15 inspection after execution of the reinstatement
16 agreement?
17   A. Make sure the store was up to par.
18   Q. Would you have been involved in the drafting
19 of that requirement?
20   A. Yes.
21   Q. 3B1 says that if the store doesn't receive a
22 passing grade C-Nine Seven will pay $150 for a
23 follow-up inspection no less than five days after, is
24 that correct?
25   A. Correct.

1 Q. If the store doesn't pass the reinspection
2 then -- it has this in capital letters -- the sale
3 provisions shall become affective, is that right?
4 A. Yes.
5 Q. The sale provisions we'll get to in a
6 moment. You understood that if C-Nine Seven didn't
7 pass the post reinstatement inspection that it would
8 still be given another opportunity to pass an
9 inspection?
10 A. Yes.
11 Q. The only obligation of C-Nine Seven after
12 failing the post reinstatement inspection would be to
13 pay the $150 for the follow-up inspection?
14 A. Yes.
15 Q. Now, Paragraph 3B2 or II says that if C-Nine
16 Seven passes the inspection or the reinspection that it
17 would go into a probationary period for one year, is
18 that right?
19 A. Yes.
20 Q. It's fair to say under 3BII the probationary
21 period means from the date they receive their passing
22 grade if they fail an inspection for a year or within a
23 year they have to pay for the failed inspection and the
24 reinspection, a total of $300 and the store will again
25 be reinstated within five days of the original failed

1 inspection, is that right?
2 A. Yes.
3 Q. Again were you involved in the drafting of
4 the requirements under Section 3B1 and 2?
5 A. Yes, I was.
6 Q. Section 3B3 indicates on a reinspection they
7 do pass then the probationary period is extended for a
8 year from the past inspection, is that right?
9 A. Yes.
10 Q. Were you involved in the drafting of that?
11 A. I was.
12 Q. 3B4 says that if they flunk the reinspection
13 then you'll be given access to the premises to clean
14 it, restore it and repair it to your reasonable
15 satisfaction at C-Nine Seven's expense, is that right?
16 A. Yes.
17 Q. That if you have to do that that they'll
18 immediately try to sell the store, is that right?
19 A. Yes.
20 Q. So even if they flunked an inspection a year
21 after the reinstatement agreement, flunked the
22 reinspection you still aren't going to take their
23 store, is that right?
24 A. That's right.
25 Q. You were going to give them a chance to sell

1 their store?
2 A. Yes.
3 Q. You were going to go in and fix at their
4 expense so it could pass an inspection?
5 A. Yes.
6 Q. How much time were you giving them to sell in
7 that circumstance, was it 30 days?
8 A. 180 days.
9 Q. 180 days, that's six months?
10 A. Six months.
11 ATTORNEY MEHL: Objection.
12 Q. Were you involved in the drafting of that
13 section?
14 A. Yes.
15 Q. They were required under Section 3B to have
16 to pass any inspections during that six month period
17 they were trying to sell the business?
18 A. Yes.
19 Q. You were involved in the drafting of that?
20 A. Yes, I was.
21 Q. Now, we come to the provision that Attorney
22 Mehl was asking you about, 3B VI. And is it fair to
23 say that only in the event there was a complete failure
24 to meet the requirements of Section 3B only then would
25 they actually have to release and relinquish the store

1 back to BII, is that correct?
2 A. Yes.
3 Q. Were you involved in the drafting of that
4 provision?
5 A. Yes.
6 Q. Did you find any of those provisions to be
7 unreasonable?
8 A. I do not.
9 Q. You were also asked about Paragraph 5 of the
10 agreement. Do you have a recollection that after BII
11 defaulted and or terminated C-Nine Seven --
12 ATTORNEY MEHL: Objection.
13 Q. That C-Nine Seven sued Bowen Investment, Inc?
14 A. Yes.
15 Q. Are you aware that the suit that C-Nine Seven
16 filed against Bowen Investment, Inc was part of a
17 punitive class action filed in the Federal District
18 Court for Massachusetts?
19 A. Yes.
20 Q. Did you require or understand that as part of
21 any reinstatement you would require C-Nine Seven to
22 dismiss its claims in that class action and release any
23 claims against Bowen Investment, Inc?
24 ATTORNEY MEHL: Objection.
25 A. Yes.

1   Q. Were you involved in the drafting of the
2 provision that would require that in the reinstatement
3 agreement?
4   A. Yes.
5   Q. Did Mr. Ciummo discuss with you at this
6 meeting you had where you gave him the reinstatement
7 agreement what was in the reinstatement agreement?
8   A. No.
9   Q. Was there any subsequent communication with
10 him about the terms of the reinstatement agreement?
11   A. I called Mr. Ciummo a week later.
12   Q. What was the substance of that communication?
13   A. As I recall he complained he had to pay $900
14 for inspection and money for legal fees and so on and
15 so forth.
16   Q. I think the legal fees were 900?
17   A. And inspection fees.
18   ATTORNEY MEHL: Objection.
19   Q. Reviewing 3A there were inspection fees,
20 service of BII inspector and legal fees, is that right?
21   A. That's right.
22   Q. Is that what he was complaining about?
23   A. That's what he was complaining about.
24   Q. Did he complain about any other provision of
25 the agreement?

1   A. I don't recall.
2   Q. Did he say any other provision of the
3 agreement other than the fees he had to pay were
4 unfair?
5   A. I don't recall.
6   Q. Did he complain about the release?
7   A. I don't remember him complaining --
8   Q. Now, the same meeting where you gave Mr.
9 Ciummo the relinquishment agreement you said the
10 meeting lasted about an hour?
11   A. Yes.
12   Q. You said Mr. Worthington discussed the
13 inspection default?
14   A. Yes.
15   Q. What did Mr. Ciummo say about what Mr.
16 Worthington had to say?
17   A. I believe Mr. Ciummo was out of the country
18 during most of that time period. He seemed to indicate
19 he was unaware what was going on.
20   Q. Did he give any indication there were
21 mistakes in any of Mr. Worthington's reports?
22   A. I don't recall him mentioning that at all.
23   Q. Do you recall him mentioning anything in Mr.
24 Worthington's reports that were unfair?
25   A. I don't recall him mentioning that.

1   Q. Now, at the beginning of the testimony you
2 were talking about the Honey Dew system. I understood
3 you to say that the Honey Dew system included
4 trademarks?
5   A. Yes.
6   Q. Proprietary formulas?
7   A. Yes.
8   ATTORNEY MEHL: What was that?
9   Q. Proprietary formulas?
10   A. I believe I did mention proprietary coffee.
11   Q. Are there formulas for ingredients for
12 products?
13   A. Yes.
14   Q. Are there formulations how products are to be
15 baked and prepared?
16   A. I don't recall.
17   Q. Is there an operating -- I think you referred
18 to an operating manual?
19   A. Yes.
20   Q. Those types of items are in the operations
21 manual?
22   A. Yes, they are.
23   Q. Are there methods of operation utilized in
24 Honey Dew Donut Shops as part of their system?
25   A. Yes.

1   Q. Are products displayed in a certain way?
2   A. Yes.
3   Q. Are cases placed in certain positions within
4 the store?
5   A. Yes.
6   Q. Certain color schemes used?
7   A. Yes.
8   Q. Would it be fair to say the Honey Dew system
9 includes all aspects of the Honey Dew Shop?
10   A. Yes.
11   Q. You mentioned I believe that the Honey Dew
12 system was exclusive to Honey Dew, is that right?
13   A. Yes.
14   Q. Did you indicate that the individual elements
15 of the system are exclusive to Honey Dew or the
16 entirety of the system is exclusive to Honey Dew?
17   A. I was referring to the entire package.
18   Q. Finally we had discussed that a franchise of
19 Bowen Investment, Inc is required to close after
20 termination, is that right?
21   A. Yes.
22   Q. In this case Mr. Ciummo did not close, is
23 that right?
24   A. I believe he did not.
25   Q. He told you he didn't, is that right?

1  A. I don't believe he actually told me
2  personally, no
3     Q. Did you understand that he testified that he
4  didn't?
5     A. Yes.
6     Q. He actually made payment to you for sales
7  from his Honey Dew Shop after termination?
8        ATTORNEY MEHL: Objection.
9     A. Yes.
10    Q. Do you know if those payments were complete
11  and full?
12    A. I do not.
13    Q. There were some payments made?
14    A. Yes.
15    Q. Do you have any understanding whether he
16  continued to operate under the Honey Dew signs?
17    A. I believe he did.
18    Q. Now, what are the types of damages that Bowen
19  Investment sustains when a franchisee continues an
20  operation post termination?
21    A. There is no way to supervise a store that's
22  been terminated and hasn't been reinstated.
23    Q. Is there a danger with respect to customers?
24    A. Customers are going in with the understanding
25  it's a Honey Dew Donut Shop and in full compliance with

1  their agreement.
2     Q. How would you calculate the damages arising
3  from somebody who's not authorized to use those
4  trademarks, essentially using them in commerce?
5     A. Priceless.
6        ATTORNEY MEHL: What?
7     A. Priceless.
8        ATTORNEY MIKELS: I don't have any further
9  questions.
10 REEXAMINATION BY ATTORNEY MEHL:
11    Q. Mr. Bowen, we took about a 15 minute break in
12  which you met with counsel. Is that accurate, sir?
13    A. Yes.
14    Q. You have now apparently changed your answers
15  on many, many areas.
16       ATTORNEY MIKELS: I object to that and
17  disagree with it.
18    Q. I asked you earlier which items in Exhibit 6
19  did you help draft. Your answers were I don't know or
20  I don't recall. Well, now you were apparently according
21  to Mr. Mikels' questions involved in drafting most of
22  this. Would you like to tell me exactly what your role
23  in this document was, sir?
24    A. I don't recall, Mr. Mehl, maybe it's in the
25  record, you asking me exactly which ones I worked on

1  with counsel.
2     Q. What did you do on this document, sir? I
3  want to know your role?
4     A. I consulted with counsel.
5     Q. Tell me the areas you personally were
6  involved in. Take the Exhibit Six and let's go down it
7  one by one.
8        ATTORNEY MIKELS: Starting with paragraph
9  one?
10    Q. Line one, did you draft that first paragraph?
11    A. Again I worked with counsel.
12    Q. What did you do? What was your role? Did
13  you sit down with Jack Mikels and go through this one
14  by one?
15       ATTORNEY MIKELS: I'm going to instruct you
16  not to answer that question.
17       ATTORNEY MEHL: On what grounds?
18       ATTORNEY MIKELS: It calls for attorney client
19  privilege. It's substance of communication --
20    Q. What did you do, sir, with regard to the
21  introductory paragraph page one?
22    A. Again, I worked with counsel in putting
23  together the addresses and names of the parties
24  involved.
25    Q. Okay.  What did you do with regard to the

1  first whereas clause?
2     A. I don't think I had to do anything on that
3  one. Mr. Mikels already knew that.
4     Q. How about the next one second whereas clause,
5  did you have a role there?
6     A. No, I think he already knew that.
7     Q. What about the other six whereas clauses on
8  page one, did you have a role in any of those?
9     A. I believe Mr. Mikels already had that
10  information.
11    Q. Turn the page, did you have a role in
12  Paragraph 1?
13    A. Again, I think he had that information.
14    Q. 2?
15    A. No, that was him.
16    Q. Do you believe 2 -- what does 2 mean to
17  you?
18    A. That this agreement is added to the current
19  franchise agreement.
20    Q. Added to or if there is any connection
21  between the two agreements which agreement would
22  control?
23    A. This one.
24    Q. This one improved the term of the franchise
25  agreement?

C

EXHIBIT C

**D F**

**The Commonwealth of Massachusetts**
**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512 *050004420*

Filing Fee: $125.00
Late Fee: $25.00

**Annual Report for Domestic
and Foreign Corporations**
(General Laws Chapter 156D Section 16.22; 950 CMR 133.56)

*/042893630*

(1)  The exact name of the corporation is __BOWEN INVESTMENT INC.__ .
(2)  The corporation is organized under the laws of __MASSACHUSETTS__ .

(3)  The street address of the corporation's registered office in the commonwealth is:
__1215 RESERVOIR AVENUE, CRANSTON, RI   02920__ .
*(number, street, city or town, state, zip code)*
(4)  The name of the registered agent at the registered office is __JACK J. MIKELS__ .
(5)  The street address of the corporation's principal office is:
__1215 RESERVOIR AVENUE, CRANSTON, RI   02920__ .
*(number, street, city or town, state, zip code)*

(6)  Provide the name and business addresses of the corporation's board of directors and its president, treasurer and secretary, and
if different, its chief executive officer and chief financial officer.

| NAME | ADDRESS |
|---|---|
| President: __ROBERT BOWEN__ | __1215 RESERVOIR AVE., CRANSTON RI__ |
| Treasurer: __ROBERT BOWEN__ | __SAME AS ABOVE__ |
| Secretary: __JACK J. MIKELS__ | __1 BATERYMARCH PARK, QUINCY, MA__ |
| Chief Executive Officer: __ROBERT BOWEN__ | __SAME AS ABOVE__ |
| Chief Financial Officer: __ROBERT BOWEN__ | __SAME AS ABOVE__ |
| Directors: __ROBERT BOWEN__ | __SAME AS ABOVE__ |
| __KATE BOWEN__ | __SAME AS ABOVE__ |

(7)  Briefly describe the business of the corporation:
__FRANCHISING BUSINESS__

(8-9)  The capital stock of each class and series

| CLASS OF STOCK | TOTAL AUTHORIZED BY ARTICLES OF ORGANIZATION OR AMENDMENTS Number of Shares   Total Par Value | | TOTAL ISSUED AND OUTSTANDING Number of Shares |
|---|---|---|---|
| COMMON | 15,000. | NONE | 500. |
| PREFERRED | | | |

(10)  Check if the stock of the corporation is publicly traded. ☐
(11)  Date of the fiscal year end is __OCTOBER    31    2004__ .
*(month, day, year)*

Signed by ✓ _____
__ROBERT BOWEN__          *(signature of authorized individual)*
*(Please check appropriate box)*

☒ Chairman of the Board of Directors    ☐ Incorporator    ☐ Other Officer    ☐ Court Appointed Fiduciary

on this ✓ __Jan -__ day of ✓ __15__        of ✓ __05__ .
3D2488 1,000                                                          156d1622 9/23/04

04-2893630                    2

D

# EXHIBIT D

**HONEY DEW ASSOCIATES, INC., AND BOWEN INVESTMENT, INC., Plaintiffs, Appellants,**

v.

**M & K FOOD CORP., IRWIN KAY, AND ADELE KAY, Defendants, Appellees.**

No. 00-1300

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

241 F.3d 23; 2001 U.S. App. LEXIS 2640; 57 U.S.P.Q.2D (BNA) 1875

February 23, 2001, Decided

**PRIOR HISTORY:** {**1} APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ronald R. Lagueux, U.S. District Judge].

**DISPOSITION:** Vacated and Remanded.

**COUNSEL:** Jack J. Mikels, with whom Linda J. Keogh and Jack Mikels & Associates were on brief for appellants.

Irving Brodsky for appellees.

**JUDGES:** Before Lynch, Circuit Judge, Coffin, Senior Circuit Judge, and Lipez, Circuit Judge.

**OPINIONBY:** LIPEZ

**OPINION:** {*24}

**LIPEZ, Circuit Judge.** The trial in the district court was about the breach of a franchise agreement and the reasonableness of a liquidated damages clause. The court refused to enforce the liquidated damages clause, deeming it a penalty. We conclude that the court misallocated the burden of proof and lacked an adequate factual basis for its penalty determination. We therefore vacate the judgment and remand for further proceedings.

**I.**

Bowen Investment Inc. ("Bowen"), a sub-franchisor of Honey Dew Associates, Inc. ("Honey Dew"), entered into a franchise agreement with M & K Food Corporation ("M & K"), on June 9, 1992. This contract included a "Supplemental Agreement," which amended the principal document's statement of damages in the event of breach. Irwin and Adele Kay were {**2} guarantors of the agreement for M & K, which gave them the right to establish and operate a Honey Dew donut shop in Providence, Rhode Island. The term of the agreement was for 10 years. The Kays expended over $ 240,000 to get the business up and running. However, due to personal financial difficulties, M & K became delinquent in weekly franchise royalties and service fees in amounts running just over $ 300. Bowen also cited operational problems with the shop

that breached the franchise agreement. After several warnings, including issuance of a default notice in February 1998, Bowen terminated the agreement on or about March 2, 1998.

Despite receipt of the termination notice, M & K continued using the Honey Dew trade marks and trade dress. This practice continued until the district court preliminarily enjoined it on February 22, 1999, after a hearing. M & K was permitted to continue operation of a generic doughnut shop in the same leased location.

The district court awarded summary judgment to the plaintiffs on M & K's liability for trademark infringement and breach of contract. The court determined that Bowen had validly terminated the franchise agreement for M & K's chronic failure {**3} to make timely royalty payments even after notice and expiration of the cure period. The court also ordered a hearing on damages and commented on the liquidated damages issue:

I recognize that plaintiffs want some sort of remedy that is prescribed by the franchise agreement. Whether that's appropriate or not, whether it results in a penalty or forfeiture, is something the Court will decide at a later time. So I will tell you now that I have no idea whether I will impose damages on Count {*25} IV [seeking enforcement of the supplemental agreement on royalty payments in the event of breach], and if I do what the amount will be. But that will be determined at a later time after proof and argument.

The district court held a hearing on damages on April 14 and 15, 1999. The court said nothing about its expectations for proof on the liquidated damages clause at the outset of the hearing. In opening remarks, the plaintiffs said they would present evidence on the calculation of liquidated damages according to the formula established in the franchise agreement. The court responded to this introduction by stating, "you've got to prove your case. . . . You've got to make some proof {**4} here."

Bowen and Honey Dew sought liquidated damages for breach in accord with the Supplemental Agreement

entered into with the franchisee. These damages included "all royalty and other payments which, but for the termination, would have been due through the intended expiration of this Agreement." These damages were to be calculated as "the average of the royalties due for the calendar year ending prior to termination." The plaintiffs put on testimony to support this calculation of damages, demonstrating how the average royalties from the franchise's history should be applied to the liquidated damages formula in the contract. The plaintiffs waived recovery for trademark infringement, stating that "in light of the damages already requested under the contract, we don't feel it's cost effective to proceed on the Lanham Act statutory damages."

In their case, the defendants did not challenge the liquidated damages calculations of the plaintiffs and they offered no evidence to show that the liquidated damages clause worked a penalty. Instead, they concentrated on aspects of the franchisee-franchisor relationship that may have contributed to M & K's failure, including exclusion from promotions {**5} and the proximity of other Honey Dew franchises. Both parties submitted evidence as to the amount of counsel fees at issue.

At the close of the evidence, the court said that the plaintiffs' "failure of proof" on the issue of actual damages and mitigation raised "a question as to whether that clause is valid and should be enforced, and I think that's an issue neither side has truly addressed." During the plaintiffs' final argument, the court said, "I don't know if it's valid . . . . It seems to me that there are penalty aspects to this." Hearing this, the defendants echoed the judge's concern in their closing argument: "I have now, of course, the benefit of your Honor's expressions and thinking with reference to [the liquidated damages clause], . . . this clause in the supplementary agreement is nothing short of a confiscatory nature and a penalty." In rebuttal, the plaintiffs complained about this late injection of the penalty issue:

I assure the Court that had these issues been raised prior to or during the trial, I not only feel comfortable that we would have been able to convince the Court that these were fair and reasonable provisions both then and now, but our entire {**6} case would have been extremely different, and I feel that it's, although I understand the Court's hesitation in enforcing the clause, I feel it's only fair to take the case as it was presented to you and not penalize us for the fact that we weren't really given an opportunity to make the appropriate arguments as to those issues and present the proof as to those issues.

In light of these arguments, the court required post-trial memoranda on enforcing the liquidated damages clause and calculating attorneys' fees.

The plaintiffs argued in their memorandum that the defendants had waived the penalty as an affirmative defense. "Significantly, the defendant in this litigation did not contest the validity of the method of calculating liquidated damages. . . . [A] {*26} party seeking to invalidate a liquidated damages clause bears the burden of proving this affirmative defense." The plaintiffs also reiterated that if they had known the validity of the liquidated damages clause was in question, "the entire case would have been litigated differently, with different witnesses."

In their memorandum, the defendants asserted that the plaintiffs "have the burden of demonstrating that the liquidated {**7} damages provision is enforceable. . . . The plaintiffs failed to prove that either the amount fixed was a reasonable forecast of just damages or that the harm caused would be incapable or difficult to estimate." Additionally, they stated that the damages formula acts as a penalty because "it is designed always to assure the plaintiffs more than their actual damages." Finally, the defendants asserted that, in seeking enforcement, the plaintiffs failed to account for mitigation of damages by the defendants.

After considering the evidence and the memoranda of counsel, the court decided that the liquidated damages clause was an unenforceable penalty and awarded nominal damages of one dollar to Bowen and Honey Dew. The court made this determination pursuant to the law of Massachusetts, as specified by a choice of law provision in the contract. Because the term specifying attorneys' fees and costs was part of the liquidated damages clause in the supplemental agreement, the district court ruled that it was also unenforceable. Both of these rulings were erroneous.

**II.**

Plaintiffs argue on appeal that because M & K never pled explicitly that the liquidated damages clause was an unenforceable {**8} penalty, they have waived any claim to this affirmative defense. Although failure to plead an affirmative defense generally "results in its waiver and exclusion from the case," **Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd., 870 F. Supp. 1153, 1161 (D. Mass. 1994),** the defendants' pleadings in this case provided notice of the penalty defense. They state that the relief plaintiffs seek would "present a definite forfeiture of defendants' business and their immense investment; and by every principle of equity and justice, such forfeiture should not be enforced." In context, this defense primarily contests the fairness of stripping the franchise of the Honey Dew trade name

and prohibiting further operation of a doughnut business at the existing site. Still, this statement indicates the defendants' concern that the relief that could be awarded to the plaintiffs would constitute a penalty. Moreover, the judge understood the presence in this case of the penalty defense to the claim of damages. Again, as the court stated at the close of the liability phase of the case, almost three months before the hearing on damages, "I recognize that plaintiffs want some sort of remedy {**9} that is prescribed by the franchise agreement. Whether that's appropriate or not, whether it results in a penalty or forfeiture, is something the Court will decide at a later time."

Under these circumstances, we conclude that the defendants did not waive the penalty defense to the enforcement of the liquidated damages clause in their pleadings. At trial, however, they failed to present evidence on the enforceability of the liquidated damages clause. So did the plaintiffs. We now assess the significance of this odd circumstance.

## III.

Not surprisingly, the court revealed some uncertainty about whether the plaintiffs had the burden of {*27} proving that the liquidated damages clause in the franchise agreement did not impose an unenforceable penalty, or whether the defendants had the burden of proving that it did. In their post-trial memorandum, the plaintiffs cited law from New Jersey and Connecticut in support of their assertion that the defendants had the burden of proving that the liquidated damages clause imposed an unenforceable penalty. See **Naporano Associates, L.P. v. B & P Builders, 309 N.J. Super. 166, 706 A.2d 1123 (N.J. Super. 1998); Norwalk Door Closer Co. v. Eagle Lock & Screw Co., 153 Conn. 681, 220 A.2d 263 (Conn. 1966).** {**10} Defendants cited law from Maine in support of their insistence that the plaintiffs had to prove that a liquidated damage clause did not impose such a penalty. See **Pacheco v. Scoblionko, 532 A.2d 1036 (Me. 1987).** n1 Neither party cited the law of Massachusetts. So far as we can discern, there is no definitive statement by the Massachusetts courts on this issue. At most, we find cases stating that defendants who challenged contract enforcement on the basis of illegality or a violation of public policy have the burden to raise and prove that defense. See **Fedenyszen v. Pollano, No. 9413, 1997 WL 382114** at *2 (Mass. App. Ct. June 25, 1997) (relating to contract enforcement: "The burden was on the defendant to raise and prove the affirmative defense of illegality or a violation of public policy.") We also find a federal district court case which assigns the burden of demonstrating unenforceability to the party hoping to avoid enforcement of the contract. See **New England**

**Mut. Life Ins. Co. v. Stuzin, 1990 U.S. Dist. LEXIS 13137** *13, No. 86-2470-S (D. Mass. Oct. 1, 1990) (regarding material issues surrounding enforceability of liquidated {**11} damages clauses, "defendants have the burden of proof.").

- - -Footnotes- - -

n1 The court in this case recognized, however, that while few jurisdictions have addressed the issue, "an apparent majority" favor the view that the party challenging the liquidated damages provision bears the burden of proof. **532 A.2d at 1038-39.**

- - -End Footnotes- - -

Our search of the treatises and academic literature leads us to the conclusion that the prevailing rule is that the party challenging the enforceability of a liquidated damages clause has the burden of proving that it is a penalty. "The trend toward increased enforcement of stipulated damages is also encouraged by a shifting of the burden of proof to the party who asserts the existence of an unlawful penalty. The shifted burden of proof, enacted by statute in some states, has probably now become the majority rule, replacing the earlier rule requiring the enforcer of a contract to prove the absence of an unlawful penalty." Joseph F. Brodley & Ching-to Albert Ma, Contract Penalties, Monopolizing Strategies, and {**12} Antitrust Policy, **45 Stan. L. Rev. 1161, 1179 (1993)** (citing 25A C.J.S. Damages § 144(f) (1966)). See also Melvin Aron Eisenberg, The Limits of Cognition and the Limits of Contract, **47 Stan. L. Rev. 211, 236 (1995)** ("[A] liquidated damages provision should relieve the plaintiff of the burden of proving damages, by shifting to the defendant the burden of establishing that the liquidated damages provision is unenforceable.); 22 Am. Jur. 2d Damages § 905 (1999) ("Where the contract contains a liquidated damages clause, the party seeking to repudiate that clause must show that agreed damage is so exorbitant as to be in [the] nature of a penalty.").

Given this authority, and the Massachusetts precedents cited above dealing with proof of the unenforceability of contracts in other contexts, we conclude that if the Massachusetts Supreme Court were required to decide the issue before us definitively, it would assign the burden of proving the unenforceability of a liquidated damages clause to the party raising that defense (here, the defendants). See **Losacco v. F.D. Rich Construction Co., Inc., 992 F.2d 382, 384 (1st Cir. 1993)** ("When {**13} the highest state court has not issued a definitive ruling on

the precise issue at hand, the federal courts may refer to analogous decisions, considered dicta, scholarly works, or other reliable sources to ascertain how the highest court would rule."). For that reason, we conclude that the trial court erred in requiring that the plaintiffs prove that the liquidated damages clause did not impose a penalty on the defendants. {*28}

In addition, we note that the district court decided the penalty issue without the benefit of any pertinent evidence. For example, after observing that plaintiff Bowen "was relieved of its duties under the Franchise Agreement as a consequence of M & K's default and termination," the court wrote in its opinion that "common sense dictates that Bowen will save an unstated amount because it does not have to supervise the operation of the shop and regularly send personnel to Rhode Island to ensure that M & K complies with the Franchise Agreement (for example, the sanitary standards set forth in Honey Dew's policies)." The court similarly emphasized that the damages clause is an unenforceable penalty "because, at the time the agreement was made, it was not a reasonable {**14} estimation of the potential loss which would occur if there was breach and termination of the Franchise Agreement." The court explained this conclusion on the basis of logic and inference:

> Under the terms of the franchise agreement, royalties were to be paid to plaintiffs on a monthly basis to June 8, 2002. It was known at the time of contracting that if M & K had defaulted under the terms of the Franchise Agreement and it was terminated, the loss sustained by Bowen would be some small unknown amount every month through to the expiration date of the agreement. To require M & K to make all of those future payments in one lump sum as of the time of termination cannot reasonably be viewed as compensation for Bowen's loss, but rather as a penalty for the breach since there is no provision for discounting the amount to present value. Consequently, the damages clause calls for the payment of an unconscionable penalty.

In the circumstances of this case, these judgments based on common sense and logic should have been informed by an understanding of the factual predicates for the liquidated damages clause. Determining the validity of a liquidated damages clause is usually a fact-specific {**15} exercise. See **A-Z Servicenter, Inc. v. Segall, 334 Mass. 672, 138 N.E.2d 266, 268 (Mass. 1956); Zapatha v. Dairy Mart, Inc., 381**

**Mass. 284, 408 N.E.2d 1370, 1374-75 (Mass. 1980).** In the relevant commercial code context, when there are claims of unconscionable contract provisions, Massachusetts law requires that "the parties shall be afforded a reasonable opportunity to present evidence as to [the contract's or clause's] commercial setting, purpose and effect to aid the court in making its determination." Mass. Gen. Laws ch. 106, § 2-302(2). n2

- - -Footnotes- - -

n2 Massachusetts courts dealing with claims of unconscionable contract terms have recognized the relevance of the Uniform Commercial Code provisions in analyzing the claims before them even if the contract was not covered by the Code. See **Zapatha, 408 N.E.2d at 1374-75** (invoking the provisions of the sales article regarding good faith and unconscionability by analogy, while recognizing that franchise agreements may be distinct from contracts for sale of items).

- - -End Footnotes- - -
{**16}

In their post-trial memorandum, the plaintiffs noted correctly the absence in the record of evidence on the penalty issue: "At trial, there was no evidence presented as to either negotiations or intention, making it virtually impossible to second guess whether the provision was reasonable at the time it was negotiated." n3 They go on to suggest the types of evidence they would have offered to defend against a claim that the clause constituted a penalty: "actual damages, the projected royalty stream over the remainder of the {*29} contractual term, the present value of the damages and the factors which were considered in establishing the liquidated damages clause." In the plaintiffs' brief on appeal, they cite "a variety of factors on both sides which could have been considered in selecting the formula to which the parties agreed." The court needed to hear evidence about these factors before deciding the penalty issue. n4

- - -Footnotes- - -

n3 Under Massachusetts law, "a judge, in determining the enforceability of a liquidated damages clause, should examine only the circumstances at contract formation. Our position is that 'where actual damages are difficult to ascertain and where the sum agreed upon by the

E

# EXHIBIT E

## REINSTATEMENT AGREEMENT

Now come Bowen Investment, Inc. ("BII"), a Massachusetts corporation with a principal place of business at 2 Taunton Street, Plainville, MA, C Nineseven, Inc. ("C97"), a Rhode Island corporation doing business at 355 Broad Street, Central Falls, RI and Vincenzo Ciummo and Sharon Ciummo, both of 1060 Oaklawn Avenue, Cranston, RI 02920 (collectively, the "Ciummos"), and state as follows:

### Recitals

WHEREAS, BII is engaged in the business of operating and franchising coffee and donut shops in Rhode Island known as Honey Dew Donuts® Shops;

WHEREAS, C97 is a franchisee of BII, by its purchase of the Honey Dew Donuts® Shop at 355 Broad Street, Central Falls, RI from Marathon Donuts, Inc., and in connection therewith, C97 executed a Franchise Agreement an Agreement Regarding Transfer of Honey Dew Donut Franchise, both dated January 11, 1999 (collectively, the "Franchise Agreement"),

WHEREAS, in connection with the Franchise Agreement, C97 and the Ciummos executed a Covenant Not to Compete and a Covenant to Protect Trade Secrets and Proprietary Information, both dated January 11, 1999 (collectively, the "Covenants");

WHEREAS, in connection with the Franchise Agreement, the Ciummos executed a Liability Agreement dated January 11, 1999 (the "Liability Agreement"), by which they are jointly and severally liable for the obligations of C97 to BII;.

WHEREAS, pursuant to the Franchise Agreement, C97 is required to operate in compliance with the provisions of the Operational Excellence Procedure Manual in effect from time to time and to maintain passing grades inspections in accordance with then-applicable store inspection policies;

WHEREAS, C97 is in default of his obligations to BII for failing to pass various store inspection, which has resulted in BII's forwarding through counsel a Notice of Default on January 5, 2004;

WHEREAS, C97 failed to cure the default specified in said Notice within the time period provided in said Notice and in the Franchise Agreement;

WHEREAS, on February 17, 2004, BII, though counsel, served C97 with a Termination Notice due to its failure to cure its default;

WHEREAS, C97 and the Ciummos have requested that the franchise be reinstated and BII is willing to do so, subject to the provisions hereof.

1

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.      The parties acknowledge and agree that the foregoing Recitals are true and accurate and the said Recitals are hereby incorporated herein by reference.

2.      The provisions of this Agreement shall supersede the provisions of the Franchise Agreement.

3.      Inspections.

(a)     Contemporaneously with the execution hereof, C97 has paid BII the sum of $750.00 for the cost of four inspections, $300.00 for additional services by BII's inspector, and $900.00 for legal fees in connection with its defaults and this Agreement.

(b)     Following execution, BII shall inspect C97's (the "Initial Inspection").

(i)     If the store does not receive a passing grade, C97 shall pay BII $150.00 for a follow-up inspection, and the store will be re-inspected no less than five days thereafter. If the store does not pass the re-inspection, or if the additional payment is not made, then the Sale Provisions hereof shall become effective;

(ii)    If C97 receives a passing score on the inspection or re-inspection provided in subparagraph (b)(i), then the Franchise Agreement shall be deemed reinstated, except that, for a one year probationary period (the "Probationary Period") from the date of the passing grade, if C97 fails any subsequent inspection, then C97 shall pay BII $300.00 for the cost of the inspection and for a re-inspection and the store will be re-inspected no less than five days thereafter;

(iii)   If C97 receives a passing score on the re-inspection provided in subparagraph (b)(ii), the Probationary Period shall be extended to run one year fro the date of said passing score;

(iv)    If C97 does not receive a passing store on any re-inspection pursuant to either section (b)(ii) or (b)(iii), or if any payment required hereunder is not made, then: (a) BII and its agents shall be given access to the Premises to clean, repair and restore C97's business premises to its reasonable satisfaction and C97 shall immediately pay the charges incurred for such work; and (b) C97 shall immediately upon completion for the work actively market its business for sale, utilize its best efforts to sell the business and shall enter into a Purchase and Sale Agreement, to a Buyer reasonably acceptable to BII, within 140 days and must complete the sale within 180 days (the "Sale Period");

(v)     During the sale period, C97 shall pay all sums due to BII when due and shall pass any inspections performed in the ordinary course of BII's business;

2

(vi)   Should C97 default in any of the provisions hereof, then it shall
relinquish the business to BII (a "Relinquishment"). At the time of any Relinquishment
hereunder, C97 shall remain liable to BII for any amounts owed through Relinquishment.
The Relinquishment shall be deemed full satisfaction of any and all post-termination
monetary obligations of C97 to BII. After Relinquishment, the Covenants shall remain in
full force and effect as if the franchise expired as of the date of Relinquishment. As
utilized herein, a "Relinquishment" shall mean that C97 shall give the keys to the
premises to BII and place BII in possession of the premises, and give BII possession and
title to all equipment and inventory therein;

(c)   All inspections hereunder shall be performed by BII's independent
contractor and shall be consistent with the inspection standards applicable to each of
BII's comparable franchises. At the time of each inspection, C97 or its employees shall
be put in possession of a copy of the report, consistent with BII's current procedures.

4.   This agreement shall not be interpreted or construed as a waiver of any
default in the operation of the shops or violation of the Franchise Agreement which may
have existed or which may exist as of the date hereof, other than as provided herein.

5.   C97 and the Ciummos hereby release and discharge BII, Robert
Bowen and Honey Dew Associates, Inc., their agents, servants, attorneys,
employees and officers from any and all actions and causes of action, claims or
demands for damages, costs, loss of use, loss of services, expenses, compensation,
consequential damage or any other thing whatsoever on account of, or in any way
growing out of transactions between the parties including, without limitation,
those pertaining arising out of, or in any way relating to transactions between the
parties including, without limitation, those pertaining to the Franchise Agreement,
from the beginning of the world to this date including, without limitation, those
pertaining arising out of, or in any way relating to the transfer and/or operation of
C97's business (the "Franchise") and/or the Franchise Agreement, including,
without limitation, the purchase, sale and/or operation of the Franchise, dealings
concerning prospective franchises, dealings concerning transfer or proposed
transfer of the Franchise, and all other claims of any nature whatsoever relating to
the Franchise, and claims for breach of contract, breach of fiduciary
responsibilities, breach of implied or express covenants, claims relating to HDA's
Advertising Fund, violations or alleged violations of Mass. G.L. c. 93A,
violations or alleged violations of any law relating to franchising and/or the
relationship of the parties hereto, and specifically releasing the claims alleged by
Seller against HDA in United States District Court civil action no: 03-10965-
RCL, which, if filed, shall be dismissed by the Seller, with prejudice, and Seller
acknowledges and agrees that it shall not participate in said action, either as a
Plaintiff or a class member.

6.   C97 and the Ciummos hereby ratify and confirm the Franchise Agreement
and the Covenants and agree that such contracts are valid and binding obligations,
enforceable in accordance with their terms, and are in full force and effect.

3

7.    Each of the parties hereto acknowledges that this Agreement has been entered into of his, her or its own volition with full knowledge of the facts as to their respective rights and liabilities and that each is individually familiar and in agreement with these various terms and provisions, and each of the parties hereto further acknowledges and represents that this Agreement is, in all respects, fair, reasonable and proper and that it correctly reflects the wishes and intentions of each party and that each party has had an opportunity to be represented by independent counsel.

8.    This agreement shall be governed and construed pursuant to the laws of the Commonwealth of Massachusetts.

Executed under seal in duplicate, each of which shall be deemed an original, this _____ day of _____, 2004.

Bowen Investment, Inc.                        C Nineseven, Inc.


By:_____        By:_____
Duly Authorized                               Duly authorized


_____             _____
Vincenzo Ciummo                            Sharon Ciummo

f/samik/bil/forms/rein-Ciummo

4

F

# EXHIBIT F

**HONEY DEW ASSOCIATES, INC., AND BOWEN INVESTMENT, INC., Plaintiffs, Appellants,**

v.

**M & K FOOD CORP., IRWIN KAY, AND ADELE KAY, Defendants, Appellees.**

No. 00-1300

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

241 F.3d 23; 2001 U.S. App. LEXIS 2640; 57 U.S.P.Q.2D (BNA) 1875

February 23, 2001, Decided

**PRIOR HISTORY:** {\*\*1} APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ronald R. Lagueux, U.S. District Judge].

**DISPOSITION:** Vacated and Remanded.

**COUNSEL:** Jack J. Mikels, with whom Linda J. Keogh and Jack Mikels & Associates were on brief for appellants.

Irving Brodsky for appellees.

**JUDGES:** Before Lynch, Circuit Judge, Coffin, Senior Circuit Judge, and Lipez, Circuit Judge.

**OPINION BY:** LIPEZ

**OPINION:** {\*24}

**LIPEZ, Circuit Judge.** The trial in the district court was about the breach of a franchise agreement and the reasonableness of a liquidated damages clause. The court refused to enforce the liquidated damages clause, deeming it a penalty. We conclude that the court misallocated the burden of proof and lacked an adequate factual basis for its penalty determination. We therefore vacate the judgment and remand for further proceedings.

## I.

Bowen Investment Inc. ("Bowen"), a sub-franchisor of Honey Dew Associates, Inc. ("Honey Dew"), entered into a franchise agreement with M & K Food Corporation ("M & K"), on June 9, 1992. This contract included a "Supplemental Agreement," which amended the principal document's statement of damages in the event of breach. Irwin and Adele Kay were {\*\*2} guarantors of the agreement for M & K, which gave them the right to establish and operate a Honey Dew donut shop in Providence, Rhode Island. The term of the agreement was for 10 years. The Kays expended over $ 240,000 to get the business up and running. However, due to personal financial difficulties, M & K became delinquent in weekly franchise royalties and service fees in amounts running just over $ 300. Bowen also cited operational problems with the shop

that breached the franchise agreement. After several warnings, including issuance of a default notice in February 1998, Bowen terminated the agreement on or about March 2, 1998.

Despite receipt of the termination notice, M & K continued using the Honey Dew trade marks and trade dress. This practice continued until the district court preliminarily enjoined it on February 22, 1999, after a hearing. M & K was permitted to continue operation of a generic doughnut shop in the same leased location.

The district court awarded summary judgment to the plaintiffs on M & K's liability for trademark infringement and breach of contract. The court determined that Bowen had validly terminated the franchise agreement for M & K's chronic failure {\*\*3} to make timely royalty payments even after notice and expiration of the cure period. The court also ordered a hearing on damages and commented on the liquidated damages issue:

I recognize that plaintiffs want some sort of remedy that is prescribed by the franchise agreement. Whether that's appropriate or not, whether it results in a penalty or forfeiture, is something the Court will decide at a later time. So I will tell you now that I have no idea whether I will impose damages on Count {\*25} IV [seeking enforcement of the supplemental agreement on royalty payments in the event of breach], and if I do what the amount will be. But that will be determined at a later time after proof and argument.

The district court held a hearing on damages on April 14 and 15, 1999. The court said nothing about its expectations for proof on the liquidated damages clause at the outset of the hearing. In opening remarks, the plaintiffs said they would present evidence on the calculation of liquidated damages according to the formula established in the franchise agreement. The court responded to this introduction by stating, "you've got to prove your case. . . . You've got to make some proof {\*\*4} here."

Bowen and Honey Dew sought liquidated damages for breach in accord with the Supplemental Agreement

entered into with the franchisee. These damages included "all royalty and other payments which, but for the termination, would have been due through the intended expiration of this Agreement." These damages were to be calculated as "the average of the royalties due for the calendar year ending prior to termination." The plaintiffs put on testimony to support this calculation of damages, demonstrating how the average royalties from the franchise's history should be applied to the liquidated damages formula in the contract. The plaintiffs waived recovery for trademark infringement, stating that "in light of the damages already requested under the contract, we don't feel it's cost effective to proceed on the Lanham Act statutory damages."

In their case, the defendants did not challenge the liquidated damages calculations of the plaintiffs and they offered no evidence to show that the liquidated damages clause worked a penalty. Instead, they concentrated on aspects of the franchisee-franchisor relationship that may have contributed to M & K's failure, including exclusion from promotions {**5} and the proximity of other Honey Dew franchises. Both parties submitted evidence as to the amount of counsel fees at issue.

At the close of the evidence, the court said that the plaintiffs' "failure of proof" on the issue of actual damages and mitigation raised "a question as to whether that clause is valid and should be enforced, and I think that's an issue neither side has truly addressed." During the plaintiffs' final argument, the court said, "I don't know if it's valid . . . . It seems to me that there are penalty aspects to this." Hearing this, the defendants echoed the judge's concern in their closing argument: "I have now, of course, the benefit of your Honor's expressions and thinking with reference to [the liquidated damages clause], . . . this clause in the supplementary agreement is nothing short of a confiscatory nature and a penalty." In rebuttal, the plaintiffs complained about this late injection of the penalty issue:

I assure the Court that had these issues been raised prior to or during the trial, I not only feel comfortable that we would have been able to convince the Court that these were fair and reasonable provisions both then and now, but our entire {**6} case would have been extremely different, and I feel that it's, although I understand the Court's hesitation in enforcing the clause, I feel it's only fair to take the case as it was presented to you and not penalize us for the fact that we weren't really given an opportunity to make the appropriate arguments as to those issues and present the proof as to those issues.

In light of these arguments, the court required post-trial memoranda on enforcing the liquidated damages clause and calculating attorneys' fees.

The plaintiffs argued in their memorandum that the defendants had waived the penalty as an affirmative defense. "Significantly, the defendant in this litigation did not contest the validity of the method of calculating liquidated damages. . . . [A] {*26} party seeking to invalidate a liquidated damages clause bears the burden of proving this affirmative defense." The plaintiffs also reiterated that if they had known the validity of the liquidated damages clause was in question, "the entire case would have been litigated differently, with different witnesses."

In their memorandum, the defendants asserted that the plaintiffs "have the burden of demonstrating that the liquidated {**7} damages provision is enforceable. . . . The plaintiffs failed to prove that either the amount fixed was a reasonable forecast of just damages or that the harm caused would be incapable or difficult to estimate." Additionally, they stated that the damages formula acts as a penalty because "it is designed always to assure the plaintiffs more than their actual damages." Finally, the defendants asserted that, in seeking enforcement, the plaintiffs failed to account for mitigation of damages by the defendants.

After considering the evidence and the memoranda of counsel, the court decided that the liquidated damages clause was an unenforceable penalty and awarded nominal damages of one dollar to Bowen and Honey Dew. The court made this determination pursuant to the law of Massachusetts, as specified by a choice of law provision in the contract. Because the term specifying attorneys' fees and costs was part of the liquidated damages clause in the supplemental agreement, the district court ruled that it was also unenforceable. Both of these rulings were erroneous.

II.

Plaintiffs argue on appeal that because M & K never pled explicitly that the liquidated damages clause was an unenforceable {**8} penalty, they have waived any claim to this affirmative defense. Although failure to plead an affirmative defense generally "results in its waiver and exclusion from the case," **Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd., 870 F. Supp. 1153, 1161 (D. Mass. 1994),** the defendants' pleadings in this case provided notice of the penalty defense. They state that the relief plaintiffs seek would "present a definite forfeiture of defendants' business and their immense investment; and by every principle of equity and justice, such forfeiture should not be enforced." In context, this defense primarily contests the fairness of stripping the franchise of the Honey Dew trade name

Page 7

and prohibiting further operation of a doughnut business at the existing site. Still, this statement indicates the defendants' concern that the relief that could be awarded to the plaintiffs would constitute a penalty. Moreover, the judge understood the presence in this case of the penalty defense to the claim of damages. Again, as the court stated at the close of the liability phase of the case, almost three months before the hearing on damages, "I recognize that plaintiffs want some sort of remedy {**9} that is prescribed by the franchise agreement. Whether that's appropriate or not, whether it results in a penalty or forfeiture, is something the Court will decide at a later time."

Under these circumstances, we conclude that the defendants did not waive the penalty defense to the enforcement of the liquidated damages clause in their pleadings. At trial, however, they failed to present evidence on the enforceability of the liquidated damages clause. So did the plaintiffs. We now assess the significance of this odd circumstance.

**III.**

Not surprisingly, the court revealed some uncertainty about whether the plaintiffs had the burden of {*27} proving that the liquidated damages clause in the franchise agreement did not impose an unenforceable penalty, or whether the defendants had the burden of proving that it did. In their post-trial memorandum, the plaintiffs cited law from New Jersey and Connecticut in support of their assertion that the defendants had the burden of proving that the liquidated damages clause imposed an unenforceable penalty. See **Naporano Associates, L.P. v. B & P Builders, 309 N.J. Super. 166, 706 A.2d 1123 (N.J. Super. 1998); Norwalk Door Closer Co. v. Eagle Lock & Screw Co., 153 Conn. 681, 220 A.2d 263 (Conn. 1966).** {**10} Defendants cited law from Maine in support of their insistence that the plaintiffs had to prove that a liquidated damage clause did not impose such a penalty. See **Pacheco v. Scoblionko, 532 A.2d 1036 (Me. 1987).** n1 Neither party cited the law of Massachusetts. So far as we can discern, there is no definitive statement by the Massachusetts courts on this issue. At most, we find cases stating that defendants who challenged contract enforcement on the basis of illegality or a violation of public policy have the burden to raise and prove that defense. See **Fedenyszen v. Pollano, No. 9413, 1997 WL 382114** at *2 (Mass. App. Ct. June 25, 1997) (relating to contract enforcement: "The burden was on the defendant to raise and prove the affirmative defense of illegality or a violation of public policy.") We also find a federal district court case which assigns the burden of demonstrating unenforceability to the party hoping to avoid enforcement of the contract. See **New England**

**Mut. Life Ins. Co. v. Stuzin, 1990 U.S. Dist. LEXIS 13137** *13, No. 86-2470-S (D. Mass. Oct. 1, 1990) (regarding material issues surrounding enforceability of liquidated {**11} damages clauses, "defendants have the burden of proof.").

- - -Footnotes- - -

n1 The court in this case recognized, however, that while few jurisdictions have addressed the issue, "an apparent majority" favor the view that the party challenging the liquidated damages provision bears the burden of proof. **532 A.2d at 1038-39.**

- - -End Footnotes- - -

Our search of the treatises and academic literature leads us to the conclusion that the prevailing rule is that the party challenging the enforceability of a liquidated damages clause has the burden of proving that it is a penalty. "The trend toward increased enforcement of stipulated damages is also encouraged by a shifting of the burden of proof to the party who asserts the existence of an unlawful penalty. The shifted burden of proof, enacted by statute in some states, has probably now become the majority rule, replacing the earlier rule requiring the enforcer of a contract to prove the absence of an unlawful penalty." Joseph F. Brodley & Ching-to Albert Ma, Contract Penalties, Monopolizing Strategies, and {**12} Antitrust Policy, **45 Stan. L. Rev. 1161, 1179 (1993)** (citing 25A C.J.S. Damages § 144(f) (1966)). See also Melvin Aron Eisenberg, The Limits of Cognition and the Limits of Contract, **47 Stan. L. Rev. 211, 236 (1995)** ("[A] liquidated damages provision should relieve the plaintiff of the burden of proving damages, by shifting to the defendant the burden of establishing that the liquidated damages provision is unenforceable.); 22 Am. Jur. 2d Damages § 905 (1999) ("Where the contract contains a liquidated damages clause, the party seeking to repudiate that clause must show that agreed damage is so exorbitant as to be in [the] nature of a penalty.").

Given this authority, and the Massachusetts precedents cited above dealing with proof of the unenforceability of contracts in other contexts, we conclude that if the Massachusetts Supreme Court were required to decide the issue before us definitively, it would assign the burden of proving the unenforceability of a liquidated damages clause to the party raising that defense (here, the defendants). See **Losacco v. F.D. Rich Construction Co., Inc., 992 F.2d 382, 384 (1st Cir. 1993)** ("When {**13} the highest state court has not issued a definitive ruling on

the precise issue at hand, the federal courts may refer to analogous decisions, considered dicta, scholarly works, or other reliable sources to ascertain how the highest court would rule."). For that reason, we conclude that the trial court erred in requiring that the plaintiffs prove that the liquidated damages clause did not impose a penalty on the defendants. {*28}

In addition, we note that the district court decided the penalty issue without the benefit of any pertinent evidence. For example, after observing that plaintiff Bowen "was relieved of its duties under the Franchise Agreement as a consequence of M & K's default and termination," the court wrote in its opinion that "common sense dictates that Bowen will save an unstated amount because it does not have to supervise the operation of the shop and regularly send personnel to Rhode Island to ensure that M & K complies with the Franchise Agreement (for example, the sanitary standards set forth in Honey Dew's policies)." The court similarly emphasized that the damages clause is an unenforceable penalty "because, at the time the agreement was made, it was not a reasonable {**14} estimation of the potential loss which would occur if there was breach and termination of the Franchise Agreement." The court explained this conclusion on the basis of logic and inference:

> Under the terms of the franchise agreement, royalties were to be paid to plaintiffs on a monthly basis to June 8, 2002. It was known at the time of contracting that if M & K had defaulted under the terms of the Franchise Agreement and it was terminated, the loss sustained by Bowen would be some small unknown amount every month through to the expiration date of the agreement. To require M & K to make all of those future payments in one lump sum as of the time of termination cannot reasonably be viewed as compensation for Bowen's loss, but rather as a penalty for the breach since there is no provision for discounting the amount to present value. Consequently, the damages clause calls for the payment of an unconscionable penalty.

In the circumstances of this case, these judgments based on common sense and logic should have been informed by an understanding of the factual predicates for the liquidated damages clause. Determining the validity of a liquidated damages clause is usually a fact-specific {**15} exercise. See **A-Z Servicenter, Inc. v. Segall, 334 Mass. 672, 138 N.E.2d 266, 268 (Mass. 1956); Zapatha v. Dairy Mart, Inc., 381**

**Mass. 284, 408 N.E.2d 1370, 1374-75 (Mass. 1980).** In the relevant commercial code context, when there are claims of unconscionable contract provisions, Massachusetts law requires that "the parties shall be afforded a reasonable opportunity to present evidence as to [the contract's or clause's] commercial setting, purpose and effect to aid the court in making its determination." Mass. Gen. Laws ch. 106, § 2-302(2). n2

- - -Footnotes- - -

n2 Massachusetts courts dealing with claims of unconscionable contract terms have recognized the relevance of the Uniform Commercial Code provisions in analyzing the claims before them even if the contract was not covered by the Code. See **Zapatha, 408 N.E.2d at 1374-75** (invoking the provisions of the sales article regarding good faith and unconscionability by analogy, while recognizing that franchise agreements may be distinct from contracts for sale of items).

- - -End Footnotes- - -
{**16}

In their post-trial memorandum, the plaintiffs noted correctly the absence in the record of evidence on the penalty issue: "At trial, there was no evidence presented as to either negotiations or intention, making it virtually impossible to second guess whether the provision was reasonable at the time it was negotiated." n3 They go on to suggest the types of evidence they would have offered to defend against a claim that the clause constituted a penalty: "actual damages, the projected royalty stream over the remainder of the {*29} contractual term, the present value of the damages and the factors which were considered in establishing the liquidated damages clause." In the plaintiffs' brief on appeal, they cite "a variety of factors on both sides which could have been considered in selecting the formula to which the parties agreed." The court needed to hear evidence about these factors before deciding the penalty issue. n4

- - -Footnotes- - -

n3 Under Massachusetts law, "a judge, in determining the enforceability of a liquidated damages clause, should examine only the circumstances at contract formation. Our position is that 'where actual damages are difficult to ascertain and where the sum agreed upon by the

parties at the time of the execution of the contract represents a reasonable estimate of the actual damages, such a contract will be enforced.'" **Kelly v. Marx, 428 Mass. 877, 705 N.E.2d 1114, 1117 (Mass. 1999)** (quoting **A-Z Servicenter, Inc. v. Segall, 334 Mass. 672, 138 N.E.2d 266, 268 (Mass. 1956)).**

{**17}

n4  In characterizing the liquidated damages provision as an acceleration clause, the court wrote, "it is well settled law that other than in a mortgage or security agreement situation, 'an acceleration clause cannot be viewed as one for liquidated damages if the full amount owing cannot be an estimate of the true extent of the damages sustained upon the breach.'" (citation omitted). Without considering evidence, the court concluded that the liquidated damages clause could not be an estimate of the true cost of the breach and thus was unenforceable. Again, this conclusion required evidence.

- - -End Footnotes- - -

We recognize that the defendants did not present any evidence on the unenforceability of the liquidated damages clause. Arguably, given this absence of evidence, and our conclusion that the defendants have the burden of proving that the clause imposes an unenforceable penalty, we should vacate the judgment of the court and order the entry of judgment for the plaintiffs. We reject that conclusion, however. The confusion about the proper allocation of the burden of proof on the enforceability of the liquidated {**18} damages clause hampered both parties in properly addressing the issue. Indeed, the court's insistence about the plaintiffs' responsibility to prove that the clause was not a penalty may have lulled the defendants into complacency about their evidentiary burden on this issue. We conclude, therefore, that the fairest outcome to both parties is a remand for further proceedings.

**IV.**

**Fees and costs**

The district court concluded that "[Bowen's] claim for counsel fees is based solely on the last sentence of the damages clause." Because it "declared that clause unenforceable and the counsel fee provision is an integral part thereof, counsel fees are not recoverable in this case." We disagree. The sentence making the franchisee "liable for all costs resulting from its default and all costs of collection including reasonable counsel fees" is not integral to the liquidated damages clause. Indeed, there was no indication at trial that this term was troubling to the court, even if the liquidated damages clause was. n5 Accordingly, with the plaintiffs having prevailed on liability, the court should award reasonable costs and fees to the plaintiffs on remand for the litigation {**19}  to date, with additional costs and fees to be awarded to the plaintiffs for the pending penalty litigation if they prevail on that issue.

- - -Footnotes- - -

n5 The district court requested post-trial briefs from the parties on whether the fees should be calculated pursuant to Rhode Island or Massachusetts rates. Neither party indicated that this term might be unenforceable as part of an invalidated liquidated damages clause.

- - -End Footnotes- - -

**Judgment  vacated.  Remanded  for  further proceedings  consistent  with  this  opinion.**