# EXHIBIT 9

```
 1        UNITED STATES DISTRICT COURT
 2        DISTRICT OF MASSACHUSETTS
 3                Docket No. 04-10702RWZ
 4
 5    ..............................
 6    BOWEN INVESTMENT, INC.
      and HONEY DEW ASSOCIATES, INC.
              Plaintiff
 7
      VS.
 8    C-MINE SEVEN, INC.,
      VINCENZO CIUMMO AND SHARON CIUMMO,
 9            Defendant
10    ..............................
11
12
13           DEPOSITION OF ROBERT P. BOWEN,
14    taken pursuant to Massachusetts Rules of Civil
15    Procedure, before Barbara A. Hoey, a Notary Public in
16    and for the Commonwealth of Massachusetts, at the Law
17    Offices of Lawrence Mehl, 21 Merchants Row, Boston,
18    Massachusetts on August 17, 2005 commencing at
19    10:00 a.m.
20
21
22           LIPMAN COURT REPORTING
23              101 Tremont Street
                Boston, MA 02108
24              617-227-9885
25
```

```
 1  APPEARANCES:
 2  ATTORNEY JACK J. MIKELS
    One Batterymarch Park
 3  Quincy, MA 02169
 4    On Behalf of the Plaintiff
 5  ATTORNEY LAWRENCE MEHL
    21 Merchants Row
 6  Boston, MA
 7    On Behalf of the Defendant
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              I N D E X
 2
 3  Witness                    Page
 4
 5  ROBERT P. BOWEN
 6
 7  Examination by Attorney Mehl:    4
 8
 9
10
11
12
13
14
15          E X H I B I T S
16
17  No.          Description
18
19  1       Notice of Deposition
20  2       Affidavit
21  3       Complaint
22  4       Franchise Agreement
23  5       Interrogatories
24  6       Reinstatement Agreement
25
```

```
 1          S T I P U L A T I O N S
 2
 3          It is hereby stipulated and agreed by
 4  and between counsel for the respective parties that the
 5  deposition transcript will be read and signed by the
 6  deponent under the pains and penalties of perjury.
 7          Counsel have further stipulated and
 8  agreed that all objections, except as to form, and
 9  motions to strike are reserved until the time of trial.
10          ROBERT P. BOWEN, a witness called by
11  the Defendant, having first been duly sworn,
12  deposes and says as follows in answer to
13  EXAMINATION BY ATTORNEY MEHL:
14      Q. Mr. Bowen, please state your full name, sir,
15  and spell your last name?
16      A. My name is Robert P. Bowen, B O W E N.
17      Q. Since we all know that you've been deposed in
18  the past I won't bore you with the process.   Do you
19  have any questions, sir?
20      A. None at the moment.
21          ATTORNEY MIKELS: I have none on cross.  Are
22  we done?
23      Q. No.  Your address is, sir?
24      A. 331 Doyle Avenue, Providence, Rhode Island.
25      Q. Your employment history, sir, please explain?
```

Condenseit!

1  A. Sorry.
2  Q. Have you always been involved with the Honey
3  Dew Donut business one way or the other?
4      ATTORNEY MIKELS: Objection.
5  A. No.
6  Q. What other areas of employment have you had?
7      ATTORNEY MIKELS: Objection. Is there a time
8  frame?
9  Q. Since 1975?
10  A. In 1975 I have owned a coffee shop called Old
11  Fashion Donuts in Attleboro, Massachusetts.
12  Q. Then after that time up to date would you
13  please trace your employment history for us?
14  A. I continued to be with Old Fashion Donuts up
15  until approximately 1987. At that time I changed my
16  donut shop that was in Franklin, Mass to a Honey Dew
17  Donut franchise.
18  Q. Then after that time?
19  A. Continued to be a Honey Dew Donut franchisee,
20  and approximately in 1986 I was granted the right to be
21  a subfranchisor for Honey Dew Donuts in the State of
22  Rhode Island which I am presently doing now.
23  Q. Who is the one that granted you that right?
24  A. Honey Dew Associates.
25  Q. As far as you know that is owned by?

1  A. Richard Bowen.
2  Q. Was that right granted in writing, sir?
3  A. Yes.
4  Q. Is it still -- is that same agreement still
5  in existence?
6  A. Yes, I believe so.
7  Q. Has it been changed since then, since 1986?
8  A. Sorry. I don't understand the question.
9  Q. On the subfranchise you said that was granted
10  to you in '86. Has that agreement ever been changed?
11  A. The original agreement?
12  Q. Yes, sir.
13  A. I don't know.
14  Q. I don't know or the answer is no?
15  A. I don't know. I don't know.
16  Q. But you would be the guy that would know --
17      ATTORNEY MIKELS: Objection.
18  Q. -- if anybody did or not?
19  A. I don't know.
20      (Deposition notice marked as Exhibit One.)
21  Q. We have here Exhibit One. Would you please,
22  sir, read that and then I will ask you a couple of
23  questions about it? Sir, have you ever seen that
24  document before?
25  A. Yes.

1  Q. Prior to today, when was that?
2  A. I believe it was yesterday afternoon.
3  Q. Where did you see it?
4  A. In my attorney's office.
5  Q. Mr. Mikels?
6  A. Yes.
7  Q. That was the first time you have seen this
8  document?
9  A. I believe so.
10  Q. How long was that meeting?
11  A. Approximately two hours.
12  Q. So you understand on behalf of Bowen
13  Investment, Inc you are the designated witness? You
14  understand that, sir?
15  A. Yes.
16  Q. For all of the items on Exhibit A to the
17  deposition notice?
18  A. Yes.
19  Q. Did you review any documents yesterday in
20  connection with this deposition notice?
21  A. Yes.
22  Q. Those documents were what, sir?
23  A. The documents right in front of me, list
24  Exhibit A.
25  Q. You reviewed all of the documents in

1  connection with those?
2  A. No, I read the items on Exhibit A.
3  Q. Yesterday?
4  A. And various other documents would be
5  inspection sheets in connection with C-Nine Seven
6  former franchisee.
7  Q. You read the inspection reports and anything
8  else?
9  A. I can't recall anything else.
10  Q. Do you own all of the stock of Bowen
11  Investment, Inc?
12  A. No.
13  Q. You don't?
14  A. No.
15  Q. Who are the other stockholders?
16  A. The other stockholder is my brother Richard
17  Bowen.
18  Q. Is that a 50/50 equal ownership?
19  A. Yes.
20  Q. Has it always been?
21  A. Yes.
22      (Affidavit marked as Exhibit Two.)
23  Q. Sir, if you will please review that. On page
24  three is that your signature?
25  A. Yes.

Condenselt!™

1    Q. Turn back to page one, paragraph one.   Does
2  it state there that you are the sole shareholder of
3  Bowen Investment, Inc? Does that say that, sir?
4    A. It does.
5    Q. Is that wrong?
6    A. I believe so.
7    Q. I think it is a yes or no question, sir?
8    A. I believe it is wrong.
9    Q. Did you draft this affidavit, sir?
10   A. With help of my counsel.
11   Q. Is that Mr. Mikels?
12   A. Yes.
13   Q. Did you read it before you signed it?
14   A. I did.
15   Q. Do you remember when that was?
16   A. Exactly, no.
17   Q. It is dated April 2, 2004.   Is that
18  accurate, sir, on the third page?
19   A. To the best of my knowledge.
20   Q. Is that what it says, sir, that it was signed
21  by you on April 2, 2004?
22   A. Yes.
23   Q. Is the 2nd, was that your own writing?
24   A. To the best of my knowledge.
25   Q. So this is in error, right, in paragraph one?

1    A. Yes.
2    Q. You are not the sole shareholder? You have
3  never owned in Bowen Investment, Inc more than 50
4  percent of the stock, is that accurate, sir?
5    A. I believe it is, yes.
6    Q. What is Bowen Investment, Incorporated's
7  address, sir?
8    A. 1215 Reservoir Ave, Cranston, Rhode Island.
9    Q. Do you know who the corporate officers are?
10   A. Yes.
11   Q. Would you tell me please?
12   A. I'm the president, Robert Bowen, also the
13  treasurer.  And I believe that's it.
14   Q. Do you know who's the corporate secretary?
15   A. I know my daughter Katie was at one time.  I
16  thought she was at one time.  I'm not sure if she still
17  is.
18   Q. If I told you that it was Mr. Mikels, would
19  that be right?
20       ATTORNEY MIKELS: Objection.
21   A. As I just stated I wasn't sure.
22   Q. I'm going to show you a document I pulled off
23  of the Secretary of State's web site and ask you if
24  that is current? Is that current, sir?
25   A. Yes.

1    Q. You told us earlier your daughter's name is
2  Kate or Katie, right?
3    A. Her legal name is Kate Bowen Jones.
4    Q. She is on the board according to this report,
5  is that accurate?
6    A. Yes.
7    Q. Does she own any of BII?
8    A. No.
9    Q. Do you recall when she went on the board?
10   A. Is that approximately?
11   Q. That's fine approximately.
12   A. Ten years ago.
13   Q. Do you know the reason?
14   A. No, I don't recall.
15   Q. You told us that BII's offices were in Rhode
16  Island.  Is that accurate, sir?
17   A. Currently, yes.
18   Q. Were they always?
19   A. No.
20   Q. When did they move?
21   A. Approximately a year ago.
22   Q. Would be August, 2004?
23   A. Approximately.
24   Q. What was their old address?
25   A. Two Taunton Street, Plainville,

1  Massachusetts.
2    Q. Why did they move?
3       ATTORNEY MIKELS: Objection.  What's the
4  relevance to the lawsuit?
5    Q. Would you answer the question please, sir?
6    A. To be more convenient to the franchisees and
7  the franchise in Rhode Island.
8    Q. Was your brother Dick Bowen ever on the board
9  of BII?
10   A. No.
11   Q. Let's go back if we may, sir, Exhibit Two
12  which is your affidavit.  In paragraph one it says --
13  are you coaching the witness?  You want me to wait?
14       ATTORNEY MIKELS: We're looking at documents.
15   Q. It reads on the third line in relevant part
16  -- well, I'll paraphrase it.  It says that BII has
17  had an agreement with HDA to act as a subsidiary of
18  HDA.  Would you explain that please, sir?
19   A. My understanding is Bowen Investment, Inc is
20  a subfranchisor of Honey Dew Associates in Rhode
21  Island.
22   Q. That's under the term of that written
23  agreement which you mentioned earlier, is that
24  accurate?
25   A. Sorry.  I don't understand the question.

Condenscit!

1  Q. Bowen Investment, Inc you said acts as HDA's
2  subfranchisee just for Rhode Island. But this says it
3  acts as a subsidiary. I'm asking you to tell me what
4  that means?
5     A. Again my understanding is that Bowen
6  Investment, Inc is a subfranchisor of Honey Dew
7  Associates. That is my understanding.
8     Q. But it also says it is to act as a subsidiary
9  of HDA. Would you explain that please?
10    A. I don't understand.
11    Q. All I am asking you, sir, is what you wrote
12 in your affidavit. Please explain it to me?
13        ATTORNEY MIKELS: Objection.
14    A. Again my understanding of this is that Bowen
15 Investment, Inc is a subfranchisor of Honey Dew
16 Associates in Rhode Island.
17    Q. I understand that, and that is exclusively
18 under the terms of the written agreement, is that
19 correct?
20    A. Sorry. Would you repeat that please?
21    Q. BII acts as HDA's subfranchisor exclusively
22 under the terms of a certain written contract, is that
23 accurate?
24    A. Yes.
25    Q. But it also says here to act as a subsidiary

1  of HDA. I don't understand that. Can you explain
2  that please?
3        ATTORNEY MIKELS: Objection.
4     A. Again my understanding we're the
5  subfranchisor for Honey Dew Donuts in the State of
6  Rhode Island.
7     Q. I understand that, sir. You are the one,
8  sir, that signed this affidavit. You are the one that
9  obviously read it. Then you signed it. I just want
10 to know what that means?
11    A. Again my understanding is that Bowen
12 Investment, Inc has been granted the right to be the
13 subfranchisor of Honey Dew Donuts in Rhode Island.
14        ATTORNEY MIKELS: Is that your understanding
15 what paragraph one means?
16    A. Yes.
17    Q. Thank you, Jack. When a company is owned by
18 you and your brother which you had told me you two
19 owned all of the stock how can that company be a HDA
20 subsidiary?
21        ATTORNEY MIKELS: Objection.
22    A. I don't know.
23    Q. Turn back to Exhibit One please, Exhibit A to
24 Exhibit One. Last page, item number one talks about
25 -- item number one on Exhibit A refers to the Honey

1  Dew system. Would you explain to me, sir, exactly
2  what that is?
3     A. My understanding is that the Honey Dew system
4  is made up of design, colors, the logo and that type of
5  thing, showcases, uniforms and things that make Honey
6  Dew Donut Shop look like a Honey Dew Donut Shop.
7     Q. So are you telling me that each of those
8  items which you just mentioned is exclusive to the
9  Honey Dew stores?
10        ATTORNEY MIKELS: Objection.
11    A. Yes.
12    Q. Is there anything else you can tell me about
13 the system, Honey Dew system?
14        ATTORNEY MIKELS: Objection.
15    A. No.
16    Q. To explain it?
17        ATTORNEY MIKELS: Objection.
18    A. Sorry. What was the question?
19    Q. In the Verified Complaint there is a
20 reference to the Honey Dew system, and I'm just asking
21 you if you will, sir, tell me what that means? You are
22 the designated witness.
23        ATTORNEY MIKELS: You want to show him what
24 you're referring to?
25    Q. In just a minute I will. I want to know what

1  he knows first. We all know what he wrote.
2     A. Sorry. I still don't understand the
3  question.
4     Q. Explain the term the Honey Dew system?
5        ATTORNEY MIKELS: Objection.
6     A. Again we talked about showcases, uniforms,
7  signage, proprietary product like coffee, manuals,
8  operation manuals. That's all I can recall at this
9  time.
10    Q. Fair enough. During the calendar year 2003
11 were there any Honey Dew stores comparable to the one
12 that's involved in this lawsuit?
13        ATTORNEY MIKELS: Objection. How do you
14 define comparable?
15        ATTORNEY MEHL: I can ask you that question.
16        ATTORNEY MIKELS: I'm not here to answer
17 questions. The question is too vague. Comparable in
18 sales? Comparable in size? Comparable in quality?
19 What are you trying to ask?
20        ATTORNEY MEHL: I will get to that.
21        ATTORNEY MIKELS: Okay. When you do he'll
22 answer it.
23    Q. Sir, are you not going to answer the question
24 now? In your mind were there any stores comparable to
25 the store operated by C-Nine Seven in 2003?

Condenselt!™

1    A. I don't understand the question.
2    Q. I'm going to show you a copy of the Verified
3 Complaint without exhibits.
4        (Verified Complaint marked as Exhibit Three.)
5    Q. We've marked as Exhibit Three a copy of the
6 Verified Complaint. Would you read that over please,
7 sir. Tell me if you've ever seen that before? With
8 regard to Exhibit Three when was the first time that
9 you saw this document?
10    A. I don't recall.
11    Q. Turn to the very next to the last page. Is
12 that your signature?
13    A. Yes.
14    Q. So you signed the verification. You don't
15 know -- sorry, do you know the date that was signed by
16 you?
17    A. I don't recall.
18    Q. Did you read all of this document prior to
19 your signing the verification?
20    A. Yes.
21    Q. Did you understand everything in this
22 Verified Complaint at the time it was signed by you?
23        ATTORNEY MIKELS: Objection.
24    A. Yes.
25    Q. Let's turn to page three, Paragraph 10. You

1 I see that?
2    A. Yes.
3    Q. It reads -- if you will, sir, please read the
4 -- is Paragraph 10 accurate?
5    A. I believe so.
6    Q. Sir, would you tell me please what BII
7 actually did with regard to the allegation in Paragraph
8 10?
9    A. I worked with the franchisee Mike Dutra in
10 assisting him every step of the way with construction
11 and purchasing the equipment and supervising the job.
12    Q. Did BII pay for any of that?
13    A. No.
14    Q. So the way Paragraph 10 is drafted is that
15 false?
16        ATTORNEY MIKELS: Objection.
17    A. Again I supervised with the franschisee in
18 preparing the Honey Dew Donut Shop in Central Falls and
19 assisting him with the purchase and the construction
20 and the finish work.
21    Q. But it states here you or BII purchased and
22 installed all of these items.
23        ATTORNEY MIKELS: No. I've got to object to
24 that. That's not what it says.
25    Q. It says BII prepared the premises including

1 the purchase and installation, that's what it says,
2 right?
3        ATTORNEY MIKELS: Yeah, the purchase and
4 installation of equipment. It does not say he
5 purchased the equipment.
6    Q. So BII did not pay for any of that, is that
7 accurate?
8        ATTORNEY MIKELS: Objection.
9    A. Yes.
10    Q. What exactly did BII do?
11        ATTORNEY MIKELS: Objection.
12    A. Again I worked with the franchisee.
13    Q. You personally?
14    A. I personally.
15    Q. How many hours or how many days, how many
16 weeks did you personally get involved?
17    A. I don't recall.
18    Q. Was it more than ten days worth of your time?
19    A. I don't recall.
20    Q. Was it more than just -- it was more than
21 you do with other new stores?
22    A. I'm not sure I understand the question.
23    Q. The effort and time that you personally
24 devoted to this store, is it comparable to the time and
25 effort that you put in with other stores?

1        ATTORNEY MIKELS: Objection.
2    A. I don't recall.
3    Q. Well, do you know?
4    A. Sorry. I don't understand the question.
5    Q. In Paragraph 10 you individually said -- I'm
6 sorry. You said that you were the individual who did
7 the things mentioned in here. What I'm asking you is
8 do you do this for all of your stores?
9        ATTORNEY MIKELS: Objection.
10    A. Sorry. I still don't understand the question.
11    Q. You told us earlier you were the guy on
12 behalf of BII who assisted Mr. Dutra in all of these
13 items here. Is that accurate, sir?
14        ATTORNEY MIKELS: Objection.
15    A. Yes.
16    Q. Do you do that for the other new stores?
17        ATTORNEY MIKELS: Objection.
18    Q. You assist all franchisees?
19    A. As much as I can.
20    Q. But the time and effort that you devoted to
21 this store is it about the same as you do to other new
22 stores?
23        ATTORNEY MIKELS: Objection.
24    A. I don't recall.
25    Q. Well, when there is a new store being built

Condenselt!

1 approximately how many hours do you individually put
2 in?
3        ATTORNEY MIKELS: I'm going to object to
4 that.  I don't know in what year this particular store
5 was built.
6    Q. It says 1998.
7        ATTORNEY MIKELS: But asking him now seven
8 years later how much he spent on a new store has no
9 relevance to anything that has to do with this
10 lawsuit.
11       ATTORNEY MEHL: Jack, Paragraph 10 is
12 extremely vague here.  You know I want to know what
13 the facts are.  You know you made the allegation -- I
14 don't think it's right.
15       ATTORNEY MIKELS: Ask him what he did with
16 this store.
17       ATTORNEY MEHL: I already asked him.
18       ATTORNEY MIKELS: I don't agree with that.
19    Q. What did you do with that store?
20       ATTORNEY MIKELS: That you've asked him twice.
21 If you have specific questions ask him specific
22 questions.
23    Q. Did you do anymore for that store than you
24 did that year for any other stores?
25       ATTORNEY MIKELS: Objection.

1    A. I don't recall.
2    Q. What did you do for this store?
3    A. I assisted the franschisee, Mike Dutra in the
4 planning of the store, the construction, the plans,
5 signage.
6    Q. Was there anyone else that did that or just
7 you?
8    A. I assisted Mr. Dutra.
9    Q. Right, and was there anybody else from Bowen
10 Investment that also helped Mr. Dutra?
11    A. Not that I recall.
12    Q. Was there anyone from HDA that helped Mr.
13 Dutra?
14    A. I don't recall.
15    Q. Am I to understand then the store was built
16 in accordance with all of HDA and BII specs?
17    A. Again, Bowen Investment, Inc assisted Mr.
18 Dutra in the planning and construction of the store.
19    Q. But was it in accordance with BII and HDA
20 specs?
21    A. I believe it was.
22    Q. So the store's construction would be like any
23 other new franchisee store being built in accordance
24 with HDA and BII's specs down in Rhode Island?
25       ATTORNEY MIKELS: Objection.

1    A. Sorry.  Would you repeat the question?
2    Q. Since you testified that this store was built
3 in accordance with HDA and BII specs that would be
4 applicable to any other store being built?
5       ATTORNEY MIKELS: Objection.
6    A. Sorry.  I don't understand.
7    Q. Before BII and HDA allow any new store to
8 open does that store have to be in accordance with HDA
9 and BII specs?
10    A. Yes.
11    Q. So this store along with all other stores
12 would have been built in accordance with HDA and BII
13 specs, is that accurate?
14       ATTORNEY MIKELS: Objection.
15    A. Yes.
16    Q. So the time and effort that you put in for
17 this store would be comparable to the other new stores
18 being built?
19       ATTORNEY MIKELS: Objection.
20    A. I don't recall.
21    Q. Why would you do more work for this store
22 than any other store being built?
23       ATTORNEY MIKELS: Is this a hypothetical?
24       ATTORNEY MEHL: No.
25       ATTORNEY MIKELS: Objection.

1    Q. I want to know the background here.  I'm not
2 getting it.
3    A. Sorry.  I don't understand the question.
4    Q. Would there be any reason why you would put
5 in more time and effort for this store than any other
6 new store?
7    A. All stores are different, different size,
8 different shapes.  Sometimes there is zoning problems. I
9 don't recall the particular circumstances with this
10 particular store.
11    Q. But does BII take care of any of the new
12 stores problems?
13       ATTORNEY MIKELS: Objection.
14    Q. Such as zoning problems that you just
15 mentioned or is that the obligation of the
16 franchisee?
17       ATTORNEY MIKELS: Objection.
18    A. We try to assist the franchisee with whatever
19 they need.
20    Q. Have you ever assisted with any zoning
21 problems?
22       ATTORNEY MIKELS: Objection.
23    A. I don't recall.
24    Q. When did this store first open?
25    A. I don't recall.

Condenselt!™

1   Q. Would it be 1998?
2   A. I don't recall.
3   Q. What was the purpose of the 1998 efforts?
4     ATTORNEY MIKELS: Objection.
5   A. Sorry. I don't understand the question.
6   Q. Paragraph 10 states that all of these efforts
7 that you did took place in the year 1998. Why would
8 those efforts have been done then?
9   A. To build a Honey Dew Donut Shop.
10   Q. So did the store open that year or the next
11 year?
12   A. I don't recall.
13   Q. Would it be possible the store opened at any
14 time earlier than 1998?
15   A. I don't recall.
16   Q. I'm not asking you that. Would it be
17 possible that the store might have opened prior to 1998
18 as a Honey Dew Donut Store, yes or no?
19   A. I don't know.
20   Q. You testified earlier that at this time you
21 assisted Mr. Dutra as a franchisee.
22     ATTORNEY MIKELS: Is that a question?
23   Q. Yes. Is that correct?
24   A. Yes.
25   Q. Mr. Dutra was the first franchisee at this

1 store?
2   A. I believe so.
3   Q. Did Mr. Dutra own the property?
4   A. I believe he did.
5   Q. Do you know Mr. Dutra?
6   A. I do.
7   Q. Are you social friends?
8   A. I am.
9     ATTORNEY MIKELS: Objection.
10   Q. Do you have any business relationship with
11 Mr. Dutra?
12     ATTORNEY MIKELS: Objection.
13   A. I'm not sure I understand the question.
14   Q. Do you individually have any business
15 relationship with Mr. Dutra at all?
16     ATTORNEY MIKELS: Objection.
17   A. Right now?
18   Q. Yes, sir.
19   A. I don't believe so.
20   Q. Did you ever have any?
21   A. Yes.
22   Q. Those were what, sir?
23   A. He was a franchisee.
24   Q. Of Bowen or HDA?
25   A. Bowen Investment.

1   Q. For the store?
2   A. For this store.
3   Q. Any other stores?
4   A. Also the one in Pawtucket.
5   Q. When was the first time that you met Mr.
6 Ciummo?
7   A. Approximately?
8   Q. Yes, sir.
9   A. 1991, '92, something along those lines.
10   Q. What were the circumstances?
11   A. It was my understanding that he was a night
12 manager for one of my franchisees.
13   Q. That franchisee's name was what?
14   A. Tom DeStephano.
15   Q. Is he related to Mr. DeStephano?
16   A. I don't know.
17   Q. Then when did you meet Sharon Ciummo?
18   A. I never met Sharon Ciummo.
19   Q. When did you have any discussions about Mr.
20 Ciummo becoming a BII franchisee?
21   A. Sorry. I don't understand the question.
22   Q. Let's back up. You met him approximately in
23 '91 or '92. When did you see him after that?
24     ATTORNEY MIKELS: Objection.
25   A. I'm not sure I understand.

1   Q. Did you have any ongoing discussion with Mr.
2 Ciummo after '92?
3   A. I don't recall.
4   Q. Did he and you ever talk about him becoming a
5 BII franchisee?
6   A. Yes.
7   Q. That was when, sir?
8   A. I don't recall.
9   Q. Where did those discussions take place?
10   A. At the Honey Dew Donut Shop in Central Falls.
11   Q. The franchisee was Mr. DeStephano, is that
12 correct?
13     ATTORNEY MIKELS: Objection.
14   A. No, the franchisee was Mr. Dutra.
15   Q. What was Mr. Ciummo doing there?
16     ATTORNEY MIKELS: Objection.
17   A. From what he told me he was observing.
18   Q. Observing what?
19   A. Honey Dew Donut Shop in Central Falls.
20   Q. What was the reason you were there?
21   A. I believe he asked me to meet him there.
22   Q. Mr. Ciummo or Mr. Dutra?
23   A. Both.
24   Q. They both asked you?
25   A. I believe so.

Condensel t!™

1  Q. What was the reason?
2  A. To discuss Mr. Ciummo becoming the
3 franschisee at the Central Falls location.
4  Q. You don't know approximately when that was?
5  A. I don't recall.
6  Q. Would you summarize those discussions for me
7 please?
8      ATTORNEY MIKELS: Objection.
9  A. Sorry. I don't understand.
10  Q. You said that you met with them at the time
11 at Mr. Dutra's store?
12  A. I met with Mr. Ciummo.
13  Q. Only?
14  A. I believe so.
15  Q. What was the nature of those discussions?
16      ATTORNEY MIKELS: Objection. When you say
17 those discussions.
18  Q. Of your meeting with Mr. Ciummo, tell me
19 about that? What did he say and what did you say?
20  A. We talked about him possibly becoming the
21 franchisee at that particular spot in Central Falls.
22  Q. What did you say to him?
23  A. I believe I gave him the franchise circular.
24  Q. Right then and there?
25  A. Right then and there.

1  Q. And did you get him to sign a receipt for it?
2  A. I believe so.
3  Q. What else did you say to him other than
4 here's the circular and sign your name on the receipt?
5  A. I don't recall.
6  Q. Was that meeting more than 30 minutes?
7  A. I don't recall.
8  Q. Was Mr. Dutra present for any part of that
9 meeting?
10  A. I don't believe so.
11  Q. Where did that meeting occur in the store?
12  A. In the front room.
13  Q. Front room meaning where the customers walk
14 in?
15  A. Sitting down on the stools right next to the
16 window.
17  Q. Where was Mr. Dutra at that time?
18  A. I don't know.
19  Q. But he was in the store?
20  A. I don't recall.
21  Q. I thought you told me earlier when you walked
22 in the store Mr. Dutra was there. No?
23      ATTORNEY MIKELS: Objection.
24  A. No, I didn't say that.
25  Q. So on that day you did not see at the store

1 Mr. Dutra?
2  A. I don't recall.
3  Q. Were there any other meetings with Mr. Ciummo
4 and you after that?
5      ATTORNEY MIKELS: Objection. At any time from
6 then to now?
7  Q. I'm getting ready to go forward. At any time
8 from that first meeting what was the next meeting, if
9 there was one?
10  A. Sorry. I don't understand the question.
11  Q. You testified that you met with him for the
12 first time to talk about Mr. Ciummo becoming possibly a
13 BII franchisee. That occurred at Mr. Dutra's store, is
14 that accurate?
15  A. I believe so.
16  Q. When was the next meeting?
17  A. I don't recall.
18  Q. Was there a next meeting?
19  A. Yes.
20  Q. What was the purpose of that meeting?
21  A. I don't recall.
22  Q. What was the reason for that subsequent
23 meeting?
24  A. I don't recall.
25  Q. Were there any subsequent meetings?

1      ATTORNEY MIKELS: Objection.
2  Q. To that next meeting which you just said?
3      ATTORNEY MIKELS: Objection.
4  A. Sorry. I don't understand the question.
5  Q. You said there was at least one more meeting,
6 but you didn't know where or when or time or what you
7 talked about. So now I'm asking you were there any
8 meetings after that meeting?
9      ATTORNEY MIKELS: Objection to the
10 characterization of what Mr. Bowen has testified to
11      ATTORNEY MEHL: I don't think so.
12      ATTORNEY MIKELS: You don't think I'm
13 objecting?
14      ATTORNEY MEHL: You can.
15  A. Sorry. Would you repeat --
16  Q. I'll ask it this way, after the first meeting
17 at Mr. Dutra's store before Mr. Ciummo's company became
18 a BII franchisee how many meetings did you have with
19 him?
20  A. I don't recall.
21  Q. More than one?
22  A. I don't recall.
23  Q. But at least one?
24  A. Sorry. I don't understand the question.
25  Q. You had at least one more meeting with him?

Condenselt!™

1  A. I don't recall.
2  Q. When the deal was signed were you at that
3  closing?
4  A. I don't recall.
5  Q. Would you have ordinarily been there?
6  A. Yes.
7  Q. Is there anyone else on behalf of BII
8  authorized to sign any franchise agreement?
9      ATTORNEY MIKELS: Objection.
10  A. I don't believe so.
11  Q. So you would be the guy that signed on behalf
12  of BII at the closing?
13      ATTORNEY MIKELS: Objection.
14  A. I'm not sure I understand.
15  Q. At the closing?
16      ATTORNEY MIKELS: At what closing?
17  Q. I'm getting ready to answer.  At the closing
18  when Mr. Ciummo's company became a BII franchisee would
19  he have signed a BII franchise agreement?
20      ATTORNEY MIKELS: Objection. You're assuming
21  there was a closing.
22      ATTORNEY MEHL: No.  I think you put that in
23  the complaint.
24      ATTORNEY MIKELS: That there was a closing?
25      ATTORNEY MEHL: All right, Jack. I won't play

1  that game.
2  Q. Did Mr. Ciummo's company ever become a BII
3  franchisee?
4  A. Yes.
5  Q. Tell us please the circumstances?
6      ATTORNEY MIKELS: Objection.
7  A. Sorry.  I don't understand the question.
8  Q. How did his company become a franchisee?
9  A. He bought the franchise from Mr. Dutra.
10  Q. Did you authorize that transaction?
11  A. I agreed to the transfer.
12  Q. To the transfer of the franchise?
13  A. From Mr. Dutra to Mr. Ciummo.
14  Q. But it was a transfer of Mr. Dutra's
15  franchise?
16  A. Yes.
17  Q. It was not a brand new franchise agreement?
18  A. Right.
19  Q. When was that, sir?
20  A. I don't recall.
21  Q. Were you there on that date when you
22  authorized that transfer?
23      ATTORNEY MIKELS: Objection.
24  A. Sorry.  I don't understand the question.
25  Q. On the date of Mr. Dutra's transfer of the

1  existing franchise you agreed to that, I'm asking you?
2      ATTORNEY MIKELS: Objection.
3  Q. Were you there on that day that you agreed to
4  that?
5      ATTORNEY MIKELS: Objection.
6  A. I don't recall.
7  Q. Are you the person that authorized that
8  transaction?
9  A. Yes.
10      ATTORNEY MIKELS: For Bowen Investment?
11  Q. For Bowen Investment, Inc, of course.  We're
12  only talking about Bowen Investment. You authorized
13  it.  Tell me how that was authorized by you?  Did you
14  sign your name on any document --
15      ATTORNEY MIKELS: Objection.
16  Q. -- approving that transaction?
17  A. I don't recall.
18      (Franchise agreement marked as Exhibit Four.)
19      (There was a discussion off the record.)
20      ATTORNEY MIKELS: Mr. Bowen had one correction
21  he wanted to make.
22  A. In connection with the transfer between Mr.
23  Dutra of the franchise to Mr. Ciummo, I believe Mr.
24  Ciummo signed new franchise documents at that time.
25  Q. Did that information -- did that correction

1  come from your lawyer, sir?
2      ATTORNEY MIKELS: Don't answer that question.
3  We're not going to discuss conversations Mr. Bowen and
4  I had.
5  Q. That was after the break?
6      ATTORNEY MIKELS: It was after the break.  The
7  information was incorrect. He's corrected it.
8  Q. Look at Exhibit Number Four please. I will
9  tell you, sir, this document was filed as to your
10  company's Verified Complaint.  Have you ever seen that
11  document, sir?
12  A. Yes.
13  Q. When did you see that for the first time?
14      ATTORNEY MIKELS: Objection.
15  A. I don't recall.
16  Q. Did you or your -- on page three did you
17  personally sign that, sir?  Is that your signature?
18  A. It looks like it.
19  Q. Is it?
20  A. I believe it is.
21  Q. Is anyone else authorized to sign your name?
22      ATTORNEY MIKELS: Objection.
23  A. No.
24  Q. What was the date on this document, sir?
25  A. 11th day of January, 1999.

Condense!!!

1    Q. So is this document the one where you on
2 behalf of BII approved and authorized the transfer to
3 C-Nine Seven, Inc?
4        ATTORNEY MIKELS: Objection.
5    A. I believe it is.
6    Q. When this was signed by you as well as C-Nine
7 Seven, Mr. Dutra's company was that at any meeting or
8 was the document just mailed around to the various
9 parties for signature?
10       ATTORNEY MIKELS: Objection.
11   A. I don't recall.
12   Q. When BII approves other transfers are you
13 usually present at some formal type of closing?
14       ATTORNEY MIKELS: Objection.
15   A. Sometimes.
16   Q. Were you in this instance?
17   A. I don't recall.
18   Q. So you don't know if on January 11th, 1999
19 whether you saw or met or talked with Mr. Ciummo?
20   A. I don't recall.
21   Q. Is it possible?
22   A. Sorry. I don't understand the question.
23   Q. When BII authorizes a transfer of a store or
24 of a franchise as they did in this deal here tell me
25 please what the process is?

1        ATTORNEY MIKELS: Objection.
2    A. I don't understand.
3    Q. You told us that this agreement is the one
4 whereby you approved this transfer, is that accurate?
5    A. Yes.
6    Q. What is the process behind this agreement?
7        ATTORNEY MIKELS: Objection.
8    A. To allow one franschisee to transfer to
9 another party.
10   Q. Did you draft this agreement, sir?
11   A. I don't recall.
12   Q. Do you know who did draft it?
13   A. I don't recall.
14   Q. Was it Mr. Mikels' office?
15   A. I don't recall.
16   Q. Would it have been any other law firm?
17   A. I don't recall.
18   Q. In 1999 did BII use any other law firm other
19 than Mr. Mikels' law firm?
20   A. I don't remember.
21   Q. Turn back to Exhibit A of the notice please,
22 sir. Let's go to item 3 please. What was your role
23 in this granting of the franchise?
24   A. Sorry. I don't understand.
25   Q. 3, what was your role in granting the

1 franchise?
2    A. I allowed Mr. Dutra to transfer the donut
3 shop to Mr. Ciummo.
4    Q. Did you draft any documents?
5    A. I don't recall.
6    Q. You personally, did you draft any documents?
7    A. I don't recall.
8    Q. Did you negotiate any terms of any of the
9 documents?
10   A. I don't recall.
11   Q. Would you normally be the one that would do
12 that?
13   A. Sorry. I don't understand.
14   Q. Would you be the individual on behalf of BII
15 that would negotiate some or all of the terms of the
16 franchise agreement?
17   A. Yes.
18   Q. Did you negotiate any of the terms with Mr.
19 Ciummo?
20   A. I don't recall.
21   Q. But if there was any negotiations you were
22 the one?
23   A. Sorry. I didn't understand the question.
24   Q. If there was any negotiation you would be the
25 guy, is that factual?

1        ATTORNEY MIKELS: Objection.
2    A. Sorry. I still don't understand the
3 question.
4    Q. You told me earlier, if I'm wrong please
5 correct me if I'm wrong now, no one other than you is
6 authorized to engage in any negotiation on behalf of
7 BII with any franschisee, is that accurate?
8        ATTORNEY MIKELS: Objection.
9    A. Sorry. I'm still confused.
10       ATTORNEY MIKELS: Me too. I don't remember
11 that ever being discussed. Are you trying to find out
12 if he has a final say on negotiations?
13       ATTORNEY MEHL: Yeah.
14       ATTORNEY MIKELS: Do you have final say on
15 franchise negotiations on behalf of BII?
16   A. Yes.
17   Q. If there was any negotiation you are the guy,
18 yes or no?
19       ATTORNEY MIKELS: You are the guy doesn't mean
20 anything. That's the problem. He just said he has
21 final say if that's what you're looking for. Can we
22 move on?
23   Q. I want to find out what was done in
24 connection with this franchise. Did you individually
25 negotiate any of the terms?

Condenseit!™

1  A. I don't recall.
2  Q. Were the individual on behalf of BII to sign
3 the franchise agreement with Mr. Ciummo?
4  A. I don't recall.
5  ATTORNEY MIKELS: Did you want to show him the
6 franchise agreement?
7  Q. No, I don't want to show him the franchise
8 agreement. Was anyone else authorized to sign on
9 behalf of BII?
10  A. Not that I know of.
11  Q. So if there was a franchise agreement between
12 BII and C-Nine Seven you signed it on behalf of BII, is
13 that accurate?
14  A. Sorry. Would you repeat that please?
15  ATTORNEY MEHL: You want me to get a franchise
16 agreement or do you want to stipulate he signed it on
17 behalf of BII?
18  ATTORNEY MIKELS: I'll stipulate that it was
19 signed on behalf of BII.
20  ATTORNEY MEHL: By him?
21  ATTORNEY MIKELS: Without seeing it I don't
22 know.
23  ATTORNEY MEHL: You don't know?
24  ATTORNEY MIKELS: I know the addendum was
25 signed by him, and the addendum was part of the

1 franchise agreement.
2  ATTORNEY MEHL: You want me to waste the time
3 and get the franchise agreement?
4  ATTORNEY MIKELS: Is it really an issue?
5  ATTORNEY MEHL: I'm getting ready to ask him
6 questions about it. You will stipulate he is the one
7 that signed the franchise agreement on behalf -- yes?
8  ATTORNEY MIKELS: I can't stipulate to that.
9  ATTORNEY MEHL: You can't.
10  ATTORNEY MEHL: He has to see it.
11  ATTORNEY MEHL: You don't know the answer to
12 that question?
13  ATTORNEY MIKELS: I have no reason to believe
14 it wasn't.
15  Q. Fine. What was your role in item 4 that's
16 the liability agreement?
17  ATTORNEY MIKELS: Objection.
18  Q. Did you draft that agreement?
19  A. Do we have the agreement in front of us?
20  Q. Not yet we don't, but you referenced it in
21 Exhibit 3. Paragraph 13, did you draft that agreement,
22 sir?
23  A. With the help of counsel.
24  Q. You negotiated that agreement with anybody?
25  A. I don't recall.

1  Q. Do you know if anybody else negotiated that
2 agreement --
3  A. I don't recall.
4  Q. -- with Mr. Ciummo. Do you know if in
5 January of '99 when the agreement for transfer, Exhibit
6 Four was executed if C-Nine Seven retained a lawyer?
7  A. Sorry. What was the question?
8  Q. Did you ever meet any lawyers for C-Nine
9 Seven?
10  A. I don't recall.
11  Q. Do you recall when the franchise agreement
12 was delivered to Mr. Ciummo?
13  A. I don't recall.
14  Q. Were you there?
15  A. Yes.
16  Q. Where was that meeting?
17  A. At Honey Dew Donut Shop in Central Falls.
18  Q. That's when you gave him the franchise
19 agreement?
20  A. When I gave him the franchise circular.
21  Q. When did you give him the franchise
22 agreement?
23  ATTORNEY MIKELS: Larry, the agreement is in
24 the circular.
25  ATTORNEY MEHL: Thanks, coach.

1  ATTORNEY MIKELS: I'm not coaching.
2  Q. I'm talking about the signed one, when did
3 you give him that?
4  A. I don't recall.
5  Q. Did you give him that?
6  A. I don't recall.
7  Q. Did anybody give him that?
8  A. I don't recall.
9  Q. So you have no idea if there is or is not --
10 if there was at the time, I'm talking about 1999, a
11 franchise agreement?
12  A. Sorry.
13  Q. At any time during 1999 was there any
14 existing franchise agreement between Mr. Ciummo or
15 C-Nine Seven, Inc?
16  ATTORNEY MIKELS: Objection.
17  A. I don't recall.
18  Q. So if you don't know if there was in 1999 a
19 franchise agreement with Mr. Ciummo who else might
20 know?
21  A. My attorney possibly.
22  Q. That's Mr. Mikels?
23  A. Yes.
24  Q. With regard to item two on Exhibit A for
25 these answers which you did not know or did not recall

Condenseit!

1  who else might know the answers?
2     A. Sorry. I don't understand your question.
3     Q. Item two talks about the preparation of the
4  store. You claim that on many of the items you just
5  did not remember. I'm asking is there anyone else
6  that might know?
7     A. I still don't understand your question.
8     Q. Item 2, do you see that?
9     A. Yes.
10    Q. On Exhibit A several things I asked you about
11 that you claimed you did not recall. So I'm asking is
12 there anyone else that might know?
13    A. I don't recall your question regarding that
14 earlier.
15    Q. You claim you didn't know the extent of your
16 time and efforts there. Is there anyone else who
17 might know that other than you?
18    A. I don't know.
19    Q. You also claim that you didn't know if your
20 time and efforts there were more or less than you would
21 do for any other store. Is there anybody else that
22 might know that answer?
23    A. I don't know.
24    Q. You are the designated witness for these
25 items. You don't know if you negotiated the terms of

1  the franchise agreement. Is there anyone else that
2  might know the answer to that?
3     A. I don't know.
4     Q. Is there anyone else that might have
5  negotiated that agreement other than you?
6     A. I don't know.
7     Q. Ordinarily who negotiates the franchise
8  agreement for the franchisees?
9     A. I do.
10    Q. Is there anyone else that does that?
11    A. I don't believe so.
12    Q. What about on the liability agreement, is
13 there anyone else other than you that negotiates that
14 agreement?
15    A. What was the question?
16    Q. Item 4 on Exhibit A, did you negotiate that
17 agreement?
18    A. I don't recall.
19    Q. Is there anybody else that might know the
20 answer to that question?
21    A. I don't know.
22    Q. Is there anybody else that might have
23 negotiated that agreement?
24    A. I don't know.
25    Q. Do you ordinarily get those from every single

1  franchisee?
2     A. I don't know.
3     Q. Did you execute it?
4     A. I don't recall.
5     Q. Is there anybody else that might know the
6  answer to that?
7     A. I don't know.
8     Q. Did you draft the agreement?
9     A. Is the agreement here in front of me?
10    Q. No, sir. Look at Exhibit Two. Let's talk
11 about paragraph nine. Exhibit Two is the Verified
12 Complaint?
13    A. That's three.
14    Q. The Verified Complaint, let's talk about
15 paragraph nine. Tell us please what the process is on
16 each deal where HDA allows BII to grant the franchise
17 please?
18    ATTORNEY MIKELS: Objection.
19    A. Sorry. I don't understand your question.
20    Q. Explain to me, sir, paragraph 9 in Exhibit
21 Three?
22    ATTORNEY MIKELS: Objection.
23    A. My understanding that Honey Dew Associates
24 gives permission to Bowen Investment, Inc to be a
25 subfranchisor to develop Honey Dew Donut Shops in the

1  State of Rhode Island.
2     Q. Did they approve each and every deal or is it
3  just a blanket approval?
4     A. I don't know.
5     Q. You don't know. Each time a new BII
6  franchise store opens do you have to seek HDA's
7  approval?
8     A. I don't know.
9     Q. You don't know the answer to that?
10    A. I don't.
11    Q. Does BII under the terms of your agreement
12 with HDA -- is BII obligated to pay them any money?
13    A. What was the question?
14    Q. You claim in your affidavit there is a
15 subfranchise agreement. I'm asking you under that does
16 BII ever have to pay any money to HDA?
17    A. I don't recall.
18    Q. When was the last time that you saw that
19 agreement?
20    A. Sorry. Which agreement are you talking
21 about?
22    Q. Subfranchise agreement?
23    A. I don't recall.
24    Q. Was it this year?
25    A. I don't remember.

Condenseit!™

1   Q. Do you know where the document is?
2   A. I don't recall.
3   Q. Do you have a copy of it?
4   A. I don't remember.
5   Q. Does Mr. Mikels have a copy of it?
6   A. I don't know. You'd have to ask him.
7   Q. One of these days I will. Does your brother
8   have a copy of it, Richard Bowen?
9   A. I don't know.
10  Q. Next area are the allegations in the
11  complaint about misappropriations. Item five, would
12  you read that over please. I'm going to ask you some
13  questions. Do you know which trademarks were infringed
14  as you claim?
15      A. Sorry. I don't understand the question.
16  Q. Were there any HDA owned trademarks infringed
17  upon in this lawsuit claimed by you?
18      ATTORNEY MIKELS: Objection.
19  A. Sorry. Would you repeat that please?
20      (The last question was read back by the court
21  reporter.)
22  A. I don't know.
23  Q. You don't know?
24  A. No.
25  Q. Who would know?

1   A. I don't know.
2   Q. Would Richard Bowen know?
3   A. I don't know.
4   Q. Would Mr. Mikels?
5   A. I don't know.
6   Q. You have no idea -- all right. So you just
7   don't know?
8   A. I don't.
9   Q. Are there any trademarks owned by HDA?
10  A. I don't know.
11  Q. Are there any trademarks owned by BII?
12  A. I don't know.
13  Q. Who would know the answer?
14  A. I don't know.
15  Q. During C-Nine Seven's operation of the store
16  did they pay all advertising fees up to the date the
17  store closed to BII?
18  A. I don't know.
19  Q. Who else might know?
20  A. I don't know.
21  Q. Would Monica Keafer know?
22  A. I don't know.
23  Q. How about royalty payments were those paid up
24  to date?
25      A. I don't know.

1   Q. Do you know if in the suit which you did sign
2   -- do you know whether in the complaint which you
3   signed whether you allege -- whether there was
4   allegations of trademark infringement?
5   A. Sorry. I don't understand the question.
6   Q. In Exhibit Number Three which is right there
7   do you know if there are any allegations of trademark
8   infringement?
9   A. Sorry. What page are you on?
10  Q. I'm actually not on any page. I'm asking you
11  the question in general.
12  A. I don't know.
13  Q. You don't know. You signed this, sir. is
14  that accurate?
15  A. Exhibit Three?
16  Q. Yes, sir. You testified that it was your
17  signature earlier?
18  A. Yes, I did sign it.
19  Q. But you have no idea if there are any
20  allegations with regard to trademark infringement?
21  A. I don't know.
22  Q. Who might know?
23      ATTORNEY MIKELS: You might.
24      ATTORNEY MEHL: How in the hell would I know?
25      ATTORNEY MIKELS: By reading it

1       ATTORNEY MEHL: I didn't sign it. I didn't
2   draft it.
3       ATTORNEY MIKELS: It's a legal document.
4   Either it is or it isn't.
5   Q. Do you have any evidence that BII might have
6   that C-Nine Seven infringed on any HDA owned
7   trademarks?
8   A. I don't know.
9   Q. What was the date C-Nine Seven was terminated
10  by BII as a franchisee?
11  A. I don't recall.
12  Q. Did they operate the store after that date?
13  A. I don't recall.
14  Q. Who would know that answer?
15  A. I don't know.
16  Q. Do you have any evidence that they did
17  operate after they were terminated?
18  A. I don't know.
19  Q. In 2004 what was the nearest store to the
20  C-Nine Seven store?
21      ATTORNEY MIKELS: Objection.
22      ATTORNEY MEHL: Why?
23      ATTORNEY MIKELS: The nearest store could be
24  the K-mart next door.
25  Q. The nearest talking about the nearest Honey

Condenseit!

1  Dew store.  Thank you for helping.  Was it one mile or
2  five miles or 50 miles?
3     A. I don't know.
4     Q. You don't know.  How many stores are there,
5  do you know, in this city?
6        ATTORNEY MIKELS: Objection.
7     Q. Is this Cranston, Rhode Island or Central
8  Falls?
9     A. I believe it's Central Falls.
10    Q. Are there any other stores in Central Falls,
11 Honey Dew stores?
12       ATTORNEY MIKELS: Objection.
13    A. I don't believe so.
14    Q. What would be the nearest -- what would be
15 the nearest Honey Dew store to this store?
16    A. I don't know.  Probably Pawtucket.
17    Q. That is approximately how far, sir?
18    A. Just guessing probably four miles.
19       (Interrogatories marked as Exhibit Five.)
20    Q. I'm going to hand you Exhibit Five.  Read 3
21 please, sir, to yourself or your counsel. 3, please
22 answer that question?
23       ATTORNEY MIKELS: Objection.
24    A. Sorry.  I don't understand the question.
25    Q. What is BII's answer to 3?

1        ATTORNEY MIKELS: You're asking him to tell
2  his answer without showing him the answer?
3        ATTORNEY MEHL: I'm going to show him that.
4        ATTORNEY MIKELS: Why don't you show it to him
5  now.
6        ATTORNEY MEHL: I want him to answer first the
7  question.
8     A. I don't recall.
9     Q. At the time you signed your affidavit as well
10 as the verification did you have any evidence with
11 regard to the answer to 3?
12    A. Sorry.  Could you repeat the question?
13       (The last question was read back by the court
14 reporter.)
15    A. I don't remember.
16    Q. Who might otherwise know if it isn't you?
17    A. I don't know.
18    Q. 4, read that please, sir.  At the time you
19 signed your affidavit and the verification what was the
20 answer to that item 4?
21       ATTORNEY MIKELS: Objection.
22    A. I don't recall.
23    Q. Who might know the answer?
24    A. I don't know.
25    Q. Would Richard Bowen know the answer?

1     A. I don't know.
2     Q. 5, same thing.
3        ATTORNEY MIKELS: Objection.
4        ATTORNEY MEHL: I'll go through it with him.
5        ATTORNEY MIKELS: I'm just stating it for the
6  record.
7        ATTORNEY MEHL: You want to get out of here
8  I'm trying to shorten my question.
9        ATTORNEY MIKELS: Do it whatever way you want.
10    Q. I'm trying to help you.  At the time of your
11 affidavit and of the verification what was the answer
12 to Interrogatory 5?
13    A. I don't recall.
14    Q. Were there any?
15    A. I don't remember.
16    Q. Is there anyone else who might know the
17 answer?
18    A. I don't know.
19    Q. 6, at the time of your affidavit and of the
20 verification what was the answer to Interrogatory
21 Six?
22    A. I don't recall.
23    Q. Do you know who might?
24    A. No, I don't know.
25    Q. On the date of your affidavit and the date

1  when you signed verification did you know on that date
2  the answers to Interrogatory Three, Four, Five and
3  Six?
4        ATTORNEY MIKELS: Objection.
5     A. I don't recall.
6     Q. You don't recall if on that date whether you
7  knew or not. Do you know if Mr. -- Do you know if
8  C-Nine Seven operated the store after the day of
9  termination?
10    A. I believe they did.
11    Q. How do you know that answer?
12    A. I remember talking with Mr. Ciummo and trying
13 to get him reinstated.
14    Q. When was that?
15    A. I don't recall.
16    Q. That was after the date they were terminated?
17    A. I believe so, yes.
18    Q. During that period from the date he was
19 terminated until the date you talked to him did BII
20 suffer any damages?
21    A. I don't know.
22    Q. If they did what would those damages be?
23    A. I don't know.
24    Q. Was BII's reputation damaged?
25    A. I don't know.

Condenselt!

1  Q. What about the good will, was that damaged?
2  A. I don't know.
3  Q. Do you know who might?
4  A. I don't know.
5  Q. Do you have any documents that might help you
6  know?
7  A. I don't know.
8  Q. You don't know whether you've got any
9  documents that might help you?
10  A. I don't know.
11  Q. You told me earlier that there was a meeting
12  -- tell me about your meeting after they were
13  terminated?
14  ATTORNEY MIKELS: Objection.
15  Q. Tell me the circumstances?
16  ATTORNEY MIKELS: Objection.
17  Q. Telephone call or face to face meeting?
18  ATTORNEY MIKELS: Could you hold it to one
19  question?
20  Q. I'm just trying to help him. Choose A, B, C
21  or D. It's multiple choice.
22  ATTORNEY MIKELS: Objection.
23  A. Sorry. What was the question again?
24  Q. You told me earlier after he was terminated
25  there was a subsequent meeting, is that right, sir?

1  A. I believe so, yes.
2  Q. Where was that meeting?
3  A. In my office in Plainville, Massachusetts.
4  Q. What was the date of that meeting?
5  A. I don't recall.
6  Q. Who was there?
7  A. I was there. Frank Worthington was there,
8  Vinny Ciummo and also he designated his manager. His
9  name is Lou. I don't know his last name.
10  Q. What was the purpose of that meeting?
11  A. To try and get the Honey Dew Donut in Central
12  Falls reinstated.
13  Q. Did you call that meeting?
14  A. I believe I invited Vinny, yes.
15  Q. What did you tell him about reinstatement?
16  A. First I had Mr. Worthington explain where he
17  was coming from with his inspections and what the
18  issues were. After that I gave him a copy of
19  reinstatement form which Vinny told me he would get
20  back to me in four or five days, and then he left.
21  Q. How long was this meeting?
22  A. Approximately one hour.
23  Q. What else was said?
24  A. I don't recall.
25  Q. What was the reinstatement form that you

1  mentioned?
2  A. It was a form that Vinny took with him, and
3  we asked him to hopefully negotiate -- as a matter of
4  fact I asked him to call Jack and see if we can get him
5  reinstated to avoid any legal issues.
6  Q. Did you draft that agreement?
7  A. With the help of counsel.
8  Q. Which parts did you draft?
9  A. I don't recall.
10  Q. Did you use that form for everything under
11  similar circumstances?
12  ATTORNEY MIKELS: Objection.
13  A. I don't recall.
14  Q. Have you ever used that form?
15  ATTORNEY MIKELS: Objection.
16  A. I don't remember.
17  Q. In the past five years have there been any
18  terminated franchisees that have been reinstated?
19  ATTORNEY MIKELS: Objection.
20  A. I don't recall.
21  Q. Who would know the answer?
22  A. I don't know.
23  Q. Let's talk about that franchise agreement --
24  sorry -- reinstatement agreement. Read that over, sir.
25  I'm going to ask you some questions. Is that the

1  document you were referring to?
2  A. I believe so.
3  Q. The date of this document is what? Let me
4  change that. Look at the top of the page in the fax
5  line. What is the date that you see there?
6  A. 12/2004.
7  Q. Turn the page. What does it say at the top
8  of the next page on the fax line? What does that say?
9  A. Looks like April 12.
10  Q. 2004?
11  A. Yes.
12  Q. Is that the date when you gave this document
13  to Mr. Ciummo?
14  A. I don't recall the exact date.
15  Q. Is this that document?
16  A. I believe it is.
17  Q. You testified that there were certain items
18  in here that you drafted. I'd like to know which ones?
19  A. I think I testified I worked with counsel in
20  drafting.
21  Q. Which items did you --
22  A. I don't recall.
23  Q. Was this the only draft or were there any
24  earlier drafts?
25  A. I don't recall.

Condenselt!™

```
1    Q. Were there any later drafts?
2    A. I don't recall.
3    Q. You testified earlier that you formally owned
4  a store and you were a HDA franchisee, is that
5  accurate?
6    A. Yes.
7    Q. What happened to that store?
8    A. I sold it.
9    Q. What was the buyer's name you recall?
10   A. I don't remember.
11   Q. When the store was sold did you transfer to
12 the buyer the HDA franchise?
13   A. I don't recall.
14   Q. Did you grant HDA a general release?
15   A. I don't recall.
16   Q. Was C-Nine Seven ever terminated prior to
17 January of 2004?
18   A. I don't recall.
19   Q. If I told you in your complaint which you
20 signed may allege that they were, would that help you?
21       ATTORNEY MIKELS: Where does it say that?
22       ATTORNEY MEHL: In the complaint I seem to
23 recall you stated they were terminated previously and
24 they were reinstated again. I just want to ask him
25 about that.
```

```
1       ATTORNEY MIKELS: I don't recall that.
2       ATTORNEY MEHL: if I'm wrong, I'm wrong.
3       ATTORNEY MIKELS: You're right.
4       ATTORNEY MEHL: Where is that?
5       ATTORNEY MIKELS: Paragraph 16.
6    Q. Do you see that, sir?
7    A. Yes.
8    Q. When they were terminated in February of 2002
9  did they sign at any time after that any form of
10 reinstatement agreement?
11   A. I don't recall.
12   Q. Who would know that answer?
13   A. I don't know.
14       (Reinstatement Agreement marked as Exhibit
15 Six.)
16   Q. Let's talk about Exhibit 6. Let's talk about
17 that. Explain to me if you will, sir, do you know as
18 of April 12, 2004 which is when this is dated
19 apparently at the top of the page Mr. Ciummo's
20 company's investment in this store and the franchise,
21 do you have any idea what that number is?
22   A. I don't recall.
23   Q. Would you think it would be more than
24 $10,000?
25   A. I don't know.
```

```
1    Q. You have no idea. My understanding, which I
2  am going to tell you, please tell me if I'm right or
3  not, under the terms of this deal, Exhibit Six, if he
4  failed -- if his store failed a reinspection after
5  this was signed his obligation was to turn over the
6  store to you, is that accurate?
7    A. I don't know.
8    Q. Read, sir, then Paragraph 3B VI at the top of
9  three.
10   A. Sorry. What was that again?
11   Q. At the top of page three read VI
12 subparagraph. You see that?
13   A. Yes.
14   Q. What does that mean to you?
15   A. I don't know.
16   Q. You don't know what that paragraph means?
17 This is an agreement you gave to Mr. Ciummo you
18 testified earlier, is that accurate? Did you give this
19 agreement to Mr. Ciummo, sir?
20   A. I believe I gave him a copy of this, yes.
21   Q. You also testified you were the one that
22 assisted Mr. Mikels in drafting this agreement. Tell me
23 what this paragraph means please, sir?
24   A. I don't know.
25   Q. You have no idea?
```

```
1    A. I don't know.
2    Q. Is there anybody else that might know what
3  this paragraph means?
4    A. I don't know.
5    Q. You think Mr. Mikels might know?
6    A. You'll have to ask him.
7    Q. I intend on that. You are the designated
8  witness, sir. Is there anybody else who might know
9  what this means?
10   A. I don't know.
11   Q. Let's go to Paragraph 5 which is on the same
12 exact page. Read that please, sir? What was the
13 purpose of this Paragraph 5?
14   A. I don't know.
15   Q. Do you know what the meaning of this
16 paragraph is, sir?
17   A. I don't know.
18   Q. You have no idea?
19   A. I don't know.
20   Q. Have you ever heard the phrase general
21 release?
22   A. I have.
23   Q. What does that mean to you?
24   A. I don't really know.
25   Q. Where did you hear that phrase?
```

Condenseit!™

```
 1     A. I don't recall.
 2     Q. Is this one of the paragraphs which you
 3  helped Mr. Mikels draft?
 4     A. No.
 5     Q. Is Paragraph 5 a general release?
 6     A. I don't know.
 7     Q. You see in Paragraph 5 towards the end of it
 8  it talks about -- come up from the bottom three and a
 9  half lines. It has a reference to a case
10  03-10965-RCL.  Do you know what that is?
11     A. I don't know.
12     Q. You have no idea?
13     A. I don't.
14     Q. Then up above that four lines it talks about
15  Mass GLC. 93A. Do you know what that is?
16     A. I don't know.
17     Q. I am not asking you what Mr. Mikels may have
18  told you, but did he explain Paragraph 5 to you ever?
19        ATTORNEY MIKELS: Don't answer that question.
20     Q. At the time you gave this document to Mr.
21  Ciummo did you understand this document?
22     A. I don't recall.
23     Q. You said there was a man named Frank
24  Writington or Worthington, one of those names, right?
25  What does he do for BII?
```

```
 1     A. Mr. Writington is the inspector.
 2     Q. Is he an employee?
 3     A. No.
 4     Q. Is he employed by any HDA affiliate?
 5     A. I don't know.
 6     Q. Who is he employed by, HDA?
 7     A. Sorry.  I don't understand the question.
 8     Q. Is he employed by HDA?
 9     A. I don't know.
10     Q. Is he an employee of BII?
11     A. No.
12     Q. Is he an employee of any of BII affiliated
13  companies?
14     A. Not that I know of.
15     Q. Who does he report to?
16        ATTORNEY MIKELS: Objection.
17     A. In Rhode Island he reports to me.
18     Q. You pay him?
19     A. I do.
20     Q. As an employee?
21     A. No.
22     Q. Do you have any contract with him?
23     A. No.
24     Q. What does he charge you?
25     A. I don't recall.
```

```
 1     Q. Does he charge you a flat fee for each store?
 2     A. I don't recall.
 3     Q. Have you reviewed all of the inspection
 4  reports on this store?
 5     A. I don't recall.
 6     Q. Have you reviewed any of them on this store?
 7     A. Yes.
 8     Q. Which ones?
 9     A. I don't recall.
10     Q. Is it possible there were any errors made in
11  those reports?
12     A. I don't know.
13     Q. Were there any errors made in any of those
14  reports which you read?
15     A. I don't know.
16     Q. With regard to Exhibit 6, do you know if that
17  agreement was ever signed by either party?
18     A. I don't believe so.
19     Q. Do you know if that agreement, if it were
20  signed, would have improved BII's terms with C-Nine
21  Seven?
22        ATTORNEY MIKELS: Objection.
23     A. I don't recall.
24     Q. Do you think that agreement was fair?
25        ATTORNEY MIKELS: Objection.
```

```
 1     A. I don't know.
 2     Q. Whose idea was paragraph number VI at the top
 3  of page three?
 4     A. I don't recall.
 5     Q. What do you think C-Nine Seven owes BII?
 6     A. I don't know.
 7     Q. Who might know?
 8     A. I don't know.
 9     Q. Thank you, sir.
10       (The proceding suspended at 1:15 p.m. The
11  proceding resumed at 1:25 p.m.)
12  EXAMINATION BY ATTORNEY MIKELS:
13     Q. Mr. Bowen, let me refer you to Exhibit Three
14  and refer you to a specific paragraph.  Paragraph 12
15  indicates that BII granted C-Nine Seven franchise on or
16  about January 11, 1999.  Do you believe that to be
17  correct?
18     A. Yes.
19     Q. It says there was a franchise agreement
20  executed.  Do you believe that to be correct?
21     A. Yes.
22     Q. Would you agree that the franchise agreement
23  was either signed by you or on your behalf?
24     A. Yes.
25        ATTORNEY MEHL: Objection.
```

Condenseit!™

1  Q. On behalf of BII
2  A. Yes.
3  Q. There is an allegation that C-Nine Seven had
4  flunked an inspection in December of 2003.
5  ATTORNEY MEHL: Objection.
6  A. Yes.
7  Q. Is that correct?
8  A. I believe so, sir.
9  Q. In Paragraph 17 there is an allegation there
10 was notice of default sent to C-Nine Seven on January
11 9, 2004. Is it correct such a notice was sent?
12 A. I believe so.
13 Q. It was sent on behalf of BII?
14 A. Yes.
15 Q. That was for failure to pass an inspection?
16 A. Yes.
17 Q. On February 17, 2004 a notice of termination
18 was sent to C-Nine Seven, is that correct?
19 A. I believe so, yes.
20 Q. That was because as stated in Paragraph 17 it
21 had not cured the default found in the store inspection
22 on December 18, 2003, is that correct?
23 A. Yes.
24 ATTORNEY MEHL: Objection.
25 Q. Under your franchise agreement that BII had

1  with C-Nine Seven after termination is a franchisee
2  allowed to continue operating as a Honey Dew Shop?
3  A. No.
4  Q. In situations where BII has the right to take
5  over the store would it be correct to say in those
6  circumstances the franchisee is required to turn the
7  keys over to Bowen Investment, Inc and it becomes Bowen
8  Investment, Inc's shop not the franchisee's. Is that
9  right?
10 ATTORNEY MEHL: Objection.
11 A. Yes.
12 Q. In that situation would you agree with me
13 whatever investment the franchisee made in the store at
14 that point is lost, is that right?
15 A. Yes.
16 Q. Would it be fair to say Bowen Investment, Inc
17 attempts to avoid situations where it terminates
18 franchisees and takes away stores?
19 A. Yes.
20 ATTORNEY MEHL: Objection.
21 Q. Now, directing your attention to Exhibit Six
22 the reinstatement agreement you talked a little bit
23 with Attorney Mehl about the first paragraph on page
24 three which is 3B VI. I'd like to take you back
25 through all of Section 3.   Paragraph 3A requires

1  C-Nine Seven to pay BII $750 for the cost of four
2  inspections, is that right?
3  A. Yes.
4  Q. Why would that cost be imposed on C-Nine
5  Seven?
6  A. That's what BII had to pay Mr. Writington.
7  Q. Then there was an additional $300 for
8  additional services provided by BII's inspector. Do
9  you recall what those were?
10 A. I don't.
11 Q. But is it fair to say it's your understanding
12 again those were charges that BII actually incurred to
13 Mr. Worthington?
14 A. Yes.
15 ATTORNEY MEHL: Objection. That's not what it
16 says.
17 Q. There is a request for $900 in legal fees in
18 connection with the default and reinstatement, is that
19 correct?
20 A. Yes.
21 Q. What's your understanding what that amount is
22 for?
23 A. Again that would be for reimbursement to BII
24 for legal counsel.
25 Q. Would it be fair to say that Section 3A

1  provides that as part of reinstatement C-Nine Seven is
2  going to reimburse Bowen Investment, Inc for its out of
3  pocket cost of the default and the termination?
4  A. Yes.
5  Q. Do you find anything unreasonable about that
6  request?
7  A. I do not.
8  Q. Would you have been involved in the drafting
9  of those terms?
10 A. Yes.
11 Q. Turning to Section 3B it requires an
12 inspection after execution, is that correct?
13 A. Yes.
14 Q. What was the purpose of requiring an
15 inspection after execution of the reinstatement
16 agreement?
17 A. Make sure the store was up to par.
18 Q. Would you have been involved in the drafting
19 of that requirement?
20 A. Yes.
21 Q. 3B1 says that if the store doesn't receive a
22 passing grade C-Nine Seven will pay $150 for a
23 follow-up inspection no less than five days after, is
24 that correct?
25 A. Correct.

Condenselt!™

1  Q. If the store doesn't pass the reinspection
2  then -- it has this in capital letters -- the sale
3  provisions shall become affective, is that right?
4  A. Yes.
5  Q. The sale provisions we'll get to in a
6  moment. You understood that if C-Nine Seven didn't
7  pass the post reinstatement inspection that it would
8  still be given another opportunity to pass an
9  inspection?
10  A. Yes.
11  Q. The only obligation of C-Nine Seven after
12  failing the post reinstatement inspection would be to
13  pay the S150 for the follow-up inspection?
14  A. Yes.
15  Q. Now, Paragraph 3B2 or II says that if C-Nine
16  Seven passes the inspection or the reinspection that it
17  would go into a probationary period for one year, is
18  that right?
19  A. Yes.
20  Q. It's fair to say under 3BII the probationary
21  period means from the date they receive their passing
22  grade if they fail an inspection for a year or within a
23  year they have to pay for the failed inspection and the
24  reinspection, a total of S300 and the store will again
25  be reinstated within five days of the original failed

1  inspection, is that right?
2  A. Yes.
3  Q. Again were you involved in the drafting of
4  the requirements under Section 3B1 and 2?
5  A. Yes, I was.
6  Q. Section 3B3 indicates on a reinspection they
7  do pass then the probationary period is extended for a
8  year from the past inspection, is that right?
9  A. Yes.
10  Q. Were you involved in the drafting of that?
11  A. I was.
12  Q. 3B4 says that if they flunk the reinspection
13  then you'll be given access to the premises to clean
14  it, restore it and repair it to your reasonable
15  satisfaction at C-Nine Seven's expense, is that right?
16  A. Yes.
17  Q. That if you have to do that then they'll
18  immediately try to sell the store, is that right?
19  A. Yes.
20  Q. So even if they flunked an inspection a year
21  after the reinstatement agreement, flunked the
22  reinspection you still aren't going to take their
23  store, is that right?
24  A. That's right.
25  Q. You were going to give them a chance to sell

1  their store?
2  A. Yes.
3  Q. You were going to go in and fix at their
4  expense so it could pass an inspection?
5  A. Yes.
6  Q. How much time were you giving them to sell in
7  that circumstance, was it 30 days?
8  A. 180 days.
9  Q. 180 days, that's six months?
10  A. Six months.
11  ATTORNEY MEHL: Objection.
12  Q. Were you involved in the drafting of that
13  section?
14  A. Yes.
15  Q. They were required under Section 3B to have
16  to pass any inspections during that six month period
17  they were trying to sell the business?
18  A. Yes.
19  Q. You were involved in the drafting of that?
20  A. Yes, I was.
21  Q. Now, we come to the provision that Attorney
22  Mehl was asking you about, 3B VI. And is it fair to
23  say that only in the event there was a complete failure
24  to meet the requirements of Section 3B only then would
25  they actually have to release and relinquish the store

1  back to BII, is that correct?
2  A. Yes.
3  Q. Were you involved in the drafting of that
4  provision?
5  A. Yes.
6  Q. Did you find any of those provisions to be
7  unreasonable?
8  A. I do not.
9  Q. You were also asked about Paragraph 5 of the
10  agreement. Do you have a recollection that after BII
11  defaulted and or terminated C-Nine Seven --
12  ATTORNEY MEHL: Objection.
13  Q. That C-Nine Seven sued Bowen Investment, Inc?
14  A. Yes.
15  Q. Are you aware that the suit that C-Nine Seven
16  filed against Bowen Investment, Inc was part of a
17  punitive class action filed in the Federal District
18  Court for Massachusetts?
19  A. Yes.
20  Q. Did you require or understand that as part of
21  any reinstatement you would require C-Nine Seven to
22  dismiss its claims in that class action and release any
23  claims against Bowen Investment, Inc?
24  ATTORNEY MEHL: Objection.
25  A. Yes.

Condenselt!™

1  Q. Were you involved in the drafting of the
2  provision that would require that in the reinstatement
3  agreement?
4  A. Yes.
5  Q. Did Mr. Ciummo discuss with you at this
6  meeting you had where you gave him the reinstatement
7  agreement what was in the reinstatement agreement?
8  A. No.
9  Q. Was there any subsequent communication with
10  him about the terms of the reinstatement agreement?
11  A. I called Mr. Ciummo a week later.
12  Q. What was the substance of that communication?
13  A. As I recall he complained he had to pay $900
14  for inspection and money for legal fees and so on and
15  so forth.
16  Q. I think the legal fees were 900?
17  A. And inspection fees.
18  ATTORNEY MEHL: Objection.
19  Q. Reviewing 3A there were inspection fees,
20  service of BII inspector and legal fees, is that right?
21  A. That's right.
22  Q. Is that what he was complaining about?
23  A. That's what he was complaining about.
24  Q. Did he complain about any other provision of
25  the agreement?

1  A. I don't recall.
2  Q. Did he say any other provision of the
3  agreement other than the fees he had to pay were
4  unfair?
5  A. I don't recall.
6  Q. Did he complain about the release?
7  A. I don't remember him complaining --
8  Q. Now, the same meeting where you gave Mr.
9  Ciummo the relinquishment agreement you said the
10  meeting lasted about an hour?
11  A. Yes.
12  Q. You said Mr. Worthington discussed the
13  inspection default?
14  A. Yes.
15  Q. What did Mr. Ciummo say about what Mr.
16  Worthington had to say?
17  A. I believe Mr. Ciummo was out of the country
18  during most of that time period. He seemed to indicate
19  he was unaware what was going on.
20  Q. Did he give any indication there were
21  mistakes in any of Mr. Worthington's reports?
22  A. I don't recall him mentioning that at all.
23  Q. Do you recall him mentioning anything in Mr.
24  Worthington's reports that were unfair?
25  A. I don't recall him mentioning that.

1  Q. Now, at the beginning of the testimony you
2  were talking about the Honey Dew system. I understood
3  you to say that the Honey Dew system included
4  trademarks?
5  A. Yes.
6  Q. Proprietary formulas?
7  A. Yes.
8  ATTORNEY MEHL: What was that?
9  Q. Proprietary formulas?
10  A. I believe I did mention proprietary coffee.
11  Q. Are there formulas for ingredients for
12  products?
13  A. Yes.
14  Q. Are there formulations how products are to be
15  baked and prepared?
16  A. I don't recall.
17  Q. Is there an operating -- I think you referred
18  to an operating manual?
19  A. Yes.
20  Q. Those types of items are in the operations
21  manual?
22  A. Yes, they are.
23  Q. Are there methods of operation utilized in
24  Honey Dew Donut Shops as part of their system?
25  A. Yes.

1  Q. Are products displayed in a certain way?
2  A. Yes.
3  Q. Are cases placed in certain positions within
4  the store?
5  A. Yes.
6  Q. Certain color schemes used?
7  A. Yes.
8  Q. Would it be fair to say the Honey Dew system
9  includes all aspects of the Honey Dew Shop?
10  A. Yes.
11  Q. You mentioned I believe that the Honey Dew
12  system was exclusive to Honey Dew, is that right?
13  A. Yes.
14  Q. Did you indicate that the individual elements
15  of the system are exclusive to Honey Dew or the
16  entirety of the system is exclusive to Honey Dew?
17  A. I was referring to the entire package.
18  Q. Finally we had discussed that a franchise of
19  Bowen Investment, Inc is required to close after
20  termination, is that right?
21  A. Yes.
22  Q. In this case Mr. Ciummo did not close, is
23  that right?
24  A. I believe he did not.
25  Q. He told you he didn't, is that right?

Condenselt!™

1     A. I don't believe he actually told me
2 personally, no.
3     Q. Did you understand that he testified that he
4 didn't?
5     A. Yes.
6     Q. He actually made payment to you for sales
7 from his Honey Dew Shop after termination?
8         ATTORNEY MEHL: Objection.
9     A. Yes.
10     Q. Do you know if those payments were complete
11 and full?
12     A. I do not.
13     Q. There were some payments made?
14     A. Yes.
15     Q. Do you have any understanding whether he
16 continued to operate under the Honey Dew signs?
17     A. I believe he did.
18     Q. Now, what are the types of damages that Bowen
19 Investment sustains when a franchisee continues an
20 operation post termination?
21     A. There is no way to supervise a store that's
22 been terminated and hasn't been reinstated.
23     Q. Is there a danger with respect to customers?
24     A. Customers are going in with the understanding
25 it's a Honey Dew Donut Shop and in full compliance with

1 their agreement.
2     Q. How would you calculate the damages arising
3 from somebody who's not authorized to use those
4 trademarks, essentially using them in commerce?
5     A. Priceless.
6         ATTORNEY MEHL: What?
7     A. Priceless.
8         ATTORNEY MIKELS: I don't have any further
9 questions.
10 REEXAMINATION BY ATTORNEY MEHL:
11     Q. Mr. Bowen, we took about a 15 minute break in
12 which you met with counsel. Is that accurate, sir?
13     A. Yes.
14     Q. You have now apparently changed your answers
15 on many, many areas.
16         ATTORNEY MIKELS: I object to that and
17 disagree with it.
18     Q. I asked you earlier which items in Exhibit 6
19 did you help draft. Your answers were I don't know or
20 I don't recall. Well, now you were apparently according
21 to Mr. Mikels' questions involved in drafting most of
22 this. Would you like to tell me exactly what your role
23 in this document was, sir?
24     A. I don't recall, Mr. Mehl, maybe it's in the
25 record, you asking me exactly which ones I worked on

1 with counsel.
2     Q. What did you do on this document, sir? I
3 want to know your role?
4     A. I consulted with counsel.
5     Q. Tell me the areas you personally were
6 involved in. Take the Exhibit Six and let's go down it
7 one by one.
8         ATTORNEY MIKELS: Starting with paragraph
9 one?
10     Q. Line one, did you draft that first paragraph?
11     A. Again I worked with counsel.
12     Q. What did you do? What was your role? Did
13 you sit down with Jack Mikels and go through this one
14 by one?
15         ATTORNEY MIKELS: I'm going to instruct you
16 not to answer that question.
17         ATTORNEY MEHL: On what grounds?
18         ATTORNEY MIKELS: It calls for attorney client
19 privilege. It's substance of communication --
20     Q. What did you do, sir, with regard to the
21 introductionary paragraph page one?
22     A. Again, I worked with counsel in putting
23 together the addresses and names of the parties
24 involved.
25     Q. Okay.  What did you do with regard to the

1 first whereas clause?
2     A. I don't think I had to do anything on that
3 one. Mr. Mikels already knew that.
4     Q. How about the next one second whereas clause,
5 did you have a role there?
6     A. No, I think he already knew that.
7     Q. What about the other six whereas clauses on
8 page one, did you have a role in any of those?
9     A. I believe Mr. Mikels already had that
10 information.
11     Q. Turn the page, did you have a role in
12 Paragraph 1?
13     A. Again, I think he had that information.
14     Q. 2?
15     A. No, that was him.
16     Q. Do you believe 2 -- what does 2 mean to
17 you?
18     A. That this agreement is added to the current
19 franchise agreement.
20     Q. Added to or if there is any connection
21 between the two agreements which agreement would
22 control?
23     A. This one.
24     Q. This one improved the term of the franchise
25 agreement?

Condenseit!

1    ATTORNEY MIKELS: Objection.  There was no
2 franchise agreement at that point.  It already had been
3 terminated.
4    ATTORNEY MEHL: Thank you for your testimony.
5 You want to testify now?
6    ATTORNEY MIKELS: I'm just correcting.
7    ATTORNEY MEHL: You don't need to correct.
8    A. Sorry.  What was the question?
9    Q. Does Paragraph Two mean to you that this
10 agreement -- you testified this agreement takes the
11 place of the franchise agreement.  Is that what you're
12 saying?
13    ATTORNEY MIKELS: Objection.
14    A. The word used here is supersedes.
15    Q. What does that mean to you?
16    A. This is added to it.
17    Q. If there are any terms in this agreement that
18 aren't in the franchise agreement this one controls,
19 right?
20    A. Yes.
21    Q. So I asked you earlier did this agreement
22 improve the terms of the franchise agreement and you
23 answered I don't know.  So I will ask you that one
24 more time.  Does that agreement, Exhibit Six, improve
25 the terms of the franchise agreement?

1    ATTORNEY MIKELS: Objection.
2    A. I don't know.
3    Q. You don't know.  You still don't know.
4 Paragraph 3A, what was your role there?
5    A. I provided Mr. Mikels with the information
6 regarding the inspection and costs that BII incurred.
7    Q. Do you have those bills?
8    A. I don't know.
9    Q. Who would have those bills?  Would Monica
10 Keafer have them?
11    A. I don't know.
12    Q. $300, what was that for additional services?
13    A. I believe that would be for two more
14 inspections.
15    Q. Well, that's a total of six?
16    A. $300 for additional service by BII's
17 inspector.
18    Q. What is that?
19    A. I believe that would be for two more
20 inspections.
21    Q. Which means they each cost $150?
22    A. I believe so.
23    Q. The first one is for four inspections and
24 that's for 750, right?
25    A. Yes.

1    Q. Why did those cost more than the others?
2    A. I don't know.
3    Q. What was your role in 3B 1 -- it's actually
4 3B 1.  What was your role there, sir?
5    A. I worked with counsel on operational issues.
6    Q. Did you draft this paragraph?
7    A. Again I worked with my counsel in drafting
8 it.
9    Q. What did you do -- what was your role?
10    ATTORNEY MIKELS: Objection.  Asked and
11 answered, Larry.
12    Q. It says it's $150, right?  Follow up, right,
13 sir?
14    A. Yes.
15    Q. I asked you earlier, sir, I asked you earlier
16 what did Mr. Writington or Worthington, whatever the
17 guy's name is, charge you.  Answer was I don't know.
18 Would you like to change that answer now, sir?
19    ATTORNEY MIKELS: Objection.
20    ATTORNEY MEHL: What grounds?
21    ATTORNEY MIKELS: Just because he didn't know
22 when he didn't have the document in front of him
23 doesn't mean he doesn't know now.
24    ATTORNEY MEHL: He absolutely has the document
25 there.  It was during the 15 minutes that you had with

1 him.
2    ATTORNEY MIKELS: He said he didn't know.
3    Q. Amazing after 15 minutes he knows
4 everything.  Let's go to 3B 2, what was your role?
5 Did you draft this?
6    A. Again I worked with counsel in drafting it.
7    Q. What did you do?  What does working with
8 counsel mean?
9    A. Sorry.  I don't understand the question.
10    Q. You said, quote, I worked with counsel.  What
11 does that mean?  What did you do?  That's what I want
12 to know.
13    A. We discussed the operational issue of this
14 particular store.
15    Q. Did you draft this, sir, this language?
16    A. Again I worked with counsel.
17    Q. Would you answer my question?  Yes or no, did
18 you -- are you the one that drafted this language 3B
19 2, yes or no?
20    A. No.
21    Q. What about 3B 3I, did you draft that?
22    A. Sorry.  Is that the next page?
23    Q. No, sir, 3B 3I right under there where we
24 were just talking?
25    ATTORNEY MIKELS: There is no 3B 3I.

Condenselt!

1   Q. My question is if that inspection which
2 caused him to have to turn over the keys was erroneous
3 do you think it's still fair?
4       ATTORNEY MIKELS: Objection.
5   A. No.
6   Q. You don't. Thank you.  Next question
7 Paragraph 5, I will paraphrase it.  I asked you all
8 about that and you had no clue.  You had no idea.  You
9 didn't recall.  I don't know.  After meeting you knew
10 the whole thing.   Sir, what does the phrase general
11 release mean to you?
12       ATTORNEY MIKELS: Objection.
13       ATTORNEY MEHL: I can't ask him that
14 question?
15       ATTORNEY MIKELS: I didn't say you couldn't
16 ask it, Larry.
17   Q. What does that mean?
18   A. I don't know.
19   Q. You don't know. Then I asked you all about
20 those items at the bottom 03-10965-RCL you said you had
21 no idea. Suddenly you knew all about the class action
22 lawsuit.  What does that class action lawsuit involve,
23 sir?
24       ATTORNEY MIKELS: Objection.
25   Q. Answer the question.  What are the claims?

1   A. I don't know.
2   Q. You don't know.  In here it talks about $900
3 in legal fees, Paragraph 3A.  How many hours worth
4 Mr. Mikels' time is $900?
5       ATTORNEY MIKELS: Objection.
6       ATTORNEY MEHL: What grounds?
7       ATTORNEY MIKELS: The form of the question.
8 Larry.
9   Q. And the question, sir, do you know?
10   A. I don't know.
11   Q. In Paragraph 5, is that a mutual release,
12 sir?
13   A. I don't know.
14   Q. Do you know what a mutual release is?
15   A. I don't know.
16   Q. You don't know or what?  You know the answer
17 yes or no, the definition of a mutual release?
18   A. I do not know.
19   Q. Thank you.  I asked you earlier if you --
20 strike that.  I asked you earlier after the date of
21 termination were there any royalty payments made and
22 you said I don't know.  Now you're saying that there
23 were but you don't know the amount or when or all of
24 that, right?  You have no idea?
25       ATTORNEY MIKELS: Objection.

1   Q. Right.  But Monica Keafer might know but you
2 don't know.
3       ATTORNEY MIKELS: Objection.
4   A. Sorry.  I don't understand the question.
5   Q. After the termination were there any
6 subsequent payments of the advertising or weekly
7 royalty payments?
8   A. I believe there was.
9   Q. Were they paid up to date?
10   A. I don't know.
11   Q. Would Monica Keafer know?
12   A. I don't know.
13   Q. Isn't she the one that keeps the books?
14   A. Sorry.  What's the question?
15   Q. Is Monica Keafer the bookkeeper?
16   A. No.
17   Q. She's not the bookkeeper.   What is Monica
18 Keafer's role at HDA?
19   A. I don't know.
20   Q. Who's the one that keeps the books for BH?
21   A. My accountant Mark Cohen.
22   Q. What about on a daily basis?
23   A. I have an assistant that comes in twice a
24 week.  Her name is Roberta Porter.
25   Q. She is the one that keeps all the BH

1 records?
2       ATTORNEY MIKELS: Objection.
3   Q. Is she the one?
4   A. I'm not sure I understand the question.
5   Q. All the daily books and records, all the
6 receipts, all the expenses, all the checks is she the
7 one that keeps all of those records?
8   A. She assists me.
9   Q. You are the one that keeps all of those
10 records?
11   A. Roberta Porter assists me.
12   Q. Who would know what was paid and when after
13 the termination paper?
14   A. I don't know.
15   Q. Would Ms. Porter know the answer to that?
16   A. I don't know.
17   Q. Would your books and records reflect that?
18   A. I don't know.
19   Q. Would Mr. Cohen know the answer to that?
20   A. I don't know.
21       ATTORNEY MEHL: Would you like to meet with
22 your client?
23       ATTORNEY MIKELS: Not at all.
24       ATTORNEY MEHL: If this is going on much
25 longer we are going to call Judge Zobel.  Would you

1    ATTORNEY MEHL: III.
2    ATTORNEY MIKELS: You didn't say III. You
3 said 3B 3I.
4    Q. Let's go to 3B 3I. Did you draft that?
5    A. Sorry. I don't understand the question.
6    Q. 3B 3I, did you draft that, yes or no?
7    A. No.
8    Q. Do you know if after any inspections Mr.
9 Ciummo or anyone else for him wrote either you or any
10 one else such as Mr. Worthington or Mr. Mikels and
11 disputed any of those inspections?
12    A. Sorry. Would you repeat that please?
13    Q. After any inspections do you know if anyone
14 such as Mr. Ciummo or his spouse wrote you, Jack Mikels
15 or Mr. Writington disputing any inspections?
16    A. I believe Mr. Ciummo wrote something to Jack
17 way back.
18    Q. And?
19    A. Looking for more time. I forget. I don't
20 remember.
21    Q. More time to fix the problem but nothing
22 else?
23    A. I don't remember the contents.
24    Q. Were there any other letters or anything like
25 that, telephone calls?

1    A. I don't recall.
2    Q. 3B IV, what was your role there?
3    A. Again I worked with counsel on these issues.
4    Q. Did you draft this paragraph?
5    A. No.
6    Q. 3B V, did you also draft that paragraph?
7    A. No.
8    Q. 3B VI, did you draft that paragraph?
9    A. No.
10    Q. What was your role in 3B VI?
11    A. I don't recall.
12    Q. Who chose the store's inspector each time?
13    A. Mr. Writington was employed by --
14 self-employed. He actually did inspections for the
15 Massachusetts stores.
16    Q. What I asked you for this store who chose the
17 inspector?
18    A. Mr. Writington is the only inspector I have.
19    Q. So each inspection was done by him?
20    A. He does all the stores in Rhode Island.
21    Q. Who told him when he should inspect this
22 store?
23    A. It's my understanding he does them in the
24 spring. Then he does them again in the fall.
25    Q. But who instructs him when to do them?

1    A. I don't know.
2    Q. He just does them randomly and bills for it.
3 And that's the -- that's his process?
4    A. He makes his own schedule.
5    Q. So he's under no instructions from anyone as
6 to when the inspections are done?
7    A. No, he makes his own schedule.
8    Q. On an annual basis how many inspections does
9 he do for you or for BII?
10    A. Two full inspections.
11    Q. Two per store?
12    A. Yes.
13    Q. Every year?
14    A. Yes.
15    Q. Are those ones that are $150?
16    A. I believe so, yes.
17    Q. So you chose the inspector. Mr. Ciummo has
18 no say in that. So my question is if Mr. Writington
19 or Worthington, whichever his name is, performs an
20 inspection that is in error and that causes Mr.
21 Ciummo's franchise to be terminated do you think that
22 is fair?
23    ATTORNEY MIKELS: Objection.
24    Q. Yes or no?
25    A. Sorry. What was the question again?

1    Q. You testified earlier that you thought
2 Paragraph VI was fair, right?
3    A. Yes.
4    Q. I'm asking if the basis for the termination
5 was erroneous do you think Paragraph VI is fair?
6    ATTORNEY MIKELS: Objection.
7    ATTORNEY MEHL: On what grounds?
8    ATTORNEY MIKELS: Form of the question.
9    ATTORNEY MEHL: I can't wait to hear that.
10    A. Sorry. Would you repeat that?
11    ATTORNEY MIKELS: Why don't you have it read
12 back?
13    Q. I will try to make it clear. If the
14 inspection that caused the termination was invalid or
15 erroneous and that caused Paragraph VI to apply, do you
16 think it's still fair?
17    ATTORNEY MIKELS: Objection.
18    A. Did you say inspection or inspections?
19    Q. You chose. Either one?
20    A. Sorry. I still don't understand.
21    Q. I'm going to try it again. Is it your
22 understanding that subparagraph VI says if he -- if the
23 store failed further inspection he has to turn over the
24 keys to you, right?
25    A. Yes.

1 like to have a chat with your client?
2       ATTORNEY MIKELS: No, Larry.
3    Q. When a franchisee sends in a check to BII
4 what do you do with that check?
5    A. I take a look at the envelope, and then I
6 leave it for Ms. Porter. And she comes in and deposits
7 it.
8    Q. Do either you or she make any records of that
9 check?
10   A. Yes, Ms. Porter does.
11   Q. So she would know all of the payments?
12      ATTORNEY MIKELS: Objection.
13   Q. Would she know of all of the checks?
14   A. You'll have to ask her.
15   Q. I will. Is there anyone else at BII that
16 would know C-Nine Seven's payments after the
17 termination date?
18      ATTORNEY MIKELS: Objection.
19   A. I don't know.
20   Q. Other than you who are BII's employees?
21   A. We don't have any employees.
22   Q. You have no employees. Only Ms. Porter is
23 your assistant?
24   A. Subcontractor.
25   Q. She is an independent contractor?

1    A. Yes.
2    Q. Do you have other independent contractors?
3    A. Mr. Cohen.
4    Q. Anybody else? Mr. Writington?
5    A. Mr. Writington.
6    Q. Anybody else?
7    A. I don't recall anyone else.
8    Q. How do you know that after the termination
9 date Mr. Ciummo did not close the store?
10   A. I drove by there.
11   Q. You did. What day?
12   A. I don't recall.
13   Q. Do you know the time?
14   A. I don't.
15   Q. But it was after the termination date?
16   A. I believe so.
17   Q. What did you do?
18   A. I saw it was still open.
19   Q. Did you stop or did you drive by?
20   A. I drove by.
21   Q. What did you see?
22   A. I saw it still open, signs out, looked like
23 it was in full operation.
24   Q. Do you know the month?
25   A. I don't recall.

1    Q. You have no idea. Could have been June or
2 October, you just don't know?
3    A. I don't recall.
4    Q. Was it warm out?
5    A. I don't recall.
6    Q. What were you driving that day, what kind of
7 car?
8    A. I don't recall.
9    Q. What do you drive now, sir?
10      ATTORNEY MIKELS: Objection.
11   A. I drive an X5 BMW.
12   Q. Do you know if Mr. Ciummo ever closed that
13 store?
14   A. I believe he did.
15   Q. Do you know when?
16   A. I do not.
17   Q. Did he ever change the name of the store?
18   A. I believe he did.
19   Q. Do you know when he did that?
20   A. I do not.
21   Q. What was the name of the store that he
22 changed it to?
23   A. I believe it was Vinny's Donuts or something
24 along those lines.
25   Q. Did you ever go by there?

1    A. I believe I did, yes.
2    Q. You want to tell me when?
3    A. I don't recall.
4    Q. What did it look like?
5    A. It looked like someone had spraypainted the
6 signs on the building, and the Honey Dew checks were
7 still visible on the awning.
8    Q. What checks?
9    A. Visible Honey Dew checks, the red and white
10 checks were visible. The sign on the street had been
11 changed to Vinny Donuts I believe.
12   Q. Did you take any pictures?
13   A. I did not.
14   Q. Was there anybody with you?
15   A. I don't recall.
16   Q. Maybe your wife?
17   A. I don't recall.
18   Q. Maybe Kate?
19   A. Sorry. Is that a question?
20   Q. Yes, sir.
21   A. I don't recall.
22   Q. Did anyone else ever drive by there that you
23 know of after the closure -- sorry -- after
24 termination?
25   A. I don't recall.

```
 1   Q. You know of anybody that did?
 2   A. I do not.
 3   Q. Did your brother?
 4   A. I don't know.
 5   Q. Mr. Mikels?
 6   A. I don't know.
 7   Q. Do you know for what period of time after
 8 termination he operated still as a Honey Dew store?
 9   A. I don't know.
10   Q. Do you know during that period, whatever
11 period that is, from the termination date all the way
12 to the time he changed the name did BII get any sort of
13 customer complaint about that store?
14   A. I don't recall.
15   Q. Would anybody else know?
16   ATTORNEY MIKELS: Objection.
17   A. I don't know.
18   Q. Do you know if any other businesses use the
19 red and white checks that you mentioned here being
20 exclusively your checks?
21   ATTORNEY MIKELS: Objection.
22   A. I don't know.
23   Q. Have you ever heard of Pizza Hut, sir?
24   A. Yes.
25   Q. Do they use red and white checks?
```

```
 1   A. I don't recall.
 2   Q. Have you ever seen the trucks driving around?
 3 Do you know the name of Albert Notini (phonetic) and
 4 Sons?  Ever seen their red and white checks?
 5   A. I'm not familiar with that name.
 6   Q. What if I told you there were red and white
 7 checks on various push carts at Faneuil Hall right next
 8 door to us here?
 9   ATTORNEY MIKELS: Is that a question?
10   Q. Yes, it is a question.
11   ATTORNEY MIKELS: Objection.
12   Q. Would that surprise you?
13   A. I don't know.
14   Q. Are you going to sue them for trademark
15 infringement too?
16   ATTORNEY MIKELS: Objection.
17   (Whereupon, the deposition concluded.     )
18
19
20
21
22
23
24
25
```

```
 1
 2        C E R T I F I C A T E
 3 Commonwealth of Massachusetts    Suffolk, ss.
 4
 5     I, Barbara A. Hoey, a Notary Public in and
 6 for the Commonwealth of Massachusetts, do hereby
 7 certify that:
 8     ROBERT BOWEN, the witness whose deposition is
 9 hereinbefore set forth, was duly sworn by me and that
10 the foregoing transcript is a true and accurate record
11 of the testimony given by such witness.
12     I further certify that I am not related to
13 any of the parties in this matter by blood or marriage
14 and that I am in no way interested in the outcome of
15 this matter.
16
17     IN WITNESS WHEREOF, I have hereunto set forth
18 my hand and seal this       day of
19          , 2005.
20
21        Barbara A. Hoey
22 My commission expires:
23 January, 2009
   ANY REPRODUCTION OF THIS TRANSCRIPT BY ANY MEANS SHALL
24 BE DONE UNDER THE DIRECT CONTROL AND/OR DIRECTION OF
25 THE CERTIFYING REPORTER.
```

```
 1   C E R T I F I C A T E   O F   W I T N E S S
 2
 3
 4 COMMONWEALTH OF MASSACHUSETTS
 5 SUFFOLK, SS.
 6
 7
 8     I, ROBERT BOWEN, hereby certify that I
 9 have read the foregoing transcript of my deposition
10 taken on August 17, 2005 pursuant to the Massachusetts
11 Rules of Civil Procedure, and that the foregoing
12 transcript is in conformity with my testimony given at
13 that time.
14
15
16
17
18      ROBERT BOWEN
19
20
21 Date
22
23
24
25
```