Volume I
Pages 1-47

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BOWEN INVESTMENT, INC., and        )
HONEY DEW ASSOCIATES, INC,         )
        Plaintiffs,                )  CIVIL ACTION
v.                                 )  NO. 04-10702 RWZ
                                   )
C-NINE SEVEN, INC., VICENZO        )
CIUMMO AND SHARON CIUMMO,          )
        Defendants.                )

DEPOSITION OF FRANK WRIGHTINGTON, a

witness called on behalf of the Defendants, taken

pursuant to the Massachusetts Rules of Civil

Procedure, before Diane Hulme, Court Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, at the Law Offices of John N.

Lewis & Associates, 21 Merchants Row, Boston,

Massachusetts, on Wednesday, September 7, 2005,

commencing at 1:55 p.m.

MELVIN LIPMAN
COURT REPORTER
101 Tremont Street - Suite 700
Boston, Massachusetts  02108
Tel. (617) 227-3985

---

**Page 2**

APPEARANCES:

LAW OFFICES OF JACK MIKELS & ASSOCIATES
(by Janell E. DeGennaro, Esq.)
1 Batterymarch Park - Suite 309
Quincy, Massachusetts  02169
on behalf of the Plaintiffs

LAW OFFICES OF JOHN N. LEWIS & ASSOCIATES
(by Lawrence Mehl, Esq.)
21 Merchants Row - 5th Floor
Boston, Massachusetts  02109
on behalf of the Defendants

---

**Page 3**

I N D E X

WITNESS:          DIRECT  CROSS  REDIRECT  RECROSS

Frank Wrightington:
(by Mr. Mehl)       4

E X H I B I T S

Exhibit No.                                          Page

  1  Honey Dew Donuts 3/18/04 Customer               32
     Satisfaction Standards Evaluation
  2  Honey Dew Donuts 10/9/01 Operational            32
     Excellence Program
  3  Honey Dew Donuts 3/19/02 Operational            32
     Excellence Program
  4  Honey Dew Donuts 10/1/02 Operational            32
     Excellence Program
  5  Honey Dew Donuts 12/18/03 Customer              32
     Satisfaction Standards Evaluation
  6  Honey Dew Donuts 2/3/04 Customer                32
     Satisfaction Standards Evaluation
  7  Honey Dew Donuts 8/21/03 Customer               32
     Satisfaction Standards Evaluation
  8  Honey Dew Donuts Customer Satisfaction          32
     Standards Evaluation Summary
  9  Quality Evaluations of 1999 and 2000            32
 10  Quality Evaluations of 2003 and 2004            32
 11  Central Falls Overview                          32
 12  Subpoena                                        32

---

**Page 4**

STIPULATIONS

        It is stipulated and agreed by and

between counsel for the respective parties that

the witness will have 30 days from receipt of the

transcript to read and sign, notarization of

signature may be waived.

        It is also stipulated and agreed by

and between counsel for the respective parties

that all objections, except as to the form of the

question, and all motions to strike are reserved

to the time of trial.

        FRANK WRIGHTINGTON, a witness

called for examination by counsel for the

Defendants, being first duly sworn, was examined

and testified as follows:

        DIRECT EXAMINATION

Q.  (By Mr. Mehl)  State your name for the record,

please, sir.

A.  Francis E. Wrightington.

Q.  Your address is what, sir?

A.  3 Daniel Drive, North Easton, Massachusetts

    02356.

Q.  How long have you lived there?

A.  Twelve years.

1  Q.  All right, sir.  And prior to that what was your
2      address?
3  A.  16 Indian Cove Way, South Easton, Massachusetts.
   Q.  How long did you live there?
   A.  Two years.
6  Q.  Do you have an address other than your residence,
7      sir?
8  A.  No, I don't.
9  Q.  So you have no offices at all?
10 A.  No.
11 Q.  So that means that you work out of your house?
12 A.  Yes.
13 Q.  How many years have you done that?
14 A.  Since 1997.
15 Q.  And prior to that what was your occupation?
16 A.  I was a purchasing and facilities professional in
17     computer industry and operations management
18     purchasing facilities and operations management
19     in computer and related industries from 1962
20     until I retired as such.
21 Q.  Which companies were you working for, sir?
22 A.  I worked fifteen years for Wang Laboratories that
23     was my predominant employment at the end of my
24     career.  I worked for NEC.  Honeywell.  Johnson &

1  A.  Both of them were with Wang Laboratories and
2      vendor relations problems.
3  Q.  Is Mr. Mikels' law firm representing you, sir?
4  A.  Yes.
5  Q.  Are you paying them?
6          MS. DeGENNARO:  Objection.
7  Q.  Answer the question, please, sir.
8  A.  As of this moment, I'm not certain.  We haven't
9      reached the billing structure.
10 Q.  Has that law firm in the past ever represented
11     you?
12 A.  No.
13 Q.  Did you hire them or did they offer their
14     services to you?
15         MS. DeGENNARO:  Objection.
16 A.  Answer the question, please.
17         MS. DeGENNARO:  Larry, that would
18     be privileged if we're representing them now.
19         MR. MEHL:  No, it wouldn't.  I did
20     not ask him was there any discussions.
21 Q.  Can you answer the question, sir?
22         MS. DeGENNARO:  You have to answer
23     the question.
24 A.  I asked.

1      Johnson.  Student Baker Worthington.
2  Q.  All of those are excellent companies.  If you
3      will, sir, what is your educational background?
4  A.  Bachelor of science and business from
5      Northeastern University in Boston and graduate
6      work at Goldsmith College University of London.
7  Q.  What is your occupation?
8  A.  My current occupation I'm semiretired but my
9      occupation could best be stated as a facilities
10     food and operations consultant.
11 Q.  Can you tell me, sir, who are your clients?
12 A.  Currently I have but one client Bowen
13     Investments, Honey Dew Associates, Inc.
14 Q.  Is that one or two clients?
15 A.  I'd say it's two.
16 Q.  Do you bill them individually?
17 A.  Yes, on the occasion I bill Honey Dew which is
18     very rarely now but that was quite frequent in
19     the past.
20 Q.  Have you ever had your deposition taken?
21 A.  Yes.
22 Q.  How many times?
23 A.  Twice.
24 Q   Which cases?

1  Q.  For them to be your attorney?
2  A.  (Witness nods.)
3  Q.  You have to speak up for the court reporter.
4  A.  Yes.  I asked for their guidance.
5  Q.  When did you contact them the first time?
6  A.  After I received your demand.
7  Q.  Did you talk with Mr. Mikels?
8  A.  No.
9  Q.  Did you talk to Mr. Wirtz?
10 A.  Yes.
11 Q.  Did you meet with them prior to today?
12 A.  Yes.
13 Q.  And that was when, sir?
14 A.  I'm not certain of the date but within recent
15     weeks.
16 Q.  Was it one day or two days or three days meeting?
17 A.  One day.
18 Q.  One hour, two hours or three hours?
19 A.  Two hours.
20 Q.  At that meeting did they show you a copy of the
21     lawsuit that you're here for today?
22 A.  No.
23 Q.  Do you know the reason you are here today, sir?
24 A.  Yes, I think so.

9

1 Q. Tell me what that reason is.
2 A. It appears Bowen Investments, Honey Dew
3    Associates are plaintiffs against C-Nine Seven,
    Vicenzo Ciummo and Sharon Ciummo as defendants in
    an action that Bowen Investments has elected to
6    take against them.
7 Q. Do you know the nature of that lawsuit?  Do you
8    know what the allegations are?
9 A. No, I do not.
10 Q. You have no idea?
11 A. No, I do not.  I haven't seen it.
12 Q. When did you start doing consulting work for
13    either H.D.A. or B.I.I.?
14 A. 1998.
15 Q. Describe the circumstances.
16 A. I just retired.  I'd known Dick Bowen through
17    sporting events over the years in which he had
18    and out of one of our conversations I arose an
19    opportunity to work for Honey Dew.
20 Q. These sporting events I don't understand.  Could
21    you tell me what you mean?
22 A. We used to meet at the same pregame location for
23    tailgating for the New England Patriots
24    football games.

11

1 Q. Had you had any experience with any of H.D.A. or
2    B.I.I. vendors?
3 A. No.
4 Q. Had you had any experience in the past with any
5    retail stores?
6 A. Retail stores, yes.
7 Q. Would you itemize those for me, please?
8 A. Yeah.  Retail stores for seven years during my
9    college years I worked in retail environment not
10    in food in retail clothing, customer services.
11 Q. Okay.  Did you ever have experience dealing with
12    food stores such as the ones that you are
13    inspecting now?
14 A. No.
15 Q. No experience at all.  When did you first meet
16    Robert Bowen?
17 A. About the same time frame that I met Richard
18    because they went to Patriots games in the same
19    environment.
20 Q. Did you have any sort of, you know, formal
21    training to do this job that Mr. Bowen had in
22    mind for you?
23 A. Yes.  I think the answer to that would be yes.
24    Sixty to seventy 0 percent of the evaluations are

10

1 Q. Oh, okay.  What happened?
2 A. What happened after that?  He asked if I'd be
3    interested in being with one of his management
4    teams potential of doing store or franchise
5    evaluations.
6 Q. Had you had any prior experience --
7 A. Yes.
8 Q. -- for doing that?
9 A. Specific store evaluations, no, however a wealth
10    of experience in evaluating vendor performance
11    including people who were involved in food
12    service industry.
13 Q. The food service industry.  Which companies were
14    you with when you did food services?
15 A. I was with Wang Laboratories in the last years of
16    my career.  I was involved in facility management
17    and in the facility management were providing for
18    all the needs of thousands of employees which we
19    had including the food service.
20       Marriott was our major provider so I
21    interfaced with Marriott on a continuing basis
22    and evaluated the way they conducted their
23    business, how well their serviced us, all that
24    type of things.

12

1    nonfood related.  They're facilities, operations,
2    merchandising, marketing, customer service.  All
3    of those things in which I had a wealth of
4    experience in my career.
5 Q. But never in the retail type store that's what
6    you testified to earlier, sir?
7 A. Well, no.
8 Q. Did you ever take any training?  Did you ever
9    take any type of the Honey Dew training course?
10 A. Yes.
11 Q. When did you take that, sir?
12 A. About the same time I started the activity, 1998.
13 Q. What was the length of that course?
14 A. It was several days over a couple of weeks.
15 Q. And then after you took the course, what did you
16    do?
17 A. After I took the course, I spent a good deal of
18    time with a company that was running for them
19    store evaluations for Honey Dew American
20    Marketing Research in Stoughton a gentleman Phil
21    DeGenscenzio (phonetically).  I'm not sure of the
22    spelling.
23 Q. What did you do for them?
24 A. I worked with them hand in hand going from store

**Page 13**

1    to store and evaluating them based on the same
2    evaluations they were conducting until such time
3    as they thought I was properly prepared to start
    on my own.
  Q.  What was the length of that time, sir?
6  A.  It was not a forty-eight hour a week job.  It was
7    probably a dozen times over a month.
8  Q.  A thousand times?
9  A.  A dozen.  Sorry.
10  Q.  No.  I didn't hear you right.  Okay.  Were you at
11    that time H.D.A.'s employee?
12  A.  No.  I was never a H.D.A. employee.  I've always
13    been a contractor.
14  Q.  Always been a independent contractor?
15  A.  Yes.
16  Q.  Back when you first started, what was your hourly
17    rate?
18           MS. DeGENNARO: Objection.  You
19    have to answer anyway.
20  A.  I would say it probably averaged out to $45.
21  Q.  Per?
22  A.  Hour.
23  Q.  Were you charging them for your time while you
24    were being trained?

**Page 15**

1  Q.  They actually did not have any say?
2  A.  No.  No.  We just agreed on the stores that would
3    be evaluated.  The timetable of events were over
4    a spring and fall 90 to 120 days, do those stores
5    during that period.  Do all stores during that
6    period.
7  Q.  Do all stores?
8  A.  Yes.
9  Q.  Did you do every single store?
10  A.  Yes, I would you.
11  Q.  That was during 1990 --
12  A.  -- 8, '99, 2000 and 2001.
13  Q.  And you reported to whom, sir?
14  A.  Mike Van Buren.
15  Q.  What is his exact title over there?
16  A.  At that time he was executive vice president.
17  Q.  And is he still there?
18  A.  No.
19  Q.  That was '98 and '99?
20  A.  Yeah, and probably --  I'm not sure when Mike
21    left the company, 2000.
22  Q.  Then after he left who did you report to?
23  A.  After he left I reported to Bob Bowen for Rhode
24    Island and Guenette for Braintree at the time.

**Page 14**

1  A.  No.
2  Q.  So then after that after that training course
3    tell me what happened?
4  A.  After the training course --
5  Q.  And you went out with this other firm?
6  A.  Right.  Then I started independent for the other
7    firm in conducting the store evaluations on my
8    own.
9  Q.  For each of those you were paid hourly?
10  A.  Yes.
11  Q.  At the $45 rate?
12  A.  As I recall.
13  Q.  All right.  That's fine.  Tell me how H.D.A. or
14    B.I.I. set up their inspections?  What was the
15    process back in '98?
16  A.  As far back as '98, I set my own schedule as an
17    independent contractor and worked independent.
18    We had a gross number of stores which we were
19    going to evaluate a total number of stores which
20    we would evaluate and I set the schedule of
21    events.
22  Q.  So you inspected x number of stores on your own
23    set schedule?
24  A.  Yes.

**Page 16**

1  Q.  For the Honey Dew stores?
2  A.  Yes.
3  Q.  So were you the sole inspector?
4  A.  Evaluator, quality officer, inspector.
5  Q.  During the years '98, '99 and 2000?
6  A.  Yes, and maybe 2001 as well, perhaps.
7  Q.  So you were the sole inspector?
8  A.  Yes.
9  Q.  For every single store?
10  A.  Every single store.
11  Q.  During that period did you have any sort of
12    contract with them?
13  A.  No.
14  Q.  You had no contract?
15  A.  No.
16  Q.  You just sent them a bill and they sent you a
17    check?
18  A.  Yes.
19  Q.  Did you ever have any problems with them?
20  A.  No.
21  Q.  At all?
22  A.  No.
23  Q.  None.  Did you ever meet with either Dick Bowen
24    or Bob Bowen with regard to your services?

17

```
1   A.  Yes.
2   Q.  What was the nature of those meetings?
3   A.  One entire period where I did all of the stores
4       Dick went with me on as many stores as he could
5       make.  I'd say 90 percent of the visitations I
6       conducted Dick accompanied me.
7   Q.  Why?
8   A.  He wanted to be seen by the stores.  Dick's an
9       up-front guy, he likes to be seen.
10  Q.  Any other reason?
11  A.  Not to my knowledge.
12  Q.  Then what happened during 2001?
13  A.  I'm not sure of the transition year.  I'm not
14      sure when it was.
15  Q.  Go ahead.
16  A.  Anyway what happened was that they began to
17      appoint more area directors to handle smaller
18      segments, No. 1.
19      No. 2, I didn't want to do that many stores
20      anymore.
21      No. 3, Bob did not want to elect to go with an
22      area director so I assumed the quality role for
23      the Rhode Island stores.
24  Q.  Only?
```

19

```
1       Money Dew christmas party.
2   Q.  When was the first time that you ever talked to
3       Jack Mikels on the telephone?
4   A.  I don't know if I've ever talked to Jack Mikels
5       on the telephone.
6   Q.  Did you get from Jack any correspondence?
7   A.  No.
8   Q.  What about from any other lawyer there at Jack's
9       office?
10  A.  Within the last two or three days or the last
11      week or so, I received correspondence from
12      Michael Wirtz confirming our meeting and the
13      directions to your office and not much more.
14  Q.  Do you have any contracts at all with either
15      H.D.A. or B.I.I. or Mr. Mikel's office?
16  A.  No.
17  Q.  Are you expecting B.I.I. or H.D.A. to pay you for
18      your time today?
19          MS. DeGENNARO:  Objection,
20      irrelevant.
21  Q.  Answer the question.
22  A.  I would hope so but it's not relevant to me, if
23      they elect to.
24  Q.  Since '97 have you --
```

18

```
1   A.  Yes, only.  And if they needed a backstop, a
2       Massachusetts store, a Nashua store, somebody's
3       schedule was too busy or for whatever reason,
4       they might call on me to fill a hole somewhere.
5   Q.  Do you inspect every single Rhode Island store
6       each year currently?
7   A.  Yes.
8   Q.  On average the number of stores you inspect down
9       there is what?
10  A.  As I set out, this year it will be this period
11      this fall period will be 28 stores.
12  Q.  So your income has gone down by approximately 75
13      percent?
14          MS. DeGENNARO:  Objection.
15  A.  As the years have gone by, the amount of money
16      has increased somewhat slightly.
17  Q.  No, no, no.
18  A.  Yes.  My income has gone down, no question.
19  Q.  Your income has gone down because you used to
20      inspect about 150 stores and now it's down to 28
21      stores approximately, right?
22  A.  Yes.
23  Q.  When was the first time that you met Jack Mikels?
24  A.  I met Jack Mikels once in my life and that was a
```

20

```
1   A.  That may be '98 by the way.
2   Q.  That's fine.  Since that date whichever one you
3       chose, have you consulted for any other firm?
4   A.  Yes.
5   Q.  Would you name them, please?
6   A.  Douglas A. King, K-i-n-g, Builders of North
7       Easton.
8   Q.  Anybody else?
9   A.  No.
10  Q.  Have you ever read what is called the Operational
11      Excellence Procedures Manual?
12  A.  Yes.
13  Q.  When did you read that last?
14  A.  Several years ago, however, it's updated
15      frequently and I read the updates when they come
16      in.
17  Q.  So if I were to ask you some questions about it,
18      you would know the answers?
19  A.  I would hope so but I'm not certain.
20  Q.  Are you that familiar with it?
21  A.  Yes.
22  Q.  Does B.I.I. have any store inspection policies?
23  A.  Store inspection policies could you clarify that
24      for me a little bit more?
```

**21**

1  Q.  Do you have any rules or regulations or things
2      they have instructed for you to do?
3  A.  No.
   Q.  Nothing?
5  A.  Nothing different than what's in the procedures
6      manual and the other guidelines.  They have a
7      customer training manual.  They have a customer
8      service manual.
9  Q.  But I understood that they may have some store
10     inspection policies and you're saying --
11 A.  No, not that I know of.  They have a couple of
12     other forms which are incidental to the
13     operational procedures, visitation checklist.
14     Whether you call those procedures or not I'm not
15     sure.
16              MR. MEHL:  Give me one second,
17     please.
18 Q.  So you're saying, as far as you know, there are
19     no store inspection policies?
20 A.  I don't fully understand the question.  I guess
21     one could call the Operational Excellence
22     Procedure Manual, Policy Manual.  There is
23     nothing Rhode Island specific.
24 Q.  Thank you, sir.

**22**

1  A.  To the best of my knowledge.
2  Q.  For each inspection what do you do to prepare?
3  A.  Just put the proper paperwork in place.  I have a
4      little kit that I take with me to make sure
5      everything is ready to go.
6  Q.  Do you ever talk to Darlene or anybody there?
7  A.  No.
8  Q.  Do you ever talk to anyone with regard to any
9      store you are just about to inspect?
10 A.  No.  Since they've aligned myself with Rhode
11     Island, I have very little in the way of
12     conversation with Darlene or anybody.
13 Q.  Do you ever talk to Bob Bowen or to -- her name
14     is Roberta Porter I think is the last name?
15 A.  No, I do not.
16 Q.  You never talk to Bob Bowen either with regard to
17     your inspection work?
18 A.  Yes.  Most of mine is just giving Bob the summary
19     studies, these documents mailing or dropping them
       in his office.  Virtually no discussion.
   Q.  From time to time, has either B.I.I. or H.D.A.
22     changed the scope of the inspection?
23 A.  Yes, they have.
24 Q.  When did they change it last?

**23**

1  A.  When Andy Gallagher became responsible for the
2      operation as it were.  He's in an operational
3      role at corporate Andy Gallagher.
4  Q.  And that would have been?
5  A.  That would have been in '03.  Some time in '03, I
6      believe.
7  Q.  What occurred in '03?
8  A.  The customer standards, evaluations, studies,
9      evaluations were introduced.
10 Q.  By who?
11 A.  By Andy Gallagher and Honey Dew corporate.
12 Q.  By that time you told me you were only inspecting
13     stores down in Rhode Island.
14 A.  That's correct.  But they use the same ones as
15     corporate does.  The same customer satisfaction
16     standards evaluation they use by everybody out of
17     headquarters Plainville as out of B.I.I. same
18     form, same document, same measuring stick.
19 Q.  How did you at that time find out that they were
20     changing the scope of your inspection?
21 A.  At that time when Andy Gallagher arrived on the
22     scene, I got myself a little closer because I
23     knew he was going to make some changes so I kept
24     myself privy to the changes.  What are you doing,

**24**

1      Andy?  What's new?
2  Q.  Did he call you or did you call him?
3  A.  I don't know.  I don't recall.  I knew that it
4      had to be done.  I don't know if it was a mutual
5      agreement.  I saw Andy or Andy -- But
6      normally -- No, I won't say that.
7          I would say that probably I was aware of the
8      fact that some of the reports were going to
9      change, forms were going to change so I took
10     initiative.
11 Q.  So after the forms changed, did you take any
12     further training course?
13 A.  I sat at a couple of meetings with Andy and the
14     other area representatives, area directors.  We
15     had several meetings in Braintree at the time.
16     He introduced another young man named Denis
17     Lacava.  He was kind of the lead evaluator for
18     the Honey Dew stores and I spent quite a good
19     deal of time with Denis Lacava.  I did side by
20     side evaluations of random stores just so we made
21     sure we were on the same page.
22 Q.  And then you started implementing that new
23     inspection, right?
24 A.  New evaluations.

25

1   Q.  For each of these stores and for all of these
2       stores, everyone got the same rate?
3   A.  Everybody got the same.  They didn't all get the
4       same evaluator.
5   Q.  Right.  That was during '03?
6   A.  Yes.
7   Q.  Did you ever know the name Rick Mellin?
8               MS. DeGENNARO:  Objection.
9   A.  Rick Mellin?  There's a Rick in the Honey Dew
10      Associates office there named Rick.  I'm not sure
11      of his last name.  I never seen a business card.
12      I don't know if that's the Rick you're referring
13      to or not.
14  Q.  Is he still working there?
15  A.  I don't know.
16  Q.  Is he terminated?
17              MS. DeGENNARO:  Objection.  Larry,
18      that's for a completely other case.  It's
19      irrelevant to this litigation.
20              MR. MEHL:  We'll see.
21  Q.  Prior to August of 2003 how many times did you
22      personally inspect the store down in Central
23      Falls, Rhode Island?
24  A.  At least five and probably more.  At least five.

26

1   Q.  Tell me for each of those five what score in your
2       opinion scored on their inspections?
3   A.  Of what Central Falls?
4   Q.  Yes, sir.
5   A.  What they scored?
6   Q.  Yes, sir.
7   A.  For those five?
8   Q.  Yes, sir.
9   A.  The average was in the high 80s.
10  Q.  Every time?
11  A.  82 to 90.
12  Q.  That was for 2001?
13  A.  2001 and 2002.
14  Q.  Passing score is what, sir?
15  A.  Eighty.
16  Q.  And to your memory back in 2001, 2002, did any
17      stores in the area make under 80 on an
18      inspection?
19  A.  Yes.
    Q.  More than five?
--  A.  Stores or incidences?
22  Q.  Incidences.
23  A.  Yes.
24  Q.  So several stores, you know -- and I don't know

27

1       the number and you might --
2   A.  Yes, I'd have to research.
3   Q.  -- failed their inspection during 2001, 2002?
4   A.  Yes.
5   Q.  However, this store never failed; is that
6       accurate?
7   A.  Yes.
8   Q.  Always ran a good store, sir; is that accurate?
9   A.  That's accurate.
10  Q.  When was the first inspection during 2003?
11  A.  August 21st, I believe my records indicate.
12  Q.  So for the first eight months of 2003, you never
13      inspected that store?
14  A.  Yes.
15  Q.  And you had -- excuse me for saying it this
16      way -- on your assignment you had less than 30
17      stores to inspect that year; is that accurate,
18      sir?
19  A.  I'm not sure.  I'm not sure.  I'd have to
20      research that because I'm not sure when we cut
21      over completely to the Braintree the stores
22      managed out of Braintree by area directors being
23      done exclusively by people from Braintree.  I'm
24      not sure.  I can't tell you the date whether it

28

1       was what time in '03 whether I had more stores
2       than just thirty.
3   Q.  I believe you testified the changeover occurred
4       in 2002, sir.
5   A.  Change of management.  I said late 2002 or early
6       2003.  I'm not sure the date that Andy Gallagher
7       came aboard.
8   Q.  So from the time Andy came aboard, you in essence
9       lost about 120 stores that you inspected for the
10      year; is that accurate?
11  A.  I can't answer that because I'd have to go back
12      and find out when the changeover took place.
13  Q.  All right.  Would you do that for me, please,
14      sir?
15  A.  Yes.
16  Q.  Thank you.  So the last inspection in 2002 was on
17      what date, sir?
18  A.  December 12th.
19  Q.  In 2002?
20  A.  Yes, December.
21  Q.  So the next inspection occurred approximately
22      eight months later?
23  A.  Right.
24  Q.  In your personal view during 2002, how would you

**29**

1    say that this store ranked against all of the
2    other stores you inspected in the area in Rhode
3    Island?
4  A.  I'd say not amongst the highest because the
5    highest would have been in the 90s but it ranked
6    above the medium, above the midpoint.
7  Q.  Do you know the number of stores you inspected
8    for August 2003 to January 1, 2004 how many
9    stores you inspected failed failed their
10    inspection from August 2003 to January 1, 2004?
11  A.  No, I do not.
12  Q.  More than five?
13  A.  Probably.
14  Q.  More than ten?
15  A.  Not certain but close.
16  Q.  During that period you conducted approximately
17    how many inspections?
18  A.  I'm still not certain of early in '03 where the
19    changeover came and when my workload in non Rhode
20    Island stores took place so I can't give an exact
21    answer.
22  Q.  That is not what I asked you, sir. Let's try it
23    once more. During the period August of 2003 to
24    January 1, 2004, so that is four months, four and

**30**

1    a half months, how many stores did you personally
2    inspect?
3  A.  Thirty plus or minus.
4  Q.  Of those thirty what percent of the stores you
5    inspected failed?
6  A.  I'd have to research that.
7  Q.  More than five?
8  A.  Yes.
9  Q.  More than ten?
10  A.  I'm not sure it was more than ten. This is a
11    qualified response. I'm not certain of the data.
12    I'd have to research it.
13  Q.  Fair enough. Did any stores unexpectedly start
14    to fail your inspections?
15  A.  I never go in with an expectation one is going to
16    fail or not fail so I can't respond to that the
17    way it's framed.
18  Q.  Fair enough. Why did you chose August of 2003 to
19    inspect this store, and this store means the
20    Central Falls' store?
21  A.  I have no idea.
22  Q.  It was just on your list to do and that's what
23    you did that day, right?
24  A.  Yes, I believe.

**31**

1  Q.  Well, I wasn't there so I have no idea.
2  A.  I don't know why.
3  Q.  Are the items on the inspection form objective or
4    subjective?
5  A.  For the most part, they're objective.
6  Q.  Which parts are not objective?
7  A.  Well, we had 1,184. At that time 1,048 items.
8    It's tough to, you know, you'd have to go through
9    them.
10  Q.  Sure. But you said -- What percent are
11    objective?
12  A.  Seventy, eighty percent.
13  Q.  So is it possible that some other inspector might
14    grade them differently?
15  A.  I change that to 70, 80, 90 percent.
16  Q.  Fair enough. Is it possible that some other
17    inspector might grade this store higher than you
18    did?
19  A.  Or lower. Yes.
20  Q.  Or lower it is possible. Why is that?
21  A.  The reason is that you do your best to look at
22    all of the points. Somebody might miss a few.
23    Somebody might see a few that another inspector
24    might not. Excuse me.

**32**

1  Q.  Yes, sir.
2  A.  Excuse me. I didn't mean to wander off.
3  Q.  No, you're not. You're doing fine.
4    Did you bring any documents with you today,
5    sir?
6  A.  I brought some documents with me today.
7  Q.  Where are those that you didn't bring?
8  A.  I brought what we thought was relevant.
9  Q.  We is who?
10        MS. DeGENNARO: Objection.
11  Q.  Sir, is it your wife or what?
12  A.  No. I'll say I brought everything that I had
13    which is relevant to Central Falls.
14  Q.  May I see those, sir.
15        MR. MEHL: I want each of these
16    introduced into the record. So while you're
17    doing that, I'll be right back. I need to bring
18    something else in.
19        (Exhibits No. 1 through 12 marked
20    for identification.)
21  Q.  Mr. Wrightington, I'm handing you a stack of
22    documents which we have entered as Exhibits
23    No. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, if you
24    would, sir, identify each of these for me,

33

1   please. Take your time.
2   A.  Let's see. March 18th, '04.
3   Q.  What is that?
    A.  Customer satisfaction standards evaluation.
    Q.  On that document do you see your signature?
6   A.  Yes.
7   Q.  What's next, sir?
8   A.  September 7, '05. No, that can't be right.
9       October 9th, '01 Operational Excellence Program.
10  Q.  And that is what, sir?
11  A.  Operational Excellence Program.
12  Q.  Do you see your signature on that document, sir?
13  A.  Not my signature but evaluated by.
14  Q.  That was, in fact, your inspection?
15  A.  Yes.
16  Q.  Thank you. What's next?
17  A.  Operational Excellence Program March 19th, '02.
18      My lettering.
19  Q.  What is that sir?
20  A.  My lettering.
21  Q.  So that was also your inspection?
22  A.  Right.
23  Q.  What's next?
24  A.  10/1/02 Operational Excellence Program.

34

1   Q.  And that is your --
2   A.  My work.
3   Q.  What's next?
4   A.  Customer Satisfaction Standards Evaluation
5       December 18th, '03.
6   Q.  Is that your work?
7   A.  That's my work.
8   Q.  That's your signature on it, too?
9   A.  Right.
10  Q.  Go ahead. 02/03/04?
11  A.  Right, 02/03/04 Customer Satisfaction Standards
12      Evaluation. My work. My signature. My
13      initials.
14  Q.  What's next?
15  A.  August 21st, '03.
16  Q.  That's Exhibit No. 7?
17  A.  That's Exhibit No. 7.
18  Q.  Go ahead.
19  A.  Customer Satisfaction Standards Evaluation, my
20      signature.
21  Q.  What's next?
22  A.  Customer Satisfaction Standards Evaluations
23      Summary, Exhibit No. 8.
24  Q.  Is that your work?

35

1   A.  That's my work. It's not signed.
2   Q.  Go ahead.
3   A.  Then there's a group of summary sheets of
4       customer satisfaction evaluations, summary
5       sheets, Exhibit No. 10.
6   Q.  And is that your work?
7   A.  Yes, sir. And then Central Falls overview 1, 2,
8       3, 4, 5, nine studies and that's Exhibit No. 11.
9       My work.
10  Q.  All right. The next testimony I'm going to
11      introduce and it's been marked as Exhibit 12
12      would you read this over, please, sir, and tell
13      me have you ever seen that document?
14  A.  Yes.
15  Q.  What is that, sir?
16  A.  It's a subpoena.
17  Q.  To you?
18  A.  Me.
19  Q.  And in there you were asked for all the items on
20      Exhibit A; is that accurate?
21  A.  Yes.
22  Q.  And you brought items that have been marked as
23      Exhibits 1 through 11; is that accurate, sir?
24  A.  Yes.

36

1   Q.  Are there any other documents?
2   A.  No.
3   Q.  From January 1, 2001 to right now, have you had
4       any correspondence with either H.D.A. or B.I.I.
5   A.  Other than that which is transmitted through
6       these documents, no. Have I?
7   Q.  Yes, sir. Would it be fair to say --
8   A.  That's not true. I receive invitations to
9       Christmas parties, golf events, quarterly
10      reports.
11  Q.  And you get a check?
12  A.  Yes.
13  Q.  And you send them a bill?
14  A.  Yes.
15  Q.  And is there anything else any correspondence
16      from anyone there in the last four years?
17  A.  Just updates to operational updates procedures,
18      routine office documents.
19  Q.  Nothing else?
20  A.  No.
21  Q.  Same question with regard do you and -- So that
22      includes both H.D.A. as well as Bowen Investment,
23      Inc.?
24  A.  Right.

37

1  Q.  Nothing from any officer, director, employee
2      there other what you just referenced?
3  A.  That's right.
4      To and from?
5  A.  Yes, to the best of my knowledge.
6  Q.  Same question with regard to Mr. Mikels' office
7      nothing, right?
8  A.  Just the current confirmation of this meeting.
9  Q.  Other than that not a letter, a telephone call,
10     nothing; is that accurate?
11 A.  Yes, just correspondence relative to today's
12     session.
13 Q.  Do you know the approximate date this store
14     closed?
15 A.  No.  The only thing I would know is that on one
16     of these pieces of paper it was after March 18th,
17     '04, subsequent to March 18.
18 Q.  '04?
19 A.  '04.  I would say it was after because it didn't
20     reappear on my listings.
21 Q.  Would you get those listings normally from Bob
22     Bowen or from who?
23 A.  No.  This is just a listing of all of the stores
24     that are transmitted by Honey Dew that are

39

1      more often?
2  A.  Yes.
3  Q.  By whom?
4  A.  Normally --  I guess the word asked doesn't quite
5      fit.  Normally if a store fails, I realize I have
6      to go back and reinspect it so I schedule it
7      myself.
8  Q.  Is that in each instance automatic on your part?
9  A.  Yes.
10 Q.  A store that fails you will go back one time?
11 A.  Yes.
12 Q.  Would you ever go back two times in six months?
13 A.  Not by plan but I might.  Generally there's no
14     discussion between Bob and I.  There's kind of a
15     casual flow there.  When I do the stores, I do
16     them -- I make a judgement call many times.
17 Q.  Have you ever been asked by Bob Bowen during 2003
18     to inspect this store?
19 A.  Not that I recall.
20 Q.  Were you asked by anyone at either H.D.A. or Bob
21     Bowen's company to inspect this store?
22 A.  Not that I recall.
23 Q.  You just don't know?
24 A.  I don't know.  Not that I recall.

38

1      franchises.
2  Q.  Do you know the date that the owners of this
3      store's franchise do you know the approximate
4      date they were, in fact, terminated?
5  A.  No.
6  Q.  You have no idea?
7  A.  No, idea.
8  Q.  Would you normally believe it was after the date
9      of one of your inspections?
10 A.  I would say it was subsequent to my last
11     inspection but I have no idea what the date was.
12 Q.  So you would think it would be sometime after
13     your last inspection?
14 A.  I would think so.
15 Q.  To your knowledge, have you ever done an
16     inspection of a store whose franchise was
17     previously terminated?
18 A.  I don't think so, because I'm not privy nor do I
19     want to be to stores coming on line or going off
       line.  I don't think so.
21 Q.  Ordinarily you would inspect a store once or
22     twice per year; is that approximately right?
23 A.  Yes.
24 Q.  Would you ever be asked to inspect a store any

40

1  Q.  What about during 2004?
2  A.  Not that I recall.  I don't recall.  Not that I
3      recall.
4  Q.  Did you ever know that there was a lawsuit
5      against H.D.A. and Bowen Investment, Inc., by
6      some of the franchisees?
7           MS. DeGENNARO:  Objection.
8  A.  Ask it again.
9  Q.  Were you ever aware that there is a suit by some
10     of the franchisees against Bowen Investment,
11     Inc., and H.D.A.?
12          MS. DeGENNARO:  Objection.
13 A.  No, I'm not.
14 Q.  No?
15 A.  This is the first my first awareness that there
16     was an action.
17 Q.  No.  There is also a suit by them against H.D.A.?
18 A.  I'm not aware of it.
19 Q.  You have no knowledge whatsoever?
20 A.  No.  I know at one point in time there was an
21     action against them but only what I read in the
22     newspapers.
23 Q.  When was that?  When was that lawsuit that you
24     read about in the newspaper?

41

1　A.　It was Greg Mascato (phonetically) lawsuit but
2　　　I'm not sure who entered it, who started it
3　　　because that was in the local newspaper where I
4　　　live.
5　Q.　Did you ever during 1993 talk to Bowen about the
6　　　store?
7　A.　I may have but it was casual and I don't recall.
8　Q.　During those conversations that you may have had
9　　　with Bob Bowen, did you talk about the fact that
10　　　the store has started to fail inspections?
11　A.　No.
12　Q.　You never discussed that and he never asked you
13　　　about that? There was no discussion whatsoever?
14　A.　No.
15　Q.　What about in 2004?
16　A.　No.
17　Q.　No what? No discussion?
18　A.　No discussion.
19　Q.　Either way about this store to Bob Bowen? What
20　　　about anyone else at B.I.I. or H.D.A.?
21　A.　No.
22　Q.　What about with Andy Gallagher?
23　A.　No.
24　Q.　No discussion?

43

1　　　all these things equally and that's just not the
2　　　case. So if you have to add those --
3　Q.　Wait a minute. You have to add the third column?
4　A.　You have to add total available which is --
5　Q.　Right.
6　A.　And divide it into 642 which is the total
7　　　received.
8　Q.　And that gives you your --
9　A.　Seventy-nine.
10　Q.　-- seventy-nine?
11　A.　If you add those four, it will probably be 80 or
12　　　81 or somewhere above 80 but that is not the true
13　　　score.
14　Q.　As far as you knew, on March 18th, 2004 the store
15　　　was operating?
16　A.　Yes.
17　Q.　And that store's franchise was still in
18　　　existence?
19　A.　Yes.
20　Q.　It had not been terminated?
21　A.　Yes.
22　Q.　Did anyone instruct you on that date to inspect
23　　　that store?
24　A.　No, nobody instructed me to go to that store and

42

1　A.　No. That's for sure.
2　Q.　Let's take, for example, Exhibit No. 1, sir,
3　　　dated 03/18/04 and that was an inspection you
4　　　performed, right?
5　A.　Right.
6　Q.　On that inspection on the first page is your
7　　　signature; is that accurate?
8　A.　Yes.
9　Q.　Now if you will, sir, put that down right here so
10　　　you and I can see it and I will turn it towards
11　　　you. All right?
12　　　　Am I to understand that you add the four
13　　　numbers appearing in the far right column and you
14　　　average them and the last line on the far right
15　　　column shows the average of the top four
16　　　right-hand numbers; is that accurate?
17　A.　No, that's not accurate.
18　Q.　Tell me how these numbers are computed.
19　A.　If you did what you just described, that would
20　　　weigh everything equally and those are not equal
21　　　weights. So you have to add the total available
22　　　and the total received and divide total received
23　　　by total available. You can't take those four
24　　　and divide them by four because that will weigh

44

1　　　inspect it on that day.
2　Q.　Did anyone during 2004 ask you to go to that
3　　　store to inspect it?
4　A.　Not that I recall.
5　Q.　But they may have?
6　A.　I don't think so but I'm not certain. I don't
7　　　think so because that just isn't the way we
8　　　conduct business.
9　Q.　How often does B.I.I. or H.D.A. advise you of new
10　　　stores or stores that have been terminated?
11　A.　The only way of finding that is from routine
12　　　documentation that comes from Honey Dew
13　　　headquarters. Occasionally I ask them to send me
14　　　the list of every store we have and I go through
15　　　and check to make sure that I'm current on all
16　　　Rhode Island stores.
17　Q.　From January 1 through the day of that inspection
18　　　of Exhibit No. 1, did you get any information
19　　　that that store was still made part of the
20　　　H.D.A. -- was a part of the system?
21　A.　I didn't receive any information that it was or
22　　　was not.
23　Q.　So as far as you knew, that store was still in
24　　　business?

1   A.  Right.
2   Q.  And a part of the Honey Dew system?
3   A.  Yes.
    .   And no one had told you otherwise?
5   A.  Right.
6   Q.  So for that inspection did you get paid?
7   A.  Yes.
8   Q.  What did you charge for that inspection?
9                   MS. DeGENNARO:  Objection.
10      Irrelevant.
11                  MR. MEHL:  It's in the
12      reinstatement agreement.  Baloney.
13                  MS. DeGENNARO:  Excuse me, how is
14      it relevant?
15                  MR. MEHL:  It's in your
16      reinstatement agreement his fee.
17  Q.  Go ahead.
18  A.  Yes, I did get paid.
19  Q.  And that was?
20  A.  $150.
21  Q.  And your hourly rate was what, sir?
22  A.  Hourly rate is not a factor in these.  It's $150
23      for customer satisfaction standards evaluations.
24      Some of them take an hour and a half.  Some of

---

1   Q.  You don't?
2   A.  I don't have every inspection I've ever
3       conducted.
4   Q.  What about for the last three years?
5   A   It might be one or two that might be missing for
6       whatever reason but I believe I have the great
7       majority of them.
8   Q.  If during an inspection an employee at the store
9       disagrees with you, you know, on any item, what
10      is the process?
11  A.  If I concur what they pointed out to me is
12      correct, I'll change the form.  I'll correct the
13      study.  I try to add value.
14  Q.  From August 2003 to 2002, March of 2004, how many
15      times was this store inspected by you?
16  A.  The dates again were?
17  Q.  Start with August of '03 to one in '04?
18  A.  Four times.
19  Q.  So in seven months that store was inspected four
20      times?
21  A.  Right.
22  Q.  Why?
23  A.  Because it wasn't passing and it's built in
24      automatically I return to the stores if they're

---

1       them take three hours.
2   Q.  So you just charge a set fee for every one of
3       these, for every store?
4   A.  Yes.
5   Q.  So if it takes one hour or if it takes five
6       hours, the same fee?
7   A.  Yes.
8   Q.  Thank you.
9   A.  The average is two and a half hours.
10  Q.  Fair enough.  Did you keep in your files a copy
11      of every inspection report for each store?
12  A.  No.
13  Q.  You don't keep a copy of your work?
14  A.  I have.  At the outset, it was going back to 1988
15      and 1999 that was not part of the process.  I
16      submitted evaluations.  More recent years I
17      decided it was the best interest for all of them
18      if I did keep them.
19          So the hit rate is very high, today it
        wasn't, early on.
21  Q.  One more time because I didn't understand that.
22          Do you keep in your personal files a copy of
23      every inspection report?
24  A.  And I said no

---

1       not passing.
2   Q.  Would you do that for every store?
3   A.  Every one that is failing.
4   Q.  You would go back there four times in the span of
5       seven months?
6   A.  I might, yes.
7   Q.  Have you ever for other stores?
8   A.  Yes.
9   Q.  You've inspected other stores at minimum of four
10      times in seven months?
11  A.  I'd say four times a year.
12  Q.  What about during seven months?  Is this the only
13      store that you have ever inspected four times?
14  A.  Don't know.
15  Q.  But do you think that there may be others or not?
16  A.  Yes, there may be others.  I'm not sure about
17      seven months.  I'd say four times a year, depends
18      on the situation.
19  Q.  I want you to only think about a span of four
20      months -- seven months four inspections.  To your
21      knowledge, have you ever done that for any other
22      store?
23                  MS. DeGENNARO:  Objection, asked
24      and answered.

49

1  Q.  Answer the question, please, sir.

2  A.  Not to my knowledge.

3  Q.  Were you ever made aware that this franchisee may
4      have been offered the opportunity to be
5      reinstated?

6  A.  No.

7  Q.  You know nothing about that?

8  A.  I know nothing about it.

9  Q.  Did you ever go by this store after March 18th,
10     '04?

11 A.  No.

12 Q.  You have not been by there since?

13 A.  No.

14 Q.  Do you know if anyone has been by that store
15     after March 18th, '04?

16 A.  Not to my knowledge.  I would not know.

17 Q.  Do you know the consequences of a franchisee
18     being terminated?

19 A.  No.

20 Q.  You have no idea?

21 A.  No.

22 Q.  Did you ever get instructions from anyone to do
23     any extraordinary type inspection?

24 A.  You'll have to explain extraordinary.

51

1      happen.  It doesn't occur to me that that happens
2      that way.

3          If they buy from an approved supplier, I
4      normally would not, you know, I wouldn't know
5      how -- If they're buying from an approved
6      supplier, I wouldn't know what to look for to
7      give them a negative mark for, date code.

8  Q.  What about the freshness of a product?

9  A.  It's imperative we check date codes.  Yes,
10     freshness is important.

11 Q.  If a product was purchased from an approved
12     supplier, let's assume it is a baked product, if
13     it was purchased from an approved supplier, could
14     there be an issue with that product by you with
15     regard to the product's freshness?

16 A.  It depends on how the product is handled.  Once
17     they buy it, how they handle it.  You know if
18     they buy a baked product, if they buy a bagel and
19     slice it at 6 a.m. and still got it out there at
20     3 p.m., it doesn't make any difference where they
21     bought it from.

22         If it's milk and it's not kept at, you know,
23     if it's kept at 48 degrees instead of 38 degrees
24     or something in the range, if they don't handle

50

1  Q.  Are your inspections all the same?

2  A.  Same eyes, all the time.  Yes.  I try to be as
3      consistent as I can.

4  Q.  And you never go hard or easy on anyone?

5  A.  No, absolutely not.

6  Q.  Do you know Mr. Ciummo?

7  A.  I've met him two or three times.

8  Q.  Do you know he's in bad health?

9  A.  No, I did not know.

10 Q.  During one of your inspections in 2003, did one
11     of the stores' employees tell you that there was
12     an error made in your inspection?

13 A.  I don't recall it.

14 Q.  What about during 2004?

15 A.  I don't recall.

16 Q.  When a store buys its product from an approved
17     supplier, would you penalize them for that
18     product?

19 A.  Ask that one again.  If they buy it from an
20     approved supplier?

21 Q.  Yes, sir.

22 A.  If it wasn't in date code or wasn't consistent
23     with what the store was supposed to be offering
24     at that point in time, I don't -- it doesn't

52

1      it properly, than it will go against them.  If
2      they handle it properly, refrigerate it the way
3      it's supposed to.

4  Q.  What about the donuts?

5  A.  Donuts most stores have a checklist of when it
6      shows how they dispose of their donuts and when
7      they receive them you figure they're starting
8      off, depending on the donuts whether they're
9      fresh baked donuts or whether they're something
10     that come out of a conventional old style dipping
11     them in fat and cooking them.

12 Q.  If they get their product at 5 a.m. and you're
13     there at 5 p.m., did you ever mark them down for
14     the product being nonfresh?

15 A.  No.

16 Q.  You don't?  Are you sure?

17 A.  No.  Unless I sample it, and I find it's not
18     fresh.

19 Q.  If the product comes in at 5 a.m., by 5 p.m. how
20     are they to keep the product fresh?

21 A.  All the product that they have theoretically
22     comes in at 5 a.m. is fresh until when they
23     close, they dispose of it.  I very rarely am in
24     the store at 5 p.m.

53

```
1    Q.  What time are you normally?
2    A.  Usually in the morning because they lock best.
3    Q.  On March 13th you were at what time, sir?
     .   I don't know, but I imagine it was in the
5        morning.
6    Q.  But it could have been in the afternoon?
7    A.  Most unlikely, however, it could have been but I
8        would believe it was in the morning.
9    Q.  You have an e-mail address?
10   A.  Yes.
11   Q.  Do you ever use that with the Honey Dew people?
12   A.  No.
13   Q.  Have you ever?
14   A.  I don't think so.
15   Q.  Did they ever e-mail you?
16   A.  No.
17   Q.  Do they know your address?
18   A.  I don't think so.
19   Q.  Do you know Darlene?
20   A.  Yes.
21   Q.  Have you ever talked to her?
22   A.  Very rarely.  I used to talk to her frequently
23       but I haven't talked to her in months.
24   Q.  Did you talk to her during 2003?
```

55

```
1    Q.  When was the last time that you saw Bob Bowen?
2    A.  About two or three weeks ago.
3    Q.  How many times did you see him during 2003?
4    A.  I probably don't see Bob ten times a year
5    Q.  And you're telling me that Bob never told you
6        that this store was terminated?
7    A.  He never told me it was terminated, no.
8    Q.  Did anyone else tell you that?
9    A.  No.
10   Q.  So you have no idea if it's been terminated?
11   A.  No.  I imagine it has been dropped from the list
12       that I receive in routine, store listing
13       correspondence.
14   Q.  When you send your inspection reports to Bob
15       Bowen, do you know what Bob Bowen does with
16       those?
17   A.  No, I don't.  I think he reviews them.  Yeah, I
18       think he reviews them and writes correspondence.
19       I think he has begun just recently to write the
20       stores indicating to him that, you know, that the
21       report was not satisfactory.
22   Q.  And other than that?
23   A.  That's a new practice.  I don't know if he plans
24       to continue with it or not.  And then I'll return
```

54

```
1    A.  Probably, but I'm not sure.
2    Q.  What was the nature of those telephone calls?
3    A.  I'm not even sure I talked to her in 2003.  Once
4        in a while during the time of the Christmas
5        party, she'll give me a call and ask he me to
6        help her with you know -- I don't talk to
7        Darlene much.  She's a lovely person.
8    Q.  Other than inspection type reports, do you have
9        anything else on this store?  Do you have any
10       videos?
11   A.  No.
12   Q.  Do you have any photographs?
13   A.  No.
14   Q.  Do you have any memorandums or letters or notes
15       to yourself or anything?
16   A.  No.
17   Q.  You don't have anything in writing?
18   A.  No.
19   Q.  You go to the stores and you do these reports and
20       you go home and that's it?
21   A.  That's it.  I drop them at Bob's office.
22   Q.  You take them over there?
23   A.  Either that or if I'm not going by his office I
24       mail them to him.
```

56

```
1        at some point in time if that's appropriate.  But
2        that's a brand new practice since he moved.
3    Q.  Do they ask you to return?
4    A.  What's that?
5    Q.  Do you automatically return or do they ask you to
6        return?
7    A.  No.  If he puts in the letter, Frank will return
8        at some point in time, I just return to my
9        schedule.  I don't talk to Bob about it.
10   Q.  How do you know then?  Do they copy you from that
11       letter?
12   A.  Yes, that's what I just said part of that
13       process.
14   Q.  So you do get that correspondence?
15   A.  Yes.
16   Q.  That comes from Bob Bowen?
17   A.  Yes.
18   Q.  Do you ever get any correspondence from Jack
19       Mikels?
20   A.  No.
21   Q.  So you have no idea whether Jack Mikels sent that
22       default notice?
23   A.  No.
24   Q.  So if I were to tell you, if I were to tell you
```

57

1  that Jack Mikels does or during 2003 and 2004
2  sent out default notices, you would know nothing
3  about that?
4  .  I would not know who sent them to me or if he
5  sent them. I would presume but I'm not in that
6  cycle and I don't want to be.
7  Q. Why would you presume?
8  A. In any franchise agreement, I imagine there's
9  remedial measures but I have no idea what they
10  are.
11  Q. Have you ever read the franchise agreement?
12  A. No, I don't want to.
13  Q. Can you explain to me what Exhibit No. 11 is,
14  sir?
15  A. Exhibit No. 11, oh, I just put down Central Falls
16  that was the old what we used to call I have -
17  Q. Right.
18  A. That's since new evaluations.
19  Q. Why in your view during 2001, 2002 they obviously
20  scored extremely well and then all of a sudden
21  they just went to hell? Why is that?
22  A. The evaluation became more detailed.
23  Q. So it was based on the more detailed evaluation?
24  A. Yes.

59

1            MS. DeCENTARO: Objection. Asked
2  and answered. Objection. Asked and answered
3  numerous times.
4  A. No.
5            MR. MEHL: I have no further
6  questions. Thank you, sir.
7            THE WITNESS: You're welcome.
8            (Whereupon the deposition concluded
9  at 3:39 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

58

1  Q. And in your view did this store deserve to be
2  terminated?
3  A. It deserved -- in my opinion it deserved the
4  opinions it received and from that constitutes.
5  Q. What?
6  A. If that constitutes termination, it deserves the
7  scores it received.
8  Q. And you think those scores were fair?
9  A. Yes, they were.
10  Q. Mr. Ciummo and his wife deserved to be put out of
11  business based on those scores?
12  A. If that's what the agreement says, yes.
13  Q. During '03 and '04 how many other stores that
14  terminated because of your scores?
15  A. I don't know.
16  Q. Is it more than one?
17  A. I don't think so.
18  Q. So this was the only one?
19  A. I don't know that to be a fact. I do know there
20  are other stores that have been terminated over
21  the years but I'm not sure whether they were --
22  Q. I'm talking during '04.
23  A. No.
24  Q. As far as you know, this was the only store?

60

1            ERRATA SHEET
2  CHANGES TO THE DEPOSITION OF FRANK WRIGHTINGTON
3
4  INSTRUCTIONS TO WITNESS: 1) Please note any
   desired corrections in your testimony by page and
   line number. 2) Enter text as it appears in the
5  transcript 3) Enter text as it should appear.
6
7  PAGE      LINE                CORRECTION
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____


**EXHIBIT 11**



# The Commonwealth of Massachusetts
## William Francis Galvin

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

---

*BRI,INC.* Summary Screen

⚲ Help with this form

| Request a Certificate |
| --- |

**The exact name of the Domestic Profit Corporation:** BRI,INC.

**Entity Type:** Domestic Profit Corporation

**Identification Number:** 042670131

**Old Federal Employer Identification Number (Old FEIN):** 000139283

**Date of Organization in Massachusetts:** 09/01/1978

**Current Fiscal Month / Day:** 9 / 30        **Previous Fiscal Month / Day:** 00 / 00

**The location of its principal office in Massachusetts:**
No. and Street:  2 TAUNTON STREET
City or Town:  PLAINVILLE    State: MA    Zip: 02762    Country: USA

**If the business entity is organized wholly to do business outside Massachusetts, the location of that office:**
No. and Street:
City or Town:    State:    Zip:    Country:

**The name and address of the Registered Agent:**
Name:  RICHARD J. BOWEN
No. and Street:  2 TAUNTON STREET
City or Town:  PLAINVILLE    State: MA    Zip: 02762    Country: USA

**The officers and all of the directors of the corporation:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration of Term |
| --- | --- | --- | --- |
| PRESIDENT | RICHARD J. BOWEN | JACOBS LANE,<br>NORWELL, MA USA | |
| TREASURER | RICHARD J. BOWEN | JACOBS LANE,<br>NORWELL, MA USA | |

| SECRETARY | DARLENE E. GUENETTE | 2 TAUNTON STREET PLAINVILLE, MA 02762 USA | |
|-----------|---------------------|-------------------------------------------|--|
| DIRECTOR | RICHARD J. BOWEN | JACOBS LANE, NORWELL, MA 02061 USA | |

**business entity stock is publicly traded:** ___

**The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:**

| Class of Stock | Par Value Per Share Enter **0** if no Par | Total Authorized by Articles of Organization or Amendments *Num of Shares      Total Par Value* | Total Issued and Outstanding *Num of Shares* |
|----------------|-------------------------------------------|------------------------------------------------------------------------------------------------|----------------------------------------------|
| No Stock Information available online. Prior to August 27, 2001, records can be obtained on microfilm. | | | |

___ Consent    ___ Manufacturer    ___ Confidential Data    ___ Does Not Require Annual Report

___ Partnership    ___ Resident Agent    ___ For Profit    ___ Merger Allowed

**Note: There is additional information located in the cardfile that is not available on the system.**

**Select a type of filing from below to view this business entity filings:**

```
ALL FILINGS
Administrative Dissolution
Annual Report
Application for Reinstatement
Application For Revival
```

View Filings       New Search

| Comments |
|----------|
| |

© 2001 - 2006 Commonwealth of Massachusetts
All Rights Reserved

Help

EXHIBIT 12

DH EXHIBIT #1 9/7/05 mr. Wrightington

# HONEY DEW DONUTS
## CUSTOMER SATISFACTION STANDARDS EVALUATION

SHOP LOCATION
_Central Falls (RI)_

DATE: _03-18-04_

| | TOTAL POINTS | - N/A | = TOTAL AVAILABLE | TOTAL RECEIVED | % |
|---|---|---|---|---|---|
| **MAINTENANCE AND CLEANLINESS** | 315 | 85 | 230 | 163 | 71 |
| **SERVICE** | ~~186~~ 196 | 0 | 196 | 156 | 80 |
| **MERCHANDISING AND MARKETING** | 131 | 21 | 110 | 96 | 87 |
| **PRODUCT QUALITY** | ~~416~~ 406 | 131 | 275 | 227 | 83 |
| **TOTAL** | ~~1158~~ 1048 | 237 | 811 | 642 | 79 |

HONEY DEW REPRESENTATIVE

_Frank Wrightington_
(SIGNATURE)

_[signature]_  3-18-04
(PRINT NAME)          (DATE)

FRANCHISEE/SHOP MANAGER

_Karen Andrade_
(SIGNATURE)

(PRINT NAME)          (DATE)

## MAINTENANCE & CLEANLINESS

| | TOTAL POINTS | N/A | TOTAL AVAILABLE | TOTAL RECEIVED | % |
|---|---|---|---|---|---|
| EXTERIOR BUILDING, SIGNAGE AND LANDSCAPING | 39 | 5 | 34 | 24 | 71 |
| RETAIL AREA | 42 | 0 | 42 | 28 | 67 |
| SERVICE AND PREP | 66 | 2 | 64 | 54 | 84 |
| REST ROOMS | 47 | 0 | 47 | 37 | 79 |
| KITCHEN AND STORAGE | 101 | 68 | 33 | 20 | 61 |
| DELIVERY | 20 | 10 | 10 | 0 | 0 |
| TOTAL | 315 | 85 | 230 | 163 | 71 |

MAINTENANCE AND CLEANLINESS

### EXTERIOR BUILDING, SIGNAGE & LANDSCAPING

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| SIGNAGE (PYLON, BUILDING, ROOF, DIRECTIONAL, DRIVE THRU) APPROVED, ALL BULBS WORKING, CONSISTENT BULB TYPE, CLEAN, CONDITION, PAINTED, CONSISTENT IMAGE, APPROVED LOGO, TIMERS/PHOTO CELLS PROPERLY SET AND WORKING | 6 | 0 | 6 | |
| LIGHTING (POLE/PARKING LOT, CANOPY, SOFFIT, AWNING) WORKING, CONSISTENT BULB TYPE, CLEAN, CONDITION, POLES PAINTED | 5 | 0 | 5 | |
| PARKING LOT (LINE STRIPING, CONDITION, SEAL COATED, CURB BUMPERS, SEASONAL MAINTENANCE) SWEPT, FREE OF TRASH, NO POT HOLES, PLOWED/SALTED | 3 | 0 | 3 | Not Swept / Rubbish ✓ |
| LANDSCAPING (LAWN, BUSHES, FLOWERS, PLANTERS, TREES, MULCH, STONE)(LAWN MAINTAINED, VARIETY, COLOR, CULTIVATION, NO WEEDS, CONDITION, TRIMMED, FREE OF TRASH) | 5 | 0 | 5 | |
| EXTERIOR BUILDING (WALLS, SILLS, MANSARD, ROOF SYSTEM) CLEAN, IN GOOD CONDITION, PAINTED | 3 | 0 | 3 | |
| AWNINGS CLEAN, CONDITION, NOT FADED | 2 | 0 | 2 | Egg crate has been replaced/awning |
| SIDEWALK, WALKWAYS, PADS, PAPER MACHINES & PHONES CLEAN, SWEPT, CONDITION, SEASONAL MAINTENANCE | 3 | 0 | 3 | Snow / needs cleaning in spring |
| WINDOWS, DOORS & FRAMING (INSIDE AND OUT) (GLASS, FRAMING, THRESHOLD, SILLS, BLINDS, WINDOW TREATMENTS, DOOR CLOSURES) CLEAN, FREE OF GRAFFITI, GOOD CONDITION | 3 | 0 | 3 | Window sill behind self serv refrigerator |
| TRASH RECEPTACLES & DUMPSTER AREA (TRASH BINS, CIGARETTE/ASH TRAYS, DUMPSTER AREA, ENCLOSURE) APPROVED TYPE, ACCEPTABLE LEVELS, LIDS CLOSED, CLEAN, GOOD CONDITION, NO ODOR. | 4 | 0 | 4 | Carriers @ Dumpster grafitti on m ✓ |
| DRIVE-THRU (ORDER AND PICKUP PADS, MENU, STACKING AREA, WALKUP WINDOWS, SPEAKER) CLEAN, OPERATIONAL | 5 | 0 | 5 | Painted post |

Total Points    39    24        Total Available (39-N/A)    34

## RETAIL AREA

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| VESTIBULE/ENTRYWAY (FLOORS, CEILING, LIGHTS, VENTS, FRAMING, SILLS)(CLEAN, WELL-SWEPT, CONDITION) | 2 | 0 | 2 | CORNERS DAMAGED / DIRTY ✓ |
| FLOORS & WALLS (BASEBOARDS, COVING, CORNERS, WALL COVERINGS, MIRRORS, TRIM, CHAIR RAIL, TILE, CARPET) (CONDITION, CLEAN, NO TRASH) | 4 | 0 | 4 | ✓ |
| TABLES AND CHAIRS (LEGS, BASES, STOOL, BOOTHS, SEATS, TOPS, UPHOLSTERY, STAND-UP/SIT-DOWN COUNTERS, HIGH CHAIRS AND BOOSTERS)(CLEAN, CONDITION, NO GRAFFITI, LEVEL NOT WOBBLING, NEAT ORGANIZATION OF TABLES AND CHAIRS, BUSSED AS NEEDED) | 5 | 0 | 5 | CHROME IMPROVED |
| CEILING LIGHTS AND VENTS (TILES, GRID, BULBS, SHIELDS, FIXTURES, HVAC) (CONDITION, CLEAN, CONSISTENT BULB TYPE) | 4 | 0 | 4 | |
| TRASH RECEPTACLES (APPROPRIATE LOCATION, ACCEPTABLE LEVEL, AROMA, CLEAN, GOOD CONDITION, LID AS REQUIRED) | 4 | 0 | 4 | DIRTY |
| ATMOSPHERE (TEMPERATURE, THERMOSTAT, AROMA, APPROPRIATE BACKGROUND MUSIC)(NOISE LEVEL, TYPE OF MUSIC, COMFORTABLE TEMPERATURE, NO LOITERING ENVIRONMENT, APPROPRIATE TV CHANNEL) | 4 | 0 | 4 | DONUT CARRIERS STACKED IN RETAIL AREA |
| COUNTER MODULES/CABINET FRONTS (COFFEE, BEVERAGE, TAKE-OUT)(CLEAN, CONDITION, NO OVERSTOCKING) | 3 | 0 | 3 | |
| SELF-SERVE REFRIGERATOR (DOOR PULL, GASKETS)(CONDITION, CLEAN, TEMPERATURE, THERMOMETERS, ILLUMINATED) | 4 | 0 | 4 | |
| CONDIMENT AREA (NAPKIN DISPENSERS, STRAWS, SUGAR PACKETS, STIR STICKS, ETC.) (APPROVED, STOCKED, CLEAN, AVAILABLE) | 3 | 0 | 3 | |
| SAFETY & SECURITY (VIDEO SYSTEMS, EXIT SIGNS, EMERGENCY LIGHTS, EMERGENCY PHONE NUMBERS POSTED) (CLEAN, CONDITION, WORKING, NO AUDIO RECORDING) | 3 | 0 | 3 | |
| MISCELLANEOUS (CLOCK, WATER FOUNTAIN, PHONES AND FANS)(APPROVED, CLEAN, OPERATIONAL, APPROPRIATE) | 3 | 0 | 3 | |
| DÉCOR, PICTURES, DECORATION (APPROPRIATE, CLEAN, ATTRACTIVE, QUANTITY) | 3 | 0 | 3 | |

TOTAL POINTS 42   28    TOTAL AVAILABLE (42-N/A) 42

## SERVICE AND PREP

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| FLOORS AND WALLS (BASEBOARD, COVING, CORNERS, WALL COVERINGS, MIRRORS, TILE) (CONDITION, CLEAN) | 3 | 0 | 3 | REPAIRS TO TILE COMPLETE |
| CEILING, LIGHTS AND VENTS (TILES, GRID, BULBS, SHIELDS, FIXTURES, HVAC SYSTEM,)(CLEAN, CONDITION, WORKING, CLOSED) | 3 | 0 | 3 | PAINT AROUND WINDOW COMPLETE |
| DOORS (SWING, GATE, GLASS/PLEXIGLASS, END PANELS) (CLEAN, CONDITION, WORKING, CLOSED) | 2 | 0 | 2 | DOOR FRAME/DOOR NEED PAINT ✓ |
| SINK(S) (HAND, MULTI-COMPARTMENT, FLOOR DRAINS)(CLEAN, PROPER USE, ANTI-BACTERIAL SOAP, HAND SANITIZER, TOWELS/DRYER, HOT/COLD POTABLE WATER AS APPLICABLE, "EMPLOYEES MUST WASH HANDS" SIGN AS REQUIRED) | 4 | 0 | 4 | |
| MENU SYSTEM (CLEAN, ILLUMINATED, ALL BULBS IN WORKING CONDITION) | 4 | 0 | 4 | ✓ |
| COUNTERS AND CABINETS (DOORS, DRAWERS, SHELVES, STORAGE AREAS, SPLASH)(CLEAN, CONDITION, ORGANIZATION, STOCK LEVELS, FOOD CONTACT SURFACES, APPROVED, APPEARANCE, LOCATION, USED AS INTENDED) | 4 | 0 | 4 | OVERSTOCKING STRAW DISPENSER TAPED ✓ |
| PRODUCT AND SUPPLIES (FOOD, PAPER, CLEANING/CHEMICAL SUPPLIES)(STORED APPROPRIATELY) | 2 | 0 | 2 | UTENSILS NOT STORED WITH HANDLES OUT |
| CASH REGISTER/INFORMATION SYSTEM (APPROVED, PROPERLY PROGRAMMED, CURRENT, NON-RESETTABLE, GRAND TOTAL, NO OPEN DRAWERS, CLEAN, OPERATIONAL) | 3 | 0 | 3 | |
| TRASH RECEPTACLES (PROPER RECEPTACLES, APPROPRIATE LOCATION, ACCEPTABLE LEVEL, CLEAN, GOOD CONDITION, LID AS REQUIRED) | 3 | 0 | 3 | |
| REFRIGERATORS (COMMERCIAL ONLY, I.E. RANDELS, DELFIELDS, SILVER KING, TRUE, TAYLOR, FOSTER, ETC.)(CLEAN, MAINTAINED, TEMPERATURE, THERMOMETERS, GASKET CONDITION, ORGANIZED, APPROVED COMMERCIAL TYPE) | 4 | 0 | 4 | GASKET / ICE / HANDLE ✓ |

| Item | Y | N | N/A | Comments |
|---|---|---|---|---|
| BEVERAGE CENTERS (DISPENSER, BAG-N-BOX, CO2, CALIBRATION, DISPENSER HEADS, NON-CARBONATED DISPENSERS) (CLEAN, STOCKED, NO OUTAGES) | 2 | 0 | 2 | |
| TISSUE DISPENSER (CLEAN, WORKING CONDITION) | 1 | 0 | 1 | |
| COFFEE BREWERS (REGULAR, DECAF, LOW AND HIGH VOLUME, GLASS POTS, BREW HEADS AND BASKETS) (CLEAN, OPERATIONAL, CONDITION, MAINTAINED PER CUSTOMER SERVICE MANUAL | 4 | 0 | 4 | |
| GRINDERS( FACEPLATES, INTERFACING) (CLEAN, NO CHAFF, WORKING CONDITION, MAINTAINED PER CUSTOMER SERVICE MANUAL) | 2 | 0 | 2 | |
| DISPENSERS (COFFEE, ICE COFFEE AND TEA, AIR POTS)(CLEANED AND SANITIZED REGULARLY, WORKING CONDITION, SPIGOTS DISASSEMBLED AND WRS DAILY) | 2 | 0 | 2 | See Check List 8-9 P.M |
| CREAM DISPENSER (CLEAN, OPERATIONAL, CALIBRATED, CONDITION, TEMPERATURE)(DIRECTIONS CLEAN & VISIBLE) | 4 | 0 | 4 | |
| HOT-CHOCOLATE MACHINE (CLEAN, OPERATIONAL, CALIBRATED MAINTAINED PER CUSTOMER SERVICE MANUAL, WATER TANK NOZZLE) | 2 | 0 | 2 | |
| BAGEL SLICER (CLEAN, OPERATIONAL, CONDITIONS) | 2 | 0 | 2 | |
| TOASTERS (CLEAN, APPROVED, OPERATIONAL, CONDITIONS, PROPER USE) | 2 | 0 | 2 | |
| MICROWAVES (CLEAN, APPROVED COMMERCIAL GRADE, PROGRAMMED, CONDITION, PROPER FILTER IN PLACE) | 2 | 0 | 2 | |
| SANDWICH MAKING STATION (CLEAN, OPERATIONAL, TEMPERATURE, SINGLE USE GLOVES IN USE) | 2 | 0 | 2 | |
| PRODUCT DISPLAY CASES (DONUT, PASTRY, BAG/WAX TISSUE HOLDER, BASKETS)(CLEAN, CONDITION, LIGHTING) | 9 | 0 | 9 | |

TOTAL POINTS 66 *54*                TOTAL AVAILABLE (66-N/A) *64*

## REST ROOMS

| Item | Y | N | N/A | Comments |
|---|---|---|---|---|
| FLOORS, WALLS AND DECORS (BASEBOARDS, COVING, CORNERS, WALL COVERINGS, TILE, MIRROR, SELF-CLOSING, LOCKS, PROPERLY LABELED | 5 | 0 | 5 | CLUTTER ✓ |
| CEILING, LIGHTS, AND VENTS (TILES, GRID, BULBS, SHIELDS, FIXTURES, HVAC SYSTEM, EXHAUST FAN) (CLEAN, CONSISTENT BULB TYPE) | 5 | 0 | 5 | CEILING STAINED ✓ |
| *FIXTURES (TOILET, SINK, URINAL, CHANGING TABLES)(CLEAN, CONDITION, OPERATIONAL, HOT/COLD POTABLE WATER) | 9 | 0 | 9 | |
| *SUPPLIES (TISSUE, LIQUID ANTIBACTERIAL SOAP, TOWELS/HAND DRYER AS APPLICABLE) (ADEQUATE AMOUNTS, BACK-UP, FUNCTIONAL) | 9 | 0 | 9 | |
| TRASH/SANITATION RECEPTACLE (APPROPRIATE PLACEMENT NEAR DOOR AND IN LADIES ROOM STALLS, CLEAN, NOT OVERFLOWING, LID REQUIRED BY LOCAL CODE) | 5 | 0 | 5 | |
| "EMPLOYEES MUST WASH HANDS" SIGN (DISPLAYED APPROPRIATELY, CONDITION) | 7 | 0 | 7 | |
| ATMOSPHERE (NO OFFENSIVE ODOR DUE TO LACK OF PROPER MAINTENANCE | 7 | 0 | 7 | |

TOTAL POINTS 47 *37*                TOTAL AVAILABLE (47-N/A) *47*

IF ANY REST ROOM ITEM MARKED WITH AN ASTERISK (*) IS RATED "N", THE ENTIRE REST ROOM SECTION IS GIVEN ZERO (0) POINTS.

## KITCHEN & STORAGE AREA

| Item | Y | N | N/A | Comments |
|---|---|---|---|---|
| FLOORS AND WALLS (BASEBOARDS, COVING, CORNERS, WALL COVERINGS, TILE)(CONDITION, CLEAN) | 3 | 0 | 3 | REPAIRS MADE ✓ |
| DOORS AND WINDOWS (KITCHEN, REAR EXIT) (CONDITION, CLEAN, WORKING, CLOSED, GLASS/PLEXIGLAS, LOCKED WHEN CLOSED) | 2 | 0 | 2 | DAYLIGHT ✓ |
| CEILINGS, LIGHTS AND VENTS (TILES/PLASTER GRIDS, BULBS, SHIELDS, FIXTURES, HVAC SYSTEM, EMERGENCY LIGHTING SYSTEM) (CONDITION, CLEAN, CONSISTENT BULB TYPE, BATTERY CHARGED) | 3 | 0 | 3 | |
| EXHAUST & FIRE-SUPPRESSION SYSTEMS (CURRENT INSPECTION TAGS, FIRE EXTINGUISHERS, EXHAUST HOODS, FILTERS, LIGHTING) (TAG NOT EXPIRED, CLEAN, OPERATIONAL, MAINTAINED) | 2 | 0 | 2 | |

| Item | | | |
|---|---|---|---|
| DRAINS & GREASE TRAPS (OPERATIONAL, CLEAN, NO ODOR, MAINTENANCE PLAN) | 2 | 0 | 2 | |
| SINK(s) (HAND, VEGETABLE AND MULTI-COMPARTMENT DISH WASHING) (CLEAN, PROPER USE, LABELED WRS, ANTIBACTERIAL SOAP, TOWELS/DRYER, HOT AND COLD POTABLE WATER AS APPLICABLE) | 5 | 0 | 5 | |
| TRASH RECEPTACLE (WITH LID AS REQUIRED, APPROPRIATE PLACEMENT, NOT OVERFLOWING, NO ODOR, PROPER RECEPTACLES) | 2 | 0 | 2 | NO LID ✓ |
| SHELVING (PALLETS, DUNNAGE)(CLEAN, GOOD REPAIR, USE AS INTENDED, LABELED, APPROVED) | 2 | 0 | 2 | |
| ORGANIZATION (NEAT, LABELED, 6" OFF FLOOR PER PQ 10CM, 12" FROM CEILING, FIFO, UNUSED OR BROKEN EQUIPMENT STORED OFF PREMISES) | 4 | 0 | 4 | |
| FREEZER, WALK-IN (FLOORS, WALLS, SHELVES, COMPRESSOR, COILS, DRAIN LIGHTING w/COVERS, DOORS AND GASKETS, PLASTIC AIR CURTAIN, DEFROST CYCLE, LOCK/SAFETY LOCK, THERMOSTAT)(TEMPERATURE, INTERNAL/EXTERNAL THERMOMETERS AND PLACEMENT,LIGHTING, CLEAN, PRODUCTS PROPERLY STORED 6" OFF FLOOR PQ 10CM, GENERAL ORGANIZATION, FIFO, APPROVED COMMERCIAL TYPE) | 10 | 0 | 10 | |
| Refrigeration, Walk-In (Floors, Walls, Shelves, Compressor, Coils, Drain, Lighting w/covers, Doors and gaskets, Plastic Air Curtain, Defrost Cycle, Lock/Safety lock, Temperature Alarm)(Temperature, Internal/External Thermometers and placement, LIGHTING, CLEAN, PRODUCTS STORED 6" OFF FLOOR PQ 10CM, GENERAL ORGANIZATION, FIFO, APPROVED COMMERCIAL TYPE) | 10 | 0 | 10 | |
| ICE MACHINES (MAKERS, HOLDING BINS, VENTS, SCOOPS) (CLEAN, DRAINING, GASKETS, CONDITION, PROPER SCOOP STORAGE) | 3 | 0 | 3 | |
| CLOSET/UTILITY ROOM/TIME CLOCK (MOP SINK, TIME CLOCK, SUPPLIES, MOPS, BROOMS, ETC.)(CLEAN CONDITION, CLEAN/NOT CLUTTERED, CHEMICALS AND SUPPLIES LABELED, MOP AND BUCKET CLEANED, RINSED AND STORED PROPERLY WHEN NOT IN USE) | 2 | 0 | 2 | |
| SCALES (FLOOR, BENCH, PROPORTION) (WORKING CONDITION, CALIBRATED, CLEAN) | 2 | 0 | 2 | |
| MIXERS ( INCL. BOWLS, ETC.) (CLEAN, MAINTAINED, OPERATIONAL, CONDITION) | 2 | 0 | 2 | |
| FRYERS ( AUTO SYSTEM, SHORTENING thermometer)(CONDITION, CALIBRATION, MAINTENANCE) | 2 | 0 | 2 | |
| FILTRATOR (HOLDING TANK, PUMP, HOSES, FILTER BAG) (OPERATIONAL, CLEAN, NOT LEAKING, GOOD REPAIR) | 2 | 0 | 2 | |
| SHORTENING (SHORTENING MAINTENANCE, CONDITION, NO SMOKE OR OFF ODORS) | 2 | 0 | 2 | |
| BELSHAW SYSTEM (MACHINE, CAMS, CUTTER, HOPPER, COLLAR) (CLEAN, CONDITION, OPERATIONAL, NOT RUSTED) | 2 | 0 | 2 | |
| PROOFER/RETARDER (CLEAN, CONDITION, CALIBRATION, OPERATIONAL) | 2 | 0 | 2 | |
| CUTTING BENCH (CLEAN, CONDITION, CONDITION OF CANVAS) | 2 | 0 | 2 | |
| GLAZER (UNIT, RODS, DRAIN, COVER) (CONDITION, CLEAN, CLEANED AND MAINTAINED DAILY, COVER AVAILABLE) | 2 | 0 | 2 | |
| OVEN (CONVECTION, RACK, THERMOMETERS, FANS, LIGHTS) (CLEAN, CONDITION, CALIBRATION) | 2 | 0 | 2 | |
| FINISHING TABLE (CLEAN, CONDITION, ORGANIZATION) | 2 | 0 | 2 | |
| FILLING UNIT (BASE, HOPPER, SPROUTS, CAPS) (CLEAN, MAINTAINED, CONDITION, FILLING CONDITION) | 2 | 0 | 2 | |
| UTENSIL/LID HOLDERS (CLEAN, IN GOOD CONDITION) | 2 | 0 | 2 | |
| MIXING AND ICING BOWLS (CLEAN, IN GOOD CONDITION) | 2 | 0 | 2 | |
| THERMOMETERS (CLEAN, IN GOOD CONDITION, PROPER TYPES, CALIBRATED, USED AS INTENDED) | 3 | 0 | 3 | STILL NONE |
| INGREDIENT BINS/CONTAINERS/CAMBROS (CLEAN, IN GOOD CONDITION, LABELED IF IN USE) | 2 | 0 | 2 | |
| HEAT & HOLD UNITS/ICING WARMER (CLEAN, WORKING CONDITION) | 2 | 0 | 2 | |
| SCOOPS (CLEAN, GOOD CONDITION) | 2 | 0 | 2 | |
| CAN OPENER (CLEAN, GOOD CONDITION) | 2 | 0 | 2 | |
| KNIVES, SPATULAS(CLEAN, GOOD CONDITION) | 2 | 0 | 2 | |
| MEASURING CUPS AND SPOONS (CLEAN, GOOD CONDITION) | 2 | 0 | 2 | |
| DONUT CUTTERS (CLEAN, GOOD CONDITION)(SIZE – RING 2 ¾", SHELL 2 ½") | 2 | 0 | 2 | |
| ROLLING PIN (CLEAN, GOOD CONDITION) | 2 | 0 | 2 | |

| | Y | N | N/A | |
|---|---|---|---|---|
| RACKS, SCREENS, DOLLIES, RACK COVERS (CLEAN, GOOD CONDITION) | 2 | 0 | (2) | |
| MUFFIN, SHEET PANS (CLEAN, GOOD CONDITION) | 2 | 0 | (2) | |

TOTAL POINTS 101 *20*     TOTAL AVAILABLE (101-N/A) *33*

## DELIVERY

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| DELIVERY VEHICLE (TYPE OF VEHICLE) (ONLY APPROVED VEHICLES USED, MAINTAINED, IN GOOD CONDITION, CLEANED INSIDE AND OUT) | 5 | 0 | (5) | |
| PRODUCT LOADING AND SAFETY (PRODUCT HANDLING) (DELIVERY RACKS COVERED TOP TO BOTTOM, PRODUCT PROTECTED FROM CONTAMINATION DURING DISTRIBUTION, DELIVERY RACKS LOADED "FIRST IN, LAST OUT") | 10 | (0) | 10 | *CARRIERS NOT CLEAN* ✓ |
| TRUCK TEMPERATURES CONTROLS (HEAT AND REFRIGERATION FEATURES IN CARGO AREA) (HEATED OR REFRIGERATED AS NECESSARY TO MAINTAIN PROPER PRODUCT TEMPERATURE DURING DELIVERY) | 5 | 0 | (5) | |

TOTAL POINTS 20 *0*     TOTAL AVAILABLE (20-N/A) *10* .

## SERVICE

| | TOTAL POINTS | N/A | TOTAL AVAILABLE | TOTAL RECEIVED | % |
|---|---|---|---|---|---|
| ACKNOWLEDGEMENT, GREETING AND COMMUNICATION | 46 | *0* | *46* | *46* | *100* |
| UNIFORM, GROOMING AND POLICIES | 65 | *0* | *65* | *50* | *77* |
| SELLING TECHNIQUE | 10 | *0* | *10* | *0* | *0* |
| FILLING THE ORDER | 45 | *0* | *45* | *45* | *100* |
| CLOSING THE SALE | 30 | *0* | *30* | *15* | *50* |
| TOTAL | *196* 186 | *0* | *196* | *154* | *80* |

## ACKNOWLEDGEMENT, GREETING AND COMMUNICATION

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| ACKNOWLEDGEMENT (EITHER EYE CONTACT, A SMILE OR WORDS USED TO ACKNOWLEDGE THE CUSTOMER) (CUSTOMER IS ACKNOWLEDGED WITHIN A REASONABLE AMOUNT OF TIME, (20 SECONDS OF ENTRY OR IMMEDIATELY UPON ADVANCING FROM THE BANK LINE) | (5) | 0 | 5 | |
| GREETING (IN PERSON, DRIVE-THRU, TELEPHONE) (FRIENDLY, COURTEOUS, PROPER, WITH EYE CONTACT, CUSTOMER IS MAJOR | (10) | 0 | 10 | |

| | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| FOCUS, SINCERE, NOT AN INTERRUPTION OF BUSINESS; DRIVE-THRU CUSTOMERS ARE GREETED THROUGH THE SPEAKER SYSTEM, NO "PULL UP"OR "NEXT") | | | | |
| INQUIRING AND VERIFICATION OF ORDER (POLITE, HELPFUL, COURTEOUS, ASKING APPROPRIATE QUESTIONS) | 5 | 0 | 5 | |
| KNOWLEDGE OF PROMOTIONS (OFFERS, AVAILABILITY, DURATION, PRICING) | 4 | 0 | 4 | |
| CLEAR SPEECH (FLUENT, EASY TO UNDERSTAND) | 4 | 0 | 4 | |
| PLEASANT DEMEANOR (POSITIVE, SINCERE, GENUINE, FRIENDLY) | 10 | 0 | 10 | |
| DRIVE-THRU COMMUNICATION IN WORKING ORDER (CLEAR, UNDERSTANDABLE, VOLUME COMFORTABLE) | 8 | 0 | 8 | |

TOTAL POINTS 46 *46*    TOTAL AVAILABLE (46-N/A) *46*

### UNIFORM, GROOMING AND POLICIES

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| UNIFORM (PROPER COMPLETE UNIFORM, ONE IMAGE, CLEAN, NEAT & GOOD CONDITION, ONLY COMPLIMENTARY UNDER/OVER GARMENTS-UNIFORM SPECIFIC, NETS COVER HAIR COMPLETELY) Shirt, Pants, Shoes | 10 | 0 | 10 | NOT TUCKED IN ✓ |
| Hat | 10 | | 10 | |
| PROFESSIONAL MANNERISMS (EMPLOYEES EXHIBIT BEHAVIOR WHICH IS PROFESSIONAL AND EFFICIENT)(DO NOT EXHIBIT ANY UNSIGHTLY PRACTICES SUCH AS TOUCHING OF FACE, HAIR OR BODY WITH GLOVES OR ENGAGE IN BEHAVIOR LIKE GUM OR TOBACCO CHEWING, HORSEPLAY, ETC.) | 10 | 0 | 10 | |
| OFF DUTY VISITS (ONLY EMPLOYEES CURRENTLY ON DUTY IN THE SERVICE AREA) | 5 | 0 | 5 | |
| EMPLOYEE BREAKS AND EATING (EATING, CHEWING AND SMOKING ONLY IN PROPER DESIGNATED AREAS, BREAK POLICY POSTED AND FOLLOWED) | 5 | 0 | 5 | |
| REQUIRED SIGNS, POSTERS & MATERIALS (IMPORTANT PHONE NUMBERS PLACARD, OSHA, MSDS, RIGHT-TO-KNOW STATION, MINIMUM WAGE, ETC.)(POSTED PROPERLY, IN GOOD CONDITION, MSDS AVAILABLE) | 5 | 0 | 5 | NO SERV SAFE ✓ |
| APPEARANCE & HYGIENE (HAIR NEATLY GROOMED, NO EXCESSIVE OR OFFENSIVE: JEWELRY, ODORS, PERFUMES, MAKEUP, NAIL POLISH, PIERCINGS OR TATOOS, ETC.) | 20 | 0 | 20 | |

TOTAL POINTS 65 *55*    TOTAL AVAILABLE (65-N/A) *65*

### SELLING TECHNIQUE

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| EMPLOYEES EXHIBIT A VARIETY OF SELLING TECHNIQUES MUST SHOW AT LEAST 50% OF THE TIME: UPSELLING, ADD-ON SELLING, SAMPLING OR OTHER SALES BUILDING TECHNIQUES. | 10 | 0 | 10 | 'DRIVE UP' ✓ |

TOTAL POINTS 10 *10 0*    TOTAL AVAILABLE (10-N/A) *10*

### FILLING THE ORDER

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| HANDLING PRODUCT (PROPER USE OF GLOVES OR WAX TISSUES) | 15 | 0 | 15 | |
| ORDER FULFILLMENT (ACCURATE, COMPLETE, PROPER SEQUENCE, PROPER QUESTIONS ASKED) | 10 | 0 | 10 | |
| PROPER PACKAGING (NEAT, CORRECT PACKAGING VEHICLE, CORRECT PROCEDURES) | 5 | 0 | 5 | |
| PRESENTATION TO CUSTOMER (VERIFIED, COURTEOUS, CORRECT) | 10 | 0 | 10 | |
| NAPKIN, STRAW, UTENSIL, ETC. (PROVIDED AS REQUIRED) | 5 | 0 | 5 | |

TOTAL POINTS 45 *45*    TOTAL AVAILABLE (45-N/A) *45*

## CLOSING THE SALE

| ITEM | Y | N | N/A | | COMMENTS |
|---|---|---|---|---|---|
| PROPER RINGING (PROPER HANDLING OF MONEY, COLLECT WHEN SERVED, COUNT BACK CHANGE, RECEIPT AS REQUIRED, ETC.) | 15 | 0 | 15 | | |
| THANK YOU AND INVITATION TO RETURN | 15 | 0 | 15 | | |

TOTAL POINTS  30 _____     TOTAL AVAILABLE (30-N/A) _____


# MERCHANDISING AND MARKETING

| | TOTAL POINTS | N/A | TOTAL AVAILABLE | TOTAL RECEIVED | % |
|---|---|---|---|---|---|
| EXTERIOR | 26 | 15 | 11 | 8 | 73 |
| INTERIOR | 32 | 6 | 26 | 20 | 77 |
| MENU BOARDS | 18 | 0 | 18 | 18 | 100 |
| PRODUCT MERCHANDISING | 55 | 0 | 55 | 50 | 91 |
| Total | 131 | 21 | 110 | 96 | 87 |


MERCHANDISING & MARKETING
## EXTERIOR

| ITEM | Y | N | N/A | | COMMENTS |
|---|---|---|---|---|---|
| READER BOARD (MATERIALS ARE CURRENT, CLEAN, NOT FADED, IN GOOD REPAIR) | 3 | 0 | 3 | | |
| WIND SIGN (MATERIALS ARE CURRENT, CLEAN, NOT FADED, IN GOOD REPAIR) | 3 | 0 | 3 | | |
| POSTER & P.O.P. MATERIALS (PARTICIPATION IN ALL REQUIRED AND RELEVANT MKTG. PROGRAMS, MATERIALS ARE CURRENT, CLEAN, NOT FADED, IN GOOD REPAIR AND HELP IN PLACE AS INTENDED, NO OLD/OUTDATED MATERIALS) | 9 | 0 | 9 | | |
| BANNERS AND FLAGS (CURRENT, NOT FADED, RIPPED OR WEATHER BEATEN) | 3 | 0 | 3 | | |
| SIGNS (OPEN/CLOSED, HOURS OF OPERATION, 24 HOURS, NOW HIRING, MENU MERCHANDISERS,) (ACCURATE, GOOD REPAIR, PROPERLY DISPLAYED) | 3 | 0 | 3 | | DAMAGED |
| ALL SIGNS PROFESSIONALLY MADE (NOT HANDMADE, APPROPRIATE, TIMELY, APPROVED) | 5 | 0 | 5 | | |

TOTAL POINTS  26    8    TOTAL AVAILABLE (26-N/A)  11


## INTERIOR

| ITEM | Y | N | N/A | | COMMENTS |
|---|---|---|---|---|---|
| MOBILES (UNCLUTTERED, MATERIALS ARE CURRENT, CLEAN, NOT FADED, IN GOOD REPAIR AND HELD IN PLACE AS INTENDED) | 2 | 0 | 2 | | |
| MISCELLANEOUS ITEMS (COUNTER CARDS) COUNTER MATS, REGISTER TOPPERS,)(MATERIALS ARE CURRENT, CLEAN, NOT FADED IN GOOD REPAIR AND HELD IN PLACE AS INTENDED, USED APPROPRIATELY) | 2 | 0 | 2 | | ✓ |
| SEASONAL AND HOLIDAY DECORATIONS (TIMELY, PROFESSIONAL, APPROVED, NOT FADED) | 4 | 0 | 4 | | |
| VARIETY/PRODUCT LABELS (PROPER PLACEMENT, NOT BROKEN OR SCRATCHED, IN PLACE FOR ALL VARIETIES, CORRECT TO VARIETY, MOST CURRENT) | 5 | 0 | 5 | | |

| | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| NO UNAPPROVED OUTSIDE PROMOTIONAL MATERIALS (FLYERS, SALES PAPERS, REAL ESTATE BOOKS, CONTESTS, CHARITIES, COLLECTIONS, CANDY MACHINES, ECT.) | 4 | 0 | 4 | |
| ILLUMINATED SIGNAGE (NEON-INTERNAL, TRANSLITES AND DURATRANS) (ON/LIT, IN GOOD REPAIR, NO BUZZING, CURRENT, NOT FADED, APPLICABLE) | 3 | 0 | 3 | |
| POSTERS (CLEAN, NOT FADED, GOOD REPAIR, HELD IN PLACE AS INTENDED, LEVEL, PROPER HEIGHT, NO OLD/OUTDATED MATERIALS) | 4 | 0 | 4 | |
| PROMOTIONAL RETAIL DISPLAYS (PARTICIPATING IN ALL REQUIRED AND RELEVANT MARKETING PROGRAMS, CURRENT, CLEAN, NOT FADED, STOCKED) | 4 | 0 | 4 | |
| ALL SIGNS PROFESSIONALLY MADE (NOT HANDMADE, APPROPRIATE, TIMELY, APPROVED) | 4 | 0 | 4 | ✔ |

TOTAL POINTS  32    *20*       TOTAL AVAILABLE (32-N/A)  *26*

## MENU BOARDS

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| MENU BOARDS (FLAVOR STRIPS, MENU SLATS, MAGNETIC PIECES) (NO GAPS, WHITE SPACES OR MISSING PIECES, CORRECT PRICING, ONLY AVAILABLE PRODUCTS LISTED) | 5 | 0 | 5 | |
| CONSISTENT WITH IMAGE (ONLY ONE IMAGE) | 5 | 0 | 5 | |
| TRANSLITES & PHOTOGELS (TRANSLIDES) (PROPER DISPLAY, NOT FADED, APPROVED) | 8 | 0 | 8 | |

TOTAL POINTS  18    *18*       TOTAL AVAILABLE (18-N/A)  *18*

## PRODUCT MERCHANDISING

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| DISPLAY NEAT AND ORGANIZED (PRODUCT MOVED TO THE FRONT, PROPER BASKET ARRANGEMENT) | 15 | 0 | 15 | |
| PRODUCT ATTRACTIVELY DECORATED (ALL PRODUCTS FINISHED PROPERLY) | 15 | 0 | 15 | |
| DONUT VARIETY LEVELS – (15 MINIMUM – MIN 6 OF EACH) | 10 | 0 | 10 | |
| MUFFIN VARIETY LEVELS – (6 MINIMUM – MIN 6 OF EACH) | 5 | 0 | 5 | |
| BAGEL VARIETY LEVELS – (6 MINIMUM – MIN 6 OF EACH) | 5 | 0 | 5 | |
| PASTRY VARIETY LEVELS – (6 MINIMUM – MIN 3 OF EACH) | 5 | 0 | 5 | |

TOTAL POINTS  55    *50*       TOTAL AVAILABLE (55-N/A)  *55*

**PRODUCT QUALITY**

| | TOTAL POINTS | N/A | TOTAL AVAILABLE | TOTAL RECEIVED | % |
|---|---|---|---|---|---|
| COFFEE | 132 | 0 | 132 | 98 | 74 |
| OTHER BEVERAGES | 31 | 10 | 21 | 21 | 100 |
| DONUTS | 142 | 75 | 67 | 61 | 91 |
| DEW DROPS | 32 | 26 | 6 | 6 | 100 |
| MUFFINS | 26 | 10 | 16 | 16 | 100 |
| BAGELS | 23 | 10 | 13 | 5 | 38 |
| PASTRIES | — | — | — | — | — |
| SANDWICHES | 20 | 0 | 20 | 20 | 100 |
| TOTAL | ~~407~~ 416 | 131 | 275 | 227 | 83 |

**PRODUCT QUALITY**
**COFFEE**

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| **HOUSE BLEND** | | | | |
| GRIND WEIGHT (3.0 OZ. + .05) OR FRAC PACKS | 5 | 0 | 5 | 3.1 |
| GRIND SIZE | 5 | 0 | 5 | |
| WATER TEMPERATURE (196 TO 200) | 5 | 0 | 5 | 198 |
| WATER AMOUNT (66 OUNCES + 2 OUNCES) | 5 | 0 | 5 | 64 |
| SHELF LIFE (CHECK USE BY DATES) | 5 | 0 | 5 | |
| FRESHNESS | 15 | 0 | 15 | Timer |
| **DECAF** | | | | |
| GRIND WEIGHT (3.0 OZ. + .05) OR FRAC PACKS | 3 | 0 | 3 | |
| GRIND SIZE | 3 | 0 | 3 | |
| WATER TEMPERATURE (196 TO 200) | 3 | 0 | 3 | |
| WATER AMOUNT (66 OUNCES + 2 OUNCES) | 3 | 0 | 3 | |
| SHELF LIFE (CHECK USE BY DATES) | 3 | 0 | 3 | |
| FRESHNESS | 15 | 0 | 15 | Timer |
| **GOURMET** | | | | |
| WATER TEMPERATURE (196 TO 200) | 4 | 0 | 4 | |
| WATER AMOUNT (66 OUNCES + 2 OUNCES) | 4 | 0 | 4 | |
| SHELF LIFE (CHECK USE BY DATES) | 4 | 0 | 4 | |
| FRESHNESS (2 HOURS IN AIRPOTS) | 15 | 0 | 15 | No Timer or Log |
| **ICED HOUSE BLEND** | | | | |
| GRIND WEIGHT – FRAC PACK (26 OZ.)(OR DOUBLE GRIND) | 5 | 0 | 5 | |
| PROPER PROCEDURE (ICE, OLD COFFEE NOT ADDED) | 5 | 0 | 5 | |

| | Y | N | N/A | |
|---|---|---|---|---|
| BREWED SHELF LIFE (12 HOURS) | 10 | 0 | 10 | *No Timer or Log* |
| ICED GOURMET | | | | |
| PROPER PROCEDURES | 5 | 0 | 5 | |
| BREWED SHELF LIFE (12 HOURS) | 10 | 0 | 10 | *// //* |

TOTAL POINTS  132  *96*    TOTAL AVAILABLE (132-N/A) *132*

## OTHER BEVERAGES

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| FROZEN DRINKS | | | | |
| DRINK PREPARED PROPERLY | 10 | 0 | 10 | |
| CONCENTRATE SHELF LIFE | 4 | 0 | 4 | |
| MOCHA MADNESS (PREPARED PROPERLY) | 6 | 0 | 6 | |
| BOTTLED BEVERAGES | | | | |
| REQUIRED BRANDS/VARIETIES | 6 | 0 | 6 | |
| SHELF LIFE | 3 | 0 | 3 | |
| HOT CHOCOLATE (TASTE, CORRECT TEMP 140-145) | 2 | 0 | 2 | |

TOTAL POINTS  31  *31 31*    TOTAL AVAILABLE (31-N/A) *31 31*

## DONUTS

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| FRESHNESS (PRODUCTION RECORDS, THROWAWAY RECORDS, PROPER PROD. START TIME. NOT LATER THAN 9:00 PM) | 25 | 0 | 25 | *SEE BAKERY* |
| YEAST RINGS | | | | |
| HEIGHT (1 ½") | 2 | 0 | 2 | *1 ½ "* |
| WIDTH (4") | 2 | 0 | 2 | |
| WEIGHT (2.2 OZ.)(1.75 PREFIRED) | 2 | 0 | 2 | |
| EXTERIOR APPEARANCE (SMOOTH, MINOR SCREEN MARKS, GOLDEN BROWN COLOR, WHITE FRY LINE) | 2 | 0 | 2 | |
| SHAPE (ROUND, SYMMETRICAL) | 2 | 0 | 2 | |
| INTERIOR APPEARANCE (EVEN TEXTURE, NO LARGE AIR POCKETS OR BLISTERS, NO EXCESS SHORTENING) | 2 | 0 | 2 | |
| TASTE | 2 | 0 | 2 | |
| YEAST SHELLS | | | | |
| HEIGHT (1 ¾") | 2 | 0 | 2 | *1 ½* |
| WIDTH (3 5/8") | 2 | 0 | 2 | |
| WEIGHT (2.1 OZ)(1.75 PREFIRED) | 2 | 0 | 2 | |
| EXTERIOR APPEARANCE (SMOOTH, MINOR SCREEN MARKS, GOLDEN BROWN COLOR, WHITE FRY LINE) | 2 | 0 | 2 | |
| SHAPE (ROUND, SYMMETRICAL) | 2 | 0 | 2 | |
| INTERIOR APPEARANCE (EVEN TEXTURE, NO LARGE AIR POCKETS OR BLISTERS, NO EXCESS SHORTENING) | 2 | 0 | 2 | |
| TASTE | 2 | 0 | 2 | |
| CAKE (PLAIN) | | | | |
| HEIGHT (1 ½") | 2 | 0 | 2 | |
| WIDTH (4") | 2 | 0 | 2 | |
| WEIGHT (3.4 OZ)(2.75 PREFIRED) | 2 | 0 | 2 | |
| EXTERIOR APPEARANCE (SMOOTH, MINOR SCREEN MARKS, GOLDEN BROWN COLOR, NO CRACKING OR PROTRUSION AT FRY LINE) | 2 | 0 | 2 | |
| SHAPE (ROUND, SYMMETRICAL, CONSISTENT) | 2 | 0 | 2 | |
| INTERIOR APPEARANCE (EVEN TEXTURE, NOT COARSE OR DRY, NO EXCESS SHORTENING) | 2 | 0 | 2 | |

| | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| TASTE | 2 | 0 | 2 | |
| OTHER VARIETIES | 5 | 0 | 5 | |
| FRESH BAKED | | | | |
| PROPER PROCEDURE FOLLOWED | 30 | 0 | 30 | |
| PROPER FRESHNESS SCHEDULING | 40 | 0 | 40 | |
| | | | | |

TOTAL POINTS  142    _____    TOTAL AVAILABLE (142-N/A) _67_

## DEW DROPS

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| FRESHNESS | 10 | 0 | 10 | |
| WIDTH (CAKE 1 3/8", YEAST 1 ½") | 1 | 0 | 1 | |
| WEIGHT (CAKE .6OZ, YEAST .4 OZ) | 1 | 0 | 1 | |
| EXTERIOR APPEARANCE (SMOOTH, EVEN COLOR) | 1 | 0 | 1 | |
| SHAPE ( ROUND, CONSISTENT SIZE) | 1 | 0 | 1 | |
| INTERIOR APPEARANCE (NO EXCESS SHORTENING, COOKED PROPERLY) | 1 | 0 | 1 | |
| TASTE | 1 | 0 | 1 | |
| FRESH BAKED | | | | |
| PROPER PROCEDURE FOLLOWED | 6 | 0 | 6 | |
| PROPER FRESHNESS SCHEDULING | 10 | 0 | 10 | |

TOTAL POINTS  32    _6_    TOTAL AVAILABLE (32-N/A) _6_

## MUFFINS

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| FRESHNESS (NONE CARRIED OVER FROM PREVIOUS DAY) | 10 | 0 | 10 | |
| HEIGHT (3 ¼") | 2 | 0 | 2 | |
| SHAPE (PROPER CROWN) | 2 | 0 | 2 | |
| COLOR (APPROPRIATE FOR VARIETY) | 2 | 0 | 2 | |
| TASTE (APPROPRIATE FOR VARIETY) | 2 | 0 | 2 | |
| SURFACE SKIN (CRISP, NOT HARD, NOT EXCESSIVELY MOIST) | 2 | 0 | 2 | |
| TOPPINGS (APPROPRIATE FOR VARIETY) | 2 | 0 | 2 | |
| INTERIOR (COOKED PROPERLY, PROPER AMOUNT OF FRUIT) | 2 | 0 | 2 | |
| WEIGHT (4.5 OZ.) | 2 | 0 | 2 | |

TOTAL POINTS  26    16    TOTAL AVAILABLE (26-N/A) 26

## BAGELS

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| APPROVED BAGEL USED | 5 | 0 | 5 | |
| PROPER PROCEDURE FOLLOWED | 8 | 0 | 8 | MONTGOMERY ST |
| SCHEDULING FOR FRESHNESS | 10 | 0 | 10 | |
| | | | | |
| | | | | |

TOTAL POINTS  23    _____    TOTAL AVAILABLE (23-N/A) _____

**SANDWICHES**

| ITEM | Y | N | N/A | COMMENTS |
|---|---|---|---|---|
| PROPER USE OF GLOVES | 4 | 0 | 4 | |
| BREAD TOASTED PROPERLY | 2 | 0 | 2 | |
| FOLLOWS PROPER PREPARATION STEPS | 4 | 0 | 4 | |
| ALL INGREDIENTS PROPERLY THAWED | 3 | 0 | 3 | |
| ALL INGREDIENTS LABELED AND ROTATED | 3 | 0 | 3 | _Wrong Date_ |
| PROPER COOKING TEMPERARATURE | 4 | 0 | 4 | |
| | | | | |

TOTAL POINTS  20   _20_          TOTAL AVAILABLE (20-N/A) _20_

**PASTRIES**